<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

</div>

| | |
|---|---|
| INTER-COASTAL WATERWAYS LLC,<br><br><div align="center">*Plaintiff,*</div><br>v.<br><br>TRADESTATION SECURITIES, INC. and<br>DOE DEFENDANTS 1-10,<br><br><div align="center">*Defendants,*</div><br>and<br><br>THE FINANCIAL INDUSTRY<br>REGULATORY AUTHORITY,<br><br><div align="center">*Nominal Defendant.*</div> | CIVIL ACTION NO. _____<br><br><br><div align="center">**COMPLAINT**</div> |

Plaintiff Inter-Coastal Waterways LLC ("Plaintiff" or "Inter-Coastal"), by and through its undersigned counsel, respectfully states as follows for its Complaint against Defendants TradeStation Securities, Inc. ("TradeStation"), Doe Defendants 1-10 (the "Doe Defendants," together with TradeStation, "Defendants") and The Financial Industry Regulatory Authority ("FINRA" or "Nominal Defendant").

<div align="center">

**THE PARTIES**

</div>

1.      Plaintiff Inter-Coastal Waterways LLC is a limited liability company formed under the laws of the State of Georgia.

2.      Defendant TradeStation Securities, Inc. is a Florida corporation with its principal place of business at 8050 S.W. 10th Street, Plantation, Florida 33324.

3.      TradeStation is a securities broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and FINRA.

<div align="center">1</div>

4.     The Doe Defendants consist of anonymous third-party broker-dealers who, between October 2021 and December 12, 2022, borrowed Meta Materials, Inc. Series A Preferred Dividend Shares ("Series A Preferred Dividend" or "MMTLP Shares") from TradeStation's customers pursuant to TradeStation's Master Securities Lending Agreement for the purpose of selling borrowed shares, including counterfeit shares, into the open market to open short positions in the ticker symbol MMTLP.

5.     Nominal Defendant The Financial Industry Regulatory Authority is a corporation formed under the laws of the State of Delaware, headquartered in Washington, D.C., and its principal place of business is located at 1735 K Street, NW, Washington, DC 20006.

6.     FINRA operates an office in the State of Florida at 5200 Town Center Circle, Suite 200, Boca Raton, Florida 33486.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Securities Exchange Act of 1934 ("Exchange Act").[1]

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims for violations of Section 678.5041, Fla. Stat. (2023), Section 678.5071, Fla. Stat. (2023), Section 772.103, Fla. Stat. (2023) and Section 895.03, Fla. Stat (2023), breach of contract, negligent misrepresentation, negligence *per se*, conversion, breach of fiduciary duty, unjust enrichment and constructive trust pursuant to 28 U.S.C. § 1367, as the claims arise out of the same "common nucleus of operative facts" as Plaintiff's claim under the Exchange Act.

---

[1] Plaintiff reserves its right to convert this action into a class action pursuant to Fed. R. Civ. P. 23.

9.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between Plaintiff and the Defendants, and the amount in controversy exceeds $75,000.00.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

*Meta Materials, Inc. Series A Preferred Dividend Shares and Next Bridge Hydrocarbons, Inc.*

11.     On or about June 28, 2021, Meta Materials, Inc. ("Meta Materials") merged with Torchlight Energy Resources, Inc. ("Torchlight Energy"), a company publicly traded on the Nasdaq Stock Market under the ticker symbol TRCH.

12.     After the merger, Meta Materials subsequently began trading on the Nasdaq Stock Market under the ticker symbol MMAT.

13.     As a part of the merger transaction, Meta Materials issued a special dividend in the form of Series A Preferred Dividend Shares to Torchlight Energy shareholders that held shares prior to the merger.[2]

14.     Although Torchlight Energy and Meta Materials never intended for the MMTLP Shares to be publicly traded, in October 2021, the Series A Preferred Dividend Shares began trading on the Over-the Counter Market under the ticker symbol MMTLP.[3]

---

[2] *See* SEC filings, i.e. Torchlight Energy Resources, Inc., Series A Preferred Shares Certificate of Designation (Form 8-K   EX-3.2)   (June   14,   2021),   available   at https://www.sec.gov/Archives/edgar/data/1431959/000119983521000381/ex3-2.htm.
[3] It was noted in a Congressional Research Report that John Brda, the former Chief Executive Officer of Torchlight Energy, stated in an interview with Forbes "MMTLP was never designed to trade." *See* Congressional Research Service.   August 21, 2023.   *Meme Stock MMTLP and FINRA Trading Halt*. (CRS Report No. IN12228). https://crsreports.congress.gov/product/pdf/IN/IN12228.

15.     The Series A Preferred Dividend Shares were actively listed and trading on the Over-The-Counter Market for approximately 14 months, between October 2021 to December 9, 2022.

16.     In July 2022, the board of directors of Meta Materials voted to spin out the assets of Torchlight Energy into a new, separate company called Next Bridge Hydrocarbons, Inc. ("Next Bridge").  The record date for the spin-off was December 12, 2022.

17.     In July 2022, Next Bridge filed an S-1 Registration statement, which was reviewed by the U.S. Securities and Exchange Commission and became effective on November 18, 2022. Pursuant to Next Bridge's Form S-1, holders of the Series A Preferred Dividend Shares would receive a 1-for-1 share exchange at a future date where one Series A Preferred Dividend Share would be exchanged for one share of Next Bridge common stock.[4]

18.     On December 14, 2022, Next Bridge executed its 1-for-1 share exchange and, as of July 21, 2023, Next Bridge has 248,830,516 common shares outstanding.[5]   Further, like the MMTLP Shares, Next Bridge's common shares were not intended to be publicly traded.[6]

---

[4] *See* SEC filings, i.e. Next Bridge Hydrocarbons, Inc., Form S-1 Registration Statement (July 15, 2022), available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522194228/d302576ds1.htm.

[5] *See* Next Bridge Hydrocarbons, Inc.'s Investors FAQ, https://www.nextbridgehydrocarbons.com/investors (last accessed May 21, 2024).

[6] *See* SEC filings, i.e. Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at) https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2, at 1.

19.     At the time the Series A Preferred Dividend was created, the Dividend represented both a financial interest in Torchlight Energy's assets and a future equity interest in Next Bridge post-spinoff.  Next Bridge's S-1 stated that holders of the Series A Preferred Dividend would be "entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business."

*TradeStation's Customer Account Agreement*

20.     On October 31, 2022, Plaintiff's principal electronically signed an application to open a TradeStation Equity Account.  *See* **Exhibit 1** at 17.

21.     On or about November 17, 2022, Plaintiff's application was approved, the account, Account Number 11583081 ("TradeStation Account"), was opened and Plaintiff's wire transfer to the account was deposited.

*TradeStation's Master Securities Lending Agreement*

22.     As part of the Customer Account Agreement, the parties also agreed to the terms and conditions contained in TradeStation's Master Securities Lending Agreement ("Lending Agreement").  *See* **Exhibit 2**.

23.     Pursuant to Section 2.1 of the Lending Agreement, the lending of a TradeStation customer's fully paid shares to third-party brokers is subject to the terms and conditions of the Lending Agreement.  *See id.* at 1.

24.     Prior to borrowing a customer's fully paid shares, both the customer and TradeStation are to agree to "the terms of each Loan …, including the issuer of the Securities, the amount of Securities to be lent, the basis of compensation, the amount of Collateral to be transferred by the Borrower, and any additional terms."  *Id.*

25.     Section 4.1 of the Lending Agreement fully secures the loan of the securities, stating:

> "Borrower [TradeStation] shall, prior to or concurrently with the transfer of the Loaned Securities, but in no case later than the Close of Business on the day of such transfer, transfer to Lender Collateral with a Market Value at least equal to 100% of the Market Value of the securities, but not to exceed 102% of the Market Value of the Loaned Securities."

*Id*. at 2.

26.     Upon information and belief, in accordance with the terms of the Lending Agreement, TradeStation placed an amount into a Collateral Account equal to 100% of the Market Value of Plaintiff's MMTLP Shares at the time Plaintiff's shares were borrowed.

27.     TradeStation publicly states on its website that the customer, whom the fully paid securities were borrowed from, "can sell or transfer your positions at any time, just as you would if they weren't on loan.  As required, shares will be recalled and deposited back into your account." *See* **Exhibit 3** at 5.

28.     Starting from the statement period between November 30, 2022 and December 30, 2022, TradeStation immediately borrowed all shares purchased by Plaintiff and began issuing interest payments to Plaintiff.  *See* **Exhibit 4** at 7.

*Plaintiff Purchased and Attempted to Submit Sell Orders on TradeStation's Platform*

29.      Between December 5, 2022 and December 8, 2022, Plaintiff executed the following thirteen trades of MMTLP Shares through its TradeStation Account:

| Trade Date | Settlement Date | Purchase or Sale | Quantity Traded | Price Per Share | Total Purchase Price |
|---|---|---|---|---|---|
| December 5, 2022 | December 7, 2022 | Purchase | 500 | $7.98996 | $3,994.98 |
| December 5, 2022 | December 7, 2022 | Purchase | 500 | $7.996 | $3,998.00 |
| December 5, 2022 | December 7, 2022 | Purchase | 1,000 | $8.017 | $8,017.00 |
| December 5, 2022 | December 7, 2022 | Purchase | 100 | $7.950 | $795.00 |
| December 5, 2022 | December 7, 2022 | Purchase | 400 | $7.960 | $3,184.00 |
| December 5, 2022 | December 7, 2022 | Purchase | 500 | $7.890 | $3,945.00 |
| December 6, 2022 | December 8, 2022 | Purchase | 100 | $8.440 | $844.00 |
| December 6, 2022 | December 8, 2022 | Purchase | 3,800 | $8.19571 | $31,143.70 |
| December 7, 2022 | December 9, 2022 | Purchase | 1,525 | $9.900 | $15,097.50 |
| December 7, 2022 | December 9, 2022 | Purchase | 114 | $8.091228 | $922.40 |
| December 7, 2022 | December 9, 2022 | Purchase | 250 | $8.400 | $2,100.00 |
| December 7, 2022 | December 9, 2022 | Purchase | 30 | $8.413 | $252.39 |
| December 8, 2022 | December 12, 2022 | Purchase | 450 | $4.480 | $2,016.00 |
| **Totals** | | | **9,269** | | **$76,309.97** |

30.     On December 7, 2022, the settlement date of Plaintiff's first purchases of MMTLP Shares, TradeStation was authorized to borrow, and subsequently lend Plaintiff's MMTLP Shares to the Doe Defendants in exchange for regular interest payments.

31.     Indeed, TradeStation almost immediately took the borrowed stock and loaned Plaintiff's MMTLP Shares to the Doe Defendants and issued its first interest payment on Plaintiff's transaction statement for the period November 30, 2022 through December 30, 2022. *See* **Exhibit 4** at 6-12.

32.     Since December 9, 2022, TradeStation disbursed monthly interest payments to Plaintiff which, over the period Plaintiff's TradeStation Account was active, totaled no less than $326.91. *See* **Exhibit 4**.

33.     On or about December 9, 2022,[7] with the understanding the shares would be trading until December 12, 2022, Plaintiff attempted to submit two limit sell orders, with both being rejected by TradeStation's platform. *See* **Exhibit 5**.

34.     Plaintiff's first limit sell order was for 4,000 shares at $50.00 per share, with an estimated trade value of $200,000.00. *Id*. at 1.

35.     Plaintiff's second limit sell order was for 9,269 shares at $40.00 per share, with an estimated trade value of $370,760.00. *Id*. at 2.

### *MMTLP Was De-Listed from the Over-The-Counter Exchange*

36.     On December 6, 2022, Nominal Defendant FINRA provided the public notice which stated that MMTLP Shares would continue trading until December 12, 2022, the shares would be canceled on December 13, 2022, and that Next Bridge shares would be distributed to

---

[7] During pre-market trading on December 9, 2022, some MMTLP shareholders had pending sell orders successfully execute at prices of up to $2,400 per share. For unknown reasons, brokers subsequently reversed the executed trades and removed the proceeds from their customers' accounts. As such, the potential damages in this action may be calculated based on the market price of these executed trades.

8

MMTLP shareholders with settled positions as of December 12, 2022, on December 14, 2022. *See* **Exhibit 6** at 1.

37.     On December 8, 2022, Nominal Defendant FINRA updated its public notice, upon information and belief, without Meta Materials' input or consent, now stating that on December 13, 2022, MMTLP Shares would be "deleted," and on December 14, 2022, would be subsequently removed. *Id*. at 2.

38.     On December 9, 2022, Nominal Defendant placed a U3 halt on the trading of MMTLP Shares. *See id*. at 3.  In its announcement, FINRA stated that the "trading and quoting halt will end concurrently with the deletion of the symbol effective Tuesday, December 13, 2022," only allowing for the sale of MMTLP stock and the closing of short positions.[8]  *Id*.

39.     On December 13, 2022, FINRA deleted the MMTLP ticker.

40.     Subsequent to Next Bridge's S-1 registration becoming effective on November 18, 2022, and to date, Next Bridge common stock has not traded on any public exchange.

*TradeStation's Refusal to Transfer Plaintiff's Shares to Another Brokerage Account and Failure to Keep Physical Share Certificates*

41.     On December 13, 2022, TradeStation sent its clients who held shares of MMTLP, including Plaintiff's principal, an email notification stating "[u]nless we hear from you to the contrary by the close of business on December 29, 2022, TradeStation will send your Next Bridge shares to American Stock Transfer & Trust Company ("AST")." *See* **Exhibit 7**.

---

[8] Shorting, or opening a short position, refers to market activity where a market participant sells a security with the belief that the price of the security is likely to decrease in the near future and with the intention of repurchasing it, or covering the short position, at a lower price. A short position is "covered" when a market participant borrows shares from another shareholder or institution and sells the borrowed shares into the open market with the intention to repurchase and return the shares borrowed at a lower price. A short position is "naked" when a market participant illegally sells a security without having possession of it, or without locating shares which can be borrowed.

42.     On December 28, 2022, Plaintiff's principal responded to TradeStation's notification stating Plaintiff would like to keep [its] shares of Next Bridge Hydrocarbons, Inc. in Inter-Coastal's TradeStation Account, and refused the transfer of the Next Bridge shares to an AST brokerage account.  *Id*. at .

43.     Subsequently, on December 22, 2023, Plaintiff's principal, through TradeStation's customer service support portal, requested TradeStation transfer a portion of Plaintiff's Next Bridge shares to an AST brokerage account.  *See* **Exhibit 8**.

44.     In response to Plaintiff's request, a TradeStation representative notified Plaintiff it was unable to transfer the Next Bridge shares to an AST brokerage account.  *Id* at 1-2.

45.     Plaintiff's principal subsequently inquired whether Inter-Coastal's Next Bridge shares were backed up by a physical share certificate issued by Next Bridge.  *Id*. at 3.

46.     Further, Plaintiff's principal correctly noted that any shares issued by Next Bridge to the shareholders' brokerage accounts should have been distributed and backed up by physical share certificates.  *Id.*

47.     The representative confirmed the Next Bridge shares held at TradeStation were "not [sic] backed up by physical certificate" because "there is currently no market for the security." [9] *Id*. at 3.

*TradeStation Announces Its Inability to Transfer a Physical Certificate Reflecting Its Customers' Fully Paid Next Bridge Shares to American Stock & Trust Company Due To a Share Imbalance*

48.     On or about December 29, 2023, MMTLP shareholders initiated a discussion on X (f/k/a Twitter) regarding an announcement made by TradeStation to some of its customers which stated that "[u]pon the initial distribution of [Next Bridge] common stock, broker-dealers, like

---

[9] Whether there is a "market" for a security is wholly irrelevant to the amount of shares, based on the amount held in TradeStation's records for the benefit of its customers, issued as a physical certificate to TradeStation pursuant to Next Bridge's share exchange.

TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP").  *See* **Exhibit 7**.

49.     The announcement further states "[t]he [Next Bridge] certificate that TradeStation received excluded a large number of [Next Bridge] shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program."  *Id.*

50.     TradeStation was not able, and still has not been able to recall its customers' shares that were loaned in excess of the amount of fully paid shares recorded by TradeStation at the time Next Bridge distributed physical share certificates.  *Id.*

51.     TradeStation noted that because some of their customers' shares were not backed up by a physical certificate, TradeStation would be unable "to honor some of [their] customers' requests to register and record their ownership in book entry form with AST," and must decline some of their customers' transfer requests, including Plaintiff's.  *Id.  See also* **Exhibit 8**.

52.     By its own admission, TradeStation loaned third-party brokers its customers' fully paid MMTLP Shares in an amount *in excess* of those it held for the benefit of its customers, i.e. counterfeit MMTLP Shares.[10]  *See* **Exhibit 7**.

53.     Because it loaned third-party brokers counterfeit shares,[11] Next Bridge issued TradeStation a share certificate that excluded a large number of shares that were loaned to third-party brokers, leading to a share imbalance.

---

[10] Federal law defines the term "counterfeited," in the context of securities of the States and private entities, as "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety."  *See* 18 U.S.C. § 513(c)(1).

[11] The SEC refers to "naked short abuse" as "counterfeiting stock."  *See* U.S. Securities and Exchange Commission, Counterfeiting Stock 2.0, at 1  (https://www.sec.gov/comments/s7-29-22/s72922-20153799-321641.pdf)  (last accessed May 21, 2024).  Pursuant to the Lending Agreement, TradeStation lends its customers' fully paid shares "in connection with short sales" or "to satisfy delivery requirements resulting from short sales."  *See* **Exhibit 2** at 1, 8, 23.  When Next Bridge sent TradeStation a share certificate in connection with the share exchange, Plaintiff believes TradeStation's excess lending in connection with naked short sales (i.e. the creation of counterfeit shares) created a share imbalance, leaving TradeStation with a pittance of physical Next Bridge shares and unable to execute its customer's entitlement orders.  *See* **Exhibit 7**.

54.     TradeStation claims it has been unable to reclaim this portion of the excess shares it had loaned to third-party brokers, causing TradeStation's customers, including Plaintiff, to be unable to transfer, sell or otherwise dispose of their fully paid Next Bridge shares.  *Id.*

*Plaintiff Terminates the Lending Agreement and TradeStation Defaults On Its Obligations Under the Lending Agreement*

55.     On March 19, 2024, Plaintiff's principal contacted TradeStation's Client Services Department to provide TradeStation notice of Plaintiff's intent to terminate the loan of its Next Bridge shares pursuant to Section 7.1 of the Lending Agreement and to terminate the Lending Agreement in full pursuant to Section 25.1.  *See* **Exhibit 2** at 1.

56.     The Lending Agreement was terminated on or about March 22, 2024.

57.     At the termination of the Lending Agreement, Plaintiff requested TradeStation return its fully paid shares by delivering physical certificated Next Bridge shares pursuant to Section 16.1 of the Lending Agreement.  *Id.* at 12.

58.     TradeStation, contrary to its previous public statement, notified Plaintiff by phone that it could not, and would not deliver physical Next Bridge certificates because *it was never sent physical certificates by Next Bridge*.

59.     Further, TradeStation's notice that it was unable and unwilling to deliver physical Next Bridge shares to Plaintiff constitutes an Event of Default under Section 13.7 of the Lending Agreement.  *Id.* at 9.

60.     A diagram to illustrate the material events of this action during the relevant period is as follows:



*The RICO Enterprise and TradeStation's RICO Predicate Acts*

61.     The relevant RICO Enterprise is an ongoing association-in-fact consisting of TradeStation (an entity) and the Doe Defendants (several entities), with apparent relationships among the Defendants as depicted below, illustrating the scheme:



62.     The Doe Defendants are a RICO association-in-fact of third-party broker-dealers, separate from TradeStation, which constitutes an "RICO enterprise" within the meaning of 895.02, Fla. Stat. (2023).

63.     Since the U3 Halt, the Doe Defendant's identities have been purposely, intentionally and with an intent to hinder any outside investigation by retail shareholders and their counsel, including Plaintiff, as well as the United States Congress, have been  hidden and being protected by FINRA who refused numerous requests for this data, not only by Congress, but also in private litigation that would identify the participants of this RICO enterprise.

64.     At all relevant times, the Doe Defendants had a common purpose of seeking to illegally short sell MMTLP shares, for profit, borrowing both legitimate and/or selling counterfeit MMTLP shares and selling the MMTLP shares on the open market to open short positions.  After the U3 halt was implemented on December 9, 2022, and the MMTLP ticker symbol was deleted on December 13, 2022, re-purchasing and returning any borrowed legitimate and/or counterfeit MMTLP shares to cover any outstanding short positions became impossible, thus allowing the Doe Defendants to retain all illicit profits and returns generated from their short sales of the borrowed true, as well as counterfeit MMTLP shares it received from TradeStation.

65.     Prior to December 14, 2022, TradeStation fraudulently and intentionally loaned an amount of MMTLP Shares to the Doe Defendants in excess of the amount of fully paid shares TradeStation held on record in its clients' accounts for the benefit of its customers at the time Next Bridge distributed share certificates, i.e., counterfeit MMTLP Shares, in violation of 517.301(1)(a)(3), Fla. Stat. (2023).   The MMTLP Shares are "securities" as defined in 517.021(22)(b), Fla. Stat. (2023).

66.     Between October 2021 and December 12, 2022, TradeStation's conduct and participation in the affairs of the Doe Defendant's enterprise included (i) obtaining its customers' fully-paid MMTLP Shares by falsely stating on its website that its customers would retain the right to sell their shares at any time; (ii) knowingly, unlawfully and consistently lending an amount of MMTLP Shares in excess of the amount held on record for the benefit of its customers, including Plaintiff, to the Doe Defendants for the purpose of opening short positions in excess of the amount held on record for the benefit its customers via electronic transfer; and (iii) charging and collecting a commission, fee or margin interest, a part of which was given to its customers as interest payments, in connection with the lending of its customers' MMTLP Shares, as well as shares loaned to the Doe Defendants in excess of the amount held on record in TradeStation's customers' accounts.

67.     Upon information and belief, this scheme was effectuated commencing around November 22, 2022, with MMTLP opening with a market price of $11.90 per share, and resulting in a precipitous drop of the then trading MMTLP securities price, just prior to FINRA instituting the U3 halt, to $2.90 per share on December 8, 2022, harming Plaintiff and other similarly situated holders of the MMTLP security (other TradeStation clients).

*Nominal Defendant FINRA Can Not Fulfill the Role of an Unbiased Arbitrator in this Matter*

68.     When Plaintiff opened its TradeStation Account, it agreed to Section 38 of the TradeStation Securities, Inc. Customer Account Agreement for Equities ("Customer Account Agreement").  *See* **Exhibit 9** at 14-15.

69.     Section 38 of the Customer Account Agreement is an arbitration agreement which provides:

[A]ny and all controversies, claims or disputes relating to your Account, the Services and/or the determination of any contractual rights and liabilities under this Agreement, which may arise between you and TradeStation Securities … shall be determined by arbitration conducted before FINRA in accordance with its arbitration rules then in force.  (the "Arbitration Agreement").

70.     On December 6, 2022, FINRA provided the public notice of Meta Material's corporate action, which stated that MMTLP shares would continue trading until December 12, 2022, the shares would be canceled on December 13, 2022, and that Next Bridge shares would be distributed to MMTLP shareholders with settled positions as of December 12, 2022 on December 14, 2022.  *See* **Exhibit 6** at 1-2.

71.     On December 8, 2022, a modified notice of corporate action was released by FINRA, which stated that on December 13, 2022, the MMTLP ticker would be "deleted", and on December 14, 2022, would be subsequently removed.

72.      Upon information and belief, this corporate action modified in violation of FINRA Rule 6490 and was not authorized, nor approved by either Meta Materials.[12]  *Id.* at 5.

73.     On December 9, 2022, FINRA placed a U3 halt on the trading of MMTLP Shares, preventing any individual or entity that held an open short position from re-purchasing MMTLP Shares on the open market, closing their short positions and returning any borrowed MMTLP shares to their respective owners.  *Id.* at 3.

74.     Later, on December 13, 2022, the MMTLP ticker symbol was deleted.

75.     In response to a pre-litigation discovery petition filed in the Supreme Court of the State of New York, County of New York for the pre-action disclosure of FINRA's Electronic Blue Sheets, FINRA filed an affidavit in opposition to the petition stating "FINRA directed its member

---

[12] On December 8, 2022, Meta Materials released a press release, informing the public that "*FINRA has revised* its notice regarding the corporate action of exchanging META's Series A Preferred shares [] for shares of common stock of Next Bridge Hydrocarbons, Inc." (emphasis added). *See* https://metamaterial.com/meta-materials-announces-finra-has-revised-corporate-action-for-exchange-of-series-a-preferred/ (last accessed May 21, 2024).

firms to halt quoting and trading in MMTLP because it determined that it was necessary to protect investors and the public interest where an extraordinary event had caused or had the potential to cause *significant uncertainty in the settlement and clearance process for shares in MMTLP.*" *See* **Exhibit 10** at 3, ¶ 9.

76.     Further, prior to the U3 halt, FINRA claimed it had initiated an investigation into potential fraud relating to both the MMTLP and MMAT ticker symbols.

77.     Pursuant to a response to a Freedom of Information Act request submitted upon the SEC, on or about December 5, 2022, FINRA noted it was made aware of fraud being committed pertaining to MMTLP as it was "bluesheeting"[13] its member broker-dealers relating to MMTLP prior to the enactment of the U3 halt.  *See* **Exhibit 6** at 4.

78.     On March 16, 2023, FINRA released a Frequently Asked Questions (FAQ) addressing public concerns regarding the U3 halt of the MMTLP ticker.[14]  *See* **Exhibit 11** at 1-4.

79.     Subsequently, on November 6, 2023, FINRA released a Supplemental FAQ addressing additional public concerns.[15]  *Id*. at 5-8.

80.     In the Supplemental FAQ, FINRA addresses a public concern regarding the short interest in the MMTLP ticker on December 12, 2022, stating that at the time MMTLP was halted, the outstanding short interest in MMTLP was approximately 2.65 million shares.  *Id.* at 6.

---

[13] FINRA uses various tools and techniques to monitor the markets and detect any instances of illegal, fraudulent, or unethical behavior of its member firms.  In its regular course of business, FINRA keeps records known as Electronic Blue Sheets that contain both trading and broker data.  The Blue Sheets are submitted by broker-dealers at the request of FINRA and are used by FINRA to detect potential insider trading, market manipulation, or other violations of federal securities laws or FINRA's rules.  *See* https://www.finra.org/filing-reporting/electronic-blue-sheets-ebs (last accessed May 21, 2024).

[14] *See* https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt (last accessed May 21, 2024).

[15] *See* https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt (last accessed May 21, 2024) (hereinafter referred to as the "Supplemental FAQ").

81.     Despite stating the U3 halt was enacted to "protect investors" from an "extraordinary event," FINRA also publicly stated that it failed to account for concerns regarding the existence of short positions in MMTLP when halting, and subsequently deleting the MMTLP ticker.

82.     Upon information and belief, FINRA failed to oversee, supervise and initiate disciplinary action against its member broker-dealers for violations of state and federal securities laws for the lending, borrowing and sale of counterfeit MMTLP Shares into the open market that resulted in the opening of short positions that could not close.

83.     The dispute between Plaintiff and TradeStation, and Plaintiff's claims set forth hereinafter, stem, in part,  from the actions taken by FINRA in its role as a self-regulatory organization, market regulator and broker-dealer regulator.

84.     Specifically, Plaintiff's claims are derived from the repercussions of FINRA's enactment of a U3 halt on the MMTLP ticker on December 9, 2022.  *See* **Exhibit 6** at 3.

85.     It has now been more than 520 days since FINRA instituted the U3 halt.  FINRA has failed to bring *any* disciplinary actions against the brokers under its supervision with admitted legal short as well as illegal short positions; has submitted conflicting public reports and statements; has approved corporate actions (exceeding their authority) that were not authorized by the issuer (Meta Materials); has failed to adequately address *several* inquiries and demands by members of Congress[16] and, in fact, has worked with the SEC to stonewall any efforts by Congressional representatives to secure information and evidence as to their constituents' complaints;[17] has not disciplined TradeStation for the admitted imbalance that TradeStation is carrying on its books and has not addressed the admitted overall short position of at least 2,650,000[18] shares that are, and have not yet been covered.[19]  This action, and the facts surrounding it, likely constitute a crime scene essentially frozen in time, directly attributable to FINRA's actions as a self-regulatory agency that it failed to take any action, at all, to correct.

---

[16] On December 23, 2023, 74 members of the House of Representatives signed a letter to the Chairman of the SEC, Gary Ginsler, and the President and Chief Executive Officer of FINRA, Robert Cook, requesting the SEC and FINRA "review events surrounding Meta Materials Series A preferred shares," including "concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP."  Notably, the signing House members inquired into evidence suggesting "the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares."  *See* https://norman.house.gov/uploadedfiles/rep-norman-mmtlp-letter-2023-12-22-final.pdf (last accessed May 22, 2024).

[17] On January 31, 2024, FINRA published a letter to Representative Ralph Norman responding to the House's December 23, 2023 letter.  In relevant part, FINRA stated that it had "reviewed its members' U.S. trading activity in MMTLP, including short sale activity, and has found no evidence that there was *significant* naked short selling … in MMTLP," (emphasis added).   *See*  https://norman.house.gov/uploadedfiles/2024-01-31-finra-response-to-rep-norman-regarding-mmtlp.pdf (last accessed May 22, 2024).  To date, FINRA has yet to initiate disciplinary action against its member brokers that it found *were* naked short selling MMTLP.

[18] On November 21, 2023, Greg McCabe, Chairman of the Board of Next Bridge, submitted a letter to FINRA stating "Next Bridge has received information from financial firms since the spin-off that suggests that the number of short positions may be significantly higher than FINRA's estimated 2.65 million."  *See* https://www.finra.org/sites/default/files/2024-02/nbh-finra-letter-11-21-23.pdf (last accessed May 22, 2024).  Further, expanding on the gravity of the short position imbalance in Next Bridge's share ledger, on January 23, 2024, Mr. McCabe submitted a letter to FINRA expressing that there is a "significant disconnect between [Next Bridge's] growing data and FINRA's stated number of 2.65mm shares of outstanding short interest" and "the results of [Next Bridge's] data gathering suggests a number considerably higher than the 2.65mm shares of aggregate short interest stated in FINRA's most recent FAQ."  Perhaps most concerning, Mr. McCabe addresses the fact that he has knowledge "of an admitted shareholder imbalance *from one single financial institution* that is *multiples more* than 2.65mm shares." (emphasis added).  *See*  https://www.finra.org/sites/default/files/2024-02/nbh-finra-letter-01-23-24.pdf (last accessed May 22, 2024).

86.     Because Plaintiff's claims against TradeStation stem directly from FINRA's actions (and inactions) as a market regulator, such as FINRA's institution of the U3 halt, FINRA cannot fulfill its duties as an *unbiased* arbitrator to this dispute pursuant to the Arbitration Agreement.

87.     As such, Plaintiff requires the instant matter be heard and decided through the unbiased lens of this Court to ensure a fair resolution for all parties involved, regardless of the language or terms of the Customer Account Agreement and Arbitration Agreement.

**FIRST CAUSE OF ACTION**
*Rescission Pursuant to Section 29(b) of the Exchange Act for*
*a Violation of 17 CFR § 240.15c3-3(b)(1)*

88.     Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

89.     Section 29(b) of the Exchange Act provides in relevant part that:

> **Every contract … the *performance* of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision or any rule or regulation thereunder, shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract…

15 U.S.C. § 78cc(b) (emphasis added).

90.     Rule 15c3-3(b)(1), codified as 17 CFR § 240.15c3-3(b)(1), states "[a] broker or dealer shall promptly obtain and shall thereafter maintain the physical possession or control of all fully-paid securities and excess margin securities carried by a broker or dealer for the account of

---

[19] On January 18, 2024, Mr. McCabe submitted an additional letter to FINRA addressing issues related to FINRA's Supplemental FAQ.  In his letter, in response to FINRA's assertion that Next Bridge "has yet to obtain a CUSIP identifier for its common stock and [Next Bridge's] shares are not DTC-eligible," Mr. McCabe notes that "Next Bridge did not plan to have publicly traded securities" and Next Bridge's common stock "will not be publicly traded."  *See* https://www.finra.org/sites/default/files/2024-02/nbh-finra-letter-01-18-24.pdf (last accessed May 22, 2024).  As such, due to the effect of the U3 halt and subsequent de-listing of the MMTLP ticker symbol prior to the share exchange, the Doe Defendants' outstanding short positions in Next Bridge cannot, *and will never be* covered.

customers."

91.     TradeStation is a securities brokerage firm registered with the SEC and FINRA pursuant to 15 U.S.C. § 78o(b).[20]

92.     As a registered brokerage firm, TradeStation had, and continues to have an obligation to follow and comply with federal securities laws, including Rule 15c3-3(b)(1) to maintain the physical possession or control of all fully paid securities for the accounts of its customers.

93.     TradeStation was authorized to borrow, and subsequently lend Plaintiff's MMTLP Shares as early as December 7, 2022, the settlement date of the first purchases Plaintiff made through its TradeStation Account.

94.     TradeStation announced to its customers that, due to the lending of MMTLP Shares as part of TradeStation's Fully Paid Lending program, Next Bridge issued a physical share certificate pursuant to its November 18, 2022 Form S-1 share exchange which excluded "a large number of [Next Bridge] shares that had been lent to other broker-dealers." *See* **Exhibit 7**.

95.     Plaintiff alleges that, with reasonable effort, TradeStation could have, and should have, acquired physical share certificates from the Doe Defendants they loaned the shares to in conjunction with short sales, as outlined in the Lending Agreement, because the third-party broker dealers were required to return any shares borrowed from TradeStation to open their short positions.

96.     Although "no market for the security" exists, as stated by TradeStation, TradeStation should have, but failed to re-acquire the shares it loaned to third-party brokers knowing that, pursuant to FINRA's modification to the December 8, 2022 notice of corporate

---

[20] *See* FINRA BrokerCheck, https://brokercheck.finra.org/firm/summary/39473 (last accessed May 21, 2024).

action, the MMTLP ticker would be deleted on December 13, 2022.

97.     TradeStation's failures in its duties to its customers, including Plaintiff, constitute

a violation of the Exchange Act, specifically Rule 15c3-3(b)(1).

98.     Due to TradeStation's performance under the Lending Agreement in violation of

the Exchange Act, Plaintiff has been indefinitely dispossessed of its property with TradeStation

failing to offer any of its customers, including Plaintiff, proper recourse.

99.     As such, Plaintiff respectfully requests that this Court find the Lending Agreement

voidable and subject to rescission pursuant to Section 29(b) of the Exchange Act.

**SECOND CAUSE OF ACTION**
*Violation of Section 678.5041, Fla. Stat (2023) for Failing to*
*Maintain Physical Next Bridge Securities Certificates*

100.    Plaintiff incorporates by reference paragraphs 1-35 and 41-54 of this Complaint as

if fully set forth herein.

101.    Section 678.5041 of the Florida Statutes establishes the duty of a securities

intermediary to maintain financial assets, stating "[a] securities intermediary shall promptly obtain

*and thereafter maintain* a financial asset in a quantity corresponding to the aggregate of all security

entitlements[21] it has established in favor of its entitlement holders[22] with respect to that financial

asset." *See* Section 678.5041, Fla. Stat. (2023) (emphasis added).

102.    The Florida Statutes define a "securities intermediary" as a "person, including a

bank or broker, that in the ordinary course of its business maintains securities accounts for others

and is acting in that capacity." *See* Section 678.1021(1)(n)(2), Fla. Stat. (2023).

---

[21]  Under Florida law, a "security entitlement" is defined as "the rights and property interest of an entitlement holder
with respect to a financial asset specified in part V" of Chapter 678 of Florida's Uniform Commercial Code regarding
investment securities.  *See* Section 678.1201(1)(q), Fla. Stat. (2023).
[22]  Under Florida law, an "entitlement holder" is defined as "a person identified in the records of a securities
intermediary as the person having a security entitlement against the securities intermediary."  *See* Section
678.1201(1)(g), Fla. Stat. (2023).

103.    Section 678.5041 of the Florida Statutes mirrors the federal law requirement found in Rule 15c3-3 establishing a securities intermediary's requirement to maintain physical possession and control of all fully paid securities held for the benefit of the intermediary's customers.

104.    TradeStation, a registered broker and securities intermediary as defined by Florida law, holds a duty to maintain financial assets, including physical securities certificates, in favor of its entitlement holders, such as Plaintiff, with respect to that financial asset.

105.    TradeStation admitted to its customers that it failed in its duty as a securities intermediary to maintain a proper, aggregate quantity of physical Next Bridge share certificates that correspond to the aggregate amount of Next Shares held for the benefit of its customers.

106.    By its own admission, TradeStation loaned third-party brokers its customers' fully paid MMTLP Shares in an amount *in excess* of those it held for the benefit of its customers.  In other words, it loaned counterfeit MMTLP Shares to third-party brokers.

107.    Because it loaned third-party brokers counterfeit shares, Next Bridge issued TradeStation a share certificate that *excluded* a large number of shares that were loaned to third-party brokers, leading to a share imbalance.

108.    TradeStation claims it has been unable to reclaim this portion of the excess shares it had loaned to third-party brokers, causing TradeStation's customers, including Plaintiff, to be unable to transfer, sell or otherwise dispose of their fully paid Next Bridge shares.

109.    In addition, TradeStation's failure to issue Plaintiff physical share certificates has denied Plaintiff a possessory right over its property, its fully paid Next Bridge shares.

110.     Further, to date, after dispossessing Plaintiff of its property, TradeStation has not disbursed the agreed upon collateral pursuant to the Lending Agreement after TradeStation failed to transfer Plaintiff's Next Bridge shares to AST or issue Plaintiff physical share certificates.

111.     As such, Plaintiff respectfully requests that this Court award monetary damages in the amount held in collateral for the benefit of Plaintiff, as well as any further relief this Court may deem just and proper.

### THIRD CAUSE OF ACTION
*Violation of Section 678.5071, Fla. Stat (2023) for Failing*
*to Comply with Plaintiff's Entitlement Order*

112.     Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

113.      Section 678.5071(1) of the Florida Statutes establishes the duty of a securities intermediary to comply with an entitlement order,[23] stating:

> A securities intermediary *shall comply* with an entitlement order if the entitlement order is originated by the appropriate person, the securities intermediary has had reasonable opportunity to assure itself that the entitlement order is genuine and authorized, and the securities intermediary has had reasonable opportunity to comply with the entitlement order.

*See* Section 678.5071(1), Fla. Stat (2023) (emphasis added).

114.     A securities intermediary satisfies this duty if:

> (a) the securities intermediary acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary; or (b) in the absence of agreement, the securities intermediary exercises due care in accordance with reasonable commercial standards to comply with the entitlement order.

*See* Section 678.5071(1)(a)-(b), Fla. Stat (2023).

---

[23] Under Florida law, an "entitlement order" is defined as "a notification communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement." *See* Section 678.1201(1)(h), Fla. Stat. (2023).

115. A cursory look at the language of Section 678.5071(1)(a), Fla. Stat. (2023) shows that an inherent duty of a securities intermediary in the intermediary's relationship with its customers is the intermediary's absolute duty to comply with its customer's entitlement orders.

116. Under Florida law, TradeStation was required to comply with Plaintiff's December 22, 2023 entitlement order requesting a portion of its shares be transferred to an AST brokerage account.

117. TradeStation noted in both its announcement to its customers, as well as TradeStation's customer service representative's disclosure to Plaintiff, that it did not maintain the proper amount of share certificates it would need to fulfill its obligations to its customers to comply with their requests to transfer their Next Bridge shares to AST.

118. TradeStation has no legal basis to claim it satisfied its duty to comply with Plaintiff's entitlement order pursuant to Section 678.5071(1)(a)-(b) of Florida's Statutes because (i) TradeStation's lending of MMTLP Shares to third-party brokers *in excess of the amount* held for the benefit of its customers prior to Next Bridge issuing a share certificate was not in compliance with the terms of the Lending Agreement and (ii) it is not reasonable to assume a broker lending shares in excess of the amount held for the benefit of its customers and subsequently failing to reclaim said excess shares complies with any "reasonable commercial standard" under Florida law.

119. By failing to maintain a proper, aggregate quantity of physical Next Bridge share certificates, Plaintiff was denied its absolute right to exercise a share transfer request.

120. As such, Plaintiff respectfully requests that this Court award monetary damages in the amount held in collateral for the benefit of Plaintiff, as well as any further relief this Court may deem just and proper.

## FOURTH CAUSE OF ACTION
### *Violation of Section 895.03, Fla. Stat (2023)*
#### *Florida Racketeer Influenced and Corrupt Organization Act*

121.    Plaintiff incorporates by reference paragraphs 1-67 of this Complaint as if fully set forth herein.

122.    The Doe Defendants are an association in fact of third-party broker-dealers, separate from TradeStation, which constitutes an "enterprise" within the meaning of 895.02, Fla. Stat. (2023).

123.    At all relevant times, the Doe Defendants operated with the common purpose of shorting MMTLP Shares, for profit, until the announced U3 halt was enacted, after which it would be impossible to re-purchase any borrowed and sold MMTLP Shares on the open market and keeping any revenue generated by the opening of short positions.

124.    TradeStation is a "person" associated with the Doe Defendants which, without TradeStation's willing participation, the Doe Defendants' scheme and common course of conduct would be unsuccessful.

125.    Pursuant to the Lending Agreement, since approximately October 2021, TradeStation consistently loaned its customer's MMTLP Shares to the Doe Defendants in connection to the Doe Defendants opening short sale positions in MMTLP.  The MMTLP Shares are "securities" as defined in 517.021(22)(b), Fla. Stat. (2023).

126.    Prior to December 14, 2022, TradeStation fraudulently and intentionally loaned an amount of MMTLP Shares to the Doe Defendants in excess of the amount of fully paid shares TradeStation held on record for the benefit of its customers at the time Next Bridge distributed share certificates, i.e., counterfeit MMTLP Shares, in violation of 517.301(1)(a)(3), Fla. Stat. (2023).

127.     As such, when Next Bridge executed its share exchange, TradeStation was issued a share certificate that excluded a large number of shares that were loaned to third-party brokers, leading to share imbalance in TradeStation's records.

128.     Further, when the Doe Defendants opened their short positions in MMTLP, the borrowed shares were sold into the open market, including any counterfeit MMTLP Shares representing "borrowed" shares loaned to the Doe Defendants by TradeStation.

129.     Due to the U3 halt implemented on December 9, 2022, and the subsequent de-listing of MMTLP on December 12, 2022, no less than 2.65 million borrowed, short sold shares remain outstanding and not yet returned to the lenders.  *See supra*, FN 12; **Exhibit 11** at 6.

130.     TradeStation's conduct and participation in the affairs of the enterprise included:

   a.   Between October 2021 and December 12, 2022, obtaining its customers' fully-paid MMTLP Shares by falsely stating on its website that its customers would retain the right to sell their shares at any time;

   b.   Between October 2021 and December 12, 2022, knowingly, unlawfully and consistently lending an amount of MMTLP Shares to the Doe Defendants for the purpose of opening short positions in excess of the amount held on record for the benefit its customers via electronic transfer; and

   c.   Between October 2021 and December 12, 2022, charging and collecting a commission, fee or margin interest, a part of which was given to its customers as interest payments, in connection with the lending of its customers' MMTLP Shares, as well as shares loaned to the Doe Defendants in excess of the amount held on record in TradeStation's customers' accounts.

131.    The actions described herein constitute a pattern of racketeering activity in violation of 517.301(1)(a)(3), Fla. Stat. (2023).  Further, TradeStation's participation in the Doe Defendants' scheme violates 895.03(1), Fla. Stat (2023).

132.    The actions described herein had a common class of victims, TradeStation's customers that held MMTLP Shares, including Plaintiff.

133.    As a direct and proximate result of the TradeStation's racketeering activities, Plaintiff has been injured with regard to its property.  Therefore, pursuant to the provisions of 772.104(1), Fla. Stat (2023), Plaintiff is entitled to treble damages against TradeStation as allowed therein, as well as costs and reasonable attorney's fees.

**FIFTH CAUSE OF ACTION**
*Violations of Section 772.103, Fla. Stat. (2023)*
*Florida Civil Remedies for Criminal Practices Act*

134.    Plaintiff incorporates by reference paragraphs 1-67 of this Complaint as if fully set forth herein.

135.    Section 772.103(3), Fla. Stat. (2023) makes it "unlawful for any person …associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity."

136.    The Doe Defendants are an association in fact of third-party broker-dealers, separate from TradeStation, which constitutes an "enterprise" within the meaning of 772.102, Fla. Stat. (2023).

137.    At all relevant times, the Doe Defendants operated with the common purpose of illegally shorting MMTLP Shares, for profit, until the announced U3 halt was enacted, after which it would be impossible to re-purchase any borrowed and sold MMTLP Shares on the open market and keeping any revenue generated by the opening of short positions.

138.    TradeStation is a "person" associated with the Doe Defendants which, without TradeStation's willing participation, the Doe Defendants' scheme and common course of conduct would be unsuccessful.

139.    Pursuant to the Lending Agreement, since approximately October 2021, TradeStation consistently loaned its customer's MMTLP Shares to the Doe Defendants in connection to the Doe Defendants opening short sale positions in MMTLP. The MMTLP Shares are "securities" as defined in 517.021(22)(b), Fla. Stat. (2023).

140.    Prior to December 14, 2022, TradeStation fraudulently and intentionally loaned an amount of MMTLP Shares to the Doe Defendants in excess of the amount of fully paid shares TradeStation held on record for the benefit of its customers at the time Next Bridge distributed share certificates, i.e., counterfeit MMTLP Shares, in violation of 517.301(1)(a)(3), Fla. Stat. (2023).

141.    As such, when Next Bridge executed its share exchange, TradeStation was issued a share certificate that excluded a large number of shares that were loaned to third-party brokers, leading to share imbalance in TradeStation's records.

142.    Further, when the Doe Defendants opened their short positions in MMTLP, the borrowed shares were sold into the open market.

143.    Due to the U3 halt implemented on December 9, 2022, and the subsequent de-listing of MMTLP on December 12, 2022, no less than 2.65 million borrowed, short sold shares remain outstanding and not yet returned to the lenders. *See* **Exhibit 11** at 6.

144.    TradeStation's conduct and participation in the affairs of the enterprise included:

a.  Between October 2021 and December 12, 2022, obtaining its customers' fully-paid MMTLP Shares by falsely stating on its website that its customers would retain the right to sell their shares at any time;

b.  Between October 2021 and December 12, 2022, knowingly, unlawfully and consistently lending an amount of MMTLP Shares to the Doe Defendants for the purpose of opening short positions in excess of the amount held on record for the benefit its customers via electronic transfer; and

c.  Between October 2021 and December 12, 2022, charging and collecting a commission, fee or margin interest, a part of which was given to its customers as interest payments, in connection with the lending of its customers' MMTLP Shares, as well as shares loaned to the Doe Defendants in excess of the amount held on record in TradeStation's customers' accounts.

145.    The actions described herein constitute a pattern of criminal activity in violation of 517.301(1)(a)(3), Fla. Stat. (2023).  Further, TradeStation's participation in the Doe Defendants' scheme violates 772.103, Fla. Stat. (2003).

146.    The actions described herein had a common class of victims, TradeStation's customers which held MMTLP Shares, including Plaintiff.

147.    As a direct and proximate result of the TradeStation's criminal activities, Plaintiff has been injured in regard to its property.  Therefore, pursuant to the provisions of 772.104(1), Fla. Stat (2023), Plaintiff is entitled to treble damages against TradeStation as allowed therein, as well as costs and reasonable attorney's fees.

## SIXTH CAUSE OF ACTION
### *Breach of Contract*

148.    Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

149.    Between December 5 and December 8, 2022, Plaintiff purchased a total of 9,269 MMTLP Shares through TradeStation's platform.

150.    On or about December 9, 2022, Plaintiff attempted to submit two limit sell orders, both being rejected by TradeStation's platform. Plaintiff's first limit sell order was for 4,000 shares at $50.00 per share, with an estimated trade value of $200,000.00 and Plaintiff's second limit sell order was for 9,269 shares at $40.00 per share, with an estimated trade value of $370,760.00. *See* **Exhibit 5**.

151.    Pursuant to the Account Agreement and TradeStation's publicly available website,[24] Plaintiff was, and is free to dispose of its shares *at any time*.

152.    Because of TradeStation's failure to execute Plaintiff's limit sell order of 9,269 Next Bridge shares, Plaintiff was unable to freely dispose of its shares, resulting in monetary damages in an amount no less than $370,760.00.

153.    Additionally, on March 19, 2024, Plaintiff's principal contacted TradeStation's Client Services Department to provide TradeStation notice of its intent to terminate the loan of Inter-Coastal's Next Bridge shares pursuant to Section 7.1 of the Lending Agreement and to terminate the Lending Agreement in full pursuant to Section 25.1. *See* **Exhibit 2** at 1.

154.    The Lending Agreement was terminated on or about March 22, 2024.

---

[24] TradeStation's website publicly states that all lenders, including Plaintiff, "can sell or transfer your positions at any time, just as you would if they weren't on loan.  As required, shares will be recalled and deposited back into your account." *See* **Exhibit 3**.

155.    At the termination of the Lending Agreement, Plaintiff requested TradeStation return its fully paid shares by delivering physical certificated Next Bridge shares pursuant to Section 16.1 of the Lending Agreement.  *Id*. at 12.

156.    TradeStation, contrary to its previous public statement, notified Plaintiff by phone that it could not, and would not deliver physical Next Bridge certificates because it was never sent physical certificates by Next Bridge.

157.    TradeStation's notice that it was unable and unwilling to deliver physical Next Bridge shares to Plaintiff constitutes a material breach of TradeStation's obligations under the Lending Agreement and Event of Default under Section 13.7 of the Lending Agreement.  *Id*. at 9.

158.    TradeStation has failed to provide Plaintiff with a replacement physical share certificate or monetary recompense in an equivalent collateral value, materially breaching the security provision set forth in Section 4 of the Lending Agreement.

159.    Section 4.1 of the Lending Agreement fully secures the Plaintiff's loan of its MMTLP/Next Bridge securities to TradeStation, requiring TradeStation to transfer collateral to a collateral account with a value equal to 100% of the Market Value of the securities.

160.    TradeStation's placement of an amount equal to 100% of the market value of the borrowed shares is to fully secure Plaintiff's interest in the loan.

161.    As such, Plaintiff respectfully requests this Court award expectation damages in the amount of $360,370.00.

## SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation

162.     Plaintiff incorporates by reference paragraphs 1-35 of this Complaint as if fully set forth herein.

163.     TradeStation made false statements of material fact to the public, including Plaintiff, on its publicly viewable website in regard to its Fully Paid Lending Program.

164.     TradeStation publicly states "[a]lthough the shares are out on loan, you can still sell the full or partial position at any time" and that, should the Lending Agreement be terminated, "on or before the Cutoff Time on the termination date of a Loan, [TradeStation would] transfer the Loaned Securities to Lender." *See* **Exhibit 2** at 5; **Exhibit 3** at 5.

165.     Plaintiff acted in justifiable reliance on TradeStation's statements when entering into the Lending Agreement, when attempting to sell its shares and when requesting its shares be transferred or physically delivered.  It was reasonable for Plaintiff to expect that, at any time, it could sell or regain full possession over its Next Bridge shares.

166.     Plaintiff was unaware that TradeStation would indefinitely dispossess it of its fully paid shares when it entered into the Lending Agreement by refusing to permit its limit sell orders or by refusing to deliver physical certificates upon termination of the Lending Agreement.

167.     Further, upon requesting the delivery of a physical share certificate, TradeStation, by phone, notified Plaintiff it was unable to comply with the request because it was not issued a physical certificate by Next Bridge.

168.     TradeStation knew, or should have known that this antithetical statement conflicts with its own prior public announcement made on or about December 29, 2023, in which TradeStation stated there was, in fact, a "NBH certificate TradeStation received." *See* **Exhibit 7**.

169.     TradeStation intended that its false statements induce its customers, including Plaintiff, into allowing TradeStation to lend out their fully paid shares and to allow TradeStation to maintain indefinite possession and dominion over its customers' property for its own financial benefit.

170.     Plaintiff has been financially harmed as a result of being deprived of the right to sell or regain possession over its Next Bridge shares in an amount no less than $360,760.00.

171.     As such, Plaintiff respectfully requests that this Court award monetary damages, compensatory damages and any further relief this Court may deem just and proper.

## EIGHTH CAUSE OF ACTION
### *Negligence per se for Violations of State and Federal Securities Laws and Regulations*

172.     Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

173.     TradeStation owed a duty to Plaintiff to perform its services and obligations in a manner that would not foreseeably injure its customers.  However, TradeStations' actions and conduct breached that duty, thereby directly and proximately causing Plaintiff's injury.

174.     Specifically, in its capacity as an agent which lends its customers' shares to the Doe Defendants pursuant to TradeStation's Fully-Paid Lending Program, TradeStation is responsible for assuring its loans comply with state and federal securities laws.

175.     Further, as a registered brokerage firm, TradeStation is obligated to ensure that it operates in compliance with state and federal securities laws, including the Exchange Act and Chapter 678 of the Florida Statutes.

176.     TradeStation negligently loaned an amount of MMTLP Shares to the Doe Defendants in excess of the amount held on record for the benefit of its customers.

177.    As a result, a share imbalance was created and TradeStation was issued a physical share certificate by Next Bridge which failed to account for the full amount of shares loaned, leaving TradeStation unwilling or unable to comply with its customers' entitlement orders, including Plaintiff's.

178.    Because of TradeStation's actions, occurring in Florida, Plaintiff has been injured and is entitled to an award of damages against TradeStation pursuant to Florida common law.

<div align="center"><strong><u>NINTH CAUSE OF ACTION</u></strong></div>
<div align="center"><em><u>Conversion</u></em></div>

179.    Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

180.    Plaintiff, as the owner of its fully paid shares, maintains a possessory right over the shares held in its TradeStation Account.

181.    At all times, including when Plaintiff opened its TradeStation Account, when it purchased MMTLP Shares through TradeStation's platform, and when TradeStation borrowed Plaintiff's shares to lend to third-party brokers, Plaintiff understood that it would maintain a possessory interest in the shares in which the shares would be freely transferable and disposable.

182.    Through no fault of Plaintiff, TradeStation has, essentially, lost Plaintiff's property.

183.    TradeStation, in its refusal to transfer Plaintiff's Next Bridge shares to AST or issue physical share certificates to Plaintiff, has wrongfully asserted dominion over Plaintiff's lawfully purchased property and constitutes an indefinite disposition of Plaintiff's property.

184.    TradeStation's continued control over its customers' Next Bridge stock stems from its admitted to lending of counterfeit MMTLP Shares, leading to TradeStation being issued a share certificate by Next Bridge in an amount that would make it impossible to comply with customer requests for transfer or physical share certificates.

185.    TradeStation's refusal to transfer Plaintiff's shares, refusal to deliver physical share certificates and TradeStation's notification to its customers it was unable to honor its customers' transfer requests or requests to issue physical share certificates are indicative of TradeStation's intent to indefinitely maintain dominion and control over, and deny its customers' their possessory interest in their Next Bridge common stock.

186.    As such, Plaintiff respectfully requests that this Court award monetary damages, compensatory damages and any further relief this Court may deem just and proper.

<div align="center">

**TENTH CAUSE OF ACTION**
*Breach of Fiduciary Duty*

</div>

187.    Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

188.    TradeStation, as a registered brokerage firm, acts as an agent to its customers and has a duty and a requirement to operate in compliance with State and Federal securities laws.

189.    As one of the parties to the Account Agreement and Lending Agreement, TradeStation has a duty to act in good faith and in a manner best suited to serve its customer's interests, including Plaintiff's.

190.    Plaintiff placed its trust in TradeStation when it purchased its MMTLP Shares through its TradeStation Account and permitted TradeStation to loan its MMTLP Shares to the Doe Defendants.

191.    TradeStation violated its agency relationship with Plaintiff and failed in its duty to perform Plaintiff's December 9, 2022 limit sell orders and deliver physical Next Bridge share certificates promptly and in Plaintiff's best interests, in violation of Fla. Stat. § 678.5071.

192.    Further, TradeStation has failed to maintain physical possession and control of *all* fully paid Next Bridge shares on behalf of its customers in violation of 17 CFR § 240.15c3-3(b)(1) and Fla. Stat. § 5041.

193.    As a direct result of TradeStation's prior and continued breaches of its fiduciary duty, Plaintiff has suffered monetary damages and has been indefinitely dispossessed of its property.

194.    As such, Plaintiff respectfully requests that this Court award monetary damages, compensatory damages and any further relief this Court may deem just and proper.

<div align="center">

**ELEVENTH CAUSE OF ACTION**
*Unjust Enrichment*

</div>

195.    Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

196.    Under the Lending Agreement, Plaintiff conferred a benefit upon TradeStation, the right to lend Plaintiff's shares to the Doe Defendants for TradeStation's financial benefit.

197.    TradeStation voluntarily accepted the benefit and, in exchange, since December 9, 2022, TradeStation disbursed monthly interest payments to Plaintiff which, over the period Plaintiff's TradeStation Account was active, totaled no less than $326.91.  *See* **Exhibit 4**.

198.    Although Plaintiff attempted to dispose of or regain possession of its Next Bridge shares and the Lending Agreement was terminated, TradeStation has refused to comply with Plaintiff's entitlement orders or transfer requests and, to date, continues to financially benefit from its retained possession and dominion over Plaintiff's Next Bridge shares.

199.    The circumstances are such that it would be inequitable for TradeStation to retain possession and dominion over Plaintiff's Next Bridge shares without due compensation to Plaintiff.

200.     As such, Plaintiff respectfully requests that this Court award monetary damages, compensatory damages and any further relief this Court may deem just and proper.

### TWELFTH CAUSE OF ACTION
*Constructive Trust*

201.     Plaintiff incorporates by reference paragraphs 1-60 of this Complaint as if fully set forth herein.

202.     Since the execution of the Lending Agreement, the parties understood that Plaintiff maintained a possessory right over its MMTLP Shares and that the shares were freely disposable at any time.

203.     Plaintiff performed its obligation under the Lending Agreement by delivering its MMTLP Shares to TradeStation that TradeStation loaned out to the Doe Defendants, for TradeStation's financial benefit, in exchange for a percentage of TradeStation's profit on the loan delivered as monthly interest payments.

204.     The parties held a confidential relationship as, under the Lending Agreement, Plaintiff relied on its fiduciary relationship with TradeStation when TradeStation loaned Plaintiff's MMTLP Shares to the Doe Defendants, on Plaintiff's behalf, with Plaintiff's trust and confidence.

205.     Plaintiff attempted to dispose of its MMTLP Shares on December 9, 2022, and attempted to regain possession of its shares on December 22, 2023 and March 19, 2024, all requests being denied by TradeStation.

206.     To date, after completion of the Next Bridge share exchange, TradeStation continues to be unjustly enriched by maintaining possession and dominion over Plaintiff's Next Bridge shares after Plaintiff's requests to dispose of and/or regain possession over the shares were denied.

207.    Plaintiff respectfully requests that this Court impose an equitable trust on Plaintiff's 9,269 Next Bridge shares, the profits TradeStation accrued since December 9, 2022 as to Plaintiff's Next Bridge shares and any other property, both real and personal, obtained through the use of the profits accrued through TradeStation's Next Bridge shares.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons set forth in Plaintiff's First through Twelfth Causes of Action, Plaintiff seeks a verdict and judgment against Defendants as follows:

A. Awarding Plaintiff monetary damages in the amount of no less than $360,370, plus consequential damages;

B. Imposing an equitable trust on Plaintiff's 9,269 Next Bridge shares, the profits TradeStation accrued since December 9, 2022 as to Plaintiff's Next Bridge shares and any other property, both real and personal, obtained through the use of the profits accrued through Plaintiff's Next Bridge shares;

C. Awarding treble damages, attorney's fees and court costs pursuant to Fla. Stat. § 772.104(1); and

D. Awarding such other just and/or equitable relief as this Court deems necessary.

Dated: May 24, 2024

Respectfully Submitted,

**THE BASILE LAW FIRM P.C.**

By:    _/s/ Agapija Cruz, Esq._

40

Agapija Cruz, Esq.
365 Fifth Avenue S.
Suite 202
Naples, Florida 33472
Tel.:    (239) 232-8400
Fax:     (631) 498-0478
Email: agapija@thebasilelawfirm.com

Joseph R. Rose, Esq. *(Pro Hac Vice forthcoming)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:    (516) 455-1500
Fax:     (631) 498-0478
Email: joe@thebasilelawfirm.com

*Counsel for Plaintiff Inter-Coastal Waterways LLC*