# EXHIBIT 2

 **Master Securities Lending Agreement**

This Master Securities Lending Agreement ("Agreement") is entered into by and among TradeStation Securities, Inc. ("TradeStation"), you, as a client or customer of TradeStation ("Counterparty") and Stable Custody Group II LLC, acting as your collateral agent ("Collateral Agent").

THIS AGREEMENT SHOULD NOT BE AGREED TO AND ACCEPTED BY COUNTERPARTY UNTIL AFTER:   (1) COUNTERPARTY HAS READ AND FULLY UNDERSTANDS THE SEPARATE DOCUMENT TITLED ***IMPORTANT RISK DISCLOSURES WITH RESPECT*** **TO** ***FULLY PAID OR EXCESS MARGIN SECURITIES LENDING TRANSACTIONS,*** WHICH DESCRIBES MANY OTHER RISKS AND CHARACTERISTICS OF THE PROGRAM; AND (2) COUNTERPARTY HAS DETERMINED THAT PARTICIPATION IN TRADESTATION'S FULLY-PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY AFTER CONSIDERING COUNTERPARTY'S FINANCIAL SITUATION AND NEEDS, TAX STATUS, INVESTMENT OBJECTIVES, INVESTMENT TIME HORIZON, LIQUIDITY NEEDS, RISK TOLERANCE, AND ANY OTHER RELEVANT INFORMATION.  IN EXECUTING THIS AGREEMENT, COUNTERPARTY ACKNOWLEDGES THAT BOTH OF THESE CONDITIONS HAVE BEEN SATISFIED.

COUNTERPARTY MAY ELECT NOT TO ALLOW FULLY PAID AND EXCESS MARGIN SECURITIES TO BE USED IN CONNECTION WITH SHORT SALES, MAY TERMINATE THE LOAN, PURSUANT TO SECTION 7, OR TERMINATE THIS AGREEMENT, PURSUANT TO SECTION 25.1, BY CONTACTING THE TRADESTATION CLIENT SERVICES DEPARTMENT AT (954) 652-7000.

1. **Applicability.**

   From time to time TradeStation and Counterparty may enter into transactions in which one party ("Borrower") will borrow from the other party ("Lender") certain Securities (as defined herein) against a transfer of Collateral (as defined herein).  Each such transaction shall be referred to herein as a "Loan" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in an Annex or Schedule hereto and in any other annexes identified herein or therein as applicable hereunder.  Capitalized terms not otherwise defined herein shall have the meanings provided in Section 26.

2. **Loans of Securities.**

   2.1.   Subject to the terms and conditions of this Agreement, Borrower or Lender may, from time to time, seek to initiate a transaction in which Borrower will borrow Securities from Lender.  Borrower and Lender shall agree on the terms of each Loan (which terms may be amended during the Loan), including the issuer of the Securities, the amount of Securities to be lent, the basis of compensation, the amount of Collateral to be transferred by Borrower, and any additional terms.  Such agreement shall be confirmed (a) by a schedule and receipt listing the Loaned Securities provided by Borrower to Lender in accordance with Section 3.1, (b) through any system that compares Loans and in which Borrower and Lender are participants, or (c) in such other manner as may be agreed by Borrower and Lender in writing.  Such confirmation (the "Confirmation"), together with the Agreement, shall constitute conclusive evidence of the terms agreed between Borrower and Lender with respect to the Loan to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof.  In the event of any inconsistency between the terms of such Confirmation and this Agreement, this

 **Master Securities Lending Agreement**

Agreement shall prevail unless each party to the Loan has executed such Confirmation.

2.2.    Notwithstanding any other provision in this Agreement regarding when a Loan commences, unless otherwise agreed, a Loan hereunder shall not occur until the Loaned Securities and the Collateral therefor have been transferred in accordance with Section 16.

3. **Transfer of Loaned Securities.**

3.1.    Unless otherwise agreed, Borrower shall provide Lender, for each Loan in which Lender is a Customer, with a schedule and receipt listing the Loaned Securities. Such schedule and receipt may consist of (a) a schedule provided to Borrower by Lender and executed and returned by Borrower when the Loaned Securities are received, (b) in the case of Securities transferred through a Clearing Organization which provides transferors with a notice evidencing such transfer, such notice, or (c) a confirmation or other document provided to Lender by Borrower.

3.2.    Notwithstanding any other provision in this Agreement, Borrower and Lender agree that they intend the Loans hereunder to be loans of Securities.  If, however, any Loan is deemed to be a loan of money by Borrower to Lender, then Borrower shall have, and Lender shall be deemed to have granted, a security interest in the Loaned Securities and the proceeds thereof.

4. **Collateral.**

4.1.    Unless otherwise agreed, Borrower shall, prior to or concurrently with the transfer of the Loaned Securities to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender Collateral with a Market Value at least equal to 100% of the Market Value of the securities, but not to exceed 102% of the Market Value of the Loaned Securities.  To protect the Lender, in the event Borrower defaults, the Collateral will consist of cash that is deposited with a bank as defined in Exchange Act Rule 15c3-3(a)(7) (the "Bank") in an account titled to reflect the manner in which Lender Collateral is being held for the Lender's benefit in accordance with Exchange Act Rule 15c3-3(b)(3) (the "Collateral Account").  The Collateral will be transferred each business day from TradeStation into the Collateral Account for the benefit of Lender pursuant to internal TradeStation procedures designed to support the movement, validation and monitoring of cash collateral transfers.

4.2.    Borrower shall be deemed to have transferred Collateral to Lender upon transfer of the Collateral to the Collateral Account in the manner described herein. The Collateral transfer will occur each business day no later than the end of business and be calculated based upon the prior night's published closing price for each Loaned Security. The Collateral transferred by Borrower to Lender, as adjusted pursuant to Section 10, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder.  Borrower hereby pledges with, assigns to, and grants Collateral Agent for the benefit of Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Securities by Lender to Borrower and which shall cease upon the

 **Master Securities Lending Agreement**

transfer of the Loaned Securities by Borrower to Lender. In addition to the rights given to Collateral Agent for the benefit of Lender, Collateral Agent on behalf of Lender shall have all rights and remedies of a secured party under the UCC. Lender understands and agrees that the Collateral transferred to the Bank for Lender's benefit will be deposited into one or more accounts which also contain collateral pledged for securities loans made between TradeStation and other lenders of securities to TradeStation and that the Collateral in such account is allocated to Lender in accordance with the calculations contained in Section 10 of this Agreement. Borrower will initiate a Loan by transferring Loaned Securities from Lender pursuant to Exchange Act Rule 15c3-3(b)(3), therefore not causing the Loaned Securities to be subject to the general possession or control requirements of Exchange Act Rule 15c3-3(b).

4.3. Except as otherwise provided herein, upon transfer to Lender of the Loaned Securities on the day a Loan is terminated pursuant to Section 7, Lender shall be obligated to transfer, and hereby authorizes Borrower to effect the transfer of, the Collateral (as adjusted pursuant to Section 10) to Borrower on such day or, if such day is not a day on which a transfer of such Collateral may be effected under Section 16, the next day on which such a transfer may be effected.

4.4. If Borrower transfers Collateral to Lender, as provided in Section 4.1, and Lender does not transfer the Loaned Securities to Borrower, Borrower shall have the absolute right to the return of the Collateral; and if Lender transfers Loaned Securities to Borrower and Borrower does not transfer Collateral to Lender as provided in Section 4.1, Lender shall have the absolute right to the return of the Loaned Securities.

5. **Appointment of Collateral Agent**

5.1. Lender appoints the Collateral Agent, including any of its affiliates, to act on behalf of and for the benefit of Lender with respect to the Collateral pledged by Borrower pursuant to the Collateral Agent Protocols ("Collateral Agent Protocols"), a copy of which is attached to this Agreement as Appendix I. Collateral Agent hereby accepts such appointment on behalf and for the benefit of Lender. TradeStation agrees to pay the Collateral Agent a fee for its services on behalf of Lender. The parties agree to the Collateral Agent Protocols, which are hereby incorporated as part of this Agreement.

5.2. Lender appoints and instructs Collateral Agent to appoint the Bank as the depositary bank for the Collateral pursuant to the terms of the Deposit Account Control Agreement, dated as of April 21, 2021, among TradeStation, Collateral Agent and the Bank (as amended, supplemented or modified from time to time, the "Control Agreement"). By signing this Agreement, Lender instructs the Collateral Agent to agree on behalf of itself and Lender to all the provisions of the Control Agreement, a copy of which will be provided to Lender upon request.

5.3. Pursuant to the Collateral Agent Protocols, Collateral Agent shall not be charged with knowledge of any Default unless Collateral Agent has actual knowledge of such Default; provided, that Collateral Agent shall be deemed to have actual knowledge of an Act of Insolvency with respect to Borrower pursuant to Section



**Master Securities Lending Agreement**

13.5 of this Agreement upon the public filing of any case, proceeding, petition or decree against Borrower under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

5.4.     TradeStation reserves the right to change the Bank by giving not less than ninety (90) days' prior notice to the Collateral Agent.  In such event, Lender instructs the Collateral Agent to approve the successor to the Bank and to enter into one or more control agreements between and among TradeStation, Collateral Agent and the successor to the Bank to establish the Collateral Agent's "control" (within the meaning of the UCC) over the applicable accounts in order to perfect the Collateral Agent's security interest in the Collateral for the benefit of Lender.

6.  **Income for Loan.**

6.1.     Unless otherwise agreed, Borrower agrees to pay Lender a portion of the rebate earned on loaned securities ("Interest"), computed daily as further described in the attached Schedule of Basis of Compensation for Loan as it may be amended from time to time by Borrower.  Interest, if any, on non-cash Collateral will be paid as agreed upon by Borrower and Lender.

6.2.     Unless otherwise agreed, Income payable hereunder shall be payable within fifteen (15) Business Days following the last Business Day of the calendar month in which such Interest was incurred.

7.  **Termination of the Loan.**

7.1.     (a) Unless otherwise agreed, either Borrower or Lender may terminate a Loan on a termination date established by notice given to the other party thereto prior to the Close of Business on a Business Day.  Unless an earlier date is agreed by Borrower and Lender, the termination date established by a termination notice shall be a date no earlier than the standard settlement date that would apply to a purchase or sale of the Loaned Securities in the principal market of such Loaned Securities (in the case of a notice given by Lender) or the non-cash Collateral securing the Loan in the principal market of such non-cash Collateral (in the case of a notice given by Borrower) entered into at the time of such notice.

(b) Borrower may terminate a Loan on any Business Day, effective as of such Business Day, by transferring the Loaned Securities to Lender on such Business Day.

(c) The execution by Borrower of an order to sell the Loaned Securities by Lender shall constitute notice of termination by Lender to Borrower.  The termination date established by such a sale of the Loaned Securities shall be the settlement date of such a sale of the Loaned Securities or any earlier date on which Borrower is deemed to have transferred Loaned Securities to Lender under paragraph (b) of this Section.

   **Master Securities Lending Agreement**

7.2.     Unless otherwise agreed, Borrower shall, on or before the Cutoff Time on the termination date of a Loan, transfer the Loaned Securities to Lender; provided, however, that upon such transfer by Borrower, the Collateral for such Loan (as adjusted pursuant to Section 10) shall be transferred to Borrower in accordance with Section 4.3.

8.   **Rights in Respect of Loaned Securities and Collateral.**

8.1.     Except as set forth in Sections 9.1 and 9.2 and as otherwise agreed by Borrower and Lender, until Loaned Securities are required to be redelivered to Lender upon termination of a Loan hereunder, Borrower shall have all of the incidents of ownership of the Loaned Securities, including the right to transfer the Loaned Securities to others.  Lender hereby waives the right to vote, or to provide any consent or to take any similar action with respect to, the Loaned Securities in the event that the record date or deadline for such vote, consent or other action falls during the term of the Loan.

9.   **Distributions.**

9.1.     Lender shall be entitled to receive all Distributions made on or in respect of the Loaned Securities which are not otherwise received by Lender, to the full extent it would be so entitled if the Loaned Securities had not been lent to Borrower.

9.2.     Any cash Distributions made on or in respect of the Loaned Securities, which Lender is entitled to receive pursuant to Section 9.1, shall be paid by the transfer of cash to Lender by Borrower, on the date any such Distribution is paid, in an amount equal to such cash Distribution, so long as Lender is not in Default at the time of such payment.  Non-cash Distributions that Lender is entitled to receive pursuant to Section 9.1 shall be added to the Loaned Securities on the date of distribution and shall be considered such for all purposes, except that if the Loan has terminated, Borrower shall forthwith transfer the same to Lender.

9.3.     Borrower shall be entitled to receive all Distributions made on or in respect of non-cash Collateral which are not otherwise received by Borrower, to the full extent it would be so entitled if the Collateral had not been transferred to Lender.

9.4.     Any cash Distributions made on or in respect of such Collateral, which Borrower is entitled to receive pursuant to Section 9.3, shall be paid by the transfer of cash to Borrower by Lender, on the date any such Distribution is paid, in an amount equal to such cash Distribution, so long as Borrower is not in Default at the time of such payment.  Non-cash Distributions that Borrower is entitled to receive pursuant to Section 9.3 shall be added to the Collateral on the date of distribution and shall be considered such for all purposes, except that if each Loan secured by such Collateral has terminated, Lender shall forthwith transfer the same to Borrower.

9.5.     Unless otherwise agreed:

(a) If (i) Borrower is required to make a payment (a "Borrower Payment") with respect to cash Distributions on Loaned Securities under Sections 9.1 and 9.2

5

("Securities Distributions"), or (ii) Lender is required to make a payment (a "Lender Payment") with respect to cash Distributions on Collateral under Sections 9.3 and 9.4 ("Collateral Distributions"), and (iii) Borrower or Lender, as the case may be ("Payor"), shall be required by law to collect any withholding or other tax, duty, fee, levy or charge required to be deducted or withheld from such Borrower Payment or Lender Payment ("Tax"), then Payor shall (subject to subsections (b) and (c) below), pay such additional amounts as may be necessary in order that the net amount of the Borrower Payment or Lender Payment received by the Lender or Borrower, as the case may be ("Payee"), after payment of such Tax equals the net amount of the Securities Distribution or Collateral Distribution that would have been received if such Securities Distribution or Collateral Distribution had been paid directly to the Payee.

(b) No additional amounts shall be payable to a Payee under subsection (a) above to the extent that Tax would have been imposed on a Securities Distribution or Collateral Distribution paid directly to the Payee.

(c) No additional amounts shall be payable to a Payee under subsection (a) above to the extent that such Payee is entitled to an exemption from, or reduction in the rate of, Tax on a Borrower Payment or Lender Payment subject to the provision of a certificate or other documentation, but has failed timely to provide such certificate or other documentation.

Each party to a Loan shall be deemed to represent that, as of the commencement of such Loan, no Tax would be imposed on any cash Distribution paid to it with respect to (i) Loaned Securities subject to a Loan in which it is acting as Lender or (ii) Collateral for any Loan in which it is acting as Borrower, unless such party has given notice to the contrary to the other party thereto (which notice shall specify the rate at which such Tax would be imposed).  Each party to a Loan agrees to notify the other of any change that occurs during the term of such Loan in the rate of any Tax that would be imposed on any such cash Distributions payable to it.

9.6.    To the extent that, under the provisions of Sections 9.1 through 9.5, (a) a transfer of cash or other property by Borrower would give rise to a Margin Excess or (b) a transfer of cash or other property by Lender would give rise to a Margin Deficit, Borrower or Lender (as the case may be) shall not be obligated to make such transfer of cash or other property in accordance with such Sections, but shall in lieu of such transfer immediately credit the amounts that would have been transferable under such Sections to the account of Lender or Borrower (as the case may be).

## 10. **Mark to Market.**

10.1.    If Lender is a Customer, Borrower shall daily mark to market any Loan hereunder and in the event that at the Close of Trading on any Business Day the Market Value of the Collateral for any Loan to Borrower shall be less than 100% of the Market Value of all the outstanding Loaned Securities subject to such Loan, Borrower shall transfer additional Collateral no later than the Close of Business on the next Business Day so that the Market Value of such additional Collateral, when added to the Market Value of the other Collateral for such Loan, shall equal 100% of the Market Value of the Loaned Securities.  As

 **Master Securities Lending Agreement**

agreed by Borrower and Lender or if Borrower determines in its discretion that applicable laws or market custom so require, Borrower may deposit additional collateral greater than 100% of the Market Value of the Loaned Securities not to exceed 102% of the Market Value of the Loaned Securities. On a daily basis, Borrower or its agent shall provide or make available to Collateral Agent mark-to-market information with respect to Lender that identifies the amount of Collateral that Borrower pledges to Lender for the Loans hereunder. Collateral Agent may rely upon, and be fully protected in relying upon, such mark-to-market information provided by TradeStation which Collateral Agent reasonably believes to be genuine. Collateral Agent shall have no obligation to determine or verify whether any such Collateral equals or exceeds 100 percent of the Market Value of all the outstanding Loaned Securities subject to the Loans hereunder.

10.2. In addition to any rights of Lender under Section 10.1, if at any time the aggregate Market Value of all Collateral for Loans by Lender shall be less than the Margin Percentage of the Market Value of all the outstanding Loaned Securities subject to such Loans (a "Margin Deficit"), Borrower shall transfer additional Collateral no later than the Close of Business on the next Business Day so that the Market Value of such additional Collateral, when added to the Market Value of all other Collateral for such Loans, shall equal or exceed the Margin Percentage of the Market Value of the Loaned Securities.

10.3. Subject to Borrower's obligations under Section 10.1, if at any time the Market Value of all Collateral for Loans to Borrower shall be greater than the Margin Percentage of the Market Value of all the outstanding Loaned Securities subject to such Loans (a "Margin Excess"), Lender hereby authorizes Borrower to transfer to Borrower such amount of the Collateral selected by Borrower so long as the Market Value of the Collateral for such Loans, after deduction of such amounts, shall thereupon not be less than the Margin Percentage of the Market Value of the Loaned Securities.

10.4. Borrower and Lender may agree, with respect to one or more Loans hereunder, to mark the values to market pursuant to Sections 10.2 and 10.3 by separately valuing the Loaned Securities lent and the Collateral given in respect thereof on a Loan-by-Loan basis.

10.5. Borrower and Lender may agree, with respect to any or all Loans hereunder, that the respective rights of Lender and Borrower under Sections 10.2 and 10.3 may be exercised only where a Margin Excess or Margin Deficit exceeds a specified dollar amount or a specified percentage of the Market Value of the Loaned Securities under such Loans (which amount or percentage shall be agreed to by Borrower and Lender prior to entering into any such Loans).

11. **Representations.**

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of any Loan hereunder:

11.1. Each party hereto represents and warrants that (a) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (b) it has taken all necessary action to

 **Master Securities Lending Agreement**

authorize such execution, delivery and performance, and (c) this Agreement constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms.

11.2.    Borrower and Lender each represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan and any dividends, remuneration or other funds received hereunder.

11.3.    Borrower and Lender each represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section 12.1(b).

11.4.    Lender represents that he or she is not an affiliate of the company that issued the Loaned Securities.

11.5.    Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein subject to the terms and conditions hereof.

11.6.    (a) Borrower represents and warrants that it (or the person to whom it relends the Loaned Securities) is borrowing or will borrow Loaned Securities that are Equity Securities for the purpose of making delivery of such Loaned Securities in the case of short sales, failure to receive securities required to be delivered, or as otherwise permitted pursuant to Regulation T as in effect from time to time.

(b) Borrower and Lender may agree, as provided in Section 25.2, that Borrower shall not be deemed to have made the representation or warranty in subsection (a) with respect to any Loan.  By entering into any such agreement, Lender shall be deemed to have represented and warranted to Borrower (which representation and warranty shall be deemed to be repeated on each day during the term of the Loan) that Lender is either (i) an "exempted borrower" within the meaning of Regulation T or (ii) a member of a national securities exchange or a broker or dealer registered with the U.S. Securities and Exchange Commission that is entering into such Loan to finance its activities as a market maker or an underwriter.

11.7.    Lender represents and warrants that it has, or will have at the time of transfer of any Loaned Securities, the right to transfer the Loaned Securities subject to the terms and conditions hereof.

12. **Covenants.**

12.1.    Borrower and Lender each agrees either (a) to be liable as principal with respect to its obligations hereunder or (b) to execute and comply fully with the provisions of Annex I (the terms and conditions of which Annex are incorporated herein and made a part hereof).

13. **Events of Default.**

 **Master Securities Lending Agreement**

All Loans hereunder may, at the option of the non-defaulting party (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), be terminated immediately upon the occurrence of any one or more of the following events (individually, a "Default"):

13.1.   if any Loaned Securities shall not be transferred to Lender upon termination of the Loan as required by Section 7;

13.2.   if Lender interferes with the return of any Collateral to Borrower upon termination of the Loan as required by Section 7;

13.3.   if Borrower shall fail to transfer Collateral as required by Section 10;

13.4.   if Borrower (a) shall fail to transfer to Lender amounts in respect of Distributions required to be transferred by Section 9, (b) shall have been notified of such failure by Lender prior to the Close of Business on any day, and (c) shall not have cured such failure by the Cutoff Time on the next day after such Close of Business on which a transfer of cash may be effected in accordance with Section 16;

13.5.   if an Act of Insolvency occurs with respect to Borrower or Lender;

13.6.   if any representation made by Borrower or Lender in respect of this Agreement or any Loan or Loans hereunder shall be incorrect or untrue in any material respect during the term of any Loan hereunder;

13.7.   if Borrower or Lender notifies the other of its inability to or its intention not to perform its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder; or

13.8.   if Borrower or Lender (a) shall fail to perform any material obligation under this Agreement not specifically set forth in clauses 13.1 through 13.7, above, including but not limited to the payment of Income as required by Section 6, and the payment of transfer taxes as required by Section 15, (b) shall have been notified of such failure by the other party prior to the Close of Business on any day, and (c) shall not have cured such failure by the Cutoff Time on the next day after such Close of Business on which a transfer of cash may be effected in accordance with Section 16.

The non-defaulting party shall (except upon the occurrence of an Act of Insolvency) give notice as promptly as practicable to the defaulting party of the exercise of its option to terminate all Loans hereunder pursuant to this Section 13. If Lender is the non-defaulting party, such notice shall (except upon the occurrence of an Act of Insolvency) be given by Collateral Agent following its receipt of Lender's notice to Collateral Agent pursuant to Section 14.1.  In the event of the occurrence of an Act of Insolvency with respect to Borrower, such notice and the termination of all Loans hereunder shall be deemed to have been given upon the public filing of any case, proceeding, petition or decree against the defaulting party under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

 **Master Securities Lending Agreement**

14. **Remedies.**

14.1.    (a) **In the event that Lender decides to exercise its rights under this Section, Lender will contact Collateral Agent at: 800-433-1918 or email at RTIDOps@rnt.com.  Collateral Agent and the Bank reserve the right to require Lender to present any information, identification, certification or any other documentation reasonably deemed necessary by Collateral Agent or the Bank to establish Lender's entitlement to funds prior to disbursing any funds to Lender.  Collateral Agent may rely upon, and be fully protected in relying upon, such instructions from Lender which it reasonably believes to be genuine, and will have no obligation to determine or verify the occurrence or continuation of a Default.**  Upon knowledge of the occurrence of an Act of Insolvency with respect to Borrower pursuant to Section 5.3, Collateral Agent shall, on Lender's behalf, immediately commence the exercise of Lender's remedies as set forth in this Section 14.1.

(b) Upon the occurrence of a Default under Section 13 entitling Lender to terminate all Loans hereunder, Lender shall have the right, in addition to any other remedies provided herein (which, upon the occurrence of an Act of Insolvency, may be exercised following the termination of any applicable stay), (i) to purchase a like amount of Loaned Securities ("Replacement Securities") in the principal market for such Loaned Securities in a commercially reasonable manner, (ii) to instruct Collateral Agent to direct the Bank to remit to Collateral Agent for the benefit of Lender Collateral in the amount that Collateral Agent instructs, which Collateral shall be remitted by Collateral Agent to Lender in accordance with Lender's instructions to Collateral Agent and (iii) to apply and set off the Collateral and any proceeds thereof (including any amounts drawn under a letter of credit supporting any Loan) received from Collateral Agent against the payment of the purchase price for such Replacement Securities and any amounts due to Lender under Sections 6, 9, 15 and 17.  Collateral Agent may rely upon, and be fully protected in relying upon, any notice received from Lender which it reasonably believes to be genuine relating to a Default with respect to Borrower and Lender's instruction to Collateral Agent to cause Collateral to be remitted from the Bank to the Collateral Agent for the benefit of Lender.  In the event that Lender shall exercise such rights, Borrower's obligation to return a like amount of the Loaned Securities shall terminate.  Lender may similarly apply the Collateral and any proceeds thereof to any other obligation of Borrower under this Agreement, including Borrower's obligations with respect to Distributions paid to Borrower (and not forwarded to Lender) in respect of Loaned Securities.  In the event that (A) the purchase price of Replacement Securities (plus all other amounts, if any, due to Lender hereunder) exceeds (B) the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon at a rate equal to (1) in the case of purchases of Foreign Securities, ESTR, (2) in the case of purchases of any other Securities (or other amounts, if any, due to Lender hereunder), the Federal Funds Rate or (3) such other rate as may be specified in Schedule B, in each case as such rate fluctuates from day to day, from the date of such purchase until the date of payment of such excess.  As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then



**Master Securities Lending Agreement**

held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower. The purchase price of Replacement Securities purchased under this Section 14.1 shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expenses related to such purchase or sale (as the case may be). In the event Lender exercises its rights under this Section 14.1, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the Replacement Securities or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of Replacement Securities or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source or the last bid quotation from such a source at the most recent Close of Trading. Subject to Section 19, upon the satisfaction of all obligations hereunder, any remaining Collateral shall be returned to Borrower.

14.2.   Upon the occurrence of a Default under Section 13 entitling Borrower to terminate all Loans hereunder, Borrower shall have the right, in addition to any other remedies provided herein (which, upon the occurrence of an Act of Insolvency, may be exercised following the termination of any applicable stay), (a) to purchase a like amount of Collateral ("Replacement Collateral") in the principal market for such Collateral in a commercially reasonable manner, (b) to sell a like amount of the Loaned Securities in the principal market for such Loaned Securities in a commercially reasonable manner and (c) to apply and set off the Loaned Securities and any proceeds thereof against (i) the payment of the purchase price for such Replacement Collateral, (ii) Lender's obligation to return any cash or other Collateral, and (iii) any amounts due to Borrower under Sections 6, 9 and 17. In such event, Borrower may treat the Loaned Securities as its own and Lender's obligation to return a like amount of the Collateral shall terminate; provided, however, that Lender shall immediately return any letters of credit supporting any Loan upon the exercise or deemed exercise by Borrower of its termination rights under Section 13. Borrower may similarly apply the Loaned Securities and any proceeds thereof to any other obligation of Lender under this Agreement, including Lender's obligations with respect to Distributions paid to Lender (and not forwarded to Borrower) in respect of Collateral. In the event that (i) the sales price received from such Loaned Securities is less than (ii) the purchase price of Replacement Collateral (plus the amount of any cash or other Collateral not replaced by Borrower and all other amounts, if any, due to Borrower hereunder), Lender shall be liable to Borrower for the amount of any such deficiency, together with interest on such amounts at a rate equal to (A) in the case of Collateral consisting of Foreign Securities, ESTR, (B) in the case of Collateral consisting of any other Securities (or other amounts due, if any, to Borrower hereunder), the Federal Funds Rate or (C) such other rate as may be specified in Schedule B, in each case as such rate fluctuates from day to day, from the date of such sale until the date of payment of such deficiency. As security for Lender's obligation to pay such deficiency, Borrower shall have, and Lender hereby grants, a security interest in any property of Lender then held by or for Borrower and a right of setoff with respect to such property and any other amount payable by Borrower to Lender. The purchase price of any Replacement Collateral purchased under this Section shall include, and the



**Master Securities Lending Agreement**

proceeds of any sale of Loaned Securities shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expenses related to such purchase or sale (as the case may be). In the event Borrower exercises its rights under this Section 14.2, Borrower may elect in its sole discretion, in lieu of purchasing all or a portion of the Replacement Collateral or selling all or a portion of the Loaned Securities, to be deemed to have made, respectively, such purchase of Replacement Collateral or sale of Loaned Securities for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source or the last bid quotation from such a source at the most recent Close of Trading. Subject to Section 19, upon the satisfaction of all Lender's obligations hereunder, any remaining Loaned Securities (or remaining cash proceeds thereof) shall be returned to Lender.

14.3.   Unless otherwise agreed, Borrower and Lender acknowledge and agree that (a) the Loaned Securities and any Collateral consisting of Securities are of a type traded in a recognized market, (b) in the absence of a generally recognized source for prices or bid or offer quotations for any security, the non-defaulting party may establish the source therefor in its sole discretion, and (c) all prices and bid and offer quotations shall be increased to include accrued interest to the extent not already included therein (except to the extent contrary to market practice with respect to the relevant Securities).

14.4.   In addition to its rights hereunder, the non-defaulting party shall have any rights otherwise available to it under any other agreement or applicable law. In addition to any other remedies to which a non-defaulting party may be entitled under the Agreement, the defaulting party shall, with respect to an individual Loan or with respect to a class of Loans, be liable to the non-defaulting party for (a) the amount of all reasonable legal or other expenses incurred by the non-defaulting party in connection with or as a result of a Default, (b) damages in an amount equal to the cost (including all payments, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of a Default, and (c) any other loss, damage, cost or expense directly arising or resulting from the occurrence of a Default in respect of a Loan.

## 15. **Transfer Taxes.**

All transfer taxes with respect to the transfer of the Loaned Securities by Lender to Borrower and by Borrower to Lender upon termination of the Loan and with respect to the transfer of Collateral by Borrower to Lender and by Lender to Borrower upon termination of the Loan or pursuant to Section 4.5 or Section 10 shall be paid by Borrower.

## 16. **Transfers.**

16.1.   All transfers by either Borrower or Lender of Loaned Securities or Collateral consisting of "financial assets" (within the meaning of the UCC) hereunder shall be by (a) in the case of certificated securities, physical delivery of certificates representing such securities together with duly executed stock and bond transfer powers, as the case may be, with signatures guaranteed by a bank or a member firm of the New York Stock Exchange, Inc., (b) registration of an uncertificated security in the transferee's name by the issuer of such

 **Master Securities Lending Agreement**

uncertificated security, (c) the crediting by a Clearing Organization of such financial assets to the transferee's "securities account" (within the meaning of the UCC) maintained with such Clearing Organization, (d) such other means as specified in this Agreement, including but not limited to those means specified in Sections 3.2(c) and 7.1(b), or (e) such other means as Borrower and Lender may agree.

16.2.   All transfers of cash hereunder shall be by (a) wire transfer in immediately available, freely transferable funds, (b) crediting Lender's account carried by Borrower or (c) such other means as Borrower and Lender may agree.

16.3.   All transfers of letters of credit from Borrower to Lender shall be made by physical delivery to Lender of an irrevocable letter of credit issued by a "bank" as defined in Section 3(a)(6)(A)-(C) of the Exchange Act.  Transfers of letters of credit from Lender to Borrower shall be made by causing such letters of credit to be returned or by causing the amount of such letters of credit to be reduced to the amount required after such transfer.

16.4.   A transfer of Securities, cash or letters of credit may be effected under this Section 16 on any day except (a) a day on which the transferee is closed for business at its primary place of business or (b) a day on which a Clearing Organization or wire transfer system is closed, if the facilities of such Clearing Organization or wire transfer system are required to effect such transfer.

16.5.   For the avoidance of doubt, Borrower and Lender agree and acknowledge that the term "securities," as used herein (except in this Section 16), shall include any "security entitlements" with respect to such securities (within the meaning of the UCC).  In every transfer of "financial assets" (within the meaning of the UCC) hereunder, the transferor shall take all steps necessary (a) to effect a delivery to the transferee under Section 8-301 of the UCC, or to cause the creation of a security entitlement in favor of the transferee under Section 8-501 of the UCC, (b) to enable the transferee to obtain "control" (within the meaning of Section 8-106 of the UCC), and (c) to provide the transferee with comparable rights under any applicable foreign law or regulation.

17. **Contractual Currency.**

17.1.   Borrower and Lender agree that (a) any payment in respect of a Distribution under Section 9 shall be made in the currency in which the underlying Distribution of cash was made, (b) any return of cash shall be made in the currency in which the underlying transfer of cash was made, and (c) any other payment of cash in connection with a Loan under this Agreement shall be in the currency agreed upon by Borrower and Lender in connection with such Loan (the currency established under clause (a), (b) or (c) is hereinafter referred to as the " Contractual Currency").  Notwithstanding the foregoing, the payee of any such payment may, at its option, accept tender thereof in any other currency; provided, however, that, to the extent permitted by applicable law, the obligation of the payor to make such payment will be discharged only to the extent of the amount of Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency

 **Master Securities Lending Agreement**

(after deduction of any premium and costs of exchange) on the banking day next succeeding its receipt of such currency.

17.2. If for any reason the amount in the Contractual Currency received under Section 17.1, including amounts received after conversion of any recovery under any judgment or order expressed in a currency other than the Contractual Currency, falls short of the amount in the Contractual Currency due in respect of this Agreement, the party required to make the payment will (unless a Default has occurred and such party is the non-defaulting party) as a separate and independent obligation and to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall.

17.3. If for any reason the amount in the Contractual Currency received under Section 17.1 exceeds the amount in the Contractual Currency due in respect of this Agreement, then the party receiving the payment will (unless a Default has occurred and such party is the non-defaulting party) refund promptly the amount of such excess.

18. **ERISA.**

Lender shall, if any of the Securities transferred to the Borrower hereunder for any Loan have been or shall be obtained, directly or indirectly, from or using the assets of any Plan, so notify Borrower in writing upon the execution of this Agreement or upon initiation of such Loan under Section 2.1.  If Lender so notifies Borrower, then Borrower and Lender shall conduct the Loan in accordance with the terms and conditions of Department of Labor Prohibited Transaction Exemption 81-6 (46 Fed. Reg. 7527, Jan. 23, 1981; as amended, 52 Fed. Reg. 18754, May 19, 1987), or any successor thereto (unless Borrower and Lender have agreed prior to entering into a Loan that such Loan will be conducted in reliance on another exemption, or without relying on any exemption, from the prohibited transaction provisions of Section 406 of the Employee Retirement Income Security Act of 1974, as amended, and Section 4975 of the Internal Revenue Code of 1986, as amended).  Without limiting the foregoing and notwithstanding any other provision of this Agreement, if the Loan will be conducted in accordance with Prohibited Transaction Exemption 81-6, then:

18.1. Borrower represents and warrants to Lender that it is either (a) a bank subject to federal or state supervision, (b) a broker-dealer registered under the Exchange Act or (c) exempt from registration under Section 15(a)(1) of the Exchange Act as a dealer in Government Securities.

18.2. Borrower represents and warrants that, during the term of any Loan hereunder, neither Borrower nor any affiliate of Borrower has any discretionary authority or control with respect to the investment of the assets of the Plan involved in the Loan or renders investment advice (within the meaning of 29 C.F.R. Section 2510.3-21(c)) with respect to the assets of the Plan involved in the Loan.  Lender agrees that, prior to or at the commencement of any Loan hereunder, it will communicate to Borrower information regarding the Plan sufficient to identify to Borrower any person or persons that have discretionary authority or control with respect to the investment of the assets of the Plan involved in the Loan or that render investment advice (as defined in the preceding sentence) with respect to the assets of the Plan involved in the Loan.



**Master Securities Lending Agreement**

In the event Lender fails to communicate and keep current during the term of any Loan such information, Lender rather than Borrower shall be deemed to have made the representation and warranty in the first sentence of this Section 18.2.

18.3. Borrower shall mark to market daily each Loan hereunder pursuant to Section 10.1 as is required if Lender is a Customer.

18.4. Borrower and Lender agree that:

(a) the term "Collateral" shall mean cash; prior to the making of any Loans hereunder, Borrower shall provide Lender with (i) the most recent available audited statement of Borrower's financial condition and (ii) the most recent available unaudited statement of Borrower's financial condition (if more recent than the most recent audited statement), and each Loan made hereunder shall be deemed a representation by Borrower that there has been no material adverse change in Borrower's financial condition subsequent to the date of the latest financial statements or information furnished in accordance herewith;

(b) the Loan may be terminated by Lender at any time, whereupon Borrower shall deliver the Loaned Securities to Lender within the lesser of (i) the customary delivery period for such Loaned Securities, (ii) five Business Days, and (iii) the time negotiated for such delivery between Borrower and Lender; provided, however, that Borrower and Lender may agree to a longer period only if permitted by Prohibited Transaction Exemption 81-6; and

(c) the Collateral transferred shall be security only for obligations of Borrower to the Plan with respect to Loans, and shall not be security for any obligation of Borrower to any agent or affiliate of the Plan.

19. **Single Agreement.**

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting party shall be entitled to set off claims and apply property held by it in respect of any Loan hereunder against obligations owing to it in respect of any other Loan with the Defaulting Party.

20. **APPLICABLE LAW.**

 **Master Securities Lending Agreement**

THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

21. **Waiver.**

The failure of a party to this Agreement to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  All waivers in respect of a Default must be in writing.

22. **Survival of Remedies.**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Securities or Collateral and termination of this Agreement.

23. **Notices and Other Communications.**

Any and all notices, statements, demands or other communications hereunder may be given by TradeStation Securities, Inc. or Collateral Agent to Counterparty by telephone, mail, facsimile, e-mail, electronic message, telegraph messenger or otherwise at the phone and facsimile numbers provided by Counterparty and maintained by TradeStation Securities, Inc. or Collateral Agent, as applicable, in its books and records for such party. Any and all notices, statements, demands or other communications hereunder may be given by Counterparty to TradeStation Securities, Inc. in writing electronically via the secure electronic message center maintained by TradeStation Securities, Inc. for the account of Counterparty.  Any and all notices, statements, demands or other communications hereunder may be given by Counterparty to Collateral Agent in writing 1411 Broadway, 28th Floor, New York, NY 10018-3450, Attn: COO.  Any notice, statement, demand or other communication hereunder will be deemed effective on the day and at the time on which it is received or, if not received, on the day and at the time on which its delivery was in good faith attempted; provided, however, that any notice by a party to the other party by telephone shall be deemed effective only if (a) such notice is followed by written confirmation thereof and (b) at least one of the other means of providing notice that are specifically listed above has previously been attempted in good faith by the notifying party.

24. **MANDATORY ARBITRATION**

THE PARTIES HEREBY AGREE THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT OR ANY LOAN HEREUNDER SHALL BE SUBJECT TO THE MANDATORY ARBITRATION PROVISION CONTAINED IN ANY CUSTOMER ACCOUNT OR SIMILAR AGREEMENT ENTERED INTO BETWEEN SUCH PARTIES.

25. **Miscellaneous.**

    25.1.    Except as otherwise agreed by the parties or as otherwise provided herein, this Agreement supersedes any other agreement between the parties hereto concerning loans of Securities between Borrower and Lender.  Except in accordance with Section 4.4 of the Collateral Agent Protocols, this Agreement shall not be assigned by Borrower, Lender, or Collateral Agent without the prior written consent of the other parties and any attempted assignment without

**TradeStation®**                                    **Master Securities Lending Agreement**

such consent shall be null and void. Any attempted assignment that would adversely affect the security interest granted pursuant to this Agreement and perfected by the Control Agreement shall likewise be null and void.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of Borrower, Lender and Collateral Agent and their respective heirs, representatives, successors and assigns.  This Agreement may be terminated by Borrower or Lender upon notice to the other, subject only to fulfillment of any obligations then outstanding.   This Agreement may be modified by TradeStation according to the amendment and modification provisions set forth in Section 32 of the TradeStation Securities, Inc. Customer Account Agreement for Equities (as such provisions may be renumbered or amended from time to time), provided that any such action shall not adversely affect the security interest granted pursuant to this Agreement and perfected by the Control Agreement.  The parties hereto acknowledge and agree that, in connection with this Agreement and each Loan hereunder, time is of the essence.   Each provision and agreement herein shall be treated as separate and independent from any other provision herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

25.2.   Any agreement between Borrower and Lender pursuant to Section 11.5(b) or Section 26.42 shall be made (a) in writing, (b) orally, if confirmed promptly in writing or through any system that compares Loans and in which Borrower and Lender are participants, or (c) in such other manner as may be agreed by Borrower and Lender in writing.

26. **Definitions.**

For the purposes hereof:

26.1.   "Act of Insolvency" shall mean, with respect to any party,  (a) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party's seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (b) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (i) is consented to or not timely contested by such party, (ii) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (iii) is not dismissed within 15 days, (c) the making by such party of a general assignment for the benefit of creditors, or (d) the admission in writing by such party of such party's inability to pay such party's debts as they become due.

26.2.   "Bank" shall have the meaning assigned in Section 4.1.

26.3.   "Bankruptcy Code" shall have the meaning assigned in Section 27.1.

26.4.    "Borrower" shall have the meaning assigned in Section 1.

 **Master Securities Lending Agreement**

26.5.   "Borrower Payment" shall have the meaning assigned in Section 9.5(a).

26.6.   "Broker-Dealer" shall mean any person that is a broker (including a municipal securities broker), dealer, municipal securities dealer, government securities broker or government securities dealer as defined in the Exchange Act, regardless of whether the activities of such person are conducted in the United States or otherwise require such person to register with the U.S. Securities and Exchange Commission or other regulatory body.

26.7.   "Business Day" shall mean, with respect to any Loan hereunder, a day on which regular trading occurs in the principal market for the Loaned Securities subject to such Loan, provided, however, that for purposes of determining the Market Value of any Securities hereunder, such term shall mean a day on which regular trading occurs in the principal market for the Securities whose value is being determined.  Notwithstanding the foregoing, (a) for purposes of Section 10, "Business Day" shall mean any day on which regular trading occurs in the principal market for any Loaned Securities or for any Collateral consisting of Securities under any outstanding Loan hereunder and "next Business Day" shall mean the next day on which a transfer of Collateral may be effected in accordance with Section 16, and (b) in no event shall a Saturday or Sunday be considered a Business Day.

26.8.   "Clearing Organization" shall mean (a) The Depository Trust Company, or, if agreed to by Borrower and Lender, such other "securities intermediary" (within the meaning of the UCC) at which Borrower (or Borrower's agent) and Lender (or Lender's agent) maintain accounts, or (b) a Federal Reserve Bank, to the extent that it maintains a book-entry system.

26.9.   "Close of Business" shall mean 4:00 p.m. (New York City time).

26.10.  "Close of Trading" shall mean, with respect to any Security, the end of the primary trading session established by the principal market for such Security on a Business Day, unless otherwise agreed.

26.11.  "Collateral" shall mean, whether now owned or hereafter acquired and to the extent permitted by applicable law, (a) any property which Borrower and Lender agree prior to the Loan shall be acceptable collateral and which is transferred to Lender pursuant to Sections 4 or 10 (including as collateral, for definitional purposes, any letters of credit mutually acceptable to Lender and Borrower), (b) all accounts in which such property is deposited and all securities and the like in which any cash collateral is invested or reinvested, and (c) any proceeds of any of the foregoing; provided, however, that if Lender is a Customer, "Collateral" shall be limited to cash.

26.12.  "Collateral Account" shall have the meaning assigned in Section 4.1.

26.13.  "Collateral Agent" shall have the meaning assigned in the first paragraph of this Agreement.

26.14.  "Collateral Agent Protocols" shall have the meaning assigned in Section 5.1.

 **Master Securities Lending Agreement**

26.15.  "Collateral Distributions" shall have the meaning assigned in Section 9.5(a).

26.16.  "Confirmation" shall have the meaning assigned in Section 2.1.

26.17.  "Contractual Currency" shall have the meaning assigned in Section 17.1.

26.18.  "Control Agreement" shall have the meaning assigned in Section 5.2.

26.19.  "Customer" shall mean any person that is a customer of Borrower under Rule 15c3-3 under the Exchange Act or any comparable regulation of the Secretary of the Treasury under Section 15C of the Exchange Act (to the extent that Borrower is subject to such Rule or comparable regulation).

26.20.  "Cutoff Time" shall mean a time on a Business Day by which a transfer of cash, securities or other property must be made by Borrower or Lender to the other, as shall be agreed by Borrower and Lender in Schedule B, or shall be as specified in the policies and procedures described on TradeStation's website or as agreed otherwise orally or in writing or, in the absence of any such agreement, as shall be determined in accordance with market practice.

26.21.  "Default" shall have the meaning assigned in Section 13.

26.22.  "Defaulting Party" shall have the meaning assigned in Section 19.

26.23.  "Distribution" shall mean, with respect to any Security at any time, any distribution made on or in respect of such Security, including, but not limited to:  (a) cash and all other property, (b) stock dividends, (c) Securities received as a result of split ups of such Security and distributions in respect thereof, (d) interest payments, (e) all rights to purchase additional Securities, and (f) any cash or other consideration paid or provided by the issuer of such Security in exchange for any vote, consent or the taking of any similar action in respect of such Security (regardless of whether the record date for such vote, consent or other action falls during the term of the Loan).  In the event that the holder of a Security is entitled to elect the type of distribution to be received from two or more alternatives, such election shall be made by Lender, in the case of a Distribution in respect of the Loaned Securities, and by Borrower, in the case of a Distribution in respect of Collateral.

26.24.  "ESTR" shall mean for any date a rate per annum equal to the Euro Short Term Rate for such date as published by the European Central Bank (or any successor administrator of the Euro Short Term Rate) on the European Central Bank's website, currently at http://www.ecb.europa.eu, or any successor source for the Euro Short Term Rate.

26.25.  "Equity Security" shall mean any security (as defined in the Exchange Act) other than a "nonequity security," as defined in Regulation T.

26.26.  "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

 **Master Securities Lending Agreement**

26.27. "Extension Deadline" shall mean, with respect to a letter of credit, the Cutoff Time on the Business Day preceding the day on which the letter of credit expires.

26.28. "FDIA" shall have the meaning assigned in Section 27.4.

26.29. "FDICIA" shall have the meaning assigned in Section 27.5.

26.30. "Federal Funds Rate" shall mean the rate of interest (expressed as an annual rate), as published in Federal Reserve Statistical Release H.15 (519) or any publication substituted therefor, charged for federal funds (dollars in immediately available funds borrowed by banks on an overnight unsecured basis) on that day or, if that day is not a banking day in New York City, on the next preceding banking day.

26.31. "Foreign Securities" shall mean, unless otherwise agreed, Securities that are principally cleared and settled outside the United States.

26.32. "Government Securities" shall mean government securities as defined in Section 3(a)(42)(A)-(C) of the Exchange Act.

26.33. "Lender" shall have the meaning assigned in Section 1.

26.34. "Lender Payment" shall have the meaning assigned in Section 9.5(a).

26.35. "Loan" shall have the meaning assigned in Section 1.

26.36. "Loan Fee" shall have the meaning assigned in Section 6.1.

26.37. "Loaned Security" shall mean any Security transferred in a Loan hereunder until such Security (or an identical Security) is transferred back to Lender hereunder, except that, if any new or different Security shall be exchanged for any Loaned Security by recapitalization, merger, consolidation or other corporate action, such new or different Security shall, effective upon such exchange, be deemed to become a Loaned Security in substitution for the former Loaned Security for which such exchange is made. For purposes of return of Loaned Securities by Borrower or purchase or sale of Securities pursuant to Section 14, such term shall include Securities of the same issuer, class and quantity as the Loaned Securities, as adjusted pursuant to the preceding sentence.

26.38. "Margin Deficit" shall have the meaning assigned in Section 10.2.

26.39. "Margin Excess" shall have the meaning assigned in Section 10.3.

26.40. "Margin Notice Deadline" shall mean the time agreed to by Borrower and Lender in the relevant Confirmation, Schedule B hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of mark-to-market obligations as provided in Section 10 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice).

 **Master Securities Lending Agreement**

26.41. "Margin Percentage" shall mean, with respect to any Loan as of any date, a percentage agreed by Borrower and Lender, which shall be not less than 100%, unless (a) Borrower and Lender agree otherwise, as provided in Section 25.2 or Borrower in its discretion determines that applicable laws or market custom require greater than 100%, and (b) Lender is not a Customer. Notwithstanding the previous sentence, in the event that the writing or other confirmation evidencing the agreement described in clause (a) does not set out such percentage with respect to any such Loan, the Margin Percentage shall not be a percentage less than the percentage obtained by dividing (i) the Market Value of the Collateral required to be transferred by Borrower to Lender with respect to such Loan at the commencement of the Loan by (ii) the Market Value of the Loaned Securities required to be transferred by Lender to Borrower at the commencement of the Loan.

26.42. "Market Value" shall have the meaning agreed to by Borrower and Lender in writing. Notwithstanding the previous sentence, in the event that the meaning of Market Value has not been set forth in Annex II or in any other writing, as described in the previous sentence, Market Value shall be reasonably determined by TradeStation in accordance with its standard practices for valuing securities. The determinations of Market Value provided for in Annex II or in any other writing described in the first sentences of this Section 26.42 shall apply for all purposes under this Agreement, except for purposes of Section 14.

26.43. "Payee" shall have the meaning assigned in Section 9.5(a).

26.44. "Payor" shall have the meaning assigned in Section 9.5(a).

26.45. "Plan" shall mean:  (a) any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (b) any "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986; or (c) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the Department of Labor's plan asset regulation, 29 C.F.R. Section 2510.3-101.

26.46. "Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System, as in effect from time to time.

26.47. "Retransfer" shall mean, with respect to any Collateral, to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer such Collateral, or to re-register any such Collateral evidenced by physical certificates in any name other than Borrower's.

26.48. "Securities" shall mean securities or, if agreed by Borrower and Lender in writing, other assets.

26.49. "Securities Distributions" shall have the meaning assigned in Section 9.5(a).

26.50. "Tax" shall have the meaning assigned in Section 9.5(a).

**TradeStation**®                                    **Master Securities Lending Agreement**

26.51.  "UCC" shall mean the New York Uniform Commercial Code.

27. **Intent.**

27.1.  The parties recognize that each Loan hereunder is a "securities contract," as such term is defined in Section 741 and used in Sections 362(b)(6), 546(e) and 555 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), as amended and Section 78eee(b)(2)(B) of the Securities Investor Protection Act of 1970.

27.2.  It is understood that each and every transfer of funds, securities and other property under this Agreement and each Loan hereunder is a "settlement payment," a "margin payment" or a "transfer" as such terms are used in Sections 362(b) (6) and 546(e) of the Bankruptcy Code.

27.3.  It is understood that the rights given to Borrower and Lender hereunder upon a Default by the other constitute a "contractual right" to cause the acceleration, termination and/or liquidation of a securities contract and the right to set off and/or net mutual debts and claims in connection with a securities contract and related credit enhancements, as such terms are used in Sections 555 and 362(b)(6) of the Bankruptcy Code.

27.4.  The parties agree and acknowledge that if a party to a Loan is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Loan hereunder is a "securities contract" and "qualified financial contract," as such terms are defined in the FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to the Loan would render such definitions inapplicable).

27.5.  It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment obligation under any Loan hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation," respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties to a Loan is not a "financial institution" as that term is defined in FDICIA).

27.6.  Except to the extent required by applicable law or regulation or as otherwise agreed, Borrower and Lender agree that Loans hereunder shall in no event be "exchange contracts" for purposes of the rules of any securities exchange and that Loans hereunder shall not be governed by the buy-in or similar rules of any such exchange, registered national securities association or other self-regulatory organization.

28. **DISCLOSURE RELATING TO CERTAIN FEDERAL PROTECTIONS.**

28.1.  **WITHOUT WAIVING ANY RIGHTS GIVEN TO LENDER HEREUNDER, IT IS UNDERSTOOD AND AGREED THAT THE PROVISIONS OF THE SECURITIES INVESTOR PROTECTION ACT OF 1970 MAY NOT PROTECT LENDER WITH RESPECT TO LOANED SECURITIES HEREUNDER AND THAT, THEREFORE, THE CASH COLLATERAL DELIVERED TO THE COLLATERAL ACCOUNT FOR THE BENEFIT OF LENDER MAY**

 **Master Securities Lending Agreement**

**CONSTITUTE THE ONLY SOURCE OF SATISFACTION OF BORROWER'S OBLIGATIONS IN THE EVENT BORROWER FAILS TO RETURN THE LOANED SECURITIES.**

28.2. **LENDER ACKNOWLEDGES THAT, IN CONNECTION WITH LOANS OF GOVERNMENT SECURITIES AND AS OTHERWISE PERMITTED BY APPLICABLE LAW, SOME SECURITIES PROVIDED BY BORROWER AS COLLATERAL UNDER THIS AGREEMENT MAY NOT BE GUARANTEED BY THE UNITED STATES.**

29. **OTHER IMPORTANT DISCLOSURES**

29.1. BY AGREEING TO AND ACCEPTING THIS AGREEMENT, COUNTERPARTY AGREES AND ACKNOWLEDGES THAT HE, SHE OR IT HAS READ AND FULLY UNDERSTANDS THE SEPARATE DOCUMENT ENTITLED IMPORTANT RISK DISCLOSURES WITH RESPECT TO FULLY PAID OR EXCESS MARGIN SECURITIES LENDING, WHICH DESCRIBES MANY OTHER RISKS AND CHARACTERISTICS OF THE PROGRAM, INCLUDING, BUT NOT LIMITED TO POTENTIAL LACK OF SIPC PROTECTION, LOSS OF VOTING RIGHTS, TRADESTATION'S ABILITY TO USE THE LOAN SECURITIES FOR ADDITIONAL LOANS AND TRADESTATION'S ABILITY TO EARN A SPREAD AND/OR OTHER PROFIT, LACK OF GUARANTEE OF RECEIVING BEST RATES, RISKS ASSOCIATED WITH EACH TYPE OF COLLATERAL, THAT THE SECURITIES MAY BE "HARD-TO-BORROW" BECAUSE OF SHORT-SELLING OR MAY BE USED TO SATISFY DELIVERY REQUIREMENTS RESULTING FROM SHORT SALES, POTENTIAL ADVERSE TAX CONSEQUENCES, INCLUDING PAYMENTS DEEMED CASH-IN-LIEU OF DIVIDEND PAID ON SECURITIES WHILE ON LOAN, TRADESTATION'S RIGHT TO LIQUIDATE THE TRANSACTION BECAUSE OF A CONDITION OF THE KIND SPECIFIED IN FINRA RULE 4314(B), AND THE FACTORS THAT DETERMINE THE AMOUNT OF COMPENSATION RECEIVED BY TRADESTATION OR PAID TO CUSTOMER IN CONNECTION WITH THE USE OF THE SECURITIES BORROWED FROM THE CUSTOMER LACK OF INTEREST ON CASH COLLATERAL, AMONG OTHER THINGS.

BY AGREEING TO AND ACCEPTING THIS AGREEMENT, COUNTERPARTY AFFIRMS THAT HE, SHE, OR IT HAS DETERMINED THAT PARTICIPATION IN TRADESTATION'S FULLY-PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY AND THAT IN MAKING SUCH DETERMINATION COUNTERPARTY HAS CONSIDERED COUNTERPARTY'S FINANCIAL SITUATION AND NEEDS, TAX STATUS, INVESTMENT OBJECTIVES, INVESTMENT TIME HORIZON, LIQUIDITY NEEDS, RISK TOLERANCE, AND ANY OTHER RELEVANT INFORMATION. COUNTERPARTY UNDERSTANDS THAT TRADESTATION DOES NOT GIVE INVESTMENT ADVICE OR MAKE ANY RECOMMENDATIONS REGARDING THE PURCHASE AND SALE OF SECURITIES AND THAT TRADESTATION HAS MADE NO DETERMINATION AS TO THE SUITABILITY OF THE PROGRAM FOR COUNTERPARTY. COUNTERPARTY SHOULD DISCUSS WITH COUNTERPARTY'S INVESTMENT AND/OR TAX ADVISORS WHETHER PARTICIPATION IN THE FULLY PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY.

 **Master Securities Lending Agreement**

29.2.    LENDER ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF, AND UNDERSTANDS, THE COLLATERAL AGENT PROTOCOLS.

 **TradeStation**®                    **Master Securities Lending Agreement**

## <u>Schedule of Basis of Compensation for Loan</u>

The compensation to Counterparty will be in the form of a cash which will be accrued daily and credited monthly.  The Income is calculated as 30% of the net proceeds earned and received by TradeStation for relending Counterparty's shares.  The remaining 70% of the net proceeds earned and received by TradeStation for relending the shares will be kept by TradeStation as its compensation.  The percentages may be changed by TradeStation in TradeStation's sole discretion.  Unless otherwise agreed, any Income payable hereunder shall be payable within 15 days following the last Business Day of the calendar month in which such fee was incurred.  For more information, Counterparty should contact TradeStation Client Services at (954) 652-7000.

 **Master Securities Lending Agreement**

**Annex I**

Party Acting as Agent does not apply.

**Annex II**

Market Value shall not apply.

**Annex III Term**

**Loans**

This Annex sets forth additional terms and conditions governing Loans designated as "Term Loans" in which Lender lends to Borrower a specific amount of Loaned Securities ("Term Loan Amount") against a pledge of cash Collateral by Borrower for an agreed upon Cash Collateral Fee until a scheduled termination date ("Termination Date"). Unless otherwise defined, capitalized terms used but not defined in this Annex shall have the meanings assigned in the Securities Loan Agreement of which it forms a part (such agreement, together with this Annex and any other annexes, schedules or exhibits, referred to as the "Agreement").

1.  The terms of this Annex shall apply to Loans of Equity Securities only if they are designated as Term Loans in a Confirmation therefor provided pursuant to the Agreement and executed by each party to such Loan, in a schedule to the Agreement or in this Annex. All Loans of Securities other than Equity Securities shall be "Term Loans" subject to this Annex, unless otherwise agreed in a Confirmation or other writing.

2.  The Confirmation for a Term Loan shall set forth, in addition to any terms required to be set forth therein under the Agreement, the Term Loan Amount, rate of Interest and the Termination Date. Lender and Borrower agree that, except as specifically provided in this Annex, each Term Loan shall be subject to all terms and conditions of the Agreement, including, without limitation, any provisions regarding the parties' respective rights to terminate a Loan.

3.  In the event that either Borrower or Lender exercises its right under the Agreement to terminate a Term Loan on a date (the "Early Termination Date") prior to the Termination Date, Lender and Borrower shall, unless otherwise agreed, use their best efforts to negotiate in good faith a new Term Loan (the "Replacement Loan") of comparable or other Securities, which shall be mutually agreed upon by Borrower and Lender, with a Market Value equal to the Market Value of the Term Loan Amount under the terminated Term Loan (the "Terminated Loan") as of the Early Termination Date. Such agreement shall, in accordance with Section 2 of this Annex, be confirmed in a new Confirmation at the commencement of the Replacement Loan and be executed by each party thereto. Each Replacement Loan shall be subject to the same terms as the corresponding Terminated Loan, other than with respect to the commencement date and the identity of the Loaned Securities. The Replacement Loan shall commence on the date on which Borrower and Lender agree which Securities shall be the subject of the Replacement Loan and shall be scheduled to terminate on the scheduled Termination Date of the Terminated Loan.

4.  Borrower and Lender agree that, except as provided in Section 5 of this Annex, if they enter into a Replacement Loan, the Collateral for the related Terminated Loan



**Master Securities Lending Agreement**

need not be returned to Borrower and shall instead serve as Collateral for such Replacement Loan.

5.      If Borrower and Lender are unable to negotiate and enter into a Replacement Loan for some or all of the Term Loan Amount on or before the Early Termination Date, (a) the party requesting termination of the Terminated Loan shall pay to the other party a Breakage Fee computed in accordance with Section 6 of this Annex with respect to that portion of the Term Loan Amount for which a Replacement Loan is not entered into, and (b) upon the transfer by Borrower to Lender of the Loaned Securities subject to the Terminated Loan, Lender shall transfer to Borrower Collateral for the Terminated Loan in accordance with and to the extent required under the Agreement, provided that no Default has occurred with respect to Borrower.

6.      For purposes of this Annex, the term "Breakage Fee" shall mean a fee agreed by Borrower and Lender in the Confirmation or otherwise orally or in writing.  In the absence of any such agreement, the term "Breakage Fee" shall mean, with respect to Loans of Government Securities, a fee equal to the sum of (a) the cost to the non-terminating party (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of the termination of the Terminated Loan, and (b) any other loss, damage, cost or expense directly arising or resulting from the termination of the Terminated Loan that is incurred by the non-terminating party (other than consequential losses or costs for lost profits or lost opportunities), as determined by the non-terminating party in a commercially reasonable manner, and (c) any other amounts due and payable by the terminating party to the non-terminating party under the Agreement on the Early Termination Date.

                    **Master Securities Lending Agreement**

## APPENDIX I: FULLY PAID LENDING PROGRAM COLLATERAL AGENT PROTOCOLS

These Collateral Agent Protocols (these "Protocols") are referred to in, and incorporated into, Section 5.1 of the TradeStation Master Securities Lending Agreement (the "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed in the Agreement.

**1.    POWERS OF COLLATERAL AGENT**

### 1.1    Powers of Collateral Agent

Collateral Agent is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Agreement and the Control Agreement (the Agreement and the Control Agreement, collectively, the "FPL Agreements") and applicable law and in equity and to act as set forth in this Section 1 and Section 2 of these Protocols or as requested in any lawful directions given to it from time to time in respect of any matter by Lender, provided such directions are consistent with the FPL Agreements.

### 1.2    Rights and Powers Exercised for Sole and Exclusive Benefit of Lender

Collateral Agent agrees that its rights and powers with respect to the Collateral hereunder are exercised solely and exclusively for the benefit of Lender. Collateral Agent will accept, hold, administer and enforce the security interest in the Collateral at any time transferred or delivered to it and all other interests, rights, powers and remedies at any time granted to or enforceable by Collateral Agent solely and exclusively for the benefit of Lender, and will distribute or cause to be distributed all proceeds received by it in realization thereon or from enforcement thereof solely and exclusively pursuant to the provisions of these Protocols and the FPL Agreements.

**2.    Obligations OF COLLATERAL AGENT**

### 2.1    Undertakings of Collateral Agent

(a)    Collateral Agent will act as collateral agent for the benefit solely and exclusively of Lender in accordance with Lender's respective interest in the Collateral as set forth in files or reports furnished or made available to Collateral Agent daily and upon its request (the "Respective Interest").

(b)    Collateral Agent shall, for the benefit of Lender, perform Collateral Agent's obligations under these Protocols and the FPL Agreements, and protect, exercise and enforce the liens in favor of Collateral Agent created under the Agreement and all interests, rights, powers and remedies granted or available to Collateral Agent under, pursuant to or in connection with the FPL Agreements.

(c)    Notwithstanding anything to the contrary contained in these Protocols or the FPL Agreements, Collateral Agent shall not commence any exercise of remedies or otherwise take any action or proceeding against any of the Collateral (other than actions as necessary to prove, protect or preserve the liens securing the obligations of TradeStation under the

**TradeStation®**                                          **Master Securities Lending Agreement**

Agreement) unless and until it has actual knowledge that a Default has occurred. Collateral Agent shall be deemed to have actual knowledge that a Default has occurred (i) upon receipt of notice from Lender or TradeStation that a Default has occurred, or (ii) with respect to an Act of Insolvency by TradeStation, upon the public filing of any case, proceeding, petition or decree against TradeStation under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**(d)**     Upon receipt of such notice or deemed notice, Collateral Agent shall, at the request and direction (or deemed direction) of Lender, instruct the Bank as to the disposition of the Collateral and apply the proceeds of the Collateral as provided herein. Collateral Agent shall remit to Lender, or cause the Bank to remit to Lender, proceeds of Collateral deliverable to Lender pursuant to Section 2.2 of these Protocols at Lender's instruction.

**2.2     Application of Proceeds**

Collateral Agent will apply or direct the application of the proceeds of any collection, sale, foreclosure or other realization upon any Collateral in the following order of application:

**(a)**     First, to the payment in full of all amounts payable to Lender pursuant to the Agreement (which amounts shall be based on (i) the most recent information concerning the amount of Collateral that should be pledged to Lender received by Collateral Agent from TradeStation and (ii) other amounts owed to Lender under the Agreement as determined on a final basis by the trustee or receiver appointed in connection with an insolvency of TradeStation or the court presiding over TradeStation's bankruptcy case);

**(b)**     Second, to the Bank on account of the Bank's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by it to the extent it would be entitled to the same under the Control Agreement;

**(c)**     Third, to Collateral Agent on account of Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by Collateral Agent to the extent it would be entitled to the same under the Agreement and these Protocols; and

**(d)**     Finally, to TradeStation any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses, its successors or assigns, or as a court of competent jurisdiction may direct.

**2.3     Amendment of FPL Agreements**

 **Master Securities Lending Agreement**

Collateral Agent will not agree or consent to any amendment of an FPL Agreement without the consent of Lender (which consent may take the form of negative consent), except that no consent of Lender shall be required for any amendment that has the effect solely of:

**(a)** adding or maintaining Collateral;

**(b)** preserving, perfecting or establishing the priority of the security interests in favor of Lender on Collateral or the rights of Collateral Agent therein; or

**(c)** curing any ambiguity, omission, defect or inconsistency; provided that such amendment does not adversely affect any security interest in Collateral securing the obligations of TradeStation to Lender under the FPL Agreements or perfection thereof or the rights of Lender.

**3.    IMMUNITIES OF COLLATERAL AGENT**

**3.1    No Implied Duty**

Collateral Agent will not have any fiduciary duties nor will it have responsibilities or obligations other than those expressly assumed by it in the FPL Agreements and these Protocols. No implied duties or responsibilities on behalf of Collateral Agent shall be read into this Agreement or otherwise exist.  Collateral Agent will not be required to take any action that is contrary to applicable law or any provision of the FPL Agreements and these Protocols.

**3.2    Solicitation of Instructions**

**(a)** Collateral Agent may at any time solicit written confirmatory instructions from Lender or request an order of a court of competent jurisdiction as to any action that it may be requested or required to take, or that it may propose to take, in the performance of any of its obligations under the FPL Agreements or these Protocols and may suspend performance of such obligations as it determines to be appropriate until it receives such instructions or order.

**(b)** No instruction or direction given to Collateral Agent by Lender that in the sole judgment of Collateral Agent imposes, purports to impose or might reasonably be expected to impose upon Collateral Agent any obligation or liability not set forth in or arising under the FPL Agreements or these Protocols will be binding upon Collateral Agent unless Collateral Agent elects, at its sole option, to accept such direction.

**3.3    Limitation of Liability**

Collateral Agent will not be responsible or liable for any action taken or omitted to be taken by it under these Protocols, except for its own negligence, bad faith, reckless disregard or willful misconduct.

**3.4    Documents in Satisfactory Form**

 **Master Securities Lending Agreement**

Collateral Agent will be entitled to require that all agreements, certificates, opinions, instruments and other documents at any time submitted to it, including those expressly provided for in the FPL Agreements, be delivered to it in a form and with substantive provisions reasonably satisfactory to it.

**3.5   Reliance**

Collateral Agent may seek and rely upon, and will be protected in relying upon, any judicial order or judgment relied upon in good faith without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof.  Collateral Agent may act in reliance upon any instrument comporting with the provisions of the FPL Agreements or any signature reasonably believed by it to be genuine and may assume that any person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

**3.6   Events of Default**

**(a)**   Collateral Agent agrees to monitor for an Act of Insolvency with respect to TradeStation and shall declare such an Act of Insolvency to have occurred upon the public filing of any case, proceeding, petition or decree against TradeStation under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**(b)**   Other than the obligation to monitor for an Act of Insolvency by TradeStation as described in paragraph (a), Collateral Agent will not be obligated to inquire as to the occurrence or absence of any Default and will not be affected by or required to act upon any notice or knowledge as to the occurrence of any Default unless and until it receives from TradeStation or Lender notice stating that a Default has occurred and is continuing, or it receives instruction from Lender pursuant to Section 14.1 of the Agreement.  Collateral Agent may rely upon, and be fully protected in relying upon, any such notice which it reasonably believes to be genuine and shall have no obligation to verify the occurrence or continuation of a Default.

**3.7   Actions by Collateral Agent**

As to any matter not expressly provided for by the FPL Agreements, Collateral Agent may act or refrain from acting as directed by Lender and will be fully protected if it does so, and any action taken, suffered or omitted pursuant to this Section 3.7 of these Protocols shall be binding on Lender.

**3.8   Security or Indemnity in Favor of Collateral Agent**

Collateral Agent will not be required to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder, including, without limitation, making any filings or other appearances on behalf of Lender or otherwise in any insolvency proceeding, unless it has been provided with security or indemnity reasonably satisfactory to it against any

 **Master Securities Lending Agreement**

and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.

**3.9    Rights of Collateral Agent**

If any disagreement among the parties to the FPL Agreements results in conflicting claims or demands being made in connection with the Collateral and if the terms of the FPL Agreements and these Protocols do not unambiguously and specifically mandate the action Collateral Agent is required to take or not to take in connection therewith under the circumstances then existing, or if Collateral Agent is in doubt as to what action it is required to take or not to take under the FPL Agreements or these Protocols, it will be entitled to refrain from taking any action, and will incur no liability for doing so, until directed otherwise in writing by a request signed jointly by the parties entitled to give such direction or by order of a court of competent jurisdiction, accompanied by all security or indemnity reasonably requested by Collateral Agent against any and all liability or expense which may be incurred by it in acting upon such direction.

**3.10   Limitations on Duty of Collateral Agent in Respect of Collateral**

**(a)**    Beyond the exercise of reasonable care in the custody of Collateral in its possession (if any), Collateral Agent will have no duty as to any Collateral in its possession or in the possession of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any liens on the Collateral. Collateral Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession (if any) if the Collateral is accorded treatment with substantially the same degree of care which it accords its own property, and Collateral Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by Collateral Agent in good faith.

**(b)**    Collateral Agent will not be responsible for the existence or sufficiency of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any act or omission on its part hereunder, for the validity of the title of TradeStation to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or liens upon the Collateral or otherwise as to the maintenance of the Collateral.

**4.    RESIGNATION AND REMOVAL OF COLLATERAL AGENT**

**4.1    Resignation or Removal of Collateral Agent**



**Master Securities Lending Agreement**

Subject to the appointment of a successor Collateral Agent as provided in Section 4.2 of these Protocols ("Successor Collateral Agent"), and the acceptance of such appointment by the Successor Collateral Agent:

**(a)**   Collateral Agent may resign at any time by giving not less than ninety (90) days' notice of resignation to TradeStation and Lender; and

**(b)**   Collateral Agent may be removed at any time by TradeStation if Collateral Agent fails to perform its duties under the FPL Agreements and these Protocols; and

**(c)**   Lender will be notified of the Successor Collateral Agent by TradeStation within reasonable time of the effective change.

**4.2   Appointment of Successor Collateral Agent**

Upon the resignation or removal of Collateral Agent, a Successor Collateral Agent may be appointed by Collateral Agent (at the expense of TradeStation) or TradeStation, or Collateral Agent may petition a court of competent jurisdiction for appointment of a Successor Collateral Agent, which must be a company organized and doing business under the laws of the United States of America or any state or territory thereof or of the District of Columbia that has experience acting as collateral agent for a fully paid securities lending program.  Collateral Agent will fulfill its obligations hereunder until a Successor Collateral Agent meeting the requirements of this Section 4.2 of these Protocols has accepted its appointment as Collateral Agent and the provisions of this Section 4.2 of these Protocols have been satisfied.

**4.3   Succession**

When the person so appointed as Successor Collateral Agent accepts such appointment:

**(a)**   such person will succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Agent, and the predecessor Collateral Agent will be discharged from its duties and obligations hereunder; and

**(b)**   the predecessor Collateral Agent will (at the expense of TradeStation) promptly transfer all liens and Collateral within its possession or control to the possession or control of the Successor Collateral Agent and Collateral Agent and TradeStation will each execute instruments and assignments as may be necessary or desirable or reasonably requested by the Successor Collateral Agent to transfer to the Successor Collateral Agent all liens, interests, rights, powers and remedies of the predecessor Collateral Agent in respect of the FPL Agreements and the Collateral.

Thereafter the predecessor Collateral Agent will remain entitled to enforce the immunities granted to it in Section 3 of these Protocols.

**4.4   Merger, Conversion or Consolidation of Collateral Agent**

 **Master Securities Lending Agreement**

Any person into which Collateral Agent may be merged or converted or with which it may be consolidated, or any person resulting from any merger, conversion or consolidation to which Collateral Agent is a party, or any person succeeding to the business of Collateral Agent will be the successor of Collateral Agent pursuant to Section 4.3 of these Protocols, without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto (except where an instrument of transfer or assignment is required by law to effect such succession), if (a) such person satisfies the eligibility requirements set forth in Section 4.2 of these Protocols and (b) prior to any such merger, conversion or consolidation, Collateral Agent has notified TradeStation and Lender thereof in writing.

### 4.5    Event or Occurrence of Bankruptcy or Insolvency of Collateral Agent

In the event that Collateral Agent becomes insolvent as declared pursuant to the public filing of any case, proceeding, petition or decree against Collateral Agent under Chapter 7 or Chapter 11 of the Bankruptcy Code, or any other applicable U.S. law or regulation, TradeStation may: (a) appoint a Successor Collateral Agent (at TradeStation's expense) subject to Lender's consent (which consent may take the form of negative consent); (b) petition a court of competent jurisdiction for appointment of a Successor Collateral Agent subject to the terms and qualifications set forth in Section 4.2 of these Protocols, or (c) terminate the FPL Agreements and return the Loaned Securities to Lender.

Collateral Agent at all times accepts, holds, administers and enforces the security interest in the Collateral, the Collateral, and any accounts in which the Collateral is held solely and exclusively as the collateral agent for the benefit of Lender.  Upon the insolvency or bankruptcy of Collateral Agent, the Collateral shall not be treated as property of Collateral Agent or Collateral Agent's estate and Collateral Agent or the estate of Collateral Agent shall not have any claim or other interest in the Collateral or any account in which the Collateral is held.

## 5.    MISCELLANEOUS COLLATERAL AGENT PROTOCOLS

### 5.1    Successors and Assigns

Except as provided in Section 4.1 and Section 4.4 of these Protocols, Collateral Agent may not, in its capacity as such, delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void; provided, however, that Collateral Agent's affiliates may perform administrative services pursuant to the Agreement and these Protocols on behalf of Collateral Agent.  All obligations of Collateral Agent hereunder will inure to the sole and exclusive benefit of, and be enforceable by, Lender.

### 5.2    Delay and Waiver

No failure to exercise, no course of dealing with respect to the exercise of, and no delay in exercising, any right, power or remedy arising under these Protocols or the Agreement will impair any such right, power or remedy or operate as a waiver thereof. No single or partial exercise of any such right, power or remedy will preclude any other or future exercise thereof or the exercise of any other right, power or remedy.  The remedies herein are cumulative and are not exclusive of any remedies provided by law.

**TradeStation**                    **Master Securities Lending Agreement**

### 5.3   Compensation; Expenses

TradeStation agrees to pay, promptly upon demand:

    **(a)**    such compensation to Collateral Agent as TradeStation and Collateral Agent may agree in writing from time to time;

    **(b)**    all reasonable out-of-pocket costs and expenses incurred by Collateral Agent and its agents in creating, perfecting, preserving, releasing or enforcing Collateral Agent's security interest in the Collateral, including filing and recording fees, expenses and taxes, stamp or documentary taxes and search fees; and

    **(c)**    after the occurrence of any Default with respect to TradeStation, all out-of-pocket costs and expenses (on a pass-through basis without mark-up) incurred by Collateral Agent in connection with the preservation, collection, foreclosure or enforcement of the Collateral or any interest, right, power or remedy of Collateral Agent or in connection with the collection or enforcement of any of the obligations of TradeStation to Lender under the FPL Agreements or the proof, protection, administration or resolution of any claim based upon such obligations in any insolvency or liquidation proceeding, including the reasonable fees and disbursements of attorneys, accountants, auditors, consultants, appraisers and other professionals engaged by Collateral Agent.

The agreements in this Section 5.3 of these Protocols will survive payment of all of TradeStation's obligations to Lender and the removal or resignation of Collateral Agent.

### 5.4   Amendment

These Protocols may only be amended (a) by TradeStation by sending Lender and Collateral Agent a written notice of such amendment, provided that such action does not adversely affect (i) the first priority perfected security interest granted pursuant to the Agreement and the Control Agreement or (ii) the duties of Collateral Agent to Lender pursuant to these Protocols or (b) with the written consent of all the parties to the Agreement.

### 5.5   Governing Law

These Protocols shall be governed by, and construed in accordance with, the laws of the State of New York.