# EXHIBIT 11

# FAQ: MMTLP Corporate Action and Trading Halt

FINRA has received a number of questions relating to a corporate action and trading halt in the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials) that traded under the symbol MMTLP. This *Investor Insights* article provides general information about how corporate actions and trading halts are processed as well as specific information related to MMTLP.

## Corporate Actions—FINRA's Role

A corporate action occurs when a company makes a change that has or could have an impact on its stock and shareholders. Corporate actions include issuing a dividend, engaging in a stock split, or effecting a merger.

When a company decides to engage in a corporate action that affects a security listed on a national securities exchange, the company must provide notice to the listing exchange and comply with all applicable listing standards and rules of the exchange concerning that security. In contrast, when a company decides to engage in a corporate action that affects an unlisted security that trades in the over-the-counter (OTC) market, federal law requires that the company submit notice of the corporate action to FINRA, and FINRA reviews the submission and publishes a notification about the corporate action to the marketplace (unless the submission is deemed deficient by FINRA). This function helps to keep investors and the market informed of corporate actions affecting OTC securities and of relevant dates.

A company can have both listed and unlisted securities, so different rules can apply to the same company depending on which security is the subject of a corporate action. In any event, FINRA does not initiate, approve, or conduct the underlying corporate action that the company is making, and the company itself is responsible for making sure the corporate action complies with all applicable laws and regulations.

FINRA regulates broker-dealers that facilitate investor access to the securities markets, including the OTC market. However, unlike securities exchanges that list securities, FINRA does not establish listing standards or otherwise regulate the companies that issue OTC securities.

## The MMTLP Corporate Action

Meta Materials' Series A Preferred Shares were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted. These unlisted shares later began trading in the OTC market under the symbol MMTLP (further discussion below).

On July 15, 2022, the company filed a [Form S-1 registration statement](#) with the Securities and Exchange Commission (SEC) to register the issuance of the common stock of Next Bridge Hydrocarbons, Inc. (Next Bridge), which at that time was a wholly owned subsidiary of Meta Materials. As disclosed in the registration statement, Meta Materials would distribute to MMTLP shareholders one share of Next Bridge common stock per one share of MMTLP held, and would cancel the Series A Preferred Shares trading under the symbol MMTLP. According to the Form S-1 filed, immediately after the corporate action, Next Bridge would be an independent public reporting company. After several amendments, the registration statement for the Next Bridge shares became [effective](#) on November 18, 2022.

On November 23, 2022, Meta Materials issued an [announcement](#) regarding the Next Bridge / MMTLP corporate action, stating that each holder of its Series A Preferred Shares—MMTLP—as of December 12, 2022, would become entitled to receive one share of the common stock of Next Bridge for every one share of MMTLP held. Meta Materials also stated that the Next Bridge shares would be distributed to MMTLP shareholders on December 14, 2022, at which time all MMTLP shares would be automatically cancelled and MMTLP holders would cease to have any rights with respect to those shares. In addition, the company stated that the Next Bridge shares received in the distribution would not be eligible for electronic transfer through The Depository Trust Company (DTC) (or through any other established clearing corporation).

As required by federal law, Meta Materials also notified FINRA of the Next Bridge / MMTLP corporate action. Consistent with the information provided by Meta Materials, on December 6 and 8, 2022, FINRA provided public notice of the corporate action on FINRA's website. FINRA's corporate action notice stated that the Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022, and further clarified that any purchasers after December 8, 2022, (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the corporate action distribution. FINRA's corporate action notice also stated that the MMTLP symbol would be [deleted](#) effective December 13, 2022  (*i.e.*, when an issuer cancels shares, FINRA will likewise delete the symbol; see the company's [announcement](#) stating that the MMTLP shares were to be cancelled as of the December 14, 2022, distribution date of the Next Bridge shares).

On December 9, 2022, FINRA [halted trading](#) in MMTLP. One of FINRA's roles in regulating the activities of broker-dealers trading OTC equity securities is exercising the authority to require such firms to halt quoting and trading activities when FINRA determines that doing so is necessary to protect investors and the public interest. Since imposing the halt, FINRA has received questions regarding the MMTLP trading halt and its impact on investors. Below are answers to some questions FINRA has received.

### 1. Why did FINRA halt trading in MMTLP?

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were [the facts](#) that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

### 2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge

**distribution?**

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

**3. Has the MMTLP trading halt ended?**

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

**4. How were MMTLP shares publicly quoted and traded in the first place?**

The answer to the question of whether a security is tradeable is determined by the application of federal law, including any applicable SEC rules. Where a security is or becomes tradeable, a public market for the security may develop—as it did with MMTLP.

FINRA does not approve a company's issuance of securities or approve or determine when broker-dealers or customers may begin trading those securities. However, once a broker-dealer executes a transaction in an unlisted security, the firm is required by FINRA rules to report the executed transaction to FINRA. And where a symbol does not yet exist for the security, the broker-dealer must request a symbol from FINRA. Because the issuer obtained a CUSIP for the Series A Preferred Shares, FINRA assigned the MMTLP symbol in 2021 upon request by a broker-dealer to facilitate electronic reporting of an executed transaction that occurred in the security.

This trade reporting process is separate from the process by which a broker-dealer begins quoting a security in compliance with SEC Rule 15c2-11. Rule 15c2-11 requires a broker-dealer, prior to quoting a security on its own behalf, to review specified information about the company that issued the security (unless an exception applies). In some cases, a broker-dealer also must file a form with FINRA—a Form 211. In this case, FINRA did not receive a Form 211. Instead, broker-dealers relied on an exception to SEC Rule 15c2-11 that permits broker-dealers to publish a quotation for unsolicited customer orders.

**5. Did FINRA cancel the MMTLP shares? Did FINRA delete the MMTLP symbol?**

FINRA did not cancel the MMTLP shares. The issuer, Meta Materials, cancelled the shares effective December 14. In fact, FINRA does not and cannot cancel any securities that are issued by a company—this was an action of the issuer. However, just as FINRA assigns symbols to unlisted securities, FINRA also can unassign or "delete" a symbol, for example, where it is no longer needed to quote or trade a security. In this case, FINRA deleted the MMTLP symbol on December 13 in light of the imminent cancellation of the shares as announced by the company in connection with the Next Bridge / MMTLP corporate action.

On December 8, FINRA amended its original December 6 corporate action announcement to clarify, among other things, that it would be deleting the MMTLP symbol on December 13 rather than cancelling the shares (because the issuer itself was responsible for cancelling the Series A Preferred Shares). Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.

**6. What happened to investors who did not sell their MMTLP shares prior to the trading halt?**

Investors who had settled positions in MMTLP on December 12 were holders entitled to receive shares of Next Bridge as part the Next Bridge / MMTLP corporate action. Thus, applying the standard settlement cycle of T+2, an investor who did not sell MMTLP by December 8 would receive Next Bridge shares in the distribution—and this would be the case even had FINRA not halted trading on December 9.

As described in the Next Bridge prospectus filed with the SEC, Next Bridge anticipated that the distribution process for the Next Bridge shares would take about two weeks and would be effected by its transfer agent, American Stock Transfer & Trust Company LLC. Transfer agents work for securities issuers to record changes of securities ownership, maintain security holder records, cancel and issue certificates, and distribute dividends. SEC rules and regulations include registration and other requirements for registered transfer agents. FINRA does not regulate transfer agents and does not have a role in distributing securities as part of a corporate action.

*See also* Question #10 regarding what investors should do if they have not received their Next Bridge shares and Question #11 regarding whether the Next Bridge shares are tradeable.

**7. What would have happened to any trades executed after December 8 had FINRA not halted trading in MMTLP?**

As mentioned above, applying the T+2 settlement cycle, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. Any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC. There also was concern that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 may not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action

distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution), and that the MMTLP shares purchased would imminently be cancelled.

### 8. Is there public data concerning short sale activity in MMTLP?

Yes, there are several data sets published by FINRA and the SEC about short sale activity that include data for MMTLP.

*Short Interest Data:* "Short interest" in a security is a snapshot of the total open short positions existing on the books and records of broker-dealers for that security on a given settlement date. FINRA's short interest reports reflect short positions held both in customer and proprietary accounts and are published twice each month. FINRA published short interest reports for MMTLP from October 15, 2021, through November 30, 2022 (the last short interest reporting settlement date available for MMTLP). These reports are available on [FINRA's website](). Short interest reports for Next Bridge are not available on FINRA's website because firms report short interest by security symbol and Next Bridge does not have a symbol. FINRA is considering how it might enhance the usefulness of the short interest information available to investors, which could include changes to the content and frequency of the short interest reporting.

*Short Sale Volume:* FINRA also publishes [daily short sale volume data]() by security for OTC equity securities. Importantly, while the two data sets are related in that short sale volume activity may ultimately result in a reportable short interest position, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reported in FINRA's short interest report. For example, while the total short sale volume for transactions in MMTLP that settled from November 16, 2022, through November 30, 2022, was 7,413,679 shares, the published short interest for MMTLP on settlement date November 30, 2022, was 4,658,068 shares.

Differences in the two data sets are expected and occur for a variety of reasons; for example, where a short sale has been covered (either on the same day or at another time prior to the short interest reporting settlement date), which means that there is no longer a short position to report as short interest by the reporting settlement date. As another example, the daily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review [information]() on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest.

*Fails-to-Deliver:* The SEC publishes data on the total quantity of ["fails-to-deliver"]() per security as of each reporting settlement date. As the SEC has [explained](), a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

### 9. What happens if short positions in MMTLP were not closed out before FINRA halted trading?

Broker-dealers have operational conventions in place for adjusting short positions following a corporate action. In this instance, FINRA understands that firms have adjusted short positions in MMTLP to reflect an equal size short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP now reflects a short position of 100 shares of Next Bridge). In other words, the corporate action did not compel short positions to be closed or extinguish any obligations associated with outstanding short positions.

### 10. What should investors do if they believe they have not received their Next Bridge shares?

If you held a settled position in MMTLP on December 12, 2022, your account should reflect your position in Next Bridge. Your broker-dealer is required to maintain possession or control of your shares in compliance with federal law. You also may request a transfer of shares from the [broker-dealer's name]() to your name; however, this transfer may take time to achieve and your broker-dealer or the transfer agent may charge a fee for this service. If you believe that your shares are not properly reflected in your account or your broker-dealer has not been willing to transfer your shares pursuant to your instructions, you should contact your broker-dealer to understand the status of your Next Bridge shares.

Your broker-dealer may reflect your Next Bridge shares in your account using a numeric or alphanumeric identifier. Different firms may use different identifiers because an official CUSIP number, which is an identifier assigned by CUSIP Global Services at the request of the issuer—not FINRA— has not, to date, been assigned to Next Bridge common stock. The absence of an official CUSIP number does not affect the status of the Next Bridge shares reflected in your account. If you believe that your broker-dealer has not provided a satisfactory explanation to your questions, you may submit an [investor complaint]() to FINRA.

### 11. Are the Next Bridge shares tradeable?

As discussed above, Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of 165,523,363 shares of common stock in connection with the Next Bridge / MMTLP corporate action, which became effective on November 18, 2022. According to the [prospectus](), Next Bridge is an independent public reporting company. The shares are freely tradeable under federal law.

As of the date of this article, the Next Bridge shares neither have a CUSIP number nor a security symbol. If Next Bridge were to obtain a CUSIP number, that would facilitate secondary market trading. Broker-dealers would be able to request that FINRA assign a symbol to the Next Bridge shares in connection with quoting and trading activity (where such request is consistent with FINRA rules and policies and with federal law). However, even without a CUSIP number, any trades in Next Bridge shares executed by a broker-dealer must be reported by the firm to

FINRA for regulatory purposes through a file submission process.

As part of its mission, FINRA provides resources on its website to assist retail investors through the investment process. As relevant to the questions around trading in MMTLP, FINRA has published Investor Insight articles addressing short interest and short sale volume data, as well as corporate actions and the mechanics and risks of trading OTC securities. Visit FINRA's For Investors webpage for more information.

*Note: This article was modified on March 27, 2023, to remove references to the registration of the MMTLP shares, which raised questions that are not relevant to the main focus of this article. The registration status of the MMTLP shares is determined under the Securities Act of 1933 and applicable SEC rules and interpretive guidance thereunder, and not FINRA rules.*

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *position*. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data *and* that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

## 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17]While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

## 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been

entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

### 17. Why did FINRA halt trading in MMTLP before December 12?

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased would imminently be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

### 18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

### 19. How can a holder of Next Bridge common stock liquidate their securities?

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[26]

---

[2] "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

[3] In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

4   "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

6   Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA, perform functions that include serving as a central securities depository and operating a centralized system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly on the books of the transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

9   For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10  FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory or law enforcement requests.

11  The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been available because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12  December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13  As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding], hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have different trading characteristics.

14  For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15  A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16  While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

18  On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19  *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

21  Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

22  *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23  *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24  It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public notice by FINRA.