# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

INTER-COASTAL WATERWAYS LLC,

                             *Plaintiff,*

     v.

TRADESTATION SECURITIES, INC. and
DOE DEFENDANTS 1-10,

                             *Defendants,*

    and

THE FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

                           *Nominal Defendant.*

CIVIL ACTION NO. 0:24-cv-60891-AHS

---

**PLAINTIFF INTER-COASTAL WATERWAYS LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TRADESTATION SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND CROSS-MOTION TO DISQUALIFY THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY <u>ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION</u>**

THE BASILE LAW FIRM P.C.

Agapija Cruz, Esq.
365 Fifth Avenue S.
Suite 202
Naples, Florida 33472
Tel.:   (239) 232-8400
Fax:   (631) 498-0478
Email: agapija@thebasilelawfirm.com

Joseph F. Rose, Esq. *(admitted Pro Hac Vice)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:   (516) 455-1500
Fax:   (631) 498-0478
Email: joe@thebasilelawfirm.com

*Counsel for Plaintiff Inter-Coastal Waterways LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 2

A.     FINRA Improperly Permitted the Listing and Trading of the MMTLP Shares ................. 2

B.     FINRA's Improper, Unilateral and Forced-Fed Revision of Meta Materials' December 8, 2022 Notice of Corporate Action and the Subsequent U3 Halt .................... 3

C.     FINRA Was Aware of Fraudulent Market Activity Occurring Amongst Its Member Brokers, Yet FINRA Failed to Initiate Any Disciplinary Action Against Member Brokers, or Provide Adequate Responses to Congressional Inquiry .................................. 6

D.     The Intimate Connection Between TradeStation and FINRA (Conflict of Interest) .......... 7

E.     FINRA Will Assert Immunity to any Discovery Requests in An Arbitration Proceeding ................................................................................................................ 9

ARGUMENT .......................................................................................................... 10

I.     THE COURT SHOULD FIND THAT FINRA CANNOT ACT AS AN IMPARTIAL ALTERNATIVE DISPUTE RESOLUTION SERVICE PURSUANT TO THE ARBITRATION PROVISION .................................. 10

     A.    FINRA's Regulatory Action of Implementing the December 9, 2022 U3 Halt was the Primary Catalyst for Plaintiff's Claims Against TradeStation ......... 11

     B.    Despite a Strong Public Policy Favoring the Enforcement of Arbitration Agreements, an Arbitration Agreement Involving an "Evidently Partial" Arbitration Service Should Not Be Enforced ....................................... 13

     C.    FINRA Would Not Be Conflicted From Administering Arbitration Services For "Virtually Every" Other Dispute Arising Out Of Its Member Brokers' Business Activities ....................................................................... 14

     D.    Each Individual Arbitrator Contracted by FINRA Holds An Innate, Implied Bias Favoring FINRA ............................................................. 15

     E.    The Limited Discovery Permitted by FINRA's Code of Arbitration Will Heavily Prejudice Plaintiff in this Matter ......................................... 17

II.     PLAINTIFF'S CLAIMS ARISE FROM TRADESTATION'S MISCONDUCT
        WHICH WAS NOT CONTEMPLATED BY THE PARTIES AT THE TIME THE
        CONTRACT WAS EXECUTED.  THUS, PLAINTIFF'S CLAIMS ARE NOT
        ARBITRABLE    UNDER    THE    TERMS    OF    THE    ARBITRATION
        AGREEMENTS ............................................................................................................18

CONCLUSION ..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Armada Coal Export, Inc. v. Interbulk, Ltd.*,
  726 F.2d 1566 (11th Cir. 1984) ........................................................................19

*Bolamos v. Globe Airport Sec. Servs.*,
  2002 U.S. Dist. LEXIS 11056 (S.D. Fla. May 21, 2002) ........................................13

*Citigroup Global Mkts., Inc. v. Berghorst*,
  2012 U.S. Dist. LEXIS 76459 (S.D. Fla. Jan. 20, 2012) ........................................15

*Commonwealth Coatings Corp. v. Continental Casualty Co.*,
  393 U.S. 145 (1968)........................................................................................14, 15

*David Khorassani v. The Financial Industry Regulatory Authority*,
  Index No. 153819/2023 (Sup. Ct. N.Y. Cty) ............................................................9

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20, 26 (1991)........................................................................................11

*Hemispherx Biopharma v. Johannesburg Consol. Invs.*,
  553 F.3d 1351 (11th Cir. 2008) ..........................................................................18

*Hensley v. TD Ameritrade, Inc.,*
  Case No. 2-23-cv-5159 (W.D. Wa. Oct. 2, 2023) ...................................................9

*Hoffman v. Fidelity Brokerage Services LLC*,
  2023 U.S. Dist. LEXIS 81166 (C.D. Cal. May 8, 2023) ............................................9

*In re Murchison*,
  349 U.S. 133, 136 (1955)....................................................................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
  473 U.S. 614 (1985)......................................................................................10, 11

*Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Local Union No. 584*,
  359 F.2d 598 (2d Cir. 1966)................................................................................18

*Park v. E-Trade Financial Corporate Services, Inc.*,
   Case No. 2:23-cv-0069 (N.D. Ga. Sept. 25, 2023) ....................................................9

*Prima Paint Corp. v. Flood & Conklin Mfg.*,
   388 U.S. 395 (1967)...................................................................................................11

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974)...................................................................................................11

*Seifert v. United States Home Corp.*,
   750 So. 2d 633 (Fla. 1999).........................................................................................18

*Shearson/Am. Express v. McMahon*,
   482 U.S. 220 (1987)...................................................................................................11

*Tawil v. Financial Industry Regulatory Authority, Inc.*,
   2023 U.S. Dist. LEXIS 117247 (N.D. Fla. May 24, 2023)..........................................9

*The Bremen v. Zapata Off-Share Co.*,
   407 U.S. 1 (1972)......................................................................................................11

*Torres v. First Transit, Inc.*,
   2021 U.S. Dist. LEXIS 144608 (S.D. Fla. Aug. 3, 2021)..........................................15

*Tumey v. Ohio*,
   273 U.S. 510 (1927)...................................................................................................10

*United States v. Perkins*,
   748 F.2d 1519 (11th Cir. 1984) .................................................................................15

*United States v. Rhodes*,
   177 F.3d 963 (11th Cir. 1999) ...................................................................................15

*Withrow v. Larkin*,
   421 U.S. 35 (1975).....................................................................................................10

**Statutes, Rules & Other Authorities:**

9 U.S.C. § 10...................................................................................................................13

17 C.F.R. § 240.15c3-3 ....................................................................................................9

iv

17 C.F.R. § 240.15c3-3(b)(1) ..............................................................................................13

Fed. R. Civ. P. 30 .............................................................................................................17

Fed. R. Civ. P. 33 .............................................................................................................17

Fed. R. Civ. P. 36 .............................................................................................................17

FINRA Rule 6490(d)(3) ......................................................................................................5

FINRA Rule 12400 ...........................................................................................................16

FINRA Rule 12405 ...........................................................................................................15

FINRA Rule 12405(a)(1) ...................................................................................................16

FINRA Rule 12507 ...........................................................................................................17

FINRA Rule 12510 ...........................................................................................................17

Fla. Stat. § 772.103 ...........................................................................................................19

Fla. Stat § 895.03 ..............................................................................................................19

Freedom of Information Act, 5 U.S.C. § 552 ......................................................................6

Plaintiff Inter-Coastal Waterways LLC ("Plaintiff" or "Inter-Coastal"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to Defendant TradeStation Securities, Inc.'s ("Defendant" or "TradeStation") motion to compel arbitration and to stay this action, ECF 29 ("Motion"), and in support of its cross-motion to disqualify The Financial Industry Regulatory Authority ("FINRA") as the mandatory alternative dispute resolution service to the dispute between Inter-Coastal and TradeStation.

## PRELIMINARY STATEMENT

This is a case of first impression where the partiality of an arbitration service and its individual paid arbitrators is challenged due to FINRA, the dispute resolution service's manager, taking actions that exceed its regulatory authority, and those same acts being at the center of the dispute between Plaintiff and TradeStation arises. Plaintiff opposes TradeStation's request to compel arbitration, and in further support of its request to disqualify FINRA as the third-party dispute resolution service mandated by the Agreements, because FINRA's Dispute Resolution Services is operated by and under the influence of the entity whose regulatory actions *caused this very dispute*. Plaintiff's position is, therefore, rooted in the widely-held, irrefutable legal principle that it must be afforded a Constitutionally unbiased avenue through which it may be afforded the opportunity to have an impartial resolution of its claims against TradeStation. On May 24, 2024, Plaintiff filed its Complaint, naming TradeStation as the Defendant and FINRA as Nominal Defendant.[1] *See* ECF 1 ("Complaint") at 1. In its Complaint, Plaintiff notes that the Customer Account Agreement contains a provision requiring the parties' agreement to arbitrate before

---

[1] Plaintiff does not allege any cause of action against FINRA, nor does it seek recourse for any liability against FINRA in its Complaint. Plaintiff names FINRA as a Nominal Defendant because: (i) FINRA was named as the mandatory alternative dispute resolution service to the dispute between Plaintiff and TradeStation in the Agreements; and (ii) FINRA's questionable regulatory activities are the nexus from which the dispute between Plaintiff and TradeStation arose. *See* ECF 33.

FINRA "any and all controversies, claims or disputes relating to your Account, the Services and/or the determination of any contractual rights and liabilities under this Agreement." *Id.* at ¶ 69; *see also* ECF 1-9 at 15.  Plaintiff asserts that optically and practically, both FINRA, as the third party mandated by the Agreements to be the alternative dispute resolution service of any dispute between Plaintiff and TradeStation, as well as any potential "neutral" arbitrator employed and compensated by FINRA, would be demonstrably biased as an alternative dispute resolution service.  The nexus from which the dispute between Plaintiff and TradeStation is unique when compared to the vast majority of disputes FINRA's Dispute Resolution Service ("DRS") mediates and resolves annually.  For the reasons set forth herein, Plaintiff respectfully requests that the Court deny TradeStation's motion to compel arbitration and grant its cross-motion to disqualify FINRA.

## FACTUAL BACKGROUND

**A.     FINRA Improperly Permitted the Listing and Trading of the MMTLP Shares**

On or about June 28, 2021, Meta Materials merged with Torchlight Energy Resources, Inc., a company publicly traded on the Nasdaq Stock Market under the ticker symbol TRCH. Complaint ¶ 11; Declaration of George Palikaras ("Palikaras Decl.") ¶ 3.  After the merger, Meta Materials subsequently began trading on the Nasdaq Stock Market under the ticker symbol MMAT.  Complaint ¶ 12; Palikaras Decl. ¶ 4.  As a part of the merger transaction, Meta Materials issued a special dividend in the form of Series A Preferred Dividend Shares ("Series A Shares" or "MMTLP Shares") to Torchlight Energy shareholders that held shares prior to the merger. Complaint ¶ 13; Palikaras Decl. ¶ 5.  The Series A shares were never intended or authorized to be listed or traded on any exchange, and were created merely to be a dividend placeholder representing the assets of Torchlight Energy that Meta Materials would continue to own as a part of the merger.  Palikaras Decl. ¶ 7.

On or about October 6, 2021, FINRA sent an email to Meta Materials with a letter notifying the Company that FINRA assigned the ticker symbol MMTLP to the Series A Shares and the MMTLP Shares may be quoted and traded on the Over-The-Counter Market ("OTC Market"). Palikaras Decl. ¶ 14.  FINRA's October 6, 2021 letter to Meta Materials indicated that the MMTLP Shares were quoted and began trading via an "exemption" and the Company's financial information provided to FINRA by the unidentified broker(s) seeking the listing exemption was incorrect and outdated, containing publicly available Company information from 2012.  ECF 33 at 2; Palikaras Decl. ¶ 15.  On October 7, 2021, Meta Materials' management responded to FINRA's letter via email, objecting to the assignment of the MMTLP symbol in light of the false and misleading information regarding Meta Materials that was published on the OTC Market's website. *Id.*

Although Torchlight Energy and Meta Materials never intended for the MMTLP Shares to be publicly traded, less than 24 hours after FINRA notified Meta Materials of the assignment of the MMTLP symbol, on October 7, 2021, the Series A Preferred Dividend Shares began trading on the OTC Market under the ticker symbol MMTLP without the authorization of Meta Materials, and despite Meta Materials' persistent objections.  Complaint ¶ 14; Palikaras Decl. ¶ 16.  The Series A Preferred Dividend Shares were actively listed, quoted and trading on the OTC Market for approximately 14 months, between October 7, 2021 and December 9, 2022.  Complaint ¶ 15.

**B.     FINRA's Improper, Unilateral and Forced-Fed Revision of Meta Materials' December 8, 2022 Notice of Corporate Action and the Subsequent U3 Halt**

On November 18, 2022, Next Bridge filed a prospectus[2] onto EDGAR notifying the public of the summary of the Next Bridge asset spin-off and share exchange.  In the prospectus, Next

---

[2] *See* SEC filings, *i.e.*, Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2), at 1.

Bridge noted that every "one share of [MMTLP] outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off …, will entitle the holder thereof to receive one share of Common Stock."  Palikaras Decl. ¶ 23.  In connection with the prospectus, on November 23, 2022, Meta Materials published a press release[3] indicating that, "on December 14, 2022 after the close of the trading markets, … all of the shares of Series A Preferred Stock will be automatically canceled."  Palikaras Decl. ¶ 24.

On December 6, 2022, FINRA published a notice of Meta Materials' corporate action, which stated that MMTLP shares would continue trading until December 12, 2022, that the MMTLP shares would be *canceled* on December 13, 2022, and that Next Bridge shares would be distributed to MMTLP shareholders with settled positions as of December 12, 2022, on December 14, 2022.  *See* ECF 1-6, at 2; Palikaras Decl. ¶ 30.  Subsequently, on December 8, 2022, a revised notice of corporate action was published by FINRA, unilaterally revising the language used by Meta Materials in the original corporate action to read, "MMTLP will be *deleted* effective 12/13/22", a revision that was not authorized by Meta Materials.  *See* ECF 1-6, at 1; Palikaras Decl. ¶ 32.  Notably, this revision deviates from the previous language used and approved by Meta Materials Board of Directors in both its December 6, 2022 corporate action, as well as Meta Materials' November 23, 2022 press release.

In its own motion to dismiss itself from this suit, even though FINRA is just a nominal party, FINRA notes that pursuant to FINRA Rule 6490, FINRA "*reviews documents* submitted by an issuer in connection with a company-related action and, if the documents are not deemed deficient, FINRA processes the request and provides notice of the company-related action through an announcement in the FINRA Daily List publication."  ECF 27 ("FINRA MTD") at 6.  FINRA

---

[3] *See*  https://www.accesswire.com/728166/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc (last accessed July 31, 2024).

"make[s] such deficiency determinations solely on the basis of one or more" of the factors outlined in FINRA Rule 6490(d)(3), including whether "there is significant uncertainty in the settlement and clearance process for the security."  FINRA Rule 6490(d)(3).  On or about December 8, 2022, FINRA notified the Company that it had unilaterally revised the language of the Company's December 6, 2022 corporate action and required the revised notice to be published on the Daily List.  Palikaras Decl. ¶ 32.  Although FINRA's Rules, as well as FINRA's Motion, specifically states that it merely *reviews* documents submitted by an issuer, on December 8, 2022, Meta Materials announced that "FINRA has revised" Meta Materials' notice of corporate action.  *Id.* ¶ 33.  This revision was made without the input or authorization of the Company.  *Id.* ¶ 31.

The very next day, on December 9, 2022, FINRA enacted a very rare U3 halt on the trading of MMTLP alleging "significant uncertainty in the settlement and clearing process" for the security.  MTD at 7, ECF 1-11, at 7; Palikaras Decl. ¶ 34.[4]  *Was this a set up?*  In effect, FINRA's revised version of the corporate action led directly to FINRA instituting the U3 halt the very next day.  In a public FAQ, FINRA stated that it had based its determination that there existed "significant uncertainty in the settlement and clearing process"[5] on the circumstances that, after December 12, 2022, "the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be canceled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible."  *Id.*  Despite revising Meta Materials' corporate action and having prior, actual knowledge of the "extraordinary event" which would lead to its determination

---

[4] It is Plaintiff's belief that, despite FINRA's assertion that the U3 halt was enacted to "protect retail investors," FINRA's intent behind enacting the halt was, instead, to protect its member brokers from expending billions of dollars covering their open short positions within the normal settlement period which, over 600 days later, have not been resolved.

[5] "Significant uncertainty in the settlement and clearing process" is an industry created term of art.  FINRA never fully explained the specific settlement issues which required the implementation of the U3 halt and, instead, referred to "the potential for confusion" for retail investors, *see* ECF 1-11 at 7, while ignoring its member brokers' obligation to cover their outstanding short positions which, at the time of the halt, was no less than 2.65 million shares.  *Id.* at 6.

to halt trading of MMTLP, FINRA failed to notify the public or Meta Materials that it would be enacting a halt, leading, in part,  to the dispute between Plaintiff and TradeStation and an open short interest of no less than 2.65 million shares at the time MMTLP ceased trading which, to date, has not been covered.[6]

## C.  FINRA Was Aware of Fraudulent Market Activity Occurring Amongst Its Member Brokers, Yet FINRA Failed to Initiate Any Disciplinary Action Against Member Brokers or Provide Adequate Responses to Congressional Inquiry

Despite having knowledge of fraudulent activity occurring among its member brokers and communicating confirmation of this knowledge with the SEC as early as December 5, 2022, FINRA failed to discipline its member brokers for illegal or unethical market activity relating to MMTLP.   As a self-regulatory organization authorized by Congress, FINRA's primary responsibility in the regulation of the financial market is the oversight and discipline of its member broker-dealers.  Electronic Blue Sheets are one of the investigative tools used by FINRA to monitor and detect illegal, fraudulent or unethical behavior of its member firms.

On or about December 16, 2022, a Freedom of Information Act request was submitted to the SEC by a member of the investing public which revealed that on December 5, 2022, FINRA noted in an email to the SEC it was made aware of fraud being committed pertaining to MMTLP as it was "Bluesheeting" its member broker-dealers relating to MMTLP prior to the enactment of the U3 halt.  *See* Complaint ¶ 77, ECF 1-6 at 4.  On December 23, 2023, after tens of thousands of registered complaints by MMTLP shareholders, including plaintiff, to the SEC, 74 members of the House of Representatives signed a letter to the Chairman of the SEC, Gary Gensler, and the President and Chief Executive Officer of FINRA, Robert Cook, requesting that the SEC and

---

[6] FINRA has failed to initiate any disciplinary action against its member brokers, including TradeStation, for the admitted failures of its member brokers to cover no less than 2.65 million shares shorted, as well as for failures to maintain physical possession of its customer's securities, such as TradeStation's failure to maintain Plaintiff's Next Bridge shares.

FINRA "review events surrounding Meta Materials Series A preferred shares," including "concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP" and "the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares." *See* Complaint at 19, n.16.  On January 31, 2024, FINRA responded to the Congressional letter stating it had "reviewed its members' U.S. trading activity in MMTLP, including short sale activity, and has found no evidence that there was *significant* naked short selling … in MMTLP." *Id.*, n.17.  FINRA's open-ended response to Congress cannot be read to say it did not find *any* naked short selling by its member brokers.  Rather, FINRA's statement clearly shows they did find their members to be naked short selling MMTLP shares, yet FINRA failed to effectively discipline its member brokers based on its own findings.[7]

**D.      The Intimate Connection Between TradeStation and FINRA (Conflict of Interest)**

On or about December 9, 2022, at the time of the MMTLP U3 halt, TradeStation's Chief Compliance Officer Nikki Brinkerhoff was, and to date is, an industry representative sitting on FINRA's South Regional Committee for District 7.[8]  FINRA's Regional Committees "advise FINRA on industry trends of regulatory concern, provide input on the impact of FINRA's regulatory programs and communicate high-level information regarding meeting discussions to their constituents," as well as serving as panelists in FINRA's disciplinary proceedings.  As a Regional Committee representative, Brinkerhoff's responsibilities include advising FINRA on regulatory trends and impacts, communicating key information and serving as a disciplinary panelist.  Following the halt, Ms. Brinkerhoff led a discussion on the Next Bridge S-1 filing for

---

[7] This Court should direct an in camera review of FINRA's Blue Sheet and Consolidated Audit Trail Data, as well as issuing an order directing FINRA to provide the Court with a comprehensive and accurate share count of the MMTLP security, to determine whether FINRA failed to initiate disciplinary proceedings against its member brokers for violations of state and federal securities laws and regulations.

[8] *See* https://www.finra.org/about/governance/regional-committees (last accessed July 31, 2024).

the Financial Information Forum (FIF), a body including broker-dealers, market makers, and SROs, which discussed MMTLP.  On February 23, 2024, Ms. Brinkerhoff spoke at an event hosted by FINRA on topics including arbitration, enforcement, and compliance.  This speaking engagement lends to the complication of FINRA's neutrality, given Ms. Brinkerhoff's influence on arbitration and enforcement actions as a representative of TradeStation.[9]  During the week of January 22, 2024, FIF members received document requests from both SEC and FINRA examination groups relating to the Next Bridge Hydrocarbons and Meta Materials reorganization. FIF solicited responses from member brokers to gauge the number of firms receiving such inquiries, promising to maintain anonymity.

Despite TradeStation's admission to over-lending MMTLP shares, Ms. Brinkerhoff was promoted to FINRA's Uniform Practice Code ("UPC") Advisory Committee.  The UPC Advisory Committee is responsible for advising and making recommendations to FINRA regarding issues relating to the Uniform Practice Code and Over-The-Counter market trading, processing and operations.  As FINRA states on its website, the UPC Advisory Committee "considers issues related to the clearance and settlement of OTC securities transactions," such as the implementation of the U3 halt of MMTLP due to "significant uncertainty in the settlement and clearance process." Ms. Brinkerhoff's dual roles on FINRA's Regional and UPC Advisory Committees present clear conflicts of interest, as her role would have allowed her to advise FINRA during the U3 halt and now influence the UPC Advisory Committee's decisions.  Her promotion, despite TradeStation's over-lending of MMTLP shares, questions her impartiality in regulatory decisions, as well as FINRA's impartiality as an alternative dispute resolution service to the dispute between Plaintiff

---

[9] Ms. Brinkerhoff's panel discussion of Next Bridge is certainly not a coincidence.  The Next Bridge securities were born from the MMTLP security and, optically, the concern FINRA had for its member brokers' sentiment toward Next Bridge seems far greater than its concern for the potential harm that would be suffered by retail investors.

and TradeStation.[10]  The coordination among FIF members and discreet regulatory handling suggests potential collusion undermining fair processes, and Ms. Brinkerhoff's involvement in regulatory decisions and forums raises concerns about impartiality, necessitating this action be heard in front of this Court as Plaintiff seeks a non-partial judicial resolution to its dispute against TradeStation and the Doe Defendants.

**E.      FINRA Will Assert Immunity to any Discovery Requests in An Arbitration Proceeding**

To complicate matters, FINRA has already asserted its immunity in several lawsuits seeking to hold FINRA liable for the issues surrounding MMTLP,[11] as well as in a Special Proceeding initiated in a New York State Court seeking FINRA's Electronic Blue Sheets[12] containing information regarding its member brokers activity around the time of the halt[13].  FINRA "bluesheeted" its member brokers because FINRA suspected fraud surrounding the trading of MMTLP from its *member brokers*, likely illegal naked short selling.  *See* ECF 1-6 at 3.  Despite the fact that FINRA has failed to provide Congress with the same requested information, FINRA will undoubtedly assert the same immunity in its own arbitration proceeding should this court grant

---

[10] Despite FINRA's November 6, 2023 Supplemental MMTLP FAQ stating that at the time of the U3 halt there were outstanding short positions of no less than 2.65 million shares which, to date (more than 600 days from the event), have yet to be covered, FINRA has failed to prosecute *any* disciplinary administrative action against its member brokers, including TradeStation. This certainly raises the question of FINRA's impartiality considering Nikki Brinkerhoff (TradeStation's Compliance Officer) and her position in FINRA to run "interference" to thwart any disciplinary action against defendant TradeStation.  Optically this is certainly a question that needs this court's consideration in determining this motion.

[11] *Tawil v. Fin. Indus. Regul. Auth., Inc.*, Case No. 4:22-cv-440, 2023 U.S. Dist. LEXIS 117247 (N.D. Fla. May 24, 2023) (dismissed due to FINRA's immunity to a private civil lawsuit); *Hoffman v. Fidelity Brokerage Servs. LLC*, Case No. 2:23-cv-00881, 2023 U.S. Dist. LEXIS 81166 (C.D. Cal. May 8, 2023) (same); *Park v. E-Trade Fin. Corp. Servs., Inc.*, Case No. 2:23-cv-0069 (N.D. Ga. Sept. 25, 2023) (same); *Hensley v. TD Ameritrade, Inc.*, Case No. 2-23-cv-5159 (W.D. Wa. Oct. 2, 2023) (same)

[12] *See David Khorassani v. The Fin. Indus. Regul. Auth.*, Index No. 153819/2023 (Sup. Ct. N.Y. Cty).

[13] Conspicuously absent from the record is any lawsuit by TradeStation against FINRA (member broker firms are the only ones that can sue FINRA) for FINRA instituting the U3 halt thereby directly affecting TradeStation's ability to deliver plaintiff's stock. Conversely, no disciplinary action has been brought by FINRA against TradeStation for violating 17 C.F.R. § 240.15c3-3. This raises the serious issue of collusion between FINRA and TradeStation against Plaintiff (as well as 65,000 other retail investors) that have been deprived of any regulatory relief for more than 600 days since the event on December 9, 2022.

TradeStation's motion and send this matter to arbitration.  This fact alone is a conflict of interest because FINRA is *directly implicated* in the chain of events leading to TradeStation's inability to deliver Plaintiff its securities.  It is highly likely that any FINRA arbitrator will disallow any discovery from FINRA, and Plaintiff would be severely prejudiced, raising serious due process concerns.

**ARGUMENT**

**I.      THE COURT SHOULD FIND THAT FINRA CANNOT ACT AS AN IMPARTIAL ALTERNATIVE DISPUTE RESOLUTION SERVICE PURSUANT TO THE ARBITRATION PROVISION**

"A fair trial in a fair tribunal is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136 (1955).  The fairness demanded by due process "requires an absence of actual bias in the trial of cases."  *Id.*  "Not only is a biased decision maker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the possibility of unfairness."  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (quoting *Murchison*, 349 U.S. at 136; *cf. Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).  In this case, legal constraints external to the parties' agreement foreclose the arbitration of these claims.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985) (approving of appellate court's two-step inquiry, "first determining whether the parties' agreement to arbitrate reached the statutory issues, and then, upon finding it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.").

Claims under statutes which are designed to advance important public policies may be subject to arbitration, unless the party resisting arbitration can show that Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 227 (1987) (citing *Mitsubishi*, 473 U.S. at 628).  Such Congressional intent "will be

10

deducible from the text of legislative history" of the statute, *Mitsubishi*, 473 U.S. at 628, "or from an inherent conflict between arbitration and the statute's underlying purposes." *McMahon*, 482 U.S. at 227 (citing *Mitsubishi*, 473 U.S. at 632-37; *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)). "[S]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi*, 473 U.S. at 637; *Gilmer*, 500 U.S. at 28.

A party resisting arbitration "may attack directly the validity of the agreement to arbitrate." *Mitsubishi*, 473 U.S. at 632 (citing *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395 (1967)). "Moreover, the party may attempt to make a showing that [] 'enforcement would be unreasonable and unjust'; or that proceedings 'in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." *Id.* (quoting *The Bremen v. Zapata Off-Share Co.*, 407 U.S. 1, at 12, 15, 18 (1972), *superseded by statute*, 28 U.S.C. § 1404(a)); *see also id.* at 630 ("'[an] agreement to arbitrate before a specified tribunal [is], in effect, a specialized kind of forum-selection clause...'" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974))).

**A. FINRA's Regulatory Action of Implementing the December 9, 2022 U3 Halt was the Primary Catalyst for Plaintiff's Claims Against TradeStation**

The primary catalyst for Plaintiff's claims against TradeStation set forth in the Complaint was the December 9, 2022 U3 halt enacted by FINRA that prevented TradeStation from fulfilling its obligations pursuant to the Agreements, as well as from complying with Florida State and federal securities laws and regulations, to the detriment of Plaintiff.

      a. <u>Plaintiff's Claims for Rescission Pursuant to Section 29(b) of the Exchange Act for a Violation of 17 C.F.R. § 240.15c3-3(b)(1), Violation of Fla. Stat § 678.5041 and Negligence *Per Se* for Violations of State and Federal Securities Laws</u>

Pursuant to the Lending Agreement, TradeStation loaned its customers', including Plaintiff's, fully-paid MMTLP Shares to unidentified third-party brokers (the "Doe Defendants") to facilitate the Doe Defendants opening of short positions in MMTLP, in exchange for regular, monthly interest payments remitted to Plaintiff.   Complaint ¶ 30; ECF 1-4.   After the implementation of the halt and subsequent delisting of the MMTLP Shares, on or about December 29, 2023, TradeStation notified its customers that "[u]pon the initial distribution of [Next Bridge] common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials" and "[t]he [Next Bridge] certificate that TradeStation received excluded a large number of [Next Bridge] shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program."   Complaint ¶¶ 48-49.   The issuance of a physical certificate which excluded a large portion of the shares loaned to the Doe Defendants is indicative of TradeStation's loans of MMTLP Shares in excess of the amount held on record for the benefit of its customers.   Complaint ¶ 52; ECF 1-7.

The Doe Defendants borrowed MMTLP Shares from TradeStation to sell the shares into the open market to purchase short positions in the security.   On December 9, 2023, FINRA implemented the U3 halt on the MMTLP ticker, creating the impossibility for TradeStation to reclaim the MMTLP Shares loaned to the Doe Defendants pursuant to the Lending Agreement. Once the trading of MMTLP was halted, the Doe Defendants were unable to sell or otherwise dispose of their outstanding short positions (which were for no less than 2.65 million shares, *see* ECF 1-11 at 6), and the MMTLP Shares that were borrowed never returned to TradeStation. Complaint ¶ 129.   As such, TradeStation was left with a share imbalance, requiring it to utilize the physical shares received from Next Bridge to cover the excess MMTLP Shares loaned rather than

holding physical certificates for the benefit of its customers pursuant to 17 C.F.R. § 240.15c3-3(b)(1).

> **b.** <u>Violation of Fla. Stat. § 678.5071 for Failure to Comply with Plaintiff's Entitlement Order, Breach of Contract, Negligent Misrepresentation, Conversion, Breach of Fiduciary Duty, Unjust Enrichment and Constructive Trust</u>

On March 19, 2024, Plaintiff's principal contacted TradeStation's Client Services Department to provide TradeStation notice of Plaintiff's intent to terminate the loan of its Next Bridge shares pursuant to Section 7.1 of the Lending Agreement and to terminate the Lending Agreement in full pursuant to Section 25.1.  Complaint ¶ 55.  On December 13, 2022, TradeStation sent its clients who held shares of MMTLP, including Plaintiff's principal, an email notification stating "[u]nless we hear from you to the contrary by the close of business on December 29, 2022, TradeStation will send your Next Bridge shares to American Stock Transfer & Trust Company ("AST")."  Complaint ¶ 41; ECF 1-7.  On March 22, 2024, the Lending Agreement was terminated and, upon such termination, Plaintiff requested TradeStation return its fully-paid Next Bridge shares by delivering physical certificated Next Bridge shares pursuant to Section 16.1 of the Lending Agreement.  Complaint ¶¶ 55-56.  TradeStation subsequently notified Plaintiff that it could and would not deliver physical certificates—an Event of Default pursuant to Section 13.7 of the Lending Agreement and a material breach pursuant to Section 16.1.  Complaint ¶¶ 57-59, 155.

**B. Despite a Strong Public Policy Favoring the Enforcement of Arbitration Agreements, an Arbitration Agreement Involving an "Evidently Partial" Arbitration Service Should Not Be Enforced**

Generally, arbitration agreements are construed in favor of arbitration.  *See Bolamos v. Globe Airport Sec. Servs.*, 2002 U.S. Dist. LEXIS 11056, at *1 (S.D. Fla. May 21, 2002) ("In enacting the FAA, Congress established a strong federal policy in favor of arbitration agreements").  However, Section 10 of the Federal Arbitration Act authorizes the "vacation of an award where there was evident partiality [] in the arbitrators.'"  *See* 9 U.S.C. § 10; *Commonwealth*

*Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147 (1968) ("These provisions show a desire of Congress to provide not merely for *any* arbitration, but for an impartial one").

Plaintiff does not disagree that an agreement to arbitrate before FINRA was entered into between the parties.  Further, Plaintiff does not disagree that public policy generally favors the enforcement of arbitration agreements, as held by the U.S. Supreme Court, should the arbitration proceedings be held with *complete impartiality*.  However, it is indisputable that FINRA, as an alternative dispute resolution service, as well as individual arbitrators independently contracted and paid by FINRA, would be biased in favor of TradeStation as it relates to Plaintiff's claims that arise from FINRA's regulatory activities.

### C.  FINRA Would Not Be Conflicted From Administering Arbitration Services For "Virtually Every" Other Dispute Arising Out Of Its Member Brokers' Business Activities

In its Motion, TradeStation notes that "thousands of arbitrations [are] administered by FINRA Dispute Resolution Services every year involv[ing] securities disputes among and between brokerage customers, like Plaintiff, and FINRA members, like TradeStation."  Motion at 9. TradeStation further argues that under Plaintiff's "bizarre" bias theory, "FINRA conceivably could be conflicted from administering virtually every arbitration dispute brought before it."  *Id.*  It is *inconceivable and nigh impossible* that *every* dispute arbitrated by FINRA directly arises from the result of FINRA's own regulatory activities.  This is an absurd reading of the Complaint and Plaintiff's position.  It is the fact, unique to this case, that FINRA had taken a series of several questionable regulatory activities directly concerning the MMTLP security which FINRA has failed to properly account for—the numerous volumes of evidence of FINRA's failure to respond to inquiries, in lawsuits, in special proceedings, in FOIA requests and above all, Congressional inquiry—leaves no doubt that the unique element to this case is FINRA's direct involvement, through its regulatory actions, that have caused this mess.

14

**D. Each Individual Arbitrator Contracted by FINRA Holds An Innate, Implied Bias Favoring FINRA**

An arbitrator is a neutral, third-party fact-finder that hears and resolves a dispute in a role similar to a judge or juror.[14] "It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Cont'l Cas.*, 393 U.S. at 149-150.  Generally, fact-finders, such as arbitrators and jurors, are excluded upon a showing of an implicit or actual bias.  *See United States v. Rhodes*, 177 F.3d 963, 965 (11th Cir. 1999) (noting a court must dismiss a prospective juror for cause when he or she reveals actual bias or when bias is implied because the juror has a special relationship to a party); FINRA Rule 12405; *Citigroup Glob. Mkts., Inc. v. Berghorst*, 2012 U.S. Dist. LEXIS 76459, at *9 (S.D. Fla. Jan. 20, 2012) (noting that pursuant to FINRA Rule 12405, FINRA arbitrators are required to disclose "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding").  This standard must be applied in the same manner to the arbitration service, as it does to the individual arbitrator.  "Actual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" *Torres v. First Transit, Inc.*, 2021 U.S. Dist. LEXIS 144608, at *55 (S.D. Fla. Aug. 3, 2021) (*quoting United States v. Perkins*, 748 F.2d 1519, 1532 [11th Cir. 1984]).  Bias may be implied if a juror (fact-finder) "has a special relationship with a party, such as a familial or master-servant relationship." *Rhodes*, 117 F.3d at 965 (noting a prospective juror must be dismissed when actual

---

[14] *See* Arbitrator, Black's Law Dictionary (2nd ed.), available at https://thelawdictionary.org/arbitrator/ (last accessed August 5, 2024) ("A private, disinterested person, chosen by the parties to a disputed question, for the purpose of hearing their contention, and giving judgment between them…").

bias is revealed or when bias is implied); *see also* FINRA Rule 12405(a)(1) ("Each potential arbitrator must make a reasonable effort to learn of, and must disclose to the Director, any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including any direct or indirect financial or personal interest in the outcome of the arbitration).

FINRA would not be a party to an arbitration proceeding arising from the dispute between Plaintiff and TradeStation.  However, FINRA's Dispute Resolution Service is the forum in which this dispute would be brought before and permitting TradeStation to use its platform to arbitrate this dispute raises severe due process concerns.  FINRA's arbitrators are independent contractors for FINRA that are chosen via "a list selection algorithm that generates, on a random basis, lists of arbitrators from FINRA's rosters of arbitrators for the selected hearing location for each proceeding." *See* FINRA Rule 12400.  As independent contractors, FINRA's "neutral" arbitrators receive compensation at a rate of $300 per hearing session.[15]  Similar to a juror, arbitrators are intended to be neutral fact-finders.  Generally, jurors are excluded when there is a showing of express or implicit bias.  In the eyes of Plaintiff, it is unjust to permit a panel of arbitrators with a financial connection to FINRA to make decisions in a dispute which arose out of the regulatory activities of the same entity that the arbitrators are financially contracted with.  Psychologically, each and every arbitrator that receives work from, and is financially compensated by FINRA will hold an implicit bias in favor of FINRA, especially when FINRA's regulatory activities are one of the main causes of the dispute.  As such, this Court should find that arbitrators that are financially compensated by FINRA would hold an implied bias in favor of a FINRA member broker in a

---

[15] *See* https://www.finra.org/arbitration-mediation/rules-case-resources/honoraria-expenses (last accessed August 1, 2024).

dispute that stems from the regulatory actions taken by FINRA, the entity *that provides financial compensation for resolving such disputes*.

### E. The Limited Discovery Permitted by FINRA's Code of Arbitration Will Heavily Prejudice Plaintiff in this Matter

FINRA's Code of Arbitration severely limits Plaintiff's ability to gather the evidence needed to prosecute its claims against TradeStation. This evidence includes, but certainly not limited to TradeStation's lending activities across all of its accounts in the MMTLP security; all discovery into up to 105 other brokers involved in TradeStation's lending of the MMTLP securities; other similar complaints filed against TradeStation as well as the other 105 brokers; communications between FINRA and TradeStation; communications between TradeStation and the borrowing brokers, etc. In FINRA arbitration, discovery is limited and the discretion to authorize interrogatories and depositions are exclusively in the hands of the arbitrator, and are rarely authorized. *See* FINRA Rule 12507 ("Standard interrogatories are generally not permitted in arbitration"); FINRA Rule 12510 ("Depositions are strongly discouraged in arbitration. Upon motion of a party, the panel may permit depositions, but only under very limited circumstances…"). The arbitrator also has complete control over a party's subpoena power as it is the arbitrator that issues the subpoena, not counsel to the parties. *See* FINRA Rule 12512(a)(1) ("[P]arties should produce documents and make witnesses available to each other without the use of subpoenas. Arbitrators shall have the authority to issue subpoenas for the production of documents or the appearance of witnesses"). Should this Court deny TradeStation's request to compel arbitration, Plaintiff would avail itself of all discovery tools under the Federal Rules of Civil Procedure including Rule 30, Rule 33 and Rule 36, as well as Plaintiff's counsel having the authority to subpoena information from third party witnesses.

**II.     PLAINTIFF'S CLAIMS ARISE FROM TRADESTATION'S MISCONDUCT WHICH WAS NOT CONTEMPLATED BY THE PARTIES AT THE TIME THE CONTRACT WAS EXECUTED.  THUS, PLAINTIFF'S CLAIMS ARE NOT ARBITRABLE UNDER THE TERMS OF THE ARBITRATION AGREEMENTS**

"[I]n order for the dispute to be characterized as arising out of or related to the subject matter of the contract, and thus subject to arbitration, it must, at the very least, raise some issue the resolution of which requires a reference to or construction of some portion of the contract itself." *Seifert v. United States Home Corp.*, 750 So. 2d 633, 639 (Fla. 1999) (*citing Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emps. Local Union No. 584*, 359 F.2d 598 (2d Cir. 1966)).  The relationship between the dispute and the contract is not satisfied simply because the dispute would not have arisen absent the existence of a contract between the parties.  *Armada Coal Exp., Inc. v. Interbulk, Ltd.*, 726 F.2d 1566 (11th Cir. 1984).  The Eleventh Circuit has held that a claim "arises under" an arbitration agreement when the claims were a "foreseeable result" of the performance of the agreement.  *See Hemispherx Biopharma v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1367 (11th Cir. 2008).

The Account Agreement arbitration provision states it is limited to "controversies, claims or disputes relating to [Plaintiff's] Account, the Services, and/or the determination of any contractual or other rights and liabilities under this Agreement."  ECF 1-9 at 15.  The Account Agreement defines "Account" as "the securities brokerage account or accounts you are opening or have opened or later open with us regarding your interests and transaction in equities, such as stocks…."  *Id.* at 1.  Similarly, the Lending Agreement arbitration provision states it is limited to "any dispute, controversy or claim arising out of this agreement or any loan hereunder."  ECF 1-2 at 16.  It is inconceivable that a rational individual could believe, or reasonably foresee, that Plaintiff's claims against TradeStation could arise out of the Agreements as a result of FINRA's regulatory activities.  Further, it was an impossibility that Plaintiff could have foreseen its claims

arising out of TradeStation's illegal activity that was unknown to Plaintiff at the time the Agreements were executed.

Plaintiff does not dispute that the factual foundation for Plaintiff's action against TradeStation stems from its interest in its MMTLP shares it fully-purchased through its TradeStation Account.  However, the parties did not contemplate that TradeStation's use of counterfeit MMTLP shares to the Doe Defendants, pursuant to the Lending Program, would lead to Plaintiff suffering financial damages.  Assuming TradeStation would operate pursuant to federal and Florida State securities laws, Plaintiff did not, and should not have been expected to foresee the possibility that TradeStation (admittedly) loaned MMTLP Shares to third-party brokers in an amount in excess of the amount held on record for the benefit of its customers, i.e. counterfeit MMTLP Shares.  This unlawful activity, along with FINRA's regulatory actions taken with respect to MMTLP, are the core facts from which Plaintiff's claims against TradeStation arise.

Additionally, Plaintiff's claims, including those for violations of Fla. Stat § 895.03 and Fla. Stat. § 772.103, are outside the scope of the contract and, thus, were not foreseeable to Plaintiff as these claims are directly traceable to TradeStation's lending of counterfeit MMTLP shares to third-party brokers in excess of the number of shares held on record for the benefit of its customers. This was an unlawful activity carried out by TradeStation for an unknown period of time prior to Plaintiff executing the Agreements with TradeStation and *unknown to Plaintiff* at the time the Agreements were executed.

Plaintiff's claims were not a foreseeable result of either parties' performance under the Agreements.  The Agreements did not contemplate TradeStation's use of counterfeit MMTLP shares to operate its Lending Program.  Because TradeStation (or the Doe defendants utilized or created counterfeit MMTLP shares in some way through its lending program), TradeStation's

claim that it was not provided with a physical share certificate from Next Bridge which covered all fully-paid shares loaned to third-party brokers that were held on record for the benefit of its customers, as well as the excess amount of shares loaned, causing TradeStation to be unable to fulfill Plaintiff's entitlement order, breaching the Lending Agreement should fall on this courts deaf ears.  As such, the Court should find that Plaintiff's claims against TradeStation did not arise from the Agreements and, thus, were not foreseeable to Plaintiff at the time of contracting with TradeStation.

<u>**CONCLUSION**</u>

Simply stated, if FINRA had not permitted the listing exemption for the MMTLP Shares utilizing incorrect and outdated information, the MMTLP Shares would never have started trading and FINRA would never have been required to implement an exceedingly rare U3 halt on the MMTLP Shares without warning, catching Meta Materials, MMTLP shareholders and its member brokers by surprise.  Because FINRA took the regulatory actions it did, it became impossible for TradeStation to fulfill its obligations under the Agreements and comply with state and federal securities laws, leading *directly* to the dispute between Plaintiff and TradeStation

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny TradeStation's motion to compel arbitration and stay this action, and grant Plaintiff's cross-motion to disqualify FINRA from acting as the dispute resolution service mandated by the Agreements between Plaintiff and TradeStation.  Plaintiff invites FINRA to explain itself before this Court how its extra-regulatory conduct was not wrong with the facts and data that indicates its bias in this matter. Plaintiff expects that this Court is the ideal forum for FINRA to provide information and a detailed explanation to properly account for its regulatory and other activities and to answer both shareholder and Congressional inquiries outstanding for more than 600 days.

<u>**Local Rule 7.1(a)(3) Certification**</u>

I hereby certify that undersigned counsel attempted to confer with counsel for TradeStation

regarding the relief Plaintiff seeks in its cross-motion. However, counsel for TradeStation did not

respond to Plaintiff's inquiry.  Based on TradeStation's motion to compel arbitration, Plaintiff

believes TradeStation would oppose the relief Plaintiff seeks herein.

Respectfully Submitted,

**THE BASILE LAW FIRM P.C.**

*/s/ Agapija Cruz*
Agapija Cruz, Esq.
365 Fifth Avenue S.
Suite 202
Naples, Florida 33472
Tel.:    (239) 232-8400
Fax:    (631) 498-0478
Email:  agapija@thebasilelawfirm.com

Joseph F. Rose, Esq. *(admitted Pro Hac Vice)*
390 N. Broadway, Ste. 140
Jericho, New York 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0478
Email:  joe@thebasilelawfirm.com

*Counsel for Plaintiff Inter-Coastal Waterways LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing was electronically filed on August 16, 2024, with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

Respectfully Submitted,

*/s/ Agapija Cruz*
Agapija Cruz, Esq.