# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   v.

JOHN BRDA,
GEORGIOS PALIKARAS,

        Defendants.

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

## COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

## I.   SUMMARY

1. Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2. Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3.      To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4.      As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5.      Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6.      As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7.      Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8.      When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger—Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9.  By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10.  For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.  JURISDICTION AND VENUE

11.  The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12.  This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13.  Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

### III. __DEFENDANTS__

15. Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

## IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

## V.     FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

6

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.　　As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B.  Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26.     To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing—Torchlight's primary asset aside from its oil and gas leases.

27.     Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

### C. Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32.     By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33.     In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

34.     Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35.     Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36.     Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

37.     Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.     Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.     Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.     Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred

Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the

potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with

negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the

Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate

Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41.     To illustrate, Torchlight's definitive proxy statement described the purported

"reasons" and "factors" that Torchlight's board (including Brda) considered in both approving

the merger and Preferred Dividend and recommending that shareholders approve the same. The

proxy statement repeatedly states that the supposed "reason" for approving and proposing the

Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to

retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false,

or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and

subsequent public filings that the reason—or at least a reason—that Torchlight and Brda

considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze

and/or to temporarily increase Torchlight's stock price.

42.     Similarly, Torchlight's definitive proxy statement also stated that "[t]he

*anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the

Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas

assets] after the consummation of the [merger]." (emphasis added). Again, this statement was

false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy

statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend

was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.     Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.     Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.    The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

**E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

51.     In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.     Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.     Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59.     Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60.     For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61.     As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … there will be **a potential jump towards the close**, **it's called a short squeeze**… (emphasis added).

62.     In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.     For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.     On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65.     Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.     Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67.     As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

> ### i. Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.

68.     In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69.     Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company will use commercially reasonable efforts to sell the O&G Assets [within six months of the merger closing]. Torchlight stockholders of record as of the Series A Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of Series A Preferred Stock.... Holders of shares of Series A Preferred Stock may receive Asset Sale Dividends from any Asset Sale Transactions consummated [within six months of the merger closing], and may also receive a Spin-Off Dividend of any Remaining Assets that have not been sold in an Asset Sale Transaction [within six months of the merger closing].

74.     These statements were made repeatedly in Torchlight's proxy materials. The company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.     These statements and representations made by Brda in Torchlight's public filings, proxy statements, and press releases were false and misleading at the time they were made. As Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas assets and had taken no actions to lay the groundwork for a sale when the statements were made. Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise, during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.     Without any identified buyers or ongoing negotiations, Brda knew, or was severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.    In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.    Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity"**). He did not publicly disclose these plans.

79.    Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80. By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81. Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

*ii. Palikaras made false statements about the value of the Preferred Dividend.*

82. On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83.     First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84.     Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85.     As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86.     By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.     After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.     Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

## G.  Defendants Succeeded In Manipulating The Price Of Torchlight Stock.

89.     As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.     On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend—which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93.     Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94.     The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95.     Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96.     Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97.     Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

## H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98. Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99. Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100. Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101.    Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

102.    Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103.    More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104.    Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… ***We have two days to take advantage of the squeeze***, today should have been a 5 million share day at 6[.]" (emphasis added).

105.     Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106.     Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107.     Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

**I.  Brda Profited From The Fraudulent Scheme.**

108.    Brda profited off his fraudulent scheme and false and misleading statements to investors.

109.    On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.    Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111.    Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

## VI.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
***(Against All Defendants)***

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

38

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116. With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

#### *(Against All Defendants)*

118. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119. Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120. Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

122.     With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]**

*(Against All Defendants)*

124.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

125.     As further described and alleged in paragraphs 39-46 and 67-81 above, Torchlight's proxy statements contained false or misleading statements and/or omissions of material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval via the proxy statements containing false or misleading statements or omissions of material fact.

126.    As further described and alleged in paragraphs 82-88 above, Palikaras  solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.    By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.    With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

129.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]
### *(Against Brda)*

130.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.     At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.     As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.     As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134.  By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135.  By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136.  By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

**FIFTH CLAIM FOR RELIEF**

**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**
*(Against Brda)*

137.  The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138.  As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

43

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.    Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

142.     By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143.     By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII.     <u>PRAYER FOR RELIEF</u>

144.     WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

- Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

- Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

- Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.  <u>JURY DEMAND</u>

145.  The SEC demands trial by jury in this action on all issues so triable.

Dated:  June 25, 2024                     Respectfully submitted,

/s/ *Patrick Disbennett*
Patrick Disbennett (*pro hac vice* application pending)
Christopher Rogers (*pro hac vice* application pending)

U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

JS 44C/SDNY
REV.
05/28/2024

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | JOHN BRDA |
| | GEORGIOS PALIKARAS |
| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
| Patrick B. Disbennett | Jason Lewis, 1900 Pearl St., Ste 2200, Dallas, TX 75201, 214-743-4548 |
| 801 Cherry St, Suite 1900, Fort Worth, TX 76102 - 817-978-3821 | Jessica B. Magee, 1722 Routh St., Ste1500, Dallas, TX, 214.969.1375 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Section 17(a) of the Securities Act of 1933, 10(b) & 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9 thereunder, 13(a), 13(b)(2)(A), & 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.  Violations of Securities.

Has this action, case, or proceeding, or one essentially the same, been previously filed in SDNY at any time? No [✓] Yes [ ] _____
*(If yes, Judge Previously Assigned)*

If yes, was this case  Vol. [ ]  Invol. [ ]  Dismissed.  No [ ]  Yes [ ]  If yes, give date _____  & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?      No [X]      Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*                    **NATURE OF SUIT**

### TORTS

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY |
|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | PHARMACEUTICAL PERSONAL |
| [ ] 130 MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [ ] 365 PERSONAL INJURY |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT |
| ENFORCEMENT | LIABILITY | LIABILITY |
| OF JUDGMENT | [ ] 340 MARINE | |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | **PERSONAL PROPERTY** |
| [ ] 152 RECOVERY OF | LIABILITY | [ ] 370 OTHER FRAUD |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | |
| (EXCL VETERANS) | PRODUCT LIABILITY | |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | |
| OVERPAYMENT | INJURY | [ ] 380 OTHER PERSONAL |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | PROPERTY DAMAGE |
| BENEFITS | MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE |
| [ ] 160 STOCKHOLDERS | | PRODUCT LIABILITY |
| SUITS | | |
| [ ] 190 OTHER | | **PRISONER PETITIONS** |
| CONTRACT | | [ ] 463 ALIEN DETAINEE |
| [ ] 195 CONTRACT | | [ ] 510 MOTIONS TO |
| PRODUCT | **ACTIONS UNDER STATUTES** | VACATE SENTENCE |
| LIABILITY | | 28 USC 2255 |
| [ ] 196 FRANCHISE | **CIVIL RIGHTS** | [ ] 530 HABEAS CORPUS |
| | [ ] 440  OTHER CIVIL RIGHTS | [ ] 535 DEATH PENALTY |
| | (Non-Prisoner) | [ ] 540 MANDAMUS & OTHER |
| **REAL PROPERTY** | [ ] 441 VOTING | |
| [ ] 210 LAND | [ ] 442 EMPLOYMENT | |
| CONDEMNATION | [ ] 443 HOUSING/ | **PRISONER CIVIL RIGHTS** |
| [ ] 220 FORECLOSURE | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS |
| [ ] 230 RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION |
| EJECTMENT | DISABILITIES - | [ ] 560 CIVIL DETAINEE |
| [ ] 240 TORTS TO LAND | EMPLOYMENT | CONDITIONS OF CONFINEMENT |
| [ ] 245 TORT PRODUCT | [ ] 446  AMERICANS WITH | |
| LIABILITY | DISABILITIES -OTHER | |
| [ ] 290 ALL OTHER | [ ] 448 EDUCATION | |
| REAL PROPERTY | | |

### ACTIONS UNDER STATUTES

| FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|
| [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 375 FALSE CLAIMS |
| SEIZURE OF PROPERTY | 28 USC 158 | [ ] 376 QUI TAM |
| 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 400 STATE |
| [ ] 690 OTHER | 28 USC 157 | REAPPORTIONMENT |
| | | [ ] 410 ANTITRUST |
| **PROPERTY RIGHTS** | | [ ] 430 BANKS & BANKING |
| [ ] 820 COPYRIGHTS | [ ] 880 DEFEND TRADE SECRETS ACT | [ ] 450 COMMERCE |
| [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [ ] 470 RACKETEER INFLU- |
| [ ] 840 TRADEMARK | | ENCED & CORRUPT |
| | | ORGANIZATION ACT |
| | **SOCIAL SECURITY** | (RICO) |
| | [ ] 861 HIA (1395ff) | [ ] 480 CONSUMER CREDIT |
| | [ ] 862 BLACK LUNG (923) | [ ] 485 TELEPHONE CONSUMER |
| **LABOR** | [ ] 863 DIWC/DIWW (405(g)) | PROTECTION ACT |
| [ ] 710 FAIR LABOR | [ ] 864 SSID TITLE XVI | |
| STANDARDS ACT | [ ] 865 RSI (405(g)) | |
| [ ] 720 LABOR/MGMT | | [ ] 490  CABLE/SATELLITE TV |
| RELATIONS | | [X] 850 SECURITIES/ |
| [ ] 740 RAILWAY LABOR ACT | | COMMODITIES/ |
| [ ] 751 FAMILY MEDICAL | **FEDERAL TAX SUITS** | EXCHANGE |
| LEAVE ACT (FMLA) | [ ] 870 TAXES (U.S. Plaintiff or | |
| | Defendant) | [ ] 890 OTHER STATUTORY |
| [ ] 790 OTHER LABOR | [ ] 871 IRS-THIRD PARTY | ACTIONS |
| LITIGATION | 26 USC 7609 | [ ] 891 AGRICULTURAL ACTS |
| [ ] 791 EMPL RET INC | | [ ] 893 ENVIRONMENTAL |
| SECURITY ACT (ERISA) | | MATTERS |
| | | [ ] 895 FREEDOM OF |
| **IMMIGRATION** | | INFORMATION ACT |
| [ ] 462 NATURALIZATION | | [ ] 896 ARBITRATION |
| [ ] 465 OTHER IMMIGRATION | | [ ] 899 ADMINISTRATIVE |
| ACTIONS | | PROCEDURE ACT/REVIEW OR |
| | | APPEAL OF AGENCY DECISION |
| | | [ ] 950 CONSTITUTIONALITY OF |
| | | STATE STATUTES |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____  OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____  DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES   NO          NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

_(PLACE AN x IN ONE BOX ONLY)_ **ORIGIN**

[x] 1 Original Proceeding    [ ] 2 Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation (Transferred)    [ ] 7 Appeal to District Judge from Magistrate Judge

     [ ] a. **all parties represented**

     [ ] b. **At least one party is pro se.**      [ ] 8 Multidistrict Litigation (Direct File)

_(PLACE AN x IN ONE BOX ONLY)_ **BASIS OF JURISDICTION**      _IF DIVERSITY, INDICATE CITIZENSHIP BELOW._

[X] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [ ] 4 DIVERSITY

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [x] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry St., Suite 1900
Fort Worth, TX 76102

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

John Brda, Saint Louis, MO 63122
Georgios Palikaras, Nova Scotia, Canada B3M 2Z8

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

### COURTHOUSE ASSIGNMENT

I have reviewed Rules 18(a) and 20(a) of the Rules for the Division of Business Among District Judges, Southern District of New York, and I hereby certify that this case should be assigned to the courthouse indicated below pursuant thereto.

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [X] MANHATTAN

DATE 06/25/2024    s/Patrick B. Disbennett

SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[x] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)
Attorney Bar Code #

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Daniel Ortiz, Acting Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)