# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-60891-CIV-SINGHAL

INTER-COASTAL WATERWAYS, INC.,

    Plaintiff,

v.

TRADESTATION SECURITIES, INC., and
DOE DEFENDANTS 1-10,

    Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant TradeStation Securities, Inc.'s Motion to Compel Arbitration and for Stay of Proceedings. (DE [29]). Plaintiff, Inter-Coastal Waterways, Inc. has filed a response in opposition and moves to disqualify the Financial Industry Regulatory Authority ("FINRA") as the alternative dispute resolution service. (DE [40]). Both motions are fully briefed and ripe for review.

I.    BACKGROUND

TradeStation Securities, Inc. ("TradeStation") is a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC"). Plaintiff opened a self-directed brokerage Account with TradeStation and executed a Customer Account Agreement and a Lending Agreement (collectively, the "Agreements").

In July 2022, a company known as Meta Materials, Inc., voted to spin out assets of a subsidiary company to a newly formed entity known as Next Bridge Hydrocarbons, Inc. ("Next Bridge"). The holders of Meta Materials, Inc. Series A Preferred Dividend Shares ("MMTLP Shares") would receive a 1-for-1 share exchange of shares of Next Bridge common shares. The exchange was to take place on December 14, 2022.

In early December 2022, Plaintiff purchased 9,269 MMTLP Shares in its TradeStation account. Pursuant to the Lending Agreement, TradeStation immediately loaned the MMTLP Shares to third-party broker dealers who opened short sale positions in MMTLP. Plaintiff alleges that TradeStation loaned third party brokers more shares of MMTLP than it held for its customers; in other words, it lent "counterfeit" MMTLP shares.

On December 9, 2022, the Financial Industry Regulatory Authority ("FINRA") placed a U3 halt on the trading of MMTLP shares. FINRA also de-listed MMTLP on December 12, 2022. Plaintiff alleges that as a result of TradeStation's lending of counterfeit MMTLP shares and the U3 halt made by FINRA, Plaintiff has never received certificates for the Next Bridge common shares.

Plaintiff sues TradeStation under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), to rescind the Lending Agreement and has raised state law claims under Florida's Uniform Commercial Code, RICO, and Civil Remedies for Criminal Practice Act. Plaintiff also named FINRA as a nominal Defendant alleging that FINRA's failure to properly regulate trading of the MMTLP Shares and its U3 halt directly led to Plaintiff's losses. The Court previously dismissed FINRA from the action on the ground of regulatory immunity. *See* Order (DE [50]).

TradeStation moves to compel arbitration as required by the Agreements. Plaintiff opposes arbitration and moves to disqualify FINRA as the arbitration forum.

II. <u>LEGAL STANDARDS</u>

"The Federal Arbitration Act (FAA) provides that a written agreement in any contract to arbitrate 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (quoting 9 U.S.C. § 2). There is a federal policy

2

favoring arbitration agreements. *Hearn v. Comcast Cable Communications, LLC,* 992 F.3d 1209, 1213 (11th Cir. 2021). "Where the parties have agreed to arbitrate their dispute, the job of the courts -- indeed, the obligation -- is to enforce that agreement." *JPay, Inc. v. Kobel,* 904 F.3d 923, 929 (11th Cir. 2018). Courts assume the parties intend to arbitrate anything not specifically excluded from the arbitration agreement. *Id*.

III. DISCUSSION

The TradeStation Securities, Inc. Customer Account Agreement for Equities ("Customer Agreement") (DE [1-9]) signed by Plaintiff contains an arbitration agreement which states in pertinent part:

> **38. Arbitration**
>
> **THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE, WHICH IS SET FORTH BELOW IN THIS SECTION. BY SIGNING AN ARBITRATION AGREEMENT, THE PARTIES AGREE AS FOLLOWS:**
>
> All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by a judge or jury, except as provided by the rules of the arbitration forum in which a claim is filed.
>
> • Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
>
> • The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
>
> • The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first hearing date.
>
> • The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.

3

> • The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
>
> • The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.
>
> (a) **You agree that any and all controversies, claims or disputes relating to your Account, the Services, and/or the determination of any contractual or other rights and liabilities under this Agreement, which may arise between you and TradeStation Securities (and/or any of its officers, directors, employees, agents) shall be determined by arbitration conducted before FINRA in accordance with its arbitration rules then in force**. **Judgment upon any award of the arbitrators may be entered in any court, state or federal, having jurisdiction thereof.**

(DE [1-9] emphasis in original). The Master Securities Lending Agreement also contained an arbitration clause:

> **24. MANDATORY ARBITRATION**
>
> THE PARTIES HEREBY AGREE THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT OR ANY LOAN HEREUNDER SHALL BE SUBJECT TO THE MANDATORY ARBITRATION PROVISION CONTAINED IN ANY CUSTOMER ACCOUNT OR SIMILAR AGREEMENT ENTERED INTO BETWEEN SUCH PARTIES.

(DE [1-2]) (emphases in original) (collectively, "Arbitration Agreements").

Plaintiff does not dispute the existence or general enforceability of the Arbitration Agreements but, rather, argues that its claims are excluded from arbitration because TradeStation's alleged misconduct was not contemplated by the parties when the contracts were executed. More specifically, Plaintiff argues that it assumed TradeStation would operate according to the law and never contemplated that it would loan counterfeit MMTLP Shares to third-party brokers and, therefore, the Arbitration Agreements do not apply. The Court disagrees.

4

The arbitration clause in the Lending Agreement contemplates arbitrating "any dispute, controversy or claim between the parties arising out of this agreement or any loan hereunder," whereas the Customer Agreement arbitration clause applies to "any and all controversies, claims or disputes relating to your Account, the Services, and/or the determination of any contractual or other rights and liabilities under this Agreement." By their terms, the arbitration clauses are limited to the universe of claims that arise from or are related to the parties' contracts. When so limited, "there must be some direct relationship between the dispute and the performance of the duties specified by the contract in order to find that the dispute arises out of, relates to, or is connected with the underlying agreement." *Hearn,* 992 F.3d at 1213.

The question is not, as Plaintiff argues, whether TradeStation's alleged malfeasance was foreseeable; the question is whether Plaintiff's claims relate to or arise out of the parties' contracts. Clearly, they do. Both the Customer Agreement and the Lending Agreement are attached to the Complaint. TradeStation's alleged wrongdoing arises from its lending of Plaintiff's MMTPL Shares to third-party brokers, which it was authorized to do by the Lending Agreement. The Complaint repeatedly refers to the Customer Agreement and the Lending Agreement as the sources of the duties, rights, and obligations it seeks to enforce. Plaintiff's claims arise from and are related to the two Agreements between the parties.

Plaintiff argues that enforcing the arbitration agreement would prejudice it because it would be deprived of the discovery process available in federal court. This is not a reason to ignore the parties' agreement to arbitrate. Indeed, the Customer Account Agreement specifically acknowledges that "[t]he ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in

5

court proceedings." Plaintiff cannot now complain of the terms of the agreement it freely signed.

Finally, Plaintiff argues that being subjected to arbitration with a FINRA panel would deprive it of due process because FINRA is not a disinterested forum. First, Plaintiff argues that its causes of action can be directly traced back to regulatory actions taken by FINRA: the allegedly improper listing of MMTLP Shares; the December 8, 2022, modification of Meta Materials' notice of corporate action; and the enactment of the U3 halt of the MMTLP ticker symbol. Second, Plaintiff argues that FINRA's arbitrators are inherently biased by virtue of being selected as a FINRA arbitrator and being paid by FINRA for their services. Finally, it contends that FINRA has a conflict of interest because one of TradeStation's former employees serves on a voluntary, regulatory committee within FINRA.

Multiple courts have rejected other MMTLP shareholders' attempts to disqualify FINRA. *See Park v. E\*Trade Fin. Corp., Servs., Inc.,* 2023 WL 11779917 (N.D. Ga. Jul. 25, 2023); *Hofman v. Fid. Brokerage Servs., LLC,* 2023 WL 3872564 (C.D. Cal. May 8, 2023); *Hensley v. TD Ameritrade, et al.,* Case No. 23-cv-05159 (DE [39]) (W.D. Wash. Oct. 2, 2023). As the *Hensley* court explained, FINRA does not actually run the arbitration. Rather, the parties select their arbitrators; the arbitrators are independent, and any party may ask an arbitrator to recuse himself for "good cause." *Hensley,* Case No. 3:23-cv-05159, p. 12 (citing FINRA RULE 12406, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12406). Additionally, Plaintiff has not produced any evidence that the as-yet-unidentified arbitrators will be biased. Plaintiff has the ability to ask a potential arbitrator to recuse himself for good cause and, further, if there is any evidence of partiality or corruption in any of the arbitrators, Plaintiff can appeal the FINRA

6

arbitration award. *See* 9 U.S.C. § 10(3); *Park,* 2023 WL 11779917, at *9. Other cases not related to claims involving MMTLP shares also routinely reject attempts to disqualify the agreed upon arbitration forum. "The weight of authority strongly supports the conclusion that the Federal Arbitration Act restricts courts' authority to intervene in arbitral processes before final awards are issued." *Peleus Ins. Co. v. Edgewater Beach Resort Cmty. Ass'n, Inc.* 2023 WL 11760950, at *1 (N.D. Fla. Sept. 19, 2023). The FAA limits pre-arbitration involvement by the courts to determining whether an agreement to arbitrate exists and enforcing that agreement by compelling arbitration. *Id.* (quoting *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.,* 304 F.3d 476, 487 (5th Cir. 2002). The FAA protects against bias by permitting post-arbitration challenges; raising issues of bias before arbitration is not permitted. *See Michaels v. Mariforum Shipping S.A.,* 624 F.2d 411, 414 n.4 (2nd Cir. 1980) ("[I]t is well established that a district court cannot entertain an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an award").

Finally, the issue of the former TradeStation employee who serves on a FINRA committee is immaterial. A court in the Southern District of New York denied a request to disqualify FINRA because one of the parties' CEO served on FINRA's Board of Governors. *Freedom Invs. Corp. v. Hadath,* 2012 WL 383944, at *2 (S.D.N.Y. Feb. 7, 2012). The court stated that the CEO's "service on FINRA's Board of Governors is insufficient to meet the objective test for assessing bias. [Movant] has not made any showing that an individual member of the FINRA Board of Governors, or indeed the Board of Governors as a whole, has any influence over the selection of FINRA arbitrators, their compensation, or their assignment to panels." *Id.* at *4-5. The court noted that challenges to partiality are properly raised in a motion to vacate the arbitration award. *Id.* As in

7

*Hadath,* Plaintiff in this case has not made any showing that TradeStation's former employee has any involvement with FINRA's arbitration panel. That is not a sufficient basis for disqualifying FINRA as the arbitration forum prior to the arbitration taking place.

For each of these reasons, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff, Inter-Coastal Waterways, Inc.'s Motion to Disqualify FINRA as the Alternative Dispute Resolution Service (DE [40]) is **DENIED**. Defendant TradeStation Securities, Inc.'s Motion to Compel Arbitration and for Stay of Proceedings (DE [29]) is **GRANTED.** This case is **STAYED** pending resolution of the arbitration proceedings and the Court reserves jurisdiction to enforce any arbitration award. The Clerk of Court is directed to **CLOSE** this case and **DENY AS MOOT** any pending motions.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 28th day of October 2024.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF