# EXHIBIT 2

# EXHIBIT 1



## 1. Parties

This agreement, which includes your application for an Account (as such term is defined below), the content of this document, and all additional agreements, including the Master Lending Securities Agreement, and separate and supplemental disclosures, disclaimers and other documents contained in the application or later provided to you that relate to your Account and which you have been required to acknowledge and accept (collectively, "**the Agreement**" or "**this Agreement**"), is between you and TradeStation Securities, Inc. ("**TradeStation Securities**," "**we**," "**us**" or "**our**").  Your "**Account**" means, individually and collectively, the securities brokerage account or accounts you are opening or have opened or later open with us regarding your interests and transaction in equities, such as stocks and other exchange-traded products (such as ETFs), and, if you have been approved (or if you later request and are approved), equity and index options. You agree that each of TradeStation Securities' affiliates is an express third-party beneficiary of this Agreement. However, you also understand and agree that no entity other than TradeStation Securities is making any representation, obligation or covenant in your favor under or related to this Agreement or your Account or the Services, and that you have no contractual or other legal right or remedy of any kind or nature against any affiliate of TradeStation Securities by reason of or relating to this Agreement, the Services your Account, or any of the transactions contemplated by this Agreement or relating to your Account.

**THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION AGREEMENT UNDER THE HEADING "ARBITRATION."**

**ALSO, THERE ARE SEVERAL IMPORTANT RISK DISCLOSURE STATEMENTS, EACH SET FORTH SEPARATELY AT THE END OF THIS DOCUMENT. THESE RISK DISCLOSURE STATEMENTS ARE ALSO POSTED ON THE COMPANY WEBSITE AND CONSTITUTE PART OF THE DOCUMENTS WHICH YOU REPRESENT AND WARRANT YOU HAVE RECEIVED, REVIEWED, UNDERSTOOD AND ACCEPTED AS PART OF YOUR ACCOUNT APPLICATION AND THE ACCOUNT APPLICATION PROCESS.**

## 2. Request for Electronic Transmission of Statements and Other Documents and Information

**You hereby request that all confirmation statements of activity and all periodic account statements, as well as all tax documents, prospectuses, corporate reports, proxy statements and reorganization notices, be delivered to you solely by electronic transmission to the e-mail address indicated by you in the Agreement. YOU REPRESENT TO US THAT YOU DO NOT WANT TO BE MAILED HARD COPIES OF ANY SUCH STATEMENTS, DOCUMENTS OR INFORMATION. You warrant and represent that the above-referenced e-mail will promptly print out for you the relevant customer statements, documents and information in the form received by you. You understand that there is a risk of failure of any electronic transmission, and will not hold TradeStation Securities liable directly or indirectly for such failure. If you fail to receive a statement of activity of which you are aware, you will contact a TradeStation Client Service representative at the Brokerage Client Service telephone numbers posted on the TradeStation company website on the business day following the day of any such activity. You acknowledge that if you choose not to accept electronic statements and documents, TradeStation Securities may charge your Account a fee for each hard-copy statement and document delivered. This consent shall be effective until revoked by you in writing, and delivered to TradeStation Securities. In addition, you acknowledge that, for your protection and the protection of TradeStation Securities, any request to change the e-mail address designated in your Agreement must be in writing and must bear the same signature as the one in your Agreement or that we have on file or otherwise satisfy our authentication and verification procedures. In the event such a request is received from a legal entity, such as a corporation, LLC or partnership, the request must be accompanied by appropriate documentation establishing that the person signing the request possesses the requisite authority to bind the entity. BY ACCEPTING THIS AGREEMENT, YOU ACKNOWLEDGE YOU HAVE REQUESTED, AND CONSENTED TO, THE DELIVERY TO YOU OF YOUR CONFIRMATION AND OTHER ACCOUNT STATEMENTS, AS WELL AS TAX DOCUMENTS, PROSPECTUSES, CORPORATE REPORTS, PROXY STATEMENTS AND REORGANIZATION NOTICES, SOLELY BY ELECTRONIC TRANSMISSION TO YOUR SPECIFIED E-MAIL ADDRESS.**



**3.  Laws, Rules, Regulations and Indemnification**

All of your transactions shall be subject to all applicable laws, rules and regulations of any state, federal, regulatory or self-regulatory statutory authority, agency, association, commission or other body, including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended, the rules and regulations of the Securities and Exchange Commission, the Financial Industry Regulatory Authority ("**FINRA**"), the Board of Governors of the Federal Reserve System, and any exchanges, markets, associations, or clearing houses or agencies where any transaction is executed, or which have jurisdiction over the transaction or any of the parties involved in the transaction (collectively, "**Applicable Laws**"). TradeStation Securities shall not be liable to you as a result of any action taken by TradeStation Securities to comply with any such Applicable Laws. TradeStation Securities' violation of any law, rule, exchange or other self-regulatory organization's regulations shall not provide you with either a defense to a claim by TradeStation Securities or the basis of a claim against TradeStation Securities. In the event that you are a regulated institution or entity, you recognize and acknowledge that you may be required to comply with regulations including, but not limited to, those regulations promulgated pursuant to the federal laws referenced above, and that TradeStation Securities has no obligation to insure that you abide by the rules and regulations pertaining to you. You agree to indemnify TradeStation Securities and its employees, agents and affiliates from and against all claims (including claims brought by you or on your behalf), including reasonable attorneys' fees and costs, arising out of your use of any products or services provided by TradeStation Securities or its affiliates or other acts or omissions by you or on your behalf which violate, or conflict with, any of such Applicable Laws.  The indemnity provided for in the previous sentence shall not be construed as limiting your ability to bring any claim against TradeStation Securities or receive an award or judgment from TradeStation Securities or any of its associated persons that you would be entitled to bring or receive under any Applicable Laws.

**4.  Service Commissions, Fees and other Costs**

TradeStation Securities agrees to provide you with securities brokerage services in your Account, which include providing you with one or more automated or electronic execution systems (an "**EES**") and other services (collectively, the "**Services**") pursuant to the terms and conditions of this Agreement, as well as your agreement with our affiliate that provides TradeStation® trading software technology and internet-based market data services, and the terms and conditions of use for any EES of a third party provided to you by TradeStation Securities or its affiliate, in connection with your use of your Account.  Your Account will be charged brokerage commissions and other fees in connection with the execution of transactions ("**Execution Fees**") and will or may be charged certain other fees for all other products and services furnished to you ("**Service Fees**"). Execution Fees may be changed from time to time without prior notice to you, and Service Fees with respect to any short sale transactions in your Account may be subject to Short Debit Fees equal to the sum of (a) the costs and expenses incurred by any clearing facility and (b) a Service Fee in connection with the establishment and/or maintenance of your short positions in the security. Short Debit Fees may be disclosed to you at the time a short position is established or may be imposed or increased from time to time in light of changing market conditions and you agree to pay such Short Debit Fees at the clearing facility's then-prevailing rates. Any other Service Fees may be changed from time to time upon thirty (30) days' prior written notice to you and, in each case, you agree to be bound thereby. You understand and agree that notice may be given by modifying the fees and rates published on the TradeStation company website and that such modification shall constitute written notice to you on the date such modifications first appear on the website. You also agree that e-mails to you constitute written notice to you on the date sent as long as the e-mails are sent to an e-mail address provided by you. There are also other ways we may modify this Agreement and our business relationship, as well as other ways we may notify you, which are discussed later in this Agreement under the heading "**Amendment by TradeStation; Presumptive Receipt of Communications**." Any interest accrued in any Account on excess cash balances may be retained by TradeStation Securities. TradeStation Securities shall be under no obligation to pay or account to you for any interest income or benefits that may be derived from or use of client monies, reserves, deposits, cash equivalents or any other property.



**5. Assumption of Risk/Your Discretion**

(a)   TradeStation Securities is not a full-service brokerage, and only serves self-directed online traders. We do not engage in discretionary trading, render investment advice, trading advice or financial planning services, recommend account types, perform or share investment research or analysis, participate in private placements or make markets or deal in individual securities. TradeStation Securities is an agency-only brokerage firm the services of which consist mainly of the provision to you of a sophisticated EES which you, as a self-directed or professional trader, may use to make and execute your own trading decisions. Accordingly, TradeStation Securities will not provide you with any legal, tax, accounting, investment, trading, planning or other advice of any kind. TradeStation Securities' employees and agents are not authorized to give you any such advice, and you agree that you will not solicit or rely upon any such advice or purported advice from any such employee or agent of TradeStation Securities, whether in connection with transactions in or for your Account, or otherwise. You acknowledge and agree that if you receive any such advice or purported advice from any employee or agent of TradeStation Securities or any of its affiliates, it was improperly given to you, should not be relied upon, you will totally disregard it, and, if you do not, you fully assume the risk of following or relying upon any such advice or purported advice.

(b)   You further acknowledge and agree that you have independently evaluated any EES or other Services you intend to use. You agree and acknowledge that any trading or execution strategies or transactions designed, programmed or implemented through any EES or any other Services provided by TradeStation Securities or its affiliates or any third-party provider shall be at your sole discretion and risk, regardless of any information, examples, tutorials, user education documentation, training, consulting services, comments, guidance, charts, indicators, graphs, simulated performance reports, strategy techniques, or other analyses obtained in any form from TradeStation Securities or any of its officers, directors, employees or agents, or from accessing or using any EES or website. You acknowledge and agree that the sole purposes of any of the foregoing tools and services are to help you learn how better to use TradeStation® or other EES trading software or to help you correctly program, test and/or automate or otherwise implement your trading strategies or ideas. You further acknowledge and agree that while you may be able to access through an EES or other Services investment research reports, examples of strategies, and market data services, the availability of such information does not constitute a recommendation to buy or sell any particular securities or the likelihood of success of using any trading strategy tools. Any investment or trading decisions you make will be based solely on your own evaluation of your financial circumstances and investment or trading objectives.

**6. Limitations and Restrictions**

You are authorized to use the EES and other Services and materials provided by or through TradeStation Securities for your own needs only, and you are not authorized to resell access to any such services or materials or to make copies of any such materials for sale to, or use by, others. You shall not delete any copyright or other intellectual property rights notices from any such materials. Your right to use any EES or other Services provided by TradeStation Securities is limited to executing your own proprietary trades. You shall be the only authorized user of any Services provided by TradeStation Securities. All orders executed through any EES or other Services provided to you shall be deemed authorized by you and executed with the understanding that an actual purchase or sale is intended and that you are unconditionally and irrevocably accepting a valid and binding legal obligation. You agree that all purchases and sales shall be for your Account in accordance with your oral, written or electronic orders or instructions; provided, however, you acknowledge and understand that the only valid way to place an order using the Services is to place it through your EES or to phone-in your order live to TradeStation Securities' trade desk. You hereby waive any and all defenses that any such order or instruction was not in writing as may be required by the Statute of Frauds or any Applicable Laws.

**7. Disclaimer of Warranties**



You acknowledge and agree that neither TradeStation Securities nor its employees or agents or affiliates make any warranties or representations with respect to any EES or other Services provided by TradeStation Securities or its affiliates, or other third parties, relating to this Agreement or your Account, including any related hardware, software, communication system or any charting, analysis or other trading strategy tool products, services or platforms. TRADESTATION SECURITIES' SERVICES AND ANY INFORMATION, DATA, CHARTING, ANALYSIS OR OTHER TRADING STRATEGY TOOL PRODUCTS, SERVICES OR PLATFORMS ARE PROVIDED ON AN AS-IS, WHERE-IS, AS-AVAILABLE BASIS AND WITHOUT WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY (INCLUDING, WITHOUT LIMITATION, TIMELINESS, TRUTHFULNESS, SEQUENCE, COMPLETENESS, ACCURACY, OR FREEDOM FROM ERROR OR INTERRUPTION), OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING, OR COURSE OF PERFORMANCE, OR THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE.

**8. Assumption of Risk; Technical Issues or Extraordinary Events**

You agree that you fully and knowingly assume all risks of loss(es) or other negative results, actual or perceived, caused directly or indirectly by any equipment or software failure, software design limitation or flaw, software bug or virus, failure of any Internet service provider, operator error, failure of any electronic or mechanical equipment, hardware, communication system or other system, or any component thereof, telephone or other interconnect problems, unauthorized access, theft, security breach, government restriction, exchange or market regulation, suspension of trading, war, terrorism, cyberterrorism, or strike or other labor dispute. Without limitation of the foregoing, this includes any of the foregoing conditions, items, events or occurrences that might prevent you from utilizing, or that may limit or corrupt the use of, any EES or other Services provided by TradeStation Securities, including, without limitation, conditions, items, events or occurrences that cause or result in an inability or failure to initiate, execute, cancel or modify an order or transaction or that cause other unintended results. To the fullest extent permitted by Applicable Laws, you fully assume all risks related to each and every one of the foregoing items, conditions, events and occurrences.

**9. Termination, Trading Restrictions, Liquidation**

You acknowledge and agree that TradeStation Securities may, at any time, in its sole discretion and without prior notice, terminate your Account or restrict or prohibit trading of securities or other property in your Account for any reason. Without limitation of the breadth of the foregoing rights, TradeStation Securities may in its sole discretion restrict trading in your Account to closing transactions only. You shall, in all such events, nevertheless remain responsible and liable for all of your obligations and liabilities to TradeStation Securities under this Agreement. ***You further agree that, notwithstanding anything in this Agreement to the contrary, in the event that the Account or any part thereof is under-margined (as we, in our sole discretion, determine), has zero equity or an equity deficit at any time, TradeStation Securities shall have the right to liquidate all or any part of your positions through any means available, without prior notice to you.*** See, also, the section under the heading "**Margin and Other Collateral Requirements**."

**10. Automated Trading**

Automated trading functionality is designed to help you follow or track more securities simultaneously and to assist in removing emotions from, and to increase efficiencies in, your trading. Automated trading functionality is not designed to allow you to leave your computer, screen or mobile phone unattended. If you, or any person you have authorized to trade your Account, uses any automated trading functionality, you hereby acknowledge and agree that there are numerous factors that may cause the automated trading functionality to send orders that you do not want, and/or fail to send orders that you do want (including, without limitation, ISP failure, power failures or surges, erroneous, delayed or out-of-sequence data, improperly designed strategies, and software or system design limitations, flaws or errors). You hereby acknowledge and assume all risks, both known and unknown, associated with using any automated trading functionality, and agree that it is your responsibility to understand precisely how it works before using it, to monitor the trading activity in your Account at all times, and to immediately take corrective action when necessary.



**11.  Monitoring and Review**

It shall be your responsibility to monitor your orders and transactions and review all confirmations, statements, notices, reports, proxy materials or other communications related to any transaction ordered or executed through any EES or other Services provided by TradeStation Securities. It shall be your obligation to make prompt written demand to TradeStation Securities for any such item not received.

**12.  Short and Long Sales**

In placing any sell order for a short account, you will designate the order as such and hereby authorize TradeStation Securities to mark the order as being "short." In placing any sell order for a long account, you will designate the order as such (which may mean, simply, that it is not expressly marked "short") and hereby authorize TradeStation Securities to mark the order as being "long." The designation by you of a sell order as being for a long account shall constitute a representation by you that you own the security with respect to which the sell order has been placed, that such security may be sold without restriction in the open market and that, if TradeStation Securities does not have the security in its possession at the time you place the sell order, you shall deliver the security by settlement date in good deliverable form or pay to TradeStation Securities any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis. You expressly authorize TradeStation Securities to liquidate your Account assets, in whole or in part, in its sole and absolute discretion, for the purpose of recovering any losses or expenses TradeStation Securities will or may suffer or incur as a result of your failure to timely make such delivery or following you making any indication to TradeStation Securities that you may not timely make such delivery.

**13.  Market or Other Data**

You acknowledge and agree that each national or regional or other market exchange or association asserts a proprietary interest in all of the market or other data it furnishes to parties that disseminate its data. YOU ACKNOWLEDGE AND AGREE THAT NEITHER TRADESTATION SECURITIES, NOR ANY EXCHANGE OR ASSOCIATION OR ANY SUPPLIER OF MARKET OR OTHER DATA, GUARANTEES THE TIMELINESS, SEQUENCE, ACCURACY, COMPLETENESS, RELIABILITY OR CONTENT OF MARKET OR OTHER INFORMATION OR MESSAGES DISSEMINATED TO, BY OR THROUGH ANY PARTY, INCLUDING ANY INTERNET SERVICE PROVIDER. YOU ACKNOWLEDGE AND AGREE THAT NEITHER TRADESTATION SECURITIES NOR ANY EXCHANGE OR ASSOCIATION OR ANY OTHER SUPPLIER OF MARKET OR OTHER DATA REPRESENTS OR WARRANTS THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE. YOU AGREE THAT YOUR USE OF ANY MARKET OR OTHER DATA IS SOLELY AT YOUR RISK. NEITHER TRADESTATION SECURITIES NOR ANY EXCHANGE OR DATA PROVIDER SHALL BE LIABLE FOR ANY INACCURACY, ERROR OR DELAY IN, OR OMISSION OF, ANY SUCH DATA, INFORMATION OR MESSAGE, OR THE TRANSMISSION OR DELIVERY OF ANY SUCH DATA, INFORMATION OR MESSAGE, OR ANY LOSS OR DAMAGE ARISING OR OCCASIONED THEREFROM, REGARDLESS OF THE SOURCE, CAUSE OR REASON THEREFOR. You understand that the terms of this Agreement may be enforced directly against you by the exchanges and associations or other parties providing market or other data. You shall use any such data or information (including quotes) only for your individual use and shall not furnish such data to any other person or entity.

**14.  Stop Orders**

(a)  All Stop Orders are handled on a best efforts basis. The stop order functionality provided by the EES for listed securities has been designed to help provide benefits such as increased anonymity (by seeking to eliminate reliance on specialists and market makers) and the ability to place stop market and stop limit orders for specific routes you choose as well as through an EES's "Intelligent" order routing. However, placing stop orders using an EES has risks that regular market and limit orders do not. A stop order is held by the EES's stop order server and then automatically released to the appropriate avenue of execution when the EES recognizes information which indicates that the stop order price condition has been met. The price information comes from the exchanges and/or data providers and there are often "bad ticks" (inaccurate,



out-of-sequence, etc.) or ticks that appear to be bad but are not (they may simply look irregular, unusual or problematic). The EES is designed to filter as many "bad ticks" as reasonably possible. However, there are times that bad ticks will not be filtered, and other times when the stop order server will mistakenly filter good ticks that looked unusual at the time. This may result in your stop order being executed at a price different than the one you specified, or not being released for execution when your price condition has been met. IF YOU USE AN EES's STOP ORDER FUNCTIONALITY, YOU FULLY ASSUME THESE RISKS AND ALL OTHER RISKS THAT EES DESIGN LIMITATIONS OR EXCHANGE OR VENDOR DATA SERVICE INACCURACIES OR FLAWS MAY PRESENT.

(b) Also, while stop orders may be a useful tool for investors who are unable to regularly monitor the price of their positions, stop orders are not without potential risks. You should be aware of the following risks inherent in the use of stop orders:

(i)  Stop prices are not guaranteed execution prices. A "stop order" becomes a "market order" when the "stop price" is reached and firms are required to execute a market order fully and promptly at the current market price. Therefore, the price at which a stop order ultimately is executed may be very different from the investor's "stop price." Accordingly, while you may receive a prompt execution of a stop order that becomes a market order, during volatile market conditions the execution may be at a significantly different price from the stop price if the market is moving rapidly.

(ii)  Stop orders may be triggered by a short-lived, dramatic price change. You should be aware that during periods of volatile market conditions the price of a security can move significantly in a short period of time and trigger an execution of a stop order (and the security may later resume trading at its prior price level). You should understand that if your stop order is triggered under these circumstances it may sell at an undesirable price even though the price of the security may stabilize during the same trading day.

(iii)  Placing a "limit price" on a stop order may help manage some of these risks. A stop order with a "limit price" (a "stop limit" order) becomes a "limit order" when the security reaches the "stop price." A "limit order" is an order to buy or sell a security for an amount no worse than a specific price (i.e., the "limit price"). The use of a stop limit order instead of a stop market order will provide you with better certainty with respect to the price you receive for the security. You should, however, be aware that because brokers cannot sell for a price that is lower (or buy for a price that is higher) than the limit price selected there is the possibility that the order will not be executed at all. You should strongly consider the use of stop limit orders in cases where they prioritize achieving a desired target price more than getting an immediate execution (irrespective of price) in a liquid market.

## 15.  GTC and GTD Orders

Good-'til-Cancel (GTC) and Good-'til-Date (GTD) orders placed through an EES are resubmitted as day orders each day until filled. Accordingly, the time priority of your GTC or GTD order is established anew each morning.  An order that is GTC or GTD will continue during our "window period" (described in the next sentence) until the order is filled (GTC) or until the date you have specified (GTD).  However, you should be aware that no matter what instruction you input, if the order has been live and remains unfilled for a certain number of days as we have prescribed in the EES (for example, 90 days), which may change from time to time (a "**window period**"), it will automatically be cancelled if not filled before the expiration of the window period. If you cancel an order and then replace it before the expiration of the window period, a new window period will begin for the order that has replaced the cancelled one. Also, if a GTC or GTD order is partially filled, the unfilled portion of the order will be automatically cancelled, and you would then need to input a new order for the unfilled portion, assuming that is still your intention.  Further, as a precautionary measure, the EES will likely cancel any GTC or GTD order if the EES is sent or perceives signals or information that the security in question has been affected by a corporate reorganization or other corporate action. Conversely, there may be times when a GTC or GTD order should be cancelled because of a corporate action, but it is not.  Your GTC or GTD order will not be modified to take into account ordinary dividends.  Also, your GTC and GTD orders are stored on the EES's server network, and there is no guarantee that

Rev 09-19-2023



the EES will, at the appropriate time, automatically and successfully place the order or implement its execution.  IF YOU USE THE EES's GTC OR GTD ORDER FUNCTIONALITY, YOU FULLY ASSUME THESE RISKS AND ALL OTHER RISKS THAT EES DESIGN LIMITATIONS OR EXCHANGE OR VENDOR DATA SERVICE INACCURACIES OR FLAWS MAY PRESENT.

**16. Program Trading**

You understand and acknowledge that TradeStation Securities offers neither arbitrage accounts nor proprietary systems for Program Trading (or any other purpose).

**17. Use of Investment Advisors**

If you have an agreement with an investment or trading advisor or manager (an "**investment advisor**") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your Account with TradeStation Securities (or on whom you are otherwise relying in any manner), you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions or advice made by your investment advisor with respect to your Account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions or advice, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your Account, and claims which successors, constructive assignees, third parties or others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor may give us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your Account and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**18. Confirmation Reports and Account Statements**

Confirmation reports of the execution of orders shall be conclusive if not objected to in writing by you within the shorter of (a) the applicable settlement cycle of the subject transactions and (b) three (3) business days after such documents have been transmitted to you. Statements of account shall be conclusive if not objected to in writing by you within ten (10) days after transmission. In all cases, TradeStation Securities reserves the right to challenge your objections.

**19. Margin and Other Collateral Requirements**

(a) ***Margin trading is highly risky and may result in a loss of funds greater than you have deposited in your Account.*** If your Account is a margin account (or becomes a margin account at any time), you hereby agree to deposit and at all times maintain such margin in your Account as TradeStation Securities may in its sole discretion require, and which may change from time to time in TradeStation Securities' sole discretion, and you agree to pay on demand any debit balance owing with respect to your Account. You agree at all times to maintain such margin in your Account as TradeStation Securities may from time to time (at its sole discretion) require, and will meet all margin calls (if any are given, and none are required to be given) immediately.  You further agree to deposit promptly and maintain such other collateral with TradeStation Securities as is required by Applicable Laws or any other agreement or open transaction you may have with TradeStation Securities, or as required by TradeStation Securities at any time or from time to time in its discretion. You agree that, if requested to do so, you will promptly wire transfer such funds.

(b) ***You further agree that, notwithstanding anything in this Agreement to the contrary, in the event that the Account or any part thereof is under-margined (as we, in our sole discretion, determine), has zero equity or an equity deficit at***

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

*any time, TradeStation Securities shall have the right to liquidate all or any part of your positions through any means available, without prior notice to you. TradeStation Securities does not have to notify you of any failure to meet margin requirements prior to TradeStation Securities exercising its rights under this Agreement.  You acknowledge that TradeStation Securities generally will not issue margin calls, generally will not credit your Account to meet intraday or overnight margin deficiencies, and is authorized to liquidate account positions in order to satisfy margin requirements without prior notice.* Any margin call or other notice we ever do give you is or was solely as a courtesy, and our doing so imposes no obligation on us to ever do so again, and you should not expect or rely on receiving any such notice. Margin calls, if given, may be communicated orally, without subsequent written confirmation. Further, if TradeStation Securities does not, for any reason, liquidate under-margined positions without notice, and issues a margin call, you must satisfy such margin call in its entirety immediately by depositing funds. You acknowledge that even if a call is issued, TradeStation Securities may still liquidate your positions at any time.

(c)   If at any time your Account does not contain the amount of margin determined by TradeStation Securities, in its sole discretion, to be appropriate for any reason (in its sole judgment), *TradeStation Securities may, at its sole discretion, reject any order made by you, close out your positions in whole or in part, or limit and/or terminate your right to trade in the Account other than for liquidation, or fully or partially liquidate all or some of the positions in your Account. TradeStation Securities is authorized to take whatever action it deems necessary including, without prior demand or notice to you, selling or otherwise liquidating any property belonging to you or in which you have an interest, buying or borrowing any property required to make delivery against any sales, including short sales, effected for your Account or otherwise liquidating the positions in your Account, all solely for your Account and solely at your risk.* Any such liquidation, sale or purchase may be public or private and may be made without notice to you and in such manner as TradeStation Securities may, in its sole discretion, determine.

(d)   TradeStation Securities may, at its sole discretion, require margin in excess of that required by Applicable Laws, including any exchange or clearinghouse minimums. *We may modify margin requirements for any or all customers, including you, for any open or new positions at any time, in our sole discretion.* All deposits shall be deemed made only when cleared funds are actually received by TradeStation Securities, which may include waiting periods it, in its sole discretion, imposes on ACH or similar electronic transfers. Any failure by TradeStation Securities to call for margin at any time shall not constitute a waiver of TradeStation Securities' right to do so any time thereafter, nor shall such failure create any liability to TradeStation Securities. TradeStation Securities shall not be liable to you for the loss or loss of use of any margin deposits option premiums, or other property, which is the direct or indirect result of bankruptcy, insolvency, liquidation, receivership, custodianship, or assignment for the benefit of creditors of any bank, other clearing broker, exchange, clearing organization or similar entity.

(e)   TradeStation Securities may, for any reason, require you to transfer your Account to another firm. If you do not transfer your positions promptly upon demand by TradeStation Securities, TradeStation Securities may liquidate the positions in your Account.  TradeStation Securities is under no obligation to offer you the ability or opportunity to transfer your Account to another firm, and we may take any and all actions permitted in this Agreement, including in this section, without doing so.

(f)   You acknowledge that TradeStation Securities is hereby specially authorized, for its account and benefit, from time to time and without notice, either separately or with others, to lend, repledge, hypothecate or rehypothecate, either to itself or to others, any and all property (including but not limited to securities) held by you in your Account and TradeStation Securities shall not at any time be required to deliver to you such identical property but may fulfill its obligation by delivery of property of the same kind and amount.

(g)   No demands, calls, tenders or notices that TradeStation Securities may have made or given in the past shall obligate TradeStation Securities to make or give the same in the future, and no failure to make or give any such demand, call, tender or notice shall constitute a waiver or limitation of any kind of any of TradeStation Securities' rights or remedies

Rev 09-19-2023

![TradeStation logo]

under this Agreement or otherwise.

(h)   You represent and acknowledge that you have reviewed and received from TradeStation Securities the *Margin Disclosure Statement*, **which is also set forth on a separate page at the end of this document**, and have read and understood the *Margin Disclosure Statement*. This *Margin Disclosure Statement* **is also available on the TradeStation website**. You represent and acknowledge that you have noted particularly those sections of that disclosure document summarizing the risk factors involved in margin trading, and you have determined that, in view of your financial situation and investment objectives, margin trading is not unsuitable for you.

**20.  Truth-In-Lending; Debit Balances**

You hereby acknowledge receipt of TradeStation Securities' Truth-in-Lending disclosure statement, which was part of your Account application and is also posted on the TradeStation company website. Interest will be charged on any debit balances in your Account in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any debit balance which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

**21.  Satisfaction of Your Liabilities; Security Interest and Lien**

(a) You agree to satisfy, upon demand, any and all indebtedness to TradeStation Securities, and to pay any debit balance in your Account, and, in the event of a sell order by you, to deliver the applicable security in good deliverable form, no later than the deadline set by TradeStation Securities; such deadline may and shall be determined or modified by TradeStation Securities, subject only to limitations imposed by Applicable Laws, in TradeStation Securities' sole and absolute discretion.

(b) All of your property held by or under the control of TradeStation Securities is subject to a lien to secure the payment and performance of your indebtedness, liabilities and obligations (of any kind or nature) to TradeStation Securities, and you hereby grant to TradeStation Securities a lien on, and a valid and first priority, perfected, continuing security interest in, the following: (i) all property, including all investment property, held, carried or controlled by or through, or on our behalf by, TradeStation Securities in which you presently have or in which you acquire an interest in the future, including all property in each account in your name, and (ii) any and all rights, claims or causes of action you may now or hereafter have against TradeStation Securities or its affiliates, employees or agents, and (iii) all other assets and property, tangible or intangible, fixed, contingent or mixed, of any kind or nature, including but not limited to any assets in any futures account you have with TradeStation Securities, owned by you that are held, carried or controlled by or through, or on behalf of, TradeStation Securities or any of its affiliates, or which TradeStation Securities or any of its affiliates has the power to access, possess or control, and (iv) all proceeds of, or distributions on, any of the foregoing (collectively, (i) through (iv) are referred to in this Agreement as "**Collateral**").

(c) Any and all Collateral is held by TradeStation Securities as secured party, and as agent and bailee for TradeStation Securities and any other entity that is part of TradeStation Securities. TradeStation Securities, holding Collateral, may, without your further consent, give, comply with and implement (i) entitlement orders or instructions with respect to the Collateral and (ii) any instructions to apply any value distributed on account of any Collateral. Additionally, TradeStation Securities, holding Collateral, has the right not to comply with (x) any entitlement order or instruction from you or a third party with respect to the Collateral and (y) any instruction from you to apply any value on account of any Collateral, if TradeStation Securities decides or instructs that such order or instruction not be complied with in order to maintain security for the payment and performance of your obligations and liabilities to it. You agree that the actions of TradeStation Securities in not complying with orders or instructions as allowed in the preceding sentence satisfy any duties it may have under the Uniform Commercial Code of any state or jurisdiction ("**UCC**"), and you further agree that TradeStation Securities' rights and remedies against you as debtor and in its favor as secured party are, and shall be, the

Rev 09-19-2023

broadest possible rights under the applicable UCC, and all notices and elections necessary to have those broadest possible rights are hereby deemed specifically given.

(d) You agree that this Agreement, and that you have acknowledged and accepted this Agreement, shall constitute notice of the security interest granted to TradeStation Securities to any and all persons and entities to whom giving notice is appropriate or required.

(e) The reasonable costs and expenses of collection of any of your indebtedness, obligations, liabilities or debit balances, including but not limited to attorneys' fees and expenses, shall be payable by you to TradeStation Securities.

(f) In order more fully to secure the payment and performance of any of your outstanding liabilities and obligations to TradeStation Securities, it may, to the fullest extent permitted by Applicable Laws, without prior notice to you, use, apply or transfer Collateral as it determines. Unless otherwise agreed in writing, TradeStation Securities may register and hold Collateral in its name or the name of one or more designees. You authorize TradeStation Securities to instruct any of its affiliates holding Collateral to liquidate such Collateral and deliver the proceeds thereof to TradeStation Securities, and for TradeStation Securities to apply same against and to satisfy your obligations, indebtedness and liabilities to TradeStation Securities, in whole or in part, with or without notice to you, and you shall hold TradeStation Securities and any such affiliate harmless with respect to any such instruction, liquidation, delivery and application, and you consent that such affiliate has the right to engage in the foregoing actions no differently than if such affiliate was the creditor and secured party.

(g) You appoint TradeStation Securities with full power as your true and lawful attorney-in-fact, to the fullest extent permitted by Applicable Laws, for the purpose of perfecting the security interest granted in this Agreement and taking any action and executing any instrument that TradeStation Securities deems necessary or advisable to accomplish the purposes of this Agreement, including, but not limited to, the full exercise and enforcement by it of its rights as secured party hereunder.

(h) Notwithstanding anything to the contrary contained in this section, or in this Agreement, and to clarify the purpose, meaning and intent of this section and any other provisions relating to security interests in any of your assets, in no event are any assets in any ERISA plan account or IRA account you may have with TradeStation Securities collateral or security for any of your obligations to TradeStation Securities or any of its affiliates, and in no event are any assets of yours in any account you have with TradeStation Securities or any of its affiliates collateral or security for any of your obligations under any type of ERISA plan account or IRA account you may have with TradeStation Securities, and, in all such cases, and for the avoidance of doubt, no such security interest has ever been created.

**22.  Free Credit Balances**

You hereby authorize TradeStation Securities to use any free credit balance in your Account in accordance with all Applicable Laws and to pay interest thereon (if any) at such rate or rates and under such conditions as are established from time to time by TradeStation Securities for your Account and for the amounts of cash so used. Free credit balances are carried in customers' accounts pending, and with a view towards, reinvestment. TradeStation Securities may determine not to pay interest on free credit balances including, by way of example but not limited to, free credit balances representing (a) uncollected funds or (b) funds that are deposited and subsequently withdrawn prior to the expiration of the minimum time period required by TradeStation Securities, or (c) amounts under a minimum threshold set by TradeStation Securities (and any interest paid may be only on the excess amount over such threshold).  Notwithstanding any of the foregoing to the contrary, TradeStation Securities is under no obligation to pay you any interest or other compensation on any free credit balance in your Account.

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

**23. Authority to Pledge Collateral**

You represent, warrant and covenant that (a) you have the right to pledge and assign the Collateral to TradeStation Securities and (b) all Collateral is and shall at all times be free and clear of any liens, claims or encumbrances, except in favor of TradeStation Securities.

**24. Deposits on Transactions**

TradeStation Securities may require you to deposit cash or other property acceptable to TradeStation Securities as Collateral in your Account in such amounts as TradeStation Securities determines in its sole discretion, and you agree to comply with any such request by no later than the deadline set by TradeStation Securities.

**25. Consent to Loan, Pledge or Use of Securities in Margin Accounts**

To the greatest extent permitted under Applicable Laws, you hereby authorize TradeStation Securities to lend either to itself or to others and to otherwise use, sell or pledge any securities held by TradeStation Securities in your Account (if it is a margin account), to convey therewith all attendant rights of ownership (including voting rights) and to use all such property as collateral for loans and other obligations made to TradeStation Securities. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated, rehypothecated, sold or otherwise used either separately or in common with other property for any amounts due to TradeStation Securities thereon or for a greater sum. You hereby acknowledge that, as a result of such activities, (a) TradeStation Securities may receive and retain certain benefits to which you will not be entitled and will not share, and (b) the securities in your Account (if a margin account) may be used as collateral by TradeStation Securities for loans made to it in excess of your indebtedness to TradeStation Securities. In certain circumstances, such loans may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities.

**26. Breach, Bankruptcy or Default**

(a)   TradeStation Securities may, in its sole and absolute discretion, elect to consider you in default of any or all agreements you may then have with it (whether or not related to your Account), including this Agreement, if: (i) you do not pay any liability or indebtedness or perform any obligation to TradeStation Securities by the time you are obligated to do so; (ii) you otherwise breach, repudiate or default under this Agreement or any other agreement you may have with TradeStation Securities or any of its affiliates or service providers; (iii) you commence a proceeding in bankruptcy or insolvency or one is commenced against you; (iv) any guarantor, co-signer or other party (a "**Responsible Party**") liable, or providing security for, any of your indebtedness, liabilities or obligations to TradeStation Securities or any of its affiliates or service providers defaults in an obligation or commences a proceeding in bankruptcy or insolvency or one is commenced against it; (v) an attachment is made against your or a Responsible Party's account(s) with TradeStation Securities; (vi) a receiver is appointed with respect to you, any of your assets or the assets of a Responsible Party; (vii) if you are a natural person, you die or become incompetent, or, if you are an entity, you merge, liquidate, sell a material portion of your assets (directly or indirectly) or dissolve; or (viii) an event, circumstance or condition occurs that, in TradeStation Securities' judgment (which shall be conclusive unless it is exercised totally arbitrarily or capriciously), materially impairs your creditworthiness, your ability to timely perform any of your obligations or otherwise causes TradeStation Securities to view itself (or any entity that is a part thereof) as insecure.

(b)   Upon the election by TradeStation Securities to consider you in default, TradeStation Securities shall have all of the rights and remedies of a secured party upon default under the UCC and other Applicable Laws and may, without notice to you, among other things, (i) foreclose, collect, sell or otherwise liquidate any Collateral TradeStation Securities selects in its sole discretion, in any order and at any time, and apply, in a manner determined by TradeStation Securities, in its sole discretion, the proceeds to satisfy any of your obligations or liabilities to TradeStation Securities or any of its affiliates and (ii) buy any property that may have been sold short. At any sale of Collateral or other sale or purchase permitted hereunder

11

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

or otherwise, TradeStation Securities may sell or purchase to or from itself or third parties, and you hereby acknowledge and agree that the securities subject to such sale or purchase are instruments traded in a recognized market. You will pay TradeStation Securities for any losses and costs incurred by TradeStation Securities as a result of any default by you. You waive marshalling of assets and any similar doctrine dealing with the application of collateral.

**27. Collection and Other Account-Related Costs**

You hereby agree to pay, on demand, all reasonable costs, fees, expenses, liabilities and damages incurred by TradeStation Securities, as the case may be ("**Costs**"), in connection with (a) enforcing its rights hereunder, or (b) any investigation, litigation or proceeding involving your Account or any property therein, or (c) the use or access by you, or any other person authorized to act on your behalf, of an EES or other Services, or (d) any breach or failure by you to perform any term or provision of this Agreement, any other agreement between you and TradeStation Securities or its affiliates or any agreement governing your use of or access to any EES, or (e) TradeStation Securities acting in reliance upon your instructions or the instructions of any person authorized to act on your behalf. In each case, and whether or not demand has been made therefor, you hereby authorize TradeStation Securities to charge your Account for any and all such Costs.

**28. Control or Restricted Securities**

Prior to placing an order in connection with any securities subject to Rule 144 or 145(d) of the Securities Act of 1933, you shall advise TradeStation Securities of the status of the securities and furnish us with the necessary documents to clear legal transfer. You acknowledge that there may be delays involved with the processing of control or restricted securities and that TradeStation Securities will not be liable for any losses caused directly or indirectly by such delays. TradeStation Securities may, in its sole discretion, require that control or restricted securities not be sold or transferred until such securities clear legal transfer.

**29. Waiver; Assignment**

Neither TradeStation Securities' failure to insist at any time upon strict compliance with the terms of this Agreement, nor any continued course of such conduct on its part, shall constitute or be considered a waiver by TradeStation Securities of any of its rights or privileges hereunder. Except as specifically permitted by this Agreement, no provision or condition of this Agreement can be, or should be deemed to be, waived, altered, modified or amended unless specifically agreed to in writing by a duly authorized officer of TradeStation Securities (President, Vice President of Finance, General Counsel, and Chief Compliance Officer are the only officers duly authorized for this purpose). TradeStation Securities' failure to enforce any provision or condition of this Agreement shall not be deemed a waiver of the requirements of said provision or condition or any other provision or condition. Any assignment of your rights and obligations hereunder or your interest in any property held by or through TradeStation Securities without obtaining the prior written consent of an authorized representative of TradeStation Securities shall be null and void. TradeStation Securities reserves the right to assign any of its rights or delegate any of its obligations hereunder without prior notice to you, except as otherwise required by Applicable Laws.

**30. Legally Binding**

You hereby agree that the terms of this Agreement shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns.

**31. Disclosure of Status**

You agree to promptly notify TradeStation Securities in writing (if you have not already done so) if you are now or if you become registered or qualified with: (a) FINRA, the National Futures Association, the Securities and Exchange Commission, the Commodity Futures Trading Commission, any state securities agency, any securities exchange or association, or any commodities or futures contract market or association; (b) engaged as an "investment advisor" as that term is defined in

Rev 09-19-2023

Section 201 of the Investment Advisors Act of 1940 (whether or not registered or qualified under that act); (c) a "commodity trading advisor" or "commodity pool operator" as those terms are defined Section 1a of the Commodity Exchange Act; or (d) employed by a bank or other organization exempt from registration under federal and state securities laws to perform functions that would require you to be so registered or qualified if you were to perform such functions for an organization not so exempt. Except as otherwise specifically set forth in your Account application, you represent and warrant that you are not any of the foregoing.

**32.  Amendment By TradeStation; Presumptive Receipt of Communications**

Communications may be sent to you at your postal or electronic mail address or at such other address as you may hereafter specify in writing in any form. Modifications and amendments of or to this Agreement (including changes in Execution Fees and Service Fees) may be posted on the TradeStation company website and shall be effective as of the date posted. All communications so sent, whether by posting, mail, e-mail, other electronic messaging, telegraph, messenger, or otherwise, shall be deemed received on the earliest date sent or published, whether or not actually received or reviewed. You acknowledge and agree that TradeStation Securities may, at any time, in its sole discretion, modify or amend the terms of this Agreement or your access to any EES or other Services provided by TradeStation Securities. Your continuing to accept or use any EES or other Services after said modification or amendment is published, posted or sent shall conclusively be deemed your express acceptance of all said modifications or amendments in exchange therefor. In addition to, and without in any way limiting the breadth or scope of any of the foregoing provisions, you acknowledge and agree that notices and other communications (including, without limitation, margin calls) delivered, faxed, sent by express delivery service, e-mailed, electronically messaged, or mailed to the address (and/or e-mail address) provided by you shall, until TradeStation Securities has received notice in writing of a different address, be deemed to have been personally delivered to you whether actually received or not. Notices and other communications may also be provided to you verbally. Such notices and other communications left for you on your answering machine, or otherwise, including, but not limited to, margin calls and other demands of immediate payment of indebtedness, debit balances, or other obligations, shall be deemed to have been delivered to you, whether actually received or not. None of the foregoing provisions is intended to suggest or imply that any notice is required to be given you as a condition to TradeStation Securities exercising or enforcing any of its rights or remedies under this Agreement, as a secured party or otherwise, and you understand and acknowledge TradeStation Securities may act without or before providing you with notice of any kind, in its sole and absolute discretion, to the fullest extent permitted and authorized by this Agreement, and the applicable UCC and other Applicable Laws. Notices and other communications from you to TradeStation Securities shall be in writing. You hereby authorize TradeStation Securities to accept facsimile, scanned or electronic copies or versions of this or any other document or instruction as if it were the original, delivered in person, and to accept facsimile or electronic signatures or acknowledgments, or other electronic equivalents, as if they were originals delivered in person.

**33.  Ownership and Confidentiality**

You acknowledge and agree that nothing in this Agreement or any other agreement with TradeStation Securities or any of its affiliates shall constitute the sale of any equipment, software, hardware, procedure or system utilized by any EES or other Services provided by or through TradeStation Securities (collectively, the "**Technology**"). You hereby agree to keep confidential and not disclose, copy, transfer, reverse engineer, or modify any Technology, whether or not said Technology is actually owned by TradeStation Securities, its affiliate or a third party. You expressly agree that, in connection with any dispute, the Technology and TradeStation Securities' or its affiliates' other trade secrets or confidential information shall be disclosed, if at all, only upon issuance of protective order(s) effectively limiting disclosure to maintain confidentiality.

**34.  Monitoring and Recording Conversations**

All communications between you and TradeStation Securities by telephone, computer link, live chat or any other satellite, cable or telecommunications device or electronic or digital method may or will be monitored, recorded and archived by



TradeStation Securities and may be used and shall be admissible in connection with any investigation, inquiry or dispute that may arise, or for any valid or legitimate business purpose that is not violative of TradeStation Securities' **Privacy Notice**, which you acknowledge you have received and read. You voluntarily and knowingly acknowledge and irrevocably consent to all of such monitoring, recording and archiving of your communications with TradeStation Securities, its affiliates, and their respective agents and employees, and acknowledge and agree that no further notice or consent is necessary.

**35. Power of Attorney**

You hereby irrevocably appoint TradeStation Securities, with full power as your true and lawful attorney-in-fact, to the fullest extent permitted by Applicable Laws, for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that TradeStation Securities deems reasonably necessary or advisable to accomplish the purposes of this Agreement.

**36. Independence**

Nothing in this Agreement shall be construed as, or to create, a joint venture, agency, partnership or other similar relationship between the parties.

**37. Choice of Law**

All matters relating to the Services, your Account or this Agreement and any dispute or claim arising therefrom or related thereto (in each case, including, but not limited to, non-contractual disputes or claims), shall be governed by and construed and enforced in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). You agree that this Agreement has been executed and delivered, and that the performance of the transactions contemplated by this Agreement will be, or will have been performed, in the State of Florida. **Also, see the "Arbitration" section directly below**.

**38. Arbitration**

**THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE, WHICH IS SET FORTH BELOW IN THIS SECTION. BY SIGNING AN ARBITRATION AGREEMENT, THE PARTIES AGREE AS FOLLOWS**:

All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by a judge or jury, except as provided by the rules of the arbitration forum in which a claim is filed.

- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

- The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first hearing date.

- The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.

- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

into this Agreement.

(a)   **You agree that any and all controversies, claims or disputes relating to your Account, the Services, and/or the determination of any contractual or other rights and liabilities under this Agreement, which may arise between you and TradeStation Securities (and/or any of its officers, directors, employees, agents) shall be determined by arbitration conducted before FINRA in accordance with its arbitration rules then in force. Judgment upon any award of the arbitrators may be entered in any court, state or federal, having jurisdiction thereof.**

(b)   **No person shall bring a putative or certified class action to arbitration, or seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action or who is a member of a putative class, who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the person is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent expressly stated herein.**

(c)   **Notwithstanding the provisions of subsection (a) above, either party may, at any time prior to the initial arbitration hearing pertaining to a dispute or controversy, seek by application to any court of competent jurisdiction any such temporary or provisional relief or remedy ("provisional remedy") provided for by the laws of the U.S. or the laws of the State of Florida as would be available in an action based upon such dispute or controversy in the absence of an agreement to arbitrate. The parties acknowledge and agree that it is their intention to have any such application for a provisional remedy decided by the court to which it is made and that such application shall not be referred to or settled by arbitration. No such application to either said court for a provisional remedy, or any act or conduct by either party in furtherance of or in opposition to such application, shall constitute a relinquishment or waiver of any right to have the underlying dispute or controversy with respect to which such application is made settled by arbitration in accordance with subsection (a) above.**

(d)   **With respect to any application for a provisional remedy and any application for judgment on an arbitration award, each party irrevocably (i) submits to any court of competent jurisdiction.**

(e)   **You hereby agree to receive service of process in connection with any legal matters or actions or proceedings based upon, arising out of or relating in any way to this Agreement by confirmed, return-receipt requested mail and that delivery shall be presumed if such service is mailed to the address maintained by TradeStation Securities in its records and the requested receipt is returned.**

## 39. Estate Issues

You agree that, in the event of your death, the survivor(s) or the estate shall immediately give TradeStation Securities written notice of your death, and TradeStation Securities may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers or federal transfer certificates, retain such portion of the Account and restrict financial transactions, transfers and withdrawals in the Account as required by law, TradeStation Securities' policies or as TradeStation Securities deems advisable to protect TradeStation Securities against any tax, liability, penalty or loss under any present or future laws or otherwise. Your estate and the Account shall be jointly liable for all costs (including reasonable attorneys' fees and costs) TradeStation Securities may incur in connection with the disposition of the Account and related assets and liabilities in the event of your death, disability or dissolution.

## 40.  Options Trading

If your Account has been approved, or is later approved, for options trading (whether you have requested such approval at the time of your Account application, or you request to be permitted to trade options and are approved, at any level, at any time in the future), the following provisions apply:

Rev 09-19-2023

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

(a)   All options transactions shall be subject to the constitution, rules, regulations, customs and usages of the Options Clearing Corporation and any exchange or other marketplace where executed.  You will not, alone or in concert with others, violate the position or exercise limits of the exchanges, which may change from time to time.

(b)   You agree that TradeStation Securities may take such steps as it considers necessary or appropriate to protect itself against loss with respect to any open options contract positions, and refuse to accept orders for the establishment of any new options positions.

(c)   You represent and acknowledge that you have received from TradeStation Securities the *"Characteristics and Risks of Standardized Options"* disclosure document, as well as the *"Margin Disclosure Statement"* disclosure documents (both of which you acknowledge having read and understood as part of your Account application process, **and both of which are set forth as separate risk disclosure statements at the end of this Agreement**). You represent and acknowledge that you have noted particularly those sections of the disclosure documents summarizing the risk factors involved in options trading, and you have determined that, in view of your financial situation and investment objectives, options trading is not unsuitable for you.

(d)   You have read and understood the sections of the disclosure documents concerning exercise and assignment.  You are award that if you fail to give instructions to the contrary by the expiration date, any option you may hold which is in the money by one (1) cent or more at expiration will be exercised automatically by the Options Clearing Corporation. You are also aware that you may not receive actual notice of an exercise or assignment until the week following the expiration date.

(e)   TradeStation Securities shall have no responsibility to notify you when an option in your Account is nearing expiration, and you will have no claim for damage or loss arising out of the fact that an option in your Account was not exercised unless you have properly instructed TradeStation Securities to exercise such option at or before the time established by TradeStation Securities

(f)   If you engage in uncovered option writing, you agree to maintain adequate cash reserves to meet reasonably foreseeable margin calls and will, upon TradeStation Securities' request, immediately deposit cash reserves in your Account that TradeStation Securities deems to be required under the circumstances. See the disclosures under the heading *"Special Statement for Uncovered Options Writers"* set out as a separate disclosure statement at the end of this Agreement, which you affirm you have already read and acknowledged as part of your Account application process.

(g)   If your Account is an Individual Retirement Account or Qualified Plan account (as the case may be, a "**Retirement Account**"), you hereby authorize TradeStation Securities to accept instructions for the purchase and sale, in your Retirement Account, of certain put and call options and certain other options strategies including American Style option spreads permitted by the terms of your Retirement Account and other agreements governing your Retirement Account. You understand and acknowledge, however, that TradeStation Securities will not allow you to borrow funds or allow you to maintain any debit balance which may have resulted from an option exercise or assignment in your Retirement Account and that you may not sell naked (uncovered) calls or sell naked (uncovered) puts, excluding cash covered puts, in your Retirement Account.  You hereby represent and warrant that engaging in options transactions is suitable for your Retirement Account. You hereby confirm that you have discussed engaging in options transactions in your Retirement Account with your professional tax advisor and that your professional tax advisor has advised you that, although options transactions may be conducted in a margin account within your Retirement Account, engaging in options transactions will not result in a prohibited pledge of the assets of your Retirement Account and therefore will not result in a deemed distribution from your Retirement Account under the Internal Revenue Code.  You also hereby confirm that you have consulted with your professional tax advisor concerning whether engaging in options transactions in your Retirement Account could give rise to any prohibited transactions within the meaning of § 4975(c)(1) of the Internal Revenue Code, and that your professional tax advisor has advised you that engaging in options transactions in your Retirement Account

will not give rise to any prohibited transaction.  You acknowledge and accept that you must closely monitor your Retirement Account and your trading in it to avoid adverse tax consequences.

(h)   You are aware that exercise assignment notices for option contracts are allocated among customer short positions pursuant to a procedure which randomly selects from among all customer short option positions, including positions established on the day of assignment, those contracts which are subject to assignment. All short option positions are liable for assignment at any time. A more detailed description of the random allocation procedure is available upon request.

### 41. Futures and Futures Options Accounts

If you have opened an account to trade futures and/or futures options with TradeStation Securities (a "**Futures Account**"), you acknowledge and agree that your Futures Account is separate from your Account and is not covered by this Agreement (other than as Collateral), but rather solely by your TradeStation Securities, Inc. Customer Account Agreement for Futures, and the agreements, disclosures and other documents supplemental to that agreement, and the rights, obligations, remedies and defenses set forth therein (the "**TSS Futures Account Agreement**"), which you confirm you agreed to and accepted before or at the time your Futures Account was approved and opened. Without limiting the breadth of the foregoing acknowledgment and agreement by you, you understand and agree that the ***pre-dispute arbitration agreement and other dispute resolution provisions of this Agreement*** cover disputes relating only to your Account (under this Agreement), and do not cover disputes in any way relating to your Futures Accounts or the TSS Futures Account Agreement, whatever the basis or nature of such disputes, which are covered solely by the ***pre-dispute arbitration agreement and other dispute resolution provisions of the TSS Futures Account Agreement***. You understand and accept that the arbitration forum requirements and choices (if any), and related procedures and mechanisms, as well as regulatory jurisdiction and rules of arbitration that apply, are significantly *different* in this Agreement (for Account disputes) compared to what they are in the TSS Futures Account Agreement (for Futures Account disputes). You represent, acknowledge and agree that you will not initiate any arbitration for any dispute (or component of any dispute) that in any manner relates to a Futures Account under any provision of this Agreement (including but not limited the ***pre-dispute arbitration agreement and other dispute resolution provisions of this Agreement***), and that you are estopped from asserting that any provision of this Agreement, including its ***pre-dispute arbitration agreement and other dispute resolution provisions***, should be applied to or govern any part of any dispute which relates to a Futures Account.  Similarly, you represent, acknowledge and agree that you will not initiate any arbitration for any dispute (or component of any dispute) that in any manner relates to your Account under any provision of the TSS Futures Account Agreement (including but not limited the ***pre-dispute arbitration agreement and other dispute resolution provisions of the TSS Futures Account Agreement***), and that you are estopped from asserting that any provision of the TSS Futures Agreement, including its ***pre-dispute arbitration agreement and other dispute resolution provisions***, should be applied to or govern any part of any dispute which relates to your Account. You are making these representations, acknowledgements and agreements with the full understanding that if a dispute arises between you and TradeStation Securities that you believe relates to both your Account and your Futures Account to any extent or degree, such dispute will, unless you and TradeStation Securities at that time otherwise agree, likely be adjudicated in two separate dispute-resolution proceedings in two separate forums, and possibly two separate venues, under two separate sets of arbitration rules and procedures.

### 42. Crypto Accounts with Affiliated Company

If you have or later open a cryptocurrency investment or trading account with TradeStation Securities' affiliate, TradeStation Crypto, Inc., these provisions apply to you. For the purposes of this section, the following capitalized terms have the respective meanings set forth below:

"**TCI**" means TradeStation Crypto, Inc., a separate legal corporate entity (separate and distinct from TradeStation Securities), which offers to its customers Digital Asset brokerage services.

"**TCI Account**" means the self-directed, online Digital Asset brokerage account between TCI as the broker, principal, dealer or counterparty, and you, as the customer, in which you may be enabled by TCI, under the TCI Customer Agreement, to purchase or sell Digital Assets.

"**TCI Customer Agreement**" means your customer agreement (and related agreements and acknowledged disclosures) with TCI with respect to your TCI Account, which is separate from, and independent of, this Agreement and your Account.

"**TCI Fee**" or "**TCI Fees**" mean the amounts that TCI charges you in your TCI Account for processing or otherwise dealing with your purchase, sale and exchange transactions for Digital Assets or other TCI Services.

"**TCI Services**" means the services available for you to receive using TCI's online web application, mobile-based version of such web application, and any future or other online charting, analysis and/or order placement platforms, applications, "apps" or desktops that TCI may provide (and which may be proprietary software technology of TCI or one of its affiliates, or of a software technology licensor which provided it to TCI for your use), and internet website(s) of TCI, and all other services regarding Digital Assets transactions provided by TCI.

"**Digital Asset**" means a digital asset (also sometimes referred to as a "cryptocurrency," "virtual currency," or "digital currency") that may be purchased, sold or traded via the TCI Services.

"**Legal Tender**" means, unless and until this definition is changed in this Agreement, solely U.S. Dollars.

(a)   You hereby represent and warrant to TradeStation Securities that, under the TCI Customer Agreement, you have consented and agreed to, and where applicable irrevocably authorized, all of the following:

(i)   That, in order to use the TCI Services, including Digital Asset brokerage and related services, you must (A) have applied and been approved for your TCI Account, and (B) concurrently have applied and been approved for, and opened, your Account (or had an Account at the time of application for your TCI Account);

(ii)   That you understand, acknowledge and agree that TCI does not accept deposits of Legal Tender to fund your TCI Account, or permit your TCI Account to retain Legal Tender credited to your Account from the sale of Digital Assets in your TCI Account, and that TCI and TradeStation Securities share technology (licensed to each of them from another affiliated company and/or third-party application service providers) designed to seamlessly permit you (A) to make withdrawals of Legal Tender from your Account for deposit and credit (as journal entries) to your TCI Account so that you can pay for your purchase of Digital Assets in your TCI Account and pay TCI the related TCI Fees, and (B) to withdraw from your TCI Account for deposit and credit to your Account (as journal entries) the Legal Tender you have received from sales in your TCI Account of Digital Assets.

(iii)   That, as a condition to your TCI Account being approved and opened by TCI, you irrevocably and unconditionally have acknowledged and agreed that any time you place an order in your TCI Account to purchase a Digital Asset using Legal Tender, you are simultaneously giving instructions to TradeStation Securities, pursuant to this Agreement, (A) to put a hold on the estimated amount of Legal Tender in your Account required to purchase the Digital Asset in your TCI Account (including to cover the TCI Fees), and (B) upon TradeStation Securities being notified that such transaction has been executed, to withdraw from and debit to your Account, and transfer for deposit and credit to your TCI Account (all as journal entries), the amount of Legal Tender required to complete the purchase of such Digital Asset (including payment to TCI of Fees);

(iv)   That, also as a condition to your TCI Account being approved and opened by TCI, you irrevocably and unconditionally have acknowledged and agreed that any time you place an order in your TCI Account to sell a Digital Asset in exchange for Legal Tender, you are simultaneously giving instructions (A) to TCI, pursuant to the TCI Customer Agreement, upon TCI recording receipt of such Legal Tender, immediately to debit from your TCI Account the amount of such Legal Tender (less the Fees to be retained by TCI) and transfer such amount for deposit and credit to your Account (all as journal entries);

**TradeStation Securities, Inc. Customer Account Agreement for Equities**

and (B) to TradeStation Securities, pursuant to this Agreement, to accept such deposit and credit in your Account (as a journal entry).

*You hereby authorize and instruct TradeStation Securities to do all of the acts described above relating to Legal Tender debit withdrawals from, and Legal Tender credit deposits to, your Account.*

(b) *You understand and agree that in no manner is or will TradeStation Securities be part of, in the business of, or otherwise involved in, the processing of Digital Asset transactions (as a principal, agent, intermediary, or otherwise), including but not limited to the purchase, sale, deposit, withdrawal, transfer or custody of Digital Assets or the receipt or retention of TCI Fees from your TCI Account transactions. Any and all cash withdrawals initiated from, and cash deposits accepted in, your Account are and will be transactions solely in your Account (and in no manner in your TCI Account), and subject to and covered solely by this Agreement, which should be read and understood by you as an agreement that is separate from, and independent of, the TCI Customer Agreement. In addition, your Account and your TCI Account are likewise separate and independent accounts in all respects, and are between you and two separate and distinct legal entities (your Account being solely with TradeStation Securities and your TCI Account being solely with TCI).*

(c)  Without limiting the breadth of the foregoing acknowledgments and agreements by you concerning the separateness and independence from one another of your Account and your TCI Account, you understand and agree that the ***pre-dispute arbitration agreement and other dispute resolution provisions of this Agreement*** cover disputes relating only to your Accounts (under this Agreement), and do not cover disputes in any way relating to your TCI Accounts or the TCI Customer Agreement, whatever the basis or nature of such disputes, which are covered solely by the ***pre-dispute arbitration agreement and other dispute resolution provisions of the TCI Customer Agreement***. The arbitration forum requirements, and related procedures and mechanisms, as well as regulatory jurisdiction and rules that apply, are significantly *different* in this Agreement (for Account disputes with TradeStation Securities) compared to what they are in the TCI Agreement (for TCI Account disputes with TCI). You represent, acknowledge and agree that you will not initiate any arbitration for any dispute (or component of any dispute), that in any manner relates to a TCI Account, under any provision of this Agreement (including but not limited to the ***pre-dispute arbitration agreement and other dispute resolution provisions of this Agreement***), and that you are estopped from asserting that any provision of this Agreement, including its ***pre-dispute arbitration agreement and other dispute resolution provisions***, should be applied to or govern any part of any dispute which relates to a TCI Account.  Similarly,  you represent, acknowledge and agree that you will not initiate any arbitration for any dispute (or component of any dispute), that in any manner relates to your Account, under any provision of the TCI Customer Agreement (including but not limited to the ***pre-dispute arbitration agreement and other dispute resolution provisions of the TCI Customer Agreement***), and that you are estopped from asserting that any provision of the TCI Customer Agreement, including its ***pre-dispute arbitration agreement and other dispute resolution provisions***, should be applied to or govern any part of any dispute which relates to your Account. You are making these representations, acknowledgements and agreements with the full understanding that if a dispute arises that you believe relates to both your Account and your TCI Account to any extent or degree, such dispute will, unless you, TradeStation Securities and TCI at that time all otherwise agree, likely be adjudicated in two separate arbitration proceedings in two separate forums, and possibly two separate venues, under two separate sets of arbitration rules and procedures, and all of your claims to the extent they relate to your TCI Account will be against solely TCI, and all of your claims to the extent they relate to your Account will be against solely TradeStation Securities.

**43. Clearly Erroneous Trades**

TradeStation Securities is subject to the any "clearly erroneous" policies which exist today for, or may be established in the future by, any exchange or other market center to which your orders are routed. A clearly erroneous trade occurs when you have entered an order with an obvious error in any term, such as the security identification, the price, or the number of shares. Any exchange or market center that has a "clearly erroneous" policy may review a transaction to

**TradeStation**®

determine if the trade was clearly erroneous and may reverse or "break" such a trade in its sole discretion. You acknowledge that if you have benefited from an erroneous transaction, TradeStation Securities, under the terms of the exchanges' or market centers' policies, may be forced to break the trade. This could have the effect of placing you in the position you were before the transaction. You also acknowledge that if you have been adversely affected by an erroneous transaction, TradeStation Securities may not be able to break the trade, and is under no obligation to break the trade. There is also no guarantee or assurance that an exchange or market center will identify or reverse a "clearly erroneous" trade, or that it will not designate a trade order you intended "clearly erroneous."  You expressly assume all risks relating to all orders entered by you, including "clearly erroneous" trades (or trades designated "clearly erroneous") and the consequences of how they are dealt with.

## 44. Severability

If any term, provision or condition of this Agreement shall be held to be invalid or unenforceable by reason of any law, rule, administrative order or decision by any court, or regulatory or self-regulatory agency or body, or in arbitration, said term, provision or condition shall be deemed modified only to such extent as is necessary to correct the invalidity or unenforceability and shall not affect the validity and enforceability of this Agreement or any other term, provision or condition of this Agreement, and the intent of this Agreement and that term, provision or condition shall be honored to the fullest possible extent in the circumstances.

## 45. Headings

The heading of each section or paragraph is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in such section or paragraph.

## 46. Trademarks

TradeStation®, EasyLanguage®, RadarScreen®, OptionStation®, ActivityBar®, Portfolio Maestro®, PositionGraphs®, ProbabilityMap® Test Before You Trade® and TradingApp® are registered trademarks, and ShowMe and PaintBar are unregistered trademarks, of TradeStation Technologies, Inc., an affiliate of TradeStation Securities, and are used by TradeStation Securities pursuant to a trademark license. You have no right to use any of such trademarks in any context without the express prior written consent of the owner of such trademarks.

## 47. Consent to Identification Procedures, Credit Reports and Other Information

You voluntarily and knowingly consent to the following: TradeStation Securities may use your name, address, social security number, date of birth, home telephone number and/or other biographical or personal information about you (collectively, "**Personal Information**") to comply with applicable federal, state, local, quasi-governmental, self-regulatory and other laws, rules, regulations, recommendations, interpretations, authorizations, licenses and registrations, and other Applicable Laws, or for any valid or legitimate business purpose. The purposes for the use of Personal Information include, but are not necessarily limited to, verification of your identity and other factual information you present to us, verification that you are not listed as a specially designated national or blocked national by the Department of Treasury's Office of Foreign Asset Control (OFAC), and to investigate or verify your creditworthiness, business history and your history with legal and administrative authorities. Whatever procedures are used by TradeStation Securities shall not be violative of the terms of its **Privacy Notice**. You authorize TradeStation Securities, in its sole discretion, to make or obtain reports concerning your credit standing, business conduct and history with legal, regulatory and administrative authorities. You may make a written request for a description of the nature and scope of the credit reports made or obtained by TradeStation Securities and the same will be provided to you within a reasonable period of time. You further agree to provide TradeStation Securities, on request, with such additional information or certifications as may be required by TradeStation Securities or Applicable Laws.

**48. Cumulative Rights**

The rights, remedies, benefits and privileges of TradeStation Securities under (a) this Agreement, (b) any other written agreement or document executed or delivered by you, and (c) any written agreement with an affiliate of TradeStation Securities (collectively, the "**Related Agreements**"), whether part of this Agreement or otherwise, are cumulative and shall be interpreted to convey to and upon TradeStation Securities and its affiliates the broadest, most expansive, most enforceable rights, remedies, benefits and privileges. Any inconsistencies or conflicts between or among any of the Related Agreements shall be disregarded, as TradeStation Securities may at any time, or from time to time, choose, so that TradeStation Securities may enjoy to the fullest extent possible the right, remedy, benefit or privilege that it, at any time or from time to time, seeks to assert, enforce or avail to itself.

**49. TradeStation Technologies, Inc. Subscription Agreement**

(a)    You acknowledge that you have received and accepted, in connection with your Account application, a subscription agreement ("**TST Subscription Agreement**") with our affiliate, TradeStation Technologies, Inc., ("**TST**"), for a subscription ("**TST Subscription**") for Software and Data (as those terms are defined in the TST Subscription Agreement).

(b)    We are authorized to offer to you the TST Subscription and the TST Subscription Agreement with your Account application, and permit you to use the Software and Data in connection with your Account in accordance with the terms and conditions of the TST Subscription Agreement as it relates to the Software and Data, and this Agreement as it relates to your Account and the Services, including EES.

(c)    You authorize TradeStation Securities to debit your Account the full amount of any fees owed for your permission to use the TST Subscription in connection with your Account.  Any such fees are for permitted access to the Software and the Data as connected to your Account, and those fees do not change, and are not reduced or prorated, based on your actual login to, or use of, the Software or the Data, or your Account, even if you rarely or never use them.  TradeStation Securities may decide not to charge you any fee amounts for use of your TST Subscription in connection with your Account, but may charge your Account fees which relate to your level of Account transaction activity in a month, quarter or year, or the size of your Account balances, and any such type of fee or charge is, regardless of what it is called or referred to as, an inactivity or low-activity fee being charged to you by TradeStation Securities incidental to the Services, and not a fee or charge for the TST Subscription, or the Software or the Data.

(d)    You acknowledge and agree that TradeStation Securities is an intended and express third-party beneficiary of the TST Subscription Agreement, and may enforce and assert against you all of the rights, remedies, benefits, defenses and counterclaims of TST thereunder to the same extent and degree as TST may or could so do (except only to the extent prohibited by Applicable Laws), and we, in any arbitration or other dispute-resolution proceeding with you, or anyone acting by or through you, may assert against you any or all of the disclaimers, assumptions of risk, limitations of liability and other provisions of the TST Subscription Agreement, as rights, remedies, benefits, defenses and counterclaims against you, no differently than had you made them directly to TradeStation Securities in this Agreement. You acknowledge and agree that neither the express beneficiary designation of TradeStation Securities under the TST Subscription Agreement, nor any other provision of the TST Subscription Agreement, creates in your favor any express or implied right or remedy, of any kind or nature, against TradeStation Securities under the TST Subscription Agreement or this Agreement.

(e)    You further acknowledge and agree that your TST Subscription is separate from your Account and is not covered by this Agreement, but rather solely by your TST Subscription Agreement, and, as stated above, TradeStation Securities being a third-party beneficiary under the TST Subscription Agreement creates no rights of any kind or nature for you against TradeStation Securities under the TST Subscription Agreement or this Agreement. Without limiting the breadth of the foregoing acknowledgment and agreement by you, you understand and agree that the ***pre-dispute arbitration agreement and other dispute resolution provisions of this Agreement*** cover disputes relating only to your Account and the Services

(under this Agreement), and do not cover disputes in any way relating to your TST Subscription, the Software or the Data or the TST Subscription Agreement (and that TST has not consented to arbitration jurisdiction of FINRA or any similar regulatory agency or industry forum) , whatever the basis or nature of such disputes, which are covered solely by the ***dispute resolution provisions of the TST Subscription Agreement***, and that you are estopped from asserting that any provision of this Agreement, including its ***pre-dispute arbitration agreement and other dispute-resolution provisions***, should be applied to or govern any part or aspect of any dispute which relates to your TST Subscription, the Software, the Data or the TST Subscription Agreement.   You are making these acknowledgements and agreements with the full understanding that if a dispute arises between you and TradeStation Securities and/or TST that you believe relates to both your Account and your TST Subscription to any extent or degree, such dispute will, unless you, TradeStation Securities and TST at that time otherwise agree, likely be adjudicated in two separate dispute-resolution proceedings in two separate forums, and possibly two separate venues, under two separate sets of rules and procedures.



## <u>SEPARATE RISK DISCLOSURE STATEMENTS</u>

## (on following pages)

- ➢ **Day Trading Risk Disclosure**

- ➢ **Extended Hours Trading Risk Disclosure**

- ➢ **Penny Stock Disclosure**

- ➢ **Characteristics and Risks of Standardized Options**

- ➢ **Special Statement for Uncovered Options Writers**

- ➢ **Margin Disclosure Statement**

07-19

**TradeStation**®

# DAY TRADING RISK DISCLOSURE

You should consider the following points before engaging in a day-trading strategy. For purposes of this notice, a "day trading strategy" means an overall trading strategy characterized by the regular transmission by a customer of intra-day orders to effect both purchase and sale transactions in the same security or securities.

***Day trading can be extremely risky.*** Day trading generally is not appropriate for someone of limited resources and limited investment or trading experience and low risk tolerance. You should be prepared to lose all of the funds that you use for day trading. In particular, you should not fund day trading activities with retirement savings, student loans, second mortgages, emergency funds, funds set aside for purposes such as education or home ownership, or funds required to meet your living expenses. Further, certain evidence indicates that an investment of less than $50,000 will significantly impair the ability of a day trader to make a profit. Of course, an investment of $50,000 or more will in no way guarantee success.

***Be cautious of claims of large profits from day trading.*** You should be wary of advertisements or other statements that emphasize the potential for large profits in day trading. Day trading can also lead to large and immediate financial losses.

***Day trading requires knowledge of securities markets.*** Day trading requires in-depth knowledge of the securities markets and trading techniques and strategies. In attempting to profit through day trading, you must compete with professional, licensed traders employed by securities firms. You should have appropriate experience before engaging in day trading.

***Day trading requires knowledge of a firm's operations.*** You should be familiar with a securities firm's business practices, including the operation of the firm's order execution systems and procedures. Under certain market conditions, you may find it difficult or impossible to liquidate a position quickly at a reasonable price. This can occur, for example, when the market for a stock suddenly drops, or if trading is halted due to recent news events or unusual trading activity. The more volatile a stock is, the greater the likelihood that problems may be encountered in executing a transaction. In addition to normal market risks, you may experience losses due to system failures.

***Day trading will generate substantial commissions, even if the per trade cost is low.*** Day trading involves aggressive trading, and generally you will pay commissions on each trade. The total daily commissions that you pay on your trades will add to your losses or significantly reduce your earnings. For instance, assuming that a trade costs $5.00 and an average of 30 transactions are conducted each trading day, an investor would need to generate an annual profit of approximately $38,000 just to cover commission expenses.

***Day trading on margin or short selling may result in losses beyond your initial investment.*** When you day trade with funds borrowed from a firm or someone else, you can lose more than the funds you originally placed at risk. A decline in the value of the securities that are purchased may require you to provide additional funds to the firm to avoid the forced sale of those securities or other securities in your account. Short selling as part of your day trading strategy also may lead to extraordinary losses, because you may have to purchase a stock at a very high price in order to cover a short position.

***Potential Registration Requirements.*** Persons providing investment advice for others or managing securities accounts for others may need to register as either an investment adviser under the Investment Advisers Act of



1940 or as a broker or dealer under the Securities Exchange Act of 1934. Such activities may also trigger state registration requirements.



# EXTENDED HOURS TRADING RISK DISCLOSURE

You should consider each of the following risks prior to engaging in extended hours trading. Extended hours trading means trading outside of regular trading hours. Regular trading hours means, in general, between 9:30 a.m. and 4:00 p.m., Eastern Time, on days when markets are open.

### Risk of Lower Liquidity

Liquidity refers to the ability of market participants to buy and sell securities. Generally, the more orders that are available in a market, the greater the liquidity. Liquidity is important because with greater liquidity it is easier for investors to buy or sell securities and, as a result, investors are more likely to pay or receive a competitive price for securities purchased or sold. There may be lower liquidity in extended hours trading as compared to regular market hours. As a result, your order may only be partially executed, if at all.

### Risk of Higher Volatility

Volatility refers to the changes in price that securities undergo when trading. Generally, the higher the volatility of a security, the greater its price swings. There may be greater volatility in extended hours trading than in regular market hours. As a result, your order may only be partially executed, or not executed at all, or you may receive an inferior price in extended hours trading than you would during regular market hours.

### Risk of Changing Prices

The prices of securities traded in extended hours trading may not reflect the prices either at the end of regular market hours, or upon the opening the next morning. As a result, you may receive a price in extended hours trading that is inferior to the one you would receive during regular market hours.

### Risk of Unlinked Markets

Depending on the extended hours trading system or the time of day, the prices displayed on a particular extended hours trading system may not reflect the prices in other concurrently operating extended hours trading systems dealing in the same securities. Accordingly, you may receive a price in one extended hours trading system that is inferior to the one you would in another extended hours trading system.



*Risk of News Announcements*

Normally, issuers make news announcements that may affect the price of their securities after regular market hours. Similarly, important financial information is frequently announced outside of regular market hours. In extended hours trading, these announcements may occur during trading, and if combined with lower liquidity or higher volatility, may cause an exaggerated and unsustainable effect on the price of a security.

*Risk of Wider Spreads*

The spread refers to the difference in price between what you can buy a security for and what you can sell it for. Lower liquidity and higher volatility in extended hours trading may result in wider than normal spreads for a particular security.

*Risk of Lack of Calculation or Dissemination of Underlying Index Value*

Risk of Lack of Calculation or Dissemination of Underlying Index Value or Intraday Indicative Value (IIV): For certain derivative securities products, an updated underlying index value or IIV may not be calculated or publicly disseminated in extended trading hours. Since the underlying index value and IIV are not calculated or widely disseminated during extended hours trading sessions, an investor who is unable to calculate implied values for certain derivative securities products in those sessions may be at a disadvantage to market professionals. Additionally, securities underlying the indexes or portfolios will not be regularly trading as they are during regular trading hours or may not be trading at all. This may cause prices during extended trading hours to not reflect the prices of those securities when they open for trading.



# PENNY STOCK DISCLOSURE

The term "penny stock" generally refers to low-priced (below $5), speculative securities of very small companies. While penny stocks generally are quoted over-the-counter, such as on the OTC Bulletin Board or in the Pink Sheets, they may also trade on securities exchanges, including foreign securities exchanges. In addition, penny stocks include the securities of certain private companies with no active trading market.

*Risks*

Investing in low-priced securities is speculative and involves considerable risk. Low-priced securities often exhibit high price volatility and erratic market movements. Often, when investors buy or sell these securities, they significantly affect the quoted price. In some cases, the liquidation of a position in a low-priced security may not be possible within a reasonable period of time and is subject to additional fees.

It may be difficult to properly value an investment in a low-priced security. Reliable information regarding issuers of low-priced securities, their prospects, or the risks associated with investing in such securities may not be available. Certain issuers of low-priced securities have no obligation to provide information to investors. Some issuers register securities with the Securities and Exchange Commission (SEC) and may provide regular reports to investors. Others, however, may not be required to maintain such registration or provide such reports. Securities may continue to be traded if issuers are delinquent in their reporting obligation to the SEC or other federal or state regulatory agencies.

Penny stocks have not been approved or disapproved by the Securities and Exchange Commission (SEC). The SEC has not passed upon the fairness, the merits, the accuracy or adequacy of the information contained in any prospectus or any other information provided by an issuer or a broker or a dealer of penny stocks.

Trading low-priced securities is subject to significant risks, increasing regulatory requirements and oversight, and additional fees.

Generally, a penny stock is a security that:

(1) Is priced under five dollars;

(2) Is not traded on a national stock exchange;

(3) May be listed in the "pink sheets" or on the Over The Counter (OTC) Bulletin Board; or

(4) Is issued by a company that has less than $5 million in net tangible assets and has been in business less than three years, by a company that has under $2 million in net tangible assets and has been in business for at least three years, or by a company that has revenues of $6 million for 3 years.

*Settlement Fees for Non-DTC Eligible Securities*

For various reasons, certain low-priced securities are not DTC-eligible or have had their eligibility revoked. As a result, the settlement of these physical positions can carry significant pass-through charges including execution fees, DTC fees, deposit fees, New York window fees, and transfer agent fees. These fees, which can vary and may be substantial, increase the cost of clearing and execution.  Customers who trade non-DTC eligible securities are responsible for these charges, which can be as high as 10 times the value of the trade. Orders that require



executions with multiple contra-parties will result in settlement fees for each separate transaction. TradeStation Securities does not mark up any of these fees before they are passed through to customers. The Firm may not receive notice of such fees until several weeks following the trade, so pass-through charges may not be immediately charged to a customer account following a trade in non-DTC eligible securities. TradeStation reserves the right to withhold funds in a customer account pending potential assessment of fees associated with trading in low-price securities. It is your responsibility to investigate the eligibility status of a low- priced security before trading it. It is strongly recommended that you contact the specific company whose equity you intend to trade to confirm eligibility.

***Can you trade non-DTC eligible securities at TradeStation Securities*?**

Yes. However, please be aware that trading such securities can result in large fees in excess of ten times the value of the trade. If your order requires multiple contra parties to execute, your account will be assessed a separate set of fees for each of these transactions.

***Does TradeStation inform customers of non-DTC eligible securities prior to trading*?**

TradeStation receives a list of non-DTC eligible securities; however, the list does not encompass the entire market of non-DTC eligible securities. ***It is up to you to determine the eligibility of these securities prior to trading OTC Bulletin Board, Pink Sheet, and other low-priced securities.***

**TradeStation**®

## CHARACTERISTICS AND RISKS OF STANDARDIZED OPTIONS

**Options trading is not suitable for all investors. Please click the links below to download the disclosures.**

Characteristics and Risks of Standardized Options

https://www.theocc.com/components/docs/riskstoc.pdf

March 2023 (PDF, 96 pages)

For additional information, please visit The Options Clearing Corporation.



## SPECIAL STATEMENT FOR UNCOVERED OPTIONS WRITERS

There are special risks associated with uncovered option writing, which exposes the investor to potentially significant loss. Therefore, this type of strategy may not be suitable for all customers approved for options transactions.

(a)   The potential loss of uncovered call writing is unlimited. The writer of an uncovered call is in an extremely risky position, and may incur large losses if the value of the underlying instrument increases above the exercise price.

(b)   As with writing uncovered calls, the risk of writing uncovered put options is substantial. The writer of an uncovered put option bears a risk of loss if the value of the underlying instrument declines below the exercise price. Such loss could be substantial if there is a significant decline in the value of the underlying instrument.

(c)   Uncovered option writing is thus suitable only for the knowledgeable investor who understands the risks, has the financial capacity and willingness to incur potentially substantial losses, and has sufficient liquid assets to meet applicable margin requirements. In this regard, if the value of the underlying instrument moves against an uncovered writer's options position, the investor's broker may request significant additional margin payments. If an investor does not make such margin payments, the broker may liquidate stock of options positions in the investor's account with little or no prior notice in accordance with the investor's margin agreement.

(d)   For combination writing, where the investor writes both a put and a call on the same underlying instrument, the potential risk is unlimited.

(e)   If a secondary market in options were to become unavailable, investors could not engage in closing transactions, and an option writer would remain obligated until expiration of assignment.

(f)   The writer of an American-style option is subject to being assigned an exercise at any time after the writer has written the option until the option expires. By contrast, the writer of a European-style option is subject to exercise assignment only during the exercise period.

Neither these statements, nor the statements and disclosures contained in *Characteristics and Risks of Standardized Options*, a document you have acknowledged you have read and accepted in your Account application, are intended to enumerate all of the risks entailed in writing uncovered options.

**TradeStation**®

## MARGIN DISCLOSURE STATEMENT

Your brokerage firm is furnishing this document to you to provide some basic facts about purchasing securities on margin, and to alert you to the risks involved with trading securities in a margin account. Before trading securities in a margin account, you should carefully review the margin agreement provided by your firm. Consult your firm regarding any questions or concerns you may have with your margin accounts.

When you purchase securities, you may pay for the securities in full or you may borrow part of the purchase price from your brokerage firm. If you choose to borrow funds from your firm, you will open a margin account with the firm. The securities purchased are the firm's collateral for the loan to you. If the securities in your account decline in value, so does the value of the collateral supporting your loan, and, as a result, the firm can take action, such as issue a margin call and/or sell securities in any of your accounts held with the member, in order to maintain the required equity in the account.

It is important that you fully understand the risks involved in trading securities on margin. These risks include the following:

You can lose more funds than you deposit in the margin account. A decline in the value of securities that are purchased on margin may require you to provide additional funds to the firm that has made the loan to avoid the forced sale of those securities or other securities in your account(s).

The firm can force the sale of securities in your account(s). If the equity in your account falls below the maintenance margin requirements under the law, or the firm's higher "house" requirements, the firm can sell the securities in any of your accounts held at the firm to cover the margin deficiency. You also will be responsible for any short fall in the account after such a sale.

The firm can sell your securities without contacting you. Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities in their accounts to meet the call unless the firm has contacted them first. This is not the case. Most firms will attempt to notify their customers of margin calls, but they are not required to do so. However, even if a firm has contacted a customer and provided a specific date by which the customer can meet a margin call, the firm can still take necessary steps to protect its financial interests, including immediately selling the securities without notice to the customer.

You are not entitled to choose which securities in your account(s) are liquidated or sold to meet a margin call. Because the securities are collateral for the margin loan, the firm has the right to decide which security to sell in order to protect its interests.

The firm can increase its "house" maintenance margin requirements at any time and is not required to provide you advance written notice. These changes in firm policy often take effect immediately and may result in the issuance of a maintenance margin call. Your failure to satisfy the call may cause the member to liquidate or sell securities in your account(s).

You are not entitled to an extension of time on a margin call. While an extension of time to meet margin requirements may be available to customers under certain conditions, a customer does not have a right to the extension.

# EXHIBIT 2

Accounts  ›  Fully Paid Lending

*TradeStation Securities, Inc.*

# What is fully paid stock lending?

TradeStation's Fully Paid Stock Lending Program gives you an opportunity to earn incremental income on your portfolio's eligible stock positions. When we lend out certain fully paid or excess margin securities in your account, you'll receive a share of the interest we earn each day.

💬 **CHAT ONLINE**



### Generate incremental income

While your shares are on loan, you'll accrue daily interest, which is paid to your account once a month, in addition to the value of any dividend payments.



### No long-term commitments

You can sell your securities on loan at any time. If you wish to stop participating in the program, you're able to unenroll at anytime



### Loans are secured

Rest easy knowing your securities on loan are backed by US dollar collateral held on your behalf by a third-party collateral agent and secured party, in a separate bank account for your benefit.





**Tax considerations**

You'll receive cash payments in lieu of dividend payments while your securities are on loan. Although dividends from your securities are taxed at a different rate.

Open Account



CHAT
ONLINE



# Here's how the Fully Paid Stock Lending Program works

When we lend out certain fully paid or excess margin securities account, you'll receive a share of the interest earned each day. interest rate is determined based on the demand in the lending market and the value of the security. The greater the demand for your

securities, the higher your potential income.

## See for yourself



Here is a hypothetical example of how the interest is calculated. income earned is calculated on a daily basis by taking the mark of the position multiplied by the interest rate on a daily basis.

| | |
|---|---|
| Shares on loan | 1,000 |
| Market price | $4 |
| Market value | $4,000 |
| Annualized lending interest rate* | 22.5% |
| **Annualized return** | **$900** |
| Daily Accrual ($4,000*22.5%/360 days) | **$2.50** |
| Hypothetical monthly income ($2.50 x 30 days/month) | **$75** |

*The interest rate is determined based on the demand in the lending market and the value of the security. The greater the demand for your securities, the higher your potential income.*





# Ready to get started?

If you're sitting on stock or ETF securities, fully paid securities lending could be an investment strategy to consider. It could add extra income to your portfolio — with little to no effort on your part.

**Open Account**



# Frequently Asked Questions

### Who is eligible for Fully Paid Stock Lending Program?

The Fully Paid Stock Lending Program is available to all TradeStation clients who meet the following criteria:



- A minimum of $25,000 in total net worth OR one (1) year of trading experience

- An equities account (excluding custodial)
- A Master Securities Lending Agreement (MSLA) and related schedules and disclosures. Have questions about your eligibility? Contact Client Services at **800.822.0512** or **954.652.7900**.

## How do I enroll?

All newly qualified clients are automatically enrolled in the program. Clients who opened an account before 2/15/19, visit the Client Center enroll in the program. For existing clients whose eligibility criteria ha changed, please complete and submit the Client Information Updat and then visit the Client Center to enroll.



## How does it work?

- We identify securities in your account that qualify for lending.
- Based on market demand, some or all of your eligible securities will be loaned out.
- You'll accrue daily income while your securities are on loan.
- Once securities on loan are sold or if the loan is recalled, income stops accruing to your account on that loan.
- All securities on loan and accrued interest will be reflected in your monthly statement.
- There's no guarantee that there will be demand for your securities, therefore your portfolio's eligible securities may not be lent out.

## Are there trading restrictions?

There are no trading restrictions on securities that are loaned out. You can sell or transfer your positions at any time, just as you would if they weren't on loan. As required, shares will be recalled and deposited back into your account.

## What Are the Risks?

Shares lent out are not protected by SIPC.



Tax considerations:



- When shares are lent out, you'll receive cash payments in lieu of dividends; these payments are treated as ordinary income rather than taxed at the dividend rate.
- Loan income is taxed as ordinary income.

There's no guarantee that your portfolio's eligible securities will be lent out, as there may be no demand for the securities.

When securities are on loan, you lose your ability to exercise voting rights. Other risks are outlined in the Fully Paid Stock Lending Risk Disclosure.



**CHAT**
ONLINE

**Important Information**

TradeStation does not offer tax or legal advice. Consult your tax professional about your individual tax situation.

ID 2837268D0423

**Why TradeStation**

Overview

Awards & Recognition

Press & News

Careers

ESG & Sustainability

**Learn**

Overview

New to trading

Using TradeStation

Getting started

Options Education

Masterclass

# EXHIBIT 3





# EXHIBIT 4

# Daily List Events 

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/08/2022 13:11:45 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

Comments

See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22.

Details

|  | Current Value |
|---|---|
| Daily List Date/Time | 12/08/2022 13:11:45 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class |  |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| Daily List Comment | See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22. |

## Daily List Events

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/06/2022 14:53:29 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

### Comments

MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. MMTLP shares will be canceled effective 12/13/22.

### Details

| | Current Value |
|---|---|
| Daily List Date/Time | 12/06/2022 14:53:29 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class | |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| Daily List Comment | MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. MMTLP shares will be canceled effective 12/13/22. |



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that **"…immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled**." Available here: https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:07 AM
**To:** (b)(6); (b)(7)(C)                    @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C)          @SEC.GOV>; (b)(6); (b)(7)(C)          @SEC.GOV>; Boyle, Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
**Subject:** RE: Inquiry

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

(b)(6); (b)(7)(C)          --looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office—but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a zoom and feel free to let me know if (b)(6); (b)(7)(C) or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

Sam

Non Responsive Record

# Meta Materials Announces FINRA Has Revised Corporate Action for Exchange of Series A Preferred

**M** metamaterial.com/meta-materials-announces-finra-has-revised-corporate-action-for-exchange-of-series-a-preferred/

December 8, 2022

**HALIFAX, NS / ACCESSWIRE / December 8, 2022 /** Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT)(FSE:MMAT), a developer of high-performance functional materials and nanocomposites, today announced that FINRA has revised its notice regarding the corporate action of exchanging META's Series A Preferred shares (OTC:MMTLP) for shares of common stock of Next Bridge Hydrocarbons, Inc. on its daily list. Please see https://otce.finra.org/otce/dailyList which notes the following regarding the trading of shares of MMTLP on OTC and the distribution of the Next Bridge Hydrocarbons, Inc. shares:

See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22.

Please note that this disclosure and dates from FINRA regarding the trading of MMTLP in connection with the distribution of the shares of Next Bridge Hydrocarbons, Inc. supersedes and replaces all of META's prior disclosure regarding the logistics and timing of the trading of MMTLP in connection with the distribution.

Please contact your broker, bank or other nominee for assistance with any questions concerning ownership or trading of META's Series A Preferred shares.

**About Meta Materials Inc.**

META® delivers previously unachievable performance, across a range of applications, by inventing, designing, developing, and manufacturing sustainable, high-performance, functional materials, components and systems. Our extensive technology platform enables leading global brands to deliver breakthrough products to their customers in consumer electronics, 5G communications, health and wellness, aerospace, automotive, and clean energy. Our nano-optic metamaterial technology provides anti-counterfeiting security features for government documents and currencies and authentication for brands. Our achievements have been widely recognized, including being named a Lux Research Innovator of the Year in 2021. Learn more at www.metamaterial.com.

**Media Inquiries**

Rob Stone
Vice President, Corporate Development and Communications
Meta Materials Inc.
[email protected]

**Investor Contact**

Mark Komonoski
Senior Vice President
Integrous Communications
Phone: 1-877-255-8483
Email: [email protected]

**Cautionary Statements**

Certain statements contained in this communication may constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements include, but are not limited to, statements regarding the expected timing of the completion of the spin-off transaction, the benefits of the spin-off transaction to either META® or Next Bridge and other events and statements that are not historical facts and are subject to significant risks and uncertainties. There can be no assurance that the proposed transaction or other future events will occur as anticipated, if at all, or that actual results will be as expected. Actual future events or results may differ materially from these statements. Such differences may result from a number of factors, including but not limited to: the timing and completion of the proposed transaction; a failure to obtain necessary regulatory approvals; a failure to obtain assurances of anticipated tax treatment; or a deterioration in the business or prospects of META® or Next Bridge.

# EXHIBIT 5

**From:** **Anna Massey** Anna@caititle.com
**Subject:** FW: Important Information re: MMTLP
**Date:** February 12, 2024 at 12:32 PM
**To:** Joe Rose joe@thebasilelawfirm.com

---

**From:** Anna Massey <annamassey17@gmail.com>
**Sent:** Tuesday, February 6, 2024 9:06 AM
**To:** Anna Massey <Anna@caititle.com>
**Subject:** Fwd: Important Information re: MMTLP

[EXTERNAL]

---------- Forwarded message ---------
From: **Anna Massey** <annamassey17@gmail.com>
Date: Wed, Dec 28, 2022 at 3:17 PM
Subject: Re: Important Information re: MMTLP
To: TradeStation Group, Inc. <reply-febf107273610375-263_HTML-337297062-514006600-2@e.tradestation.com>

Attention: Trade Station:
Please keep my shares of Next Bridge Hydrocarbons, Inc., in my Trade Station, account titled, Inter-Coastal
Waterways, LLC.
Thank you,
Anna Gjekaj

On Tue, Dec 13, 2022 at 5:30 PM TradeStation Securities <noreply@e.tradestation.com> wrote:

Click here if you are having trouble viewing this email.



## Dear Client,

Meta Materials, Inc. recently announced a corporate action pursuant to which holders of their
preferred shares (Symbol: MMTLP, CUSIP: 59134N203) will receive shares of Next Bridge
Hydrocarbons, Inc. ("Next Bridge") at a 1-for-1 ratio.

As a holder of MMTLP on the record date, you are eligible to receive the shares of Next Bridge.
Next Bridge, however, will not be listed on any national exchange and will only be possible to
transact via a private placement. TradeStation can hold your Next Bridge shares as custodian, but
you will not be able to transact in the Next Bridge shares in your TradeStation account. Unless we
hear from you to the contrary by the close of business on December 29, 2022, TradeStation will
send your Next Bridge shares to American Stock Transfer & Trust Company ("AST"). Beginning
January 3rd, 2023, if you want more information regarding your Next Bridge shares, please contact

AST at (800) 937-5449 or (718) 921-8124.

Please contact **TradeStation Client Services** with any additional questions.

**IMPORTANT INFORMATION**

Securities and futures trading is offered to self-directed customers by TradeStation Securities, Inc., a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a futures commission merchant licensed with the Commodity Futures Trading Commission ("CFTC"). TradeStation Securities is a member of the Financial Industry Regulatory Authority, the National Futures Association ("NFA"), and a number of exchanges. TradeStation Crypto, Inc. offers to self-directed investors and traders cryptocurrency brokerage services under federal and state money services business/money-transmitter and similar registrations and licenses.

TradeStation Securities, Inc., TradeStation Crypto, Inc., and TradeStation Technologies, Inc. are each wholly-owned subsidiaries of TradeStation Group, Inc., all operating, and providing products and services, under the TradeStation brand and trademark. You Can Trade, Inc. is also a wholly-owned subsidiary of TradeStation Group, Inc., operating under its own brand and trademarks. TradeStation Crypto, Inc. offers to self-directed investors and traders cryptocurrency brokerage services. It is neither licensed with the SEC or the CFTC nor is it a member of NFA. When applying for, or purchasing, accounts, subscriptions, products, and services, it is important that you know which company you will be dealing with. Click here for further important information explaining what this means.

© TradeStation. All rights reserved.

We respect your right to privacy – click here to view our Privacy Notice.

This email was sent by: **TradeStation**
8050 SW 10th St Plantation, FL, 33324-3290, US

← **Post**



**Meta News** 🚨
@MMATNEWS
...

BREAKING🚨 Brokerage Firm TradeStation Confirms a Share Imbalance and Potential Counterfeit Shares in MMTLP

"The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers... This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate."

- For clarification each brokerage firm is given a certain amount of shares, when combined with ALL brokerage's the total amount of shares are "suppose" to equal the amount of Next Bridge Hydrocarbons outstanding shares

- TradeStation admits their firm exceeds the amount of shares they were given and can NO longer transfer their customer shares to AST

What is a Counterfeit Share: shares created that has the effect of increasing the number of shares that are in the market place beyond the number issued by the company, is considered counterfeit.

In my book, TradeStation is the first transparent broker to admit the Counterfeit Shares in $MMTLP

1:48 PM · Dec 29, 2023 · **152.6K** Views



**Meta News**⚠️ @MMATNEWS · Dec 29, 2023

TradeStation Official Statement to Customers:

"Upon the initial distribution of NBH common stock, broker–dealers, like TradeStation, were granted physical certificates based on their customers* former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation...

Show more

record ownership of their NBH shares in book entry form with the transfer agent, the American Stock Transfer & Trust Company ("AST").  Registration must be completed within sixty (60) days (the "record date") from the effective date of a Form S-1 Registration Statement that NBH filed with the SEC on July 26, 2023.  NBH will issue a press release notifying shareholders of the record date once the Registration Statement is declared effective by the SEC. TradeStation will be transmitting its requested list of clients' shares to AST, but will not be able to send any additional shares once that list has been sent.

Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security.  This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate.  If the Registration Statement is declared effective by the SEC, TradeStation will fulfill its obligation to transfer the

 31    351    527    99K   

We understand that some TradeStation customers may seek to participate in the non-transferable subscription rights offering for shares of common stock in the future subsidiary of Next Bridge Hydrocarbons, Inc. ("NBH"). Such participation requires NBH holders to register and record ownership of their NBH shares in book entry form with the transfer agent, the American Stock Transfer & Trust Company ("AST"). Registration must be completed within sixty (60) days (the "record date") from the effective date of a Form S-1 Registration Statement that NBH filed with the SEC on July 26, 2023. NBH will issue a press release notifying shareholders of the record date once the Registration Statement is declared effective by the SEC. TradeStation will be transmitting its requested list of clients' shares to AST, but will not be able to send any additional shares once that list has been sent.

Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security. This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate. If the Registration Statement is declared effective by the SEC, TradeStation will fulfill its obligation to transfer the current list of clients who own NBH of record to AST. In the meantime, we must decline your request to transfer a physical certificate reflecting your ownership interest to AST.

# EXHIBIT 6

nt Window - Google Chrome

psnmedia.net/le_unified_window/index.html?lpUnifiedWindowConfig=%7B"accountId"%3A"11492692"%2C"env"%3A"prod"%2C"clickedChannel"%3A"-lpuw-chat"%2C"external"%3Atru...

**Thank you**

## TradeStation

Info at 12:52, Dec 22:
Thank you for choosing to chat with us. An agent will be with you shortly.

Info at 12:52, Dec 22:
You are now chatting with Representative Jason.

You at 12:52, Dec 22:
hello

Representative J… at 12:52, Dec 22:
Thank you for choosing TradeStation. How may I assist you today?

Representative J… at 12:52, Dec 22:
Hello, How can I help you?

You at 12:55, Dec 22:
I would like to transfer a portion of my Next Bridge Hydro Carbon shares to AST

Representative J… at 12:58, Dec 22:
Did you receive an email on this?

You at 12:59, Dec 22:
not recently

You at 12:59, Dec 22:
the stock was formerly MMTLP

Type your message

Russell 2000  +1.24%

4:04 PM
12/22/2023



Representative J... at 13:00, Dec 22:

I was just told you can't transfer those shares anymore

You at 13:01, Dec 22:

What why not?

Representative J... at 13:01, Dec 22:

The cutoff data already passes

Representative J... at 13:01, Dec 22:

passed

Representative J... at 13:01, Dec 22:

Date

Representative J... at 13:02, Dec 22:

Is there anything else I can assist you with today?

You at 13:03, Dec 22:

when did the date passed and when were we notified that we had to transfer

You at 13:05, Dec 22:

are you there?

Representative J... at 13:05, Dec 22:

You had sixty days to inform us that you wanted transfer the shares from the record date

You at 13:09, Dec 22:

The company is offering a dividend per the S1 to shareholders

+  Type your message

Type here to search

Russell 2000 +1.24%

**Thank you**

You at 13:09, Dec 22:

The company is offering a dividend per the S1 to shareholders who have transffered there shares which is in the process of getting approval from the SEC

You at 13:10, Dec 22:

Why can't you transfer now. Aren't my shares backed by a physical certificate which was distributed from NBH

You at 13:10, Dec 22:

?

You at 13:11, Dec 22:

are you still there?

Representative J... at 13:11, Dec 22:

with AST because the shares are not backed by a physical certificate.

Representative J... at 13:12, Dec 22:

If it gets approved you can contact us back

You at 13:13, Dec 22:

all shares were distributed to the broker dealers and should be backed by physical certificates.

Representative J... at 13:14, Dec 22:

there is currently no market for the security.

Representative J... at 13:16, Dec 22:

It's npt backed by physical certificate

Type your message

## Thank you — ✕

You at 13:11, Dec 22:

are you stiil there?

Representative J... at 13:11, Dec 22:

with AST because the shares are not backed by a physical certificate.

Representative J... at 13:12, Dec 22:

If it gets approved you can contact us back

You at 13:13, Dec 22:

all shares were distributed to the broker dealers and should be backed by physical certificates.

Representative J... at 13:14, Dec 22:

there is currently no market for the security.

Representative J... at 13:16, Dec 22:

It's npt backed by physical certificate

Representative J... at 13:16, Dec 22:

Is there anything else I can assist you with today?

Representative J... at 13:19, Dec 22:

Sorry we couldn't finish our chat. As I haven't heard from you for some time, I'm going to close this chat. If you need any help in future, please do not hesitate to chat with us again.

Info at 13:19, Dec 22:

Thank you for chatting with us.

+ Type your message

Russell 2000  +1.24%

4:03 PM
12/22/2023

Type here to search

# EXHIBIT 7



# Account Application Package

- **Individual**
- **Joint**
- **IRA**

<u>**ALL**</u> completed and signed pages must be returned.

This application package covers applications for equities (including equity options) and futures (including options on futures) accounts, with TradeStation Securities, Inc., and cryptocurrency accounts with TradeStation Crypto, Inc.

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

**TradeStation** ®

| | |
|---|---|
| **Introduction** | TradeStation Securities, Inc. ("we", "our" or "us") is registered with the U.S. Securities and Exchange Commission (SEC) as a broker-dealer and is a member of the Financial Industry Regulatory Authority (FINRA) and the Securities Investor Protection Corporation (SIPC). Brokerage and investment advisory services and fees differ and it is important for you to understand these differences.<br><br>Free and simple tools are available to research firms and financial professionals at https://www.investor.gov/CRS, which also provides educational materials about broker-dealers, investment advisers and investing. |
| **What investment services and advice can you provide me?** | We provide brokerage services to retail and institutional traders and investors, including the buying and selling of equities, ETFs, options, mutual funds and bonds ("Securities"). We don't offer any of our own Securities. We do not offer investment advice.<br><br>We also offer the *TradeStation* Desktop Platform (the "Platform") through TradeStation Technologies, Inc., our affiliate. The Platform is a proprietary electronic trading platform that allows you to design, test and monitor your own custom trading and investment strategies, and then automate them with electronic order placement. You may also enter and monitor orders and perform some analytics via our mobile and web-based applications. We offer certain free real-time market data packages provided you qualify as a non-professional subscriber. Other market data packages and platform features are made available to non-professional and professional subscribers at extra cost, as described at: https://www.tradestation.com/pricing/market-data-pricing.<br><br>TradeStation is an online broker for self-directed clients. We do not make recommendations regarding Securities, investment strategies or account types. We do not provide you with investment monitoring services, nor do we accept authorization from you to trade your account. You will make all decisions regarding the purchase or sale of Securities in your account, therefore it is your responsibility to understand the risks associated with your investment decisions. To learn more about the risks associated with trading, please visit: https://www.tradestation.com/important-information.<br><br>For additional information about the services we provide, please visit: https://www.tradestation.com.<br><br>**Conversation starters: Ask your financial professional...**<br>• Given my financial situation, should I choose a brokerage service? Why or why not?<br>• How will you choose investments to recommend to me?<br>• What is your relevant experience, including your licenses, education, and other qualifications? What do these qualifications mean? |
| **What fees will I pay?** | **Commissions:** Commissions are transaction-based fees charged by brokers. We offer a variety of pricing plans. Depending on the pricing plan chosen, you may be charged more fees when you trade more. Access to, and use of, the Platform features and functions are provided to you at no additional cost on certain pricing plans. Information about all available plans, including other trade and account-related costs, can be viewed at: https://www.tradestation.com/pricing.<br><br>**Interest:** Margin and day trading allow you to leverage assets to increase your buying power. Margin interest rates vary per the size of your debit balance. These rates may be adjusted at our discretion. For additional information on margin rates, please visit: https://www.tradestation.com/pricing/margin-rates.<br><br>**Other:** Margin accounts may be subject to Short Debit Fees for the maintenance of short positions in securities. Short Debit Fees may be increased from time to time in light of changing market conditions without prior notice. You may incur additional fees and costs related to brokerage services and investments including, but not limited to wire fees, account transfer fees, IRA account annual fees, inactivity fees and termination fees. For a full list of additional fees and costs that you may incur, please visit: https://www.tradestation.com/pricing/service-fees.<br><br>If you custody or plan to purchase mutual funds with us, you should review the mutual fund prospectus for applicable fees, such as management fees and 12b-1 fees.<br><br>You will pay certain fees and costs regardless of whether you make or lose money in your account. Fees and costs will reduce any amount of money you make on your investments over time. We encourage you to learn about all of the fees and costs associated with your account and trading activity. |

**TradeStation**®

| | |
|---|---|
| | **Conversation starters:** Ask your financial professional… <br> • Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me? |
| **What are your legal obligations to me when providing recommendations?** <br><br> **How else does your firm make money and what conflicts of interest do you have?** | We do not make recommendations regarding Securities, investment strategies or account types. The way we make money may create a potential conflict with your interests. You should learn about and ask us about these conflicts, because they may affect the services we provide. Here are some examples to help explain some potential conflicts. <br><br> a.  We route certain equities and options orders to exchanges, electronic communication networks, and broker-dealers during normal business hours and during extended trading sessions. Some of these market centers may provide us with payment in exchange for us sending them your orders, and might also charge you access fees, depending upon the characteristics of the order and any subsequent execution. If you trade more frequently, the payments we receive from these venues may increase. The material aspects of our relationship with each such venue, including any payment for order flow arrangements, can be found in the SEC Rule 606 Report & Rule 607 Disclosure at: https://www.tradestation. com/important-information, and further details of these payments and fees are available to you upon written request. <br> b.  In addition, if you trade using margin, that means you are borrowing money from us to conduct your equities trading. The margin interest we charge you to borrow this money is revenue to us. The more you trade using margin, the more money we may earn. Please learn about the risks of margin trading at: https://www.tradestation.com/important-information. <br> c.  We receive a portion of the revenue generated from fully paid securities lent to other institutions. <br> d.  Some of our registered representatives may be dually employed by us and our affiliate, TradeStation Crypto, Inc. We manage this potential conflict so that it does not affect your dealings with either company. <br><br> For additional information about potential conflicts of interest, please visit our Important Documents page: https://www. tradestation.com/important-information. |
| | **Conversation starters:** Ask your financial professional… <br> • How might your conflicts of interest affect me, and how will you address them? |
| **How do your financial professionals make money?** | Some of our registered representatives may be paid a base salary and a monthly bonus based on certain metrics, such as the number of new customer accounts they open and the commissions generated by those accounts. Our registered representatives may also receive periodic bonuses based on a combination of job performance and our overall profitability as a company. Our registered representatives have an incentive to encourage you to try various TradeStation products and services which may result in you choosing to trade more frequently and/or to consider alternative asset classes. |
| **Do you or your financial professionals have legal or disciplinary history?** | Yes. You may visit: https://www.investor.gov/CRS or https://brokercheck.finra.org for free and simple tools to research us and our registered representatives. |
| | **Conversation starters:** Ask your financial professional… <br> • As a financial professional, do you have any disciplinary history? For what type of conduct? |
| **Additional Information** | You can obtain additional information about us and request a copy of this relationship summary by visiting: https://www.tradestation.com/important-information or by calling one of our specialists at 800.808.9336. |
| | **Conversation starters:** Ask your financial professional… <br> • Who is my primary contact person? Is he or she a representative of an investment adviser or a broker-dealer? <br> • Who can I talk to if I have concerns about how this person is treating me? |

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc.
(Member NYSE, FINRA, CME and SIPC).



**TradeStation Securities, Inc.** is an SEC-licensed broker dealer and a CFTC-licensed futures commission merchant (FCM), and a member of FINRA, SIPC, CME, NFA and several equities and futures exchanges, which offers to self-directed investors and traders Equities accounts for stocks, exchange-traded products (such as ETFs) and equity and index options, and Futures accounts for commodity and financial futures and futures options (TradeStation Securities ***does not*** offer Crypto accounts).

**TradeStation Crypto, Inc.** is neither a securities broker dealer nor an FCM, and offers to self-directed investors and traders cryptocurrency brokerage services under federal and state money services business/money-transmitter and similar registrations and licenses (TradeStation Crypto ***is not*** a member of FINRA, SIPC, CME, NFA or any equities or futures exchange, and ***does not*** offer Equities or Futures accounts).

**TradeStation Technologies, Inc.** is a software development company which offers analytics subscriptions that self-directed investors and traders can use to chart, analyze and design back-tested strategies for Equities, Options, Futures, Forex and Crypto markets (TradeStation Technologies ***is not*** a financial services company).

TradeStation Crypto accepts *only* cryptocurrency deposits, and *no* cash (fiat currency) deposits, for account funding. In order for you to purchase cryptocurrencies using cash, or sell your cryptocurrencies for cash, in a TradeStation Crypto account, you must also have qualified for, and opened, a TradeStation Equities account with TradeStation Securities so that your cryptocurrency purchases may be paid for with cash withdrawals from, and your cryptocurrency cash sale proceeds may be deposited in, your TradeStation Securities Equities account. Therefore, if you want to open a TradeStation Crypto account, you must also have an Equities account with TradeStation Securities. This cash in your TradeStation Securities Equities account may also, of course, be used for your equities and options trading with TradeStation Securities.

*TradeStation* account services, subscriptions and products are designed for speculative or active investors and traders, or those who are interested in becoming one. No offer or solicitation to buy or sell securities, securities derivative or futures products of any kind, cryptocurrencies or other digital assets, or any type of trading or investment advice, recommendation or strategy, is made, given or in any manner endorsed by any TradeStation Group company, and the information made available on or in any TradeStation Group company website or other publication or communication is not an offer or solicitation of any kind in any jurisdiction where such TradeStation Group company or affiliate is not authorized to do business. Past performance, whether actual or indicated by historical tests of strategies, is no guarantee of future performance or success. There is a possibility that you may sustain a loss equal to or greater than your entire investment regardless of which asset class you trade (equities, options, futures, futures options, or crypto); therefore, you should not invest or risk money that you cannot afford to lose. System access and trade placement and execution may be delayed or fail due to market volatility and volume, quote delays, system, platform and software errors or attacks,



internet traffic, outages and other factors. The trademark "TradeStation®," as well as other trademarks, domain names and other proprietary intellectual property of TradeStation Group companies, are owned by TradeStation Technologies. The proprietary *TradeStation* platform is offered by TradeStation Securities for Equities (including equity options) and Futures trading. TradeStation Crypto offers its online platform trading services, and TradeStation Securities offers futures options online platform trading services, through unaffiliated third-party platform applications and systems licensed to TradeStation Crypto and TradeStation Securities, respectively, which are permitted to be offered by those TradeStation companies for use by their customers.

*Please also read carefully the agreements, disclosures, disclaimers and assumptions of risk presented to you separately by TradeStation Securities, TradeStation Crypto, and TradeStation Technologies on the TradeStation Group company site and the separate sites, portals and account or subscription application or sign-up processes of each of these TradeStation Group companies. They contain important information, rights and obligations, as well as important disclaimers and limitations of liability, and assumptions of risk, by you that will apply when you do business with these companies.*

01-04-2023

**TradeStation**

*103998*

# *Welcome.*

# How to Open Your TradeStation Account

Please complete this application in its entirety by typing your answers and information in the appropriate fields. **Please list your name exactly as it appears on your government issued photo identification.** You can save your progress at any point. Once completed, simply print and sign the application before sending it to us. You will need the latest version of the free Adobe Acrobat reader (https://get.adobe.com/reader/) to use the interactive features on this form. Alternatively, you can print then complete the entire form using blue or black ink. Please do not use white-out.

To ensure that your account application is complete and may be processed as soon as reasonably possible, *please make sure you've completed all applicable documents and that you return this entire package, including the pages on which you are not required to sign or provide information.*

Visit our website to view the funding instructions.

Please return your completed application and additional documentation to TradeStation via email or regular mail:

1) **Email: newaccountservices@tradestation.com**
2) **Post to the following address:**
   TradeStation New Accounts
   8050 SW 10th Street, Suite 2000
   Plantation, FL 33324, USA

## REQUIRED FORMS

☐ **Account Application and Agreements, Disclosures, Disclaimers and Assumption of Risks** For all accounts.

## IDENTITY VERIFICATION FOR NON-U.S. RESIDENTS

Please include when you return application package.

☐ **Copy of Passport**
E.U. residents may provide a copy of a government issued ID in lieu of a passport.

☐ **Address Verification Documents**
A document such as a recent utility bill or bank statement. Must be within 90 days of submission date.

**Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.**
Rev 07272023

6

**⁊ TradeStation**                                                    **Account Application**

## REQUIRED

Please complete all information carefully.  You are representing to TradeStation that all information you provide is true, complete and accurate.  Information provided under "Trading Experience" means of the Primary Account Holder.

To expedite your account opening process, if you have been working with a Representative, please enter that person's name below:

**Representative's Name:**............................................ **Promotional Code:**.................................................................

### Please select the account type you would like to open within the next 90 days:

| ☐ **Equities** | Includes equity options, if selected below and approved for options trading. |
|---|---|
| ☐ **Futures** | Includes options on futures, if selected below. |
| ☐ **Crypto** | *Must also have an Equities account.  By checking, you are also applying for a new Equities account.* |

### For Futures accounts only
#### What type of futures trading will you be doing with this account?
If you do not make a selection below, your futures account will be coded for Futures Only, which means that you do not intend to trade options on futures but intend to trade only futures using the TradeStation Platform.

☐ **Futures Only**                                      ☐ **Futures Options**
(Trading through the TradeStation platform.)        (Trading through the TradeStation FuturesPlus platform.)

### For IRAs only
#### U.S. citizens and U.S residents only:

**Please select your account preference:** ☐ Traditional IRA   ☐ Roth IRA   ☐ SEP IRA   ☐ Simple IRA   ☐ Beneficiary IRA

**For Futures IRAs only, please select your custodian:**  ☐ Equity Trust   ☐ Midland IRA   ☐ Millennium Trust

### For Equities accounts only
#### Would you like the ability to trade options with this account?
☐ **Yes**                        ☐ **No**
*If yes, please provide the following additional information.*

Investment Objectives:
   ☐ Income        ☐ Growth        ☐ Speculation

Please check one or more of the option strategies you may wish to employ:

☐ 1. Covered call writing, Protective puts
☐ 2. Put/call buys, Collars, Covered puts (speculative)
☐ 3. Put/call spreads (speculative)

☐ 4. Put writing (speculative), Cash-covered puts (cash accounts only)
☐ 5. Uncovered call writing (this is a highly speculative activity)

Options trading is not suitable for all investors. If you would like the ability to trade options through a TradeStation account, you should first read the disclosure document titled Characteristics and Risks of Standardized Options.

## FOR INTERNAL USE ONLY (APPROVAL OF EQUITY OPTIONS TRADING)

| Date approved | R.R. Signature | Approved option levels: |
|---|---|---|
| Date approved | ROP Signature | ☐1  ☐2  ☐3  ☐4  ☐5 |
| CID# | Account # | |

**Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.**   Rev 07272023



# REQUIRED

## Primary Account Holder Information

**If you have moved within the past 2 years, please include a copy of a utility bill or your driver's license with your current address.**

| First Name (Legal) | Middle | Last |
|---|---|---|
| Date of Birth | Citizenship | U.S. Social Security # |

| Permanent Address (no P.O. Boxes) | | | |
|---|---|---|---|
| City | State/Province | Zip | Country |

| Mailing Address   ☐ Check here if same as Permanent Address | | | |
|---|---|---|---|
| City | State/Province | Zip | Country |

| Primary/Daytime Phone Number | Home/Evening Phone Number |
|---|---|
| E-mail Address | |

☐ Please tick if you do wish to receive marketing communications. (E.U. Residents only.)

## Employment Information

Are you or your spouse employed by or associated with an NYSE, FINRA and/or NFA registered brokerage firm or an exchange?
☐ No   ☐ Yes   *If yes, please provide an authorization letter from the member firm with whom you or your spouse is associated. Letter should be on corporate letterhead and signed by a Principal or Compliance Officer of the firm. If duplicate confirms and statements are required, an e-mail address to which they are to be sent must be provided in the letter.*

Are you a director, 10% shareholder or policy-making officer of a publicly-owned company?
☐ No   ☐ Yes   If Yes, please list trading symbol(s): _____

| Employment Status | ☐ Employed | ☐ Retired | ☐ Student | ☐ Unemployed | Self-Employed | Homemaker |
|---|---|---|---|---|---|---|

| Current Occupation | Type of Business/Industry |
|---|---|
| Name of Employer | Employer's Address |

| City | State/Province | Zip | Country |
|---|---|---|---|

Source of income
☐ Salary   ☐ Inheritance   ☐ Insurance Proceeds   ☐ Legal Settlement
☐ Savings/Investments/Real Estate   ☐ Gift   ☐ Other_____ (specify)

**Source of Funds in Account** (Check all that apply.)
Please provide the source of assets that will be deposited or held in the account. If the source is a transfer from another firm, please indicate the source of funds that were used to purchase the assets.
☐ Salary, wages, savings   ☐ Working capital   ☐ Investment capital gains   ☐ Family, relatives, inheritance
☐ Sales of property/assets   ☐ Business income   ☐ Other (specify): _____

**Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.**   Rev 07272023

8

**TradeStation**®   **Account Application**

## REQUIRED

### Primary Account Holder Information (Continued)

## Financial Information

**Annual Net Income in USD:**
☐ If under $50,000 specify _____
☐ $50,000-$99,999
☐ $100,000-$249,999
☐ $250,000-$999,999
☐ Over $1 million

**Total Net Assets in USD:**
This includes all assets, minus all obligations, debts and liabilities.
☐ If under $75,000 specify _____
☐ $75,000-$99,999
☐ $100,000-$199,999
☐ $200,000-$499,999
☐ $500,000-$999,999
☐ $1,000,000-$4,999,999
☐ Over $5 million

**Liquid Net Assets in USD:**
This includes cash and marketable securities, minus all obligations, debts and liabilities.
☐ If under $75,000 specify _____
☐ $75,000-$99,999
☐ $100,000-$199,999
☐ $200,000-$499,999
☐ $500,000-$999,999
☐ $1,000,000-$4,999,999
☐ Over $5 million

## Trading Experience

**EQUITIES**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

**OPTIONS**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

**FUTURES**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

If this will be a Joint Account, please select your account preference below, as either Joint Account with Right of Survivorship **OR** Joint Account as Tenants-In-Common, and complete the information requested below. **You must choose one.**
☐ **Joint Account with Right of Survivorship/by the Entirety (if married and recognized by applicable state law)**
☐ **Joint Account as Tenants-in-Common**

### Joint Account Holder Information

**If you have moved within the past 2 years, please include a copy of a utility bill or your driver's license with your current address.**

| First Name | Middle Name | Last Name |
|---|---|---|
| U.S. Social Security # | Date of Birth | Citizenship |

| Permanent Address (No P.O. Boxes) | | | |
|---|---|---|---|
| City | State/Province | Zip | Country |

Mailing Address   ☐ Check here if same as Permanent Address

| City | State/Province | Zip | Country |
|---|---|---|---|

| Primary/Daytime Phone Number | Home/Evening Phone Number |
|---|---|
| E-mail Address | |



## Joint Account Holder Information (Continued)

### Joint Account Holder Employment Information

Are you or your spouse employed by or associated with an NYSE, FINRA and/or NFA registered brokerage firm or an exchange?
☐ No    ☐ Yes    *If yes, please provide an authorization letter from the member firm with whom you or your spouse is associated.  Letter should be on corporate letterhead and signed by a Principal or Compliance Officer of the firm.  If duplicate confirms and statements are required, an e-mail address to which they are to be sent must be provided in the letter.*

Are you a director, 10% shareholder or policy-making officer of a publicly-owned company?
☐ No    ☐ Yes   If Yes, please list trading symbol(s): _____

| Employment Status | ☐ Employed | ☐ Retired | ☐ Student | ☐ Unemployed | ☐ Self-Employed | ☐ Homemaker |
|---|---|---|---|---|---|---|

| Current Occupation | Type of Business/Industry |
|---|---|
| Name of Employer | Employer's Address |

| City | State/Province | Zip | Country |
|---|---|---|---|

Source of income
☐ Salary    ☐ Inheritance    ☐ Insurance Proceeds    ☐ Legal Settlement
☐ Savings/Investments/Real Estate    ☐ Gift    ☐ Other_____(specify)

**Source of Funds in Account** (Check all that apply.)
Please provide the source of assets that will be deposited or held in the account.  If the source is a transfer from another firm, please indicate the source of funds that were used to purchase the assets.
☐ Salary, wages, savings    ☐ Working capital    ☐ Investment capital gains    ☐ Family, relatives, inheritance
☐ Sales of property/assets    ☐ Business income    ☐ Other (specify): _____

### Financial Information

Annual Net Income in USD:
☐ If under $50,000 specify _____
☐ $50,000-$99,999
☐ $100,000-$249,999
☐ $250,000-$999,999
☐ Over $1 million

Total Net Assets in USD:
This includes all assets, minus all obligations, debts and liabilities.
☐ If under $75,000 specify _____
☐ $75,000-$99,999
☐ $100,000-$199,999
☐ $200,000-$499,999
☐ $500,000-$999,999
☐ $1,000,000-$4,999,999
☐ Over $5 million

Liquid Net Assets in USD:
This includes cash and marketable securities, minus all obligations, debts and liabilities.
☐ If under $75,000 specify _____
☐ $75,000-$99,999
☐ $100,000-$199,999
☐ $200,000-$499,999
☐ $500,000-$999,999
☐ $1,000,000-$4,999,999
☐ Over $5 million

### Trading Experience

**EQUITIES**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

**OPTIONS**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

**FUTURES**
No. of years trading
☐ None
☐ If under 1, specify months _____
☐ 1-5
☐ Over 5

---

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

**TradeStation**®                                                                                    **Trusted Contact Person**

This applies to account number _____ and any and all other accounts
that I may have or later open with TradeStation. *(complete this field if you have an existing brokerage account)*

TradeStation has asked, or you have requested, that you designate a trusted contact person age 18 or older. TradeStation is hereby authorized and permitted by you to contact your trusted contact person and disclose information about your account as described below. Please let us know if you have any questions about this form. This request and form applies to all of your TradeStation accounts, both with TradeStation Securities, Inc. and TradeStation Crypto, Inc.

You hereby designate the person identified below as your trusted contact person. You understand that by providing contact information for a trusted contact person, age 18 or older, you are authorizing TradeStation to contact the aforementioned trusted contact person and disclose information about your account in order to address possible financial exploitation, to confirm the specifics of your current contact information, health status or the identity of any legal guardian, executor, trustee or holder of a power of attorney, or as otherwise permitted by FINRA Rule 2165 or any other applicable equivalent or similar rules of any applicable agency or regulatory organization.

You understand that (1) TradeStation **is not required to contact your trusted contact person**; and **(2) the completion of this form is optional and you may withdraw it at any time by notifying TradeStation in writing (use TradeStation address shown on account statement).** If you would like to change your trusted contact person, you may do so by giving TradeStation a newly-signed Trusted Contact Person form with the box checked below to indicate that the new form supersedes the previous form.

| CONTACT PERSON INFORMATION | |
|---|---|
| Name of Trusted Contact Person (First, Middle, and Last) | Relationship (e.g. spouse, child, holder of my power of attorney, lawyer, accountant, etc.) |
| Home Address | |
| City | State (U.S.) | Zip |
| Country | Province |
| Primary Phone Number | E-mail Address |

☐ Check here if this contact authorization supersedes previous contact authorizations.

| Signature | |
|---|---|
| Signature of Client | SIGN HERE |
| Print Name | |
| Date | |

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). TradeStation International Ltd is an introducing broker authorized and regulated by the Financial Conduct Authority in the UK. Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

**TradeStation**

## EQUITIES AND CRYPTO

Dear Applicant,

Thank you for your interest in equities trading at TradeStation Securities, Inc. and cryptocurrency trading at TradeStation Crypto, Inc. through your self-directed Individual Retirement Account ("IRA"). Please be advised that TradeStation does not provide its own custodial services for self-directed IRAs. As such, customers must open a self-directed IRA with an approved custodian. Please see the list of below IRA companies TradeStation is able to do business with. By providing you this information, TradeStation is not recommending or endorsing any of the companies listed below. This document is for information purposes only.

> Before opening a self-directed IRA, you should familiarize yourself with the investment and income tax risks, along with the costs associated with such trading. We also strongly encourage you to consult with your legal and/or tax advisor to discuss these risks.

Trust Companies: Please consult with the trust company regarding minimum deposits, costs and paperwork requirements as the requirement may vary for each.

**Equity Trust Company** – www.trustetc.com
Client Services, Processing Team
225 Burns Rd.
Elyria, OH 44036
440-323-5491

**Midland IRA, Inc.** – www.MidlandIRA.com
135 South LaSalle Street
Suite 4000
Chicago, IL 60603

If you open a TradeStation Securities Equities IRA and TradeStation Crypto IRA, so that you can withdraw cash from your TradeStation Securities Equities account to purchase Crypto in your TradeStation Crypto account, and deposit in your TradeStation Securities Equities account cash proceeds you receive from sales of Crypto in your TradeStation Crypto account, you acknowledge and agree that your TradeStation Crypto account will be linked to your TradeStation Securities Account. For linked IRAs, the IRA custodian does not consider withdrawals from the TradeStation Securities IRA Equities account to purchase Crypto in your TradeStation Crypto IRA account to be distributions, nor does the IRA custodian consider the deposit of cash proceeds in your TradeStation Securities IRA Equities account that you receive from sales of Crypto in your TradeStation Crypto IRA account to be contributions for tax reporting purposes.

> You understand and agree that the IRA Custodian agreement you agree to, accept, and acknowledge to open your TradeStation Securities Equities IRA applies to your TradeStation Crypto IRA. You further agree that the beneficiary information you provide for your TradeStation Securities Equities IRA applies to your TradeStation Crypto IRA.

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

12

**TradeStation**   For Futures IRAs

# FUTURES

Dear Applicant,

Thank you for your interest in futures trading at TradeStation Securities, Inc. ("TradeStation") through your self-directed IRA. Please be advised that TradeStation does not provide its own custodial services for self-directed IRAs that invest in alternative assets such as futures. As such, customers who wish to trade such alternative investments at TradeStation, must open a self-directed IRA with an approved custodian that accepts alternative investments.

TradeStation currently accepts alternative investment self-directed IRAs from a limited number of custodians. Please see the list below of IRA companies TradeStation is able to do business with. By providing you with this information, TradeStation is not recommending or endorsing any of the companies listed below. This document is for information purposes only. If you do not see your trust company of choice listed below, please contact one of the trust companies below to establish an account.

> Before you choose to open an alternative investment self-directed IRA, you should familiarize yourself with the investment and income tax risks, along with the costs associated with such trading. We also strongly encourage you to consult with your legal and/or tax advisor to discuss these risks.

Once you have initiated the account opening process with your custodian, please complete the TradeStation Futures IRA application and return it to:

**TradeStation**
**Attn: Account Services**
8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Upon receipt of your application, TradeStation will review your account application and, if approved, your application will be forwarded directly to your custodian for completion of the account opening process.

> Final approval is dependent upon your custodian and TradeStation (FCM and executing agent) accepting the account. TradeStation cannot be held responsible for any delay associated with establishing your custodial IRA account.

Trust Companies: Please consult with the trust company regarding minimum deposits, costs and paperwork requirements as the requirements may vary for each.

**Equity Trust Company** – www.trustetc.com
Client Services, Processing Team
225 Burns Rd.
Elyria, OH 44036
440-323-5491

**Midland IRA, Inc.** – www.MidlandIRA.com
135 South LaSalle Street
Suite 4000
Chicago, IL 60603

**Millennium Trust Company IRA Accounts** – www.mtrustcompany.com
820 Jorie Blvd., Suite 420
Oakbrook, IL 60523
630-368-5600 or 800-258-7878

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

13

**TradeStation**

*108735*

**REQUIRED**

*Please carefully review all of the content in this package, including all of the information below and in each of the required agreements and other documents listed below* (which each can be opened and read from the links below and are all easily accessible at www.tradestation.com through the link "Important Documents and Information"). *PLEASE READ ALL AGREEMENTS AND DOCUMENTS CAREFULLY, including the ones listed below and on the website, which are legally binding on you to the same extent as if set forth fully in this package. If this is a joint account application, "you" means each joint account applicant, jointly and severally.* Once you have reviewed and agreed with each document, but not before, you should sign below where indicated. We strongly recommend that you print a copy of each agreement and document for your records, *as your acknowledgment and acceptance of these agreements and other documents are legally binding on you and create estoppel and affirmative defenses against you, and you agree that they do so no differently than if each one was individually signed by you in ink and delivered to TradeStation in person.*

You understand and agree that the respective customer account agreements which will apply to, and govern, your account relationships with TradeStation companies are as follows: (1) for an **Equities** account (including for equity/index options trading), the **TradeStation Securities, Inc. Customer Account Agreement for Equities**, together with the **Master Securities Lending Agreement**, (2) for a **Futures** and/or **Futures Options** account, the **TradeStation Securities, Inc. Account Agreement for Futures**, and (3) for a **Crypto** account, the **TradeStation Crypto, Inc. Customer Account Agreement**. Also, there are supplemental agreements, disclosures and other documents which will apply to one or more your accounts (as set forth below) which you must agree to, accept and acknowledge. Depending on which accounts you are applying for, the following apply and govern:

TradeStation Securities, Inc. Accounts – Equities & Options (Agreements, Disclosures, Disclaimers and Assumption of Risk):

> TradeStation Securities, Inc. Customer Account Agreement for Equities
> Master Securities Lending Agreement
> TradeStation Technologies, Inc. Subscription Agreement
> User Agreement (Websites, Electronic Services, Social Media and Education)
> Investment and Trading Disclosures Booklet – Equities & Options
> Equity Trust Company IRA Agreement

TradeStation Securities, Inc. Accounts – Futures & Futures Options (Agreements, Disclosures, Disclaimers and Assumption of Risk):

> TradeStation Securities, Inc. Customer Account Agreement for Futures
> TradeStation Technologies, Inc. Subscription Agreement
> User Agreement (Websites, Electronic Services, Social Media and Education)
> Investment and Trading Disclosures Booklet – Futures & Futures Options on Futures
> Firm Specific Disclosure Statement  - CFTC Rule 1.55

TradeStation Crypto, Inc. Accounts (Agreements, Disclosures, Disclaimers and Assumption of Risk)

> TradeStation Crypto, Inc. Customer Account Agreement
> User Agreement (Websites, Electronic Services, Social Media and Education)
> Investment and Trading Disclosures Booklet – Cryptocurrencies
> U.S. States Where TradeStation Crypto is Licensed or Permitted to do Business and Related Notices and Information

Residents of United Kingdom Only

> Terms of Business of TradeStation International Ltd

The TradeStation Technologies, Inc. Subscription Agreement is a separate license agreement governing your use of TradeStation and third-party software and market data/content for Equities and Futures accounts, and the User Agreement (Websites, Electronic Services, Social Media and Education) applies to your use of those products and services offered by any of the TradeStation companies. We also direct you to review our Privacy Notice on the TradeStation website.

---

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

14

**TradeStation**

**REQUIRED**

Please be aware that you acknowledge and agree that even if you are not applying to open a particular kind of account in this application, but already have such type of account (for example, you already have a Futures or Equities account, and are not applying for one in this application), the applicable agreements and documents listed above which pertain to those accounts will now apply to all of your existing accounts (for example, all of the agreements and documents listed above for Equities accounts, in their current form, now apply to all of your existing Equities accounts, and all of the agreements and documents above listed for Futures accounts now apply, in their current form, to all of your existing Futures accounts).   You agree, intending to be legally bound, that any future action you take in any of such existing accounts constitutes irrevocable and unconditional acceptance by you of the current form of each of such agreements and documents (as same my later be amended or modified).

This account application, together with all of the applicable agreements, acknowledgments, representations, warranties, notices, disclaimers and assumptions of risk contained in this application and any of such documents, including those listed above on this page (collectively, the "Agreement"), may from time to time be modified or amended, in whole or in part, by any reasonable method of notice to you, including posting on a TradeStation website, platform application you use, or other electronic communication, and you agree that any transaction or activity you initiate in any of your accounts after such modification or amendment constitutes your unconditional acceptance of any such modification or amendment.

You represent and affirm that (1) you are a self-directed online investor or trader, and the sole reason for your account(s) is for you to invest in and trade, online, the market assets offered by such account(s), (2) you have the financial ability to withstand a total loss of all funds and other assets you deposit or maintain in any of your accounts, (3) all funds or assets deposited or later deposited in any of your accounts are and will be your personal funds or assets, and have not been and will not be solicited or sourced from any third party, and any withdrawals you make from any of your accounts will be transferred solely to an account in your name, under your control, and which only you own, and (4) no third party has or will have any direct or indirect ownership or other beneficial or financial interest in those funds or assets, or any asset or other property purchased with or through the use of such funds or assets, or in any of your accounts, in any manner.

If you are opening an IRA, by signing this account application, you acknowledge and agree that: (a) no TradeStation company has provided, and no TradeStation company will provide, you with any investment, financial, tax or legal advice in connection with your decision to open your IRA, the type of IRA, your selection of the custodian with whom you open your IRA , or any investment or transaction in your IRA; (b) you have made or will make your own independent investigations and assessments with respect to your IRA, your selection of the type of account, the custodian with whom you open your IRA account and any investments and transactions in your IRA; (c) no TradeStation company has solicited, and no TradeStation company will solicit, you to acquire any investment or enter into any transaction in your IRA; (d) no TradeStation company is a fiduciary and no TradeStation company will make any recommendations to you regarding your IRA, the type of IRA you select, your selection of the custodian with whom you open your IRA account or any investment or transaction in your IRA; and (e) no TradeStation company is responsible for, and you will hold harmless each TradeStation company and its affiliates from, any and all tax consequences and other liability or losses that you incur in your IRA.

**Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.**

Rev 07272023

15

**TradeStation**

**REQUIRED**

**AGREEMENT TO ARBITRATION OF DISPUTES RELATING TO (1) EQUITIES ACCOUNTS AND (2) CRYPTO ACCOUNTS: (**1) If you are applying for an Equities **(Equities & Options)** account, you acknowledge and affirm that you have read and agree to the **pre-dispute arbitration provisions** set forth in **section 38 of the TradeStation Securities, Inc. Customer Account Agreement for Equities,** and (2) if you are applying for a **Crypto** account, you acknowledge and affirm that you have read and agree to the **pre-dispute arbitration provisions** set forth in **section 42 of the TradeStation Crypto, Inc. Customer Account Agreement.**

**ELECTION OF ARBITRATION FOR DISPUTES RELATING TO FUTURES ACCOUNTS: If you are applying for a Futures or Futures Options account, you acknowledge and affirm that you have read the pre-dispute arbitration provisions set forth in section 38 of the TradeStation Securities, Inc. Account Agreement for Futures, and that you are making the following election (please type your initials - must choose one):**

☐   I (We) Accept the Arbitration Provision          ☐   I (We) Do Not Accept the Arbitration Provision

**U.S. citizens and U.S. residents only — Tax Withholding Certification. Under penalty of perjury, you certify that: (1) the number provided by you in this account application is your correct taxpayer identification number**; (2) you are not subject to backup withholding because (a) you are exempt from backup withholding, or (b) you have not been notified by the Internal Revenue Service (IRS) that you are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified you that you are no longer subject to backup withholding; (3) you are a U.S. person (which includes being a U.S. resident alien); and (4) the FATCA code(s) entered in this account application (if any) indicating that you are exempt from FATCA reporting is correct. You understand that if you are not a U.S. person, or have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return, you may not sign below and you must contact us to complete your application so that we can apply any required backup withholding. **Note: The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding. If this is a joint account, each joint account owner is separately making the certification.**

**Note:  If you are not a U.S. person, you will likely be required to complete and submit applicable Form W-8.  You further represent and confirm that no TradeStation company solicited you to apply for, open or establish any kind of account with any TradeStation company.**

You confirm and affirm that all information, representations, warranties, affirmations, acknowledgements and agreements that you have provided or made in this application are voluntarily and knowingly given and made, are true, complete and accurate, and not misleading in any respect, *and you will promptly notify us in writing if any of the information or any representation you have provided materially changes or ceases to be true, complete and accurate.*

**By signing below, you hereby execute and deliver the Agreement, intending to be legally bound by it.**

| Account Owner's Signature | SIGN HERE | Date |
| --- | --- | --- |
| Print Name of Account Owner | | |
| Joint Account Owner's Signature (if a joint account) | SIGN HERE | Date |
| Print Joint Account Owner's Name (if a joint account) | | |

Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.

Rev 07272023

16

 **TradeStation®**

**TradeStation Account Application –
Entity Accounts**

**REQUIRED**

any reasonable method of notice to you, including posting on a TradeStation website, platform application you use, or other electronic communication, and you agree that any transaction or activity you initiate in any of your accounts after such modification or amendment constitutes your unconditional acceptance of any such modification or amendment.

You represent and affirm that (1) you understand you will be categorized, billed and required to pay as a "professional" subscriber for market data fees, (2) you have the financial ability to withstand a total loss of all funds and other assets you deposit or maintain in any of your accounts, (3) all funds or assets deposited or later deposited in any of your accounts are and will be your own funds or assets, and have not been and will not be solicited or sourced from any third party (unless you have clearly disclosed in this application that you manage investments of others), and any withdrawals you make from any of your accounts will be transferred solely to an account in your name, under your control, and which only you own, and (4) no third party has or will have any direct or indirect ownership or other beneficial or financial interest in those funds or assets, or any asset or other property purchased with or through the use of such funds or assets, or in any of your accounts, in any manner (except only as you have clearly disclosed in this application).

**AGREEMENT TO ARBITRATION OF DISPUTES RELATING TO (1) EQUITIES ACCOUNTS AND (2) CRYPTO ACCOUNTS:** (1) If you are applying for an **Equities (Equities & Options)** account, you acknowledge and affirm that you have read and agree to the **pre-dispute arbitration provisions** set forth in **section 38 of the TradeStation Securities, Inc. Customer Account Agreement for Equities**, and (2) if you are applying for a **Crypto** account, you acknowledge and affirm that you have read and agree to the **pre-dispute arbitration provisions** set forth in **section 42 of the TradeStation Crypto, Inc. Customer Account Agreement**.

**ELECTION OF ARBITRATION FOR DISPUTES RELATING TO FUTURES ACCOUNTS:** If you are applying for a **Futures or Futures Options** account, you acknowledge and affirm that you have read the **pre-dispute arbitration provisions** set forth in **section 38 of the TradeStation Securities, Inc. Account Agreement for Futures**, and that you are making the following election (please type your initials – **must** choose one):

|   |
|---|

I (We) Accept the Arbitration Provision     X [AnG,etc.]     I (We) Do Not Accept the Arbitration Provision

**U.S. citizens and U.S. residents only — Tax Withholding Certification. Under penalty of perjury, you certify that: (1) the number provided by you in this account application is your correct taxpayer identification number**; (2) you are not subject to backup withholding because (a) you are exempt from backup withholding, or (b) you have not been notified by the Internal Revenue Service (IRS) that you are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified you that you are no longer subject to backup withholding; (3) you are a U.S. person (which includes being a U.S. resident alien); and (4) the FATCA code(s) entered in this account application (if any) indicating that you are exempt from FATCA reporting is correct. You understand that if you are not a U.S. person, or have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return, you may not sign below and you must contact us to complete your application so that we can apply any required backup withholding. **Note: The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding. If this is a joint account, each joint account owner is separately making the certification.**

**Note:  If you are not a U.S. person, you will likely be required to complete and submit applicable Forms W-8. You further represent and confirm that no TradeStation company solicited you to apply for, open or establish any kind of account with any TradeStation company.**

You confirm and affirm that all information, representations, warranties, affirmations, acknowledgements and agreements that you have provided or made in this application are voluntarily and knowingly given and made, are true, complete and accurate, and not misleading in any respect, *and you will promptly notify us in writing if any of the information or any representation you have provided materially changes or ceases to be true, complete and accurate.*

**By signing below, you hereby execute and deliver the Agreement, intending to be legally bound by it.**

| Authorized Signature *DocuSigned by:* [signature] | SIGN HERE | Date | 10/31/2022 |
|---|---|---|---|
| Print Authorized Signor's Name and Title (If sole proprietorship, simply state "owner.") Anna Gjekaj | | | |
| Authorized Signature | SIGN HERE | Date | |
| Print Authorized Signor's Name and Title | | | |

**Equities, equity options, and commodity futures products and services are offered by TradeStation Securities, Inc. (Member NYSE, FINRA, CME and SIPC). Cryptocurrency and digital asset products and services are offered by TradeStation Crypto, Inc.**

0422

# EXHIBIT 8



**Master Securities Lending Agreement**

This Master Securities Lending Agreement ("Agreement") is entered into by and among TradeStation Securities, Inc. ("TradeStation"), you, as a client or customer of TradeStation ("Counterparty") and Stable Custody Group II LLC, acting as your collateral agent ("Collateral Agent").

THIS AGREEMENT SHOULD NOT BE AGREED TO AND ACCEPTED BY COUNTERPARTY UNTIL AFTER:   (1) COUNTERPARTY HAS READ AND FULLY UNDERSTANDS THE SEPARATE DOCUMENT TITLED **_IMPORTANT RISK DISCLOSURES WITH RESPECT_ TO _FULLY PAID OR EXCESS MARGIN SECURITIES LENDING TRANSACTIONS,_** WHICH DESCRIBES MANY OTHER RISKS AND CHARACTERISTICS OF THE PROGRAM; AND (2) COUNTERPARTY HAS DETERMINED THAT PARTICIPATION IN TRADESTATION'S FULLY-PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY AFTER CONSIDERING COUNTERPARTY'S FINANCIAL SITUATION AND NEEDS, TAX STATUS, INVESTMENT OBJECTIVES, INVESTMENT TIME HORIZON, LIQUIDITY NEEDS, RISK TOLERANCE, AND ANY OTHER RELEVANT INFORMATION.  IN EXECUTING THIS AGREEMENT, COUNTERPARTY ACKNOWLEDGES THAT BOTH OF THESE CONDITIONS HAVE BEEN SATISFIED.

COUNTERPARTY MAY ELECT NOT TO ALLOW FULLY PAID AND EXCESS MARGIN SECURITIES TO BE USED IN CONNECTION WITH SHORT SALES, MAY TERMINATE THE LOAN, PURSUANT TO SECTION 7, OR TERMINATE THIS AGREEMENT, PURSUANT TO SECTION 25.1, BY CONTACTING THE TRADESTATION CLIENT SERVICES DEPARTMENT AT (954) 652-7000.

1. **Applicability.**

    From time to time TradeStation and Counterparty may enter into transactions in which one party ("Borrower") will borrow from the other party ("Lender") certain Securities (as defined herein) against a transfer of Collateral (as defined herein).  Each such transaction shall be referred to herein as a "Loan" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in an Annex or Schedule hereto and in any other annexes identified herein or therein as applicable hereunder.  Capitalized terms not otherwise defined herein shall have the meanings provided in Section 26.

2. **Loans of Securities.**

    2.1.   Subject to the terms and conditions of this Agreement, Borrower or Lender may, from time to time, seek to initiate a transaction in which Borrower will borrow Securities from Lender.  Borrower and Lender shall agree on the terms of each Loan (which terms may be amended during the Loan), including the issuer of the Securities, the amount of Securities to be lent, the basis of compensation, the amount of Collateral to be transferred by Borrower, and any additional terms.  Such agreement shall be confirmed (a) by a schedule and receipt listing the Loaned Securities provided by Borrower to Lender in accordance with Section 3.1, (b) through any system that compares Loans and in which Borrower and Lender are participants, or (c) in such other manner as may be agreed by Borrower and Lender in writing.  Such confirmation (the "Confirmation"), together with the Agreement, shall constitute conclusive evidence of the terms agreed between Borrower and Lender with respect to the Loan to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof.  In the event of any inconsistency between the terms of such Confirmation and this Agreement, this



**Master Securities Lending Agreement**

Agreement shall prevail unless each party to the Loan has executed such Confirmation.

2.2.    Notwithstanding any other provision in this Agreement regarding when a Loan commences, unless otherwise agreed, a Loan hereunder shall not occur until the Loaned Securities and the Collateral therefor have been transferred in accordance with Section 16.

3. **Transfer of Loaned Securities.**

3.1.    Unless otherwise agreed, Borrower shall provide Lender, for each Loan in which Lender is a Customer, with a schedule and receipt listing the Loaned Securities. Such schedule and receipt may consist of (a) a schedule provided to Borrower by Lender and executed and returned by Borrower when the Loaned Securities are received, (b) in the case of Securities transferred through a Clearing Organization which provides transferors with a notice evidencing such transfer, such notice, or (c) a confirmation or other document provided to Lender by Borrower.

3.2.    Notwithstanding any other provision in this Agreement, Borrower and Lender agree that they intend the Loans hereunder to be loans of Securities.  If, however, any Loan is deemed to be a loan of money by Borrower to Lender, then Borrower shall have, and Lender shall be deemed to have granted, a security interest in the Loaned Securities and the proceeds thereof.

4. **Collateral.**

4.1.    Unless otherwise agreed, Borrower shall, prior to or concurrently with the transfer of the Loaned Securities to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender Collateral with a Market Value at least equal to 100% of the Market Value of the securities, but not to exceed 102% of the Market Value of the Loaned Securities.  To protect the Lender, in the event Borrower defaults, the Collateral will consist of cash that is deposited with a bank as defined in Exchange Act Rule 15c3-3(a)(7) (the "Bank") in an account titled to reflect the manner in which Lender Collateral is being held for the Lender's benefit in accordance with Exchange Act Rule 15c3-3(b)(3) (the "Collateral Account").  The Collateral will be transferred each business day from TradeStation into the Collateral Account for the benefit of Lender pursuant to internal TradeStation procedures designed to support the movement, validation and monitoring of cash collateral transfers.

4.2.    Borrower shall be deemed to have transferred Collateral to Lender upon transfer of the Collateral to the Collateral Account in the manner described herein. The Collateral transfer will occur each business day no later than the end of business and be calculated based upon the prior night's published closing price for each Loaned Security. The Collateral transferred by Borrower to Lender, as adjusted pursuant to Section 10, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder.  Borrower hereby pledges with, assigns to, and grants Collateral Agent for the benefit of Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Securities by Lender to Borrower and which shall cease upon the

 **Master Securities Lending Agreement**

transfer of the Loaned Securities by Borrower to Lender. In addition to the rights given to Collateral Agent for the benefit of Lender, Collateral Agent on behalf of Lender shall have all rights and remedies of a secured party under the UCC. Lender understands and agrees that the Collateral transferred to the Bank for Lender's benefit will be deposited into one or more accounts which also contain collateral pledged for securities loans made between TradeStation and other lenders of securities to TradeStation and that the Collateral in such account is allocated to Lender in accordance with the calculations contained in Section 10 of this Agreement. Borrower will initiate a Loan by transferring Loaned Securities from Lender pursuant to Exchange Act Rule 15c3-3(b)(3), therefore not causing the Loaned Securities to be subject to the general possession or control requirements of Exchange Act Rule 15c3-3(b).

4.3.    Except as otherwise provided herein, upon transfer to Lender of the Loaned Securities on the day a Loan is terminated pursuant to Section 7, Lender shall be obligated to transfer, and hereby authorizes Borrower to effect the transfer of, the Collateral (as adjusted pursuant to Section 10) to Borrower on such day or, if such day is not a day on which a transfer of such Collateral may be effected under Section 16, the next day on which such a transfer may be effected.

4.4.    If Borrower transfers Collateral to Lender, as provided in Section 4.1, and Lender does not transfer the Loaned Securities to Borrower, Borrower shall have the absolute right to the return of the Collateral; and if Lender transfers Loaned Securities to Borrower and Borrower does not transfer Collateral to Lender as provided in Section 4.1, Lender shall have the absolute right to the return of the Loaned Securities.

5.  **Appointment of Collateral Agent**

5.1.    Lender appoints the Collateral Agent, including any of its affiliates, to act on behalf of and for the benefit of Lender with respect to the Collateral pledged by Borrower pursuant to the Collateral Agent Protocols ("Collateral Agent Protocols"), a copy of which is attached to this Agreement as Appendix I. Collateral Agent hereby accepts such appointment on behalf and for the benefit of Lender. TradeStation agrees to pay the Collateral Agent a fee for its services on behalf of Lender. The parties agree to the Collateral Agent Protocols, which are hereby incorporated as part of this Agreement.

5.2.    Lender appoints and instructs Collateral Agent to appoint the Bank as the depositary bank for the Collateral pursuant to the terms of the Deposit Account Control Agreement, dated as of April 21, 2021, among TradeStation, Collateral Agent and the Bank (as amended, supplemented or modified from time to time, the "Control Agreement"). By signing this Agreement, Lender instructs the Collateral Agent to agree on behalf of itself and Lender to all the provisions of the Control Agreement, a copy of which will be provided to Lender upon request.

5.3.    Pursuant to the Collateral Agent Protocols, Collateral Agent shall not be charged with knowledge of any Default unless Collateral Agent has actual knowledge of such Default; provided, that Collateral Agent shall be deemed to have actual knowledge of an Act of Insolvency with respect to Borrower pursuant to Section



**Master Securities Lending Agreement**

13.5 of this Agreement upon the public filing of any case, proceeding, petition or decree against Borrower under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

5.4.      TradeStation reserves the right to change the Bank by giving not less than ninety (90) days' prior notice to the Collateral Agent.  In such event, Lender instructs the Collateral Agent to approve the successor to the Bank and to enter into one or more control agreements between and among TradeStation, Collateral Agent and the successor to the Bank to establish the Collateral Agent's "control" (within the meaning of the UCC) over the applicable accounts in order to perfect the Collateral Agent's security interest in the Collateral for the benefit of Lender.

6.  **Income for Loan.**

6.1.      Unless otherwise agreed, Borrower agrees to pay Lender a portion of the rebate earned on loaned securities ("Interest"), computed daily as further described in the attached Schedule of Basis of Compensation for Loan as it may be amended from time to time by Borrower.  Interest, if any, on non-cash Collateral will be paid as agreed upon by Borrower and Lender.

6.2.      Unless otherwise agreed, Income payable hereunder shall be payable within fifteen (15) Business Days following the last Business Day of the calendar month in which such Interest was incurred.

7.  **Termination of the Loan.**

7.1.      (a) Unless otherwise agreed, either Borrower or Lender may terminate a Loan on a termination date established by notice given to the other party thereto prior to the Close of Business on a Business Day.  Unless an earlier date is agreed by Borrower and Lender, the termination date established by a termination notice shall be a date no earlier than the standard settlement date that would apply to a purchase or sale of the Loaned Securities in the principal market of such Loaned Securities (in the case of a notice given by Lender) or the non-cash Collateral securing the Loan in the principal market of such non-cash Collateral (in the case of a notice given by Borrower) entered into at the time of such notice.

(b) Borrower may terminate a Loan on any Business Day, effective as of such Business Day, by transferring the Loaned Securities to Lender on such Business Day.

(c) The execution by Borrower of an order to sell the Loaned Securities by Lender shall constitute notice of termination by Lender to Borrower.  The termination date established by such a sale of the Loaned Securities shall be the settlement date of such a sale of the Loaned Securities or any earlier date on which Borrower is deemed to have transferred Loaned Securities to Lender under paragraph (b) of this Section.

 **Master Securities Lending Agreement**

7.2.   Unless otherwise agreed, Borrower shall, on or before the Cutoff Time on the termination date of a Loan, transfer the Loaned Securities to Lender; provided, however, that upon such transfer by Borrower, the Collateral for such Loan (as adjusted pursuant to Section 10) shall be transferred to Borrower in accordance with Section 4.3.

8.   **Rights in Respect of Loaned Securities and Collateral.**

8.1.   Except as set forth in Sections 9.1 and 9.2 and as otherwise agreed by Borrower and Lender, until Loaned Securities are required to be redelivered to Lender upon termination of a Loan hereunder, Borrower shall have all of the incidents of ownership of the Loaned Securities, including the right to transfer the Loaned Securities to others.  Lender hereby waives the right to vote, or to provide any consent or to take any similar action with respect to, the Loaned Securities in the event that the record date or deadline for such vote, consent or other action falls during the term of the Loan.

9.   **Distributions.**

9.1.   Lender shall be entitled to receive all Distributions made on or in respect of the Loaned Securities which are not otherwise received by Lender, to the full extent it would be so entitled if the Loaned Securities had not been lent to Borrower.

9.2.   Any cash Distributions made on or in respect of the Loaned Securities, which Lender is entitled to receive pursuant to Section 9.1, shall be paid by the transfer of cash to Lender by Borrower, on the date any such Distribution is paid, in an amount equal to such cash Distribution, so long as Lender is not in Default at the time of such payment.  Non-cash Distributions that Lender is entitled to receive pursuant to Section 9.1 shall be added to the Loaned Securities on the date of distribution and shall be considered such for all purposes, except that if the Loan has terminated, Borrower shall forthwith transfer the same to Lender.

9.3.   Borrower shall be entitled to receive all Distributions made on or in respect of non-cash Collateral which are not otherwise received by Borrower, to the full extent it would be so entitled if the Collateral had not been transferred to Lender.

9.4.   Any cash Distributions made on or in respect of such Collateral, which Borrower is entitled to receive pursuant to Section 9.3, shall be paid by the transfer of cash to Borrower by Lender, on the date any such Distribution is paid, in an amount equal to such cash Distribution, so long as Borrower is not in Default at the time of such payment.  Non-cash Distributions that Borrower is entitled to receive pursuant to Section 9.3 shall be added to the Collateral on the date of distribution and shall be considered such for all purposes, except that if each Loan secured by such Collateral has terminated, Lender shall forthwith transfer the same to Borrower.

9.5.   Unless otherwise agreed:

(a) If (i) Borrower is required to make a payment (a "Borrower Payment") with respect to cash Distributions on Loaned Securities under Sections 9.1 and 9.2



**Master Securities Lending Agreement**

("Securities Distributions"), or (ii) Lender is required to make a payment (a "Lender Payment") with respect to cash Distributions on Collateral under Sections 9.3 and 9.4 ("Collateral Distributions"), and (iii) Borrower or Lender, as the case may be ("Payor"), shall be required by law to collect any withholding or other tax, duty, fee, levy or charge required to be deducted or withheld from such Borrower Payment or Lender Payment ("Tax"), then Payor shall (subject to subsections (b) and (c) below), pay such additional amounts as may be necessary in order that the net amount of the Borrower Payment or Lender Payment received by the Lender or Borrower, as the case may be ("Payee"), after payment of such Tax equals the net amount of the Securities Distribution or Collateral Distribution that would have been received if such Securities Distribution or Collateral Distribution had been paid directly to the Payee.

(b) No additional amounts shall be payable to a Payee under subsection (a) above to the extent that Tax would have been imposed on a Securities Distribution or Collateral Distribution paid directly to the Payee.

(c) No additional amounts shall be payable to a Payee under subsection (a) above to the extent that such Payee is entitled to an exemption from, or reduction in the rate of, Tax on a Borrower Payment or Lender Payment subject to the provision of a certificate or other documentation, but has failed timely to provide such certificate or other documentation.

Each party to a Loan shall be deemed to represent that, as of the commencement of such Loan, no Tax would be imposed on any cash Distribution paid to it with respect to (i) Loaned Securities subject to a Loan in which it is acting as Lender or (ii) Collateral for any Loan in which it is acting as Borrower, unless such party has given notice to the contrary to the other party thereto (which notice shall specify the rate at which such Tax would be imposed).  Each party to a Loan agrees to notify the other of any change that occurs during the term of such Loan in the rate of any Tax that would be imposed on any such cash Distributions payable to it.

9.6.    To the extent that, under the provisions of Sections 9.1 through 9.5, (a) a transfer of cash or other property by Borrower would give rise to a Margin Excess or (b) a transfer of cash or other property by Lender would give rise to a Margin Deficit, Borrower or Lender (as the case may be) shall not be obligated to make such transfer of cash or other property in accordance with such Sections, but shall in lieu of such transfer immediately credit the amounts that would have been transferable under such Sections to the account of Lender or Borrower (as the case may be).

10. **Mark to Market.**

10.1.    If Lender is a Customer, Borrower shall daily mark to market any Loan hereunder and in the event that at the Close of Trading on any Business Day the Market Value of the Collateral for any Loan to Borrower shall be less than 100% of the Market Value of all the outstanding Loaned Securities subject to such Loan, Borrower shall transfer additional Collateral no later than the Close of Business on the next Business Day so that the Market Value of such additional Collateral, when added to the Market Value of the other Collateral for such Loan, shall equal 100% of the Market Value of the Loaned Securities.  As



**Master Securities Lending Agreement**

agreed by Borrower and Lender or if Borrower determines in its discretion that applicable laws or market custom so require, Borrower may deposit additional collateral greater than 100% of the Market Value of the Loaned Securities not to exceed 102% of the Market Value of the Loaned Securities. On a daily basis, Borrower or its agent shall provide or make available to Collateral Agent mark-to-market information with respect to Lender that identifies the amount of Collateral that Borrower pledges to Lender for the Loans hereunder. Collateral Agent may rely upon, and be fully protected in relying upon, such mark-to-market information provided by TradeStation which Collateral Agent reasonably believes to be genuine. Collateral Agent shall have no obligation to determine or verify whether any such Collateral equals or exceeds 100 percent of the Market Value of all the outstanding Loaned Securities subject to the Loans hereunder.

10.2.    In addition to any rights of Lender under Section 10.1, if at any time the aggregate Market Value of all Collateral for Loans by Lender shall be less than the Margin Percentage of the Market Value of all of the outstanding Loaned Securities subject to such Loans (a "Margin Deficit"), Borrower shall transfer additional Collateral no later than the Close of Business on the next Business Day so that the Market Value of such additional Collateral, when added to the Market Value of all other Collateral for such Loans, shall equal or exceed the Margin Percentage of the Market Value of the Loaned Securities.

10.3.    Subject to Borrower's obligations under Section 10.1, if at any time the Market Value of all Collateral for Loans to Borrower shall be greater than the Margin Percentage of the Market Value of all the outstanding Loaned Securities subject to such Loans (a "Margin Excess"), Lender hereby authorizes Borrower to transfer to Borrower such amount of the Collateral selected by Borrower so long as the Market Value of the Collateral for such Loans, after deduction of such amounts, shall thereupon not be less than the Margin Percentage of the Market Value of the Loaned Securities.

10.4.    Borrower and Lender may agree, with respect to one or more Loans hereunder, to mark the values to market pursuant to Sections 10.2 and 10.3 by separately valuing the Loaned Securities lent and the Collateral given in respect thereof on a Loan-by-Loan basis.

10.5.    Borrower and Lender may agree, with respect to any or all Loans hereunder, that the respective rights of Lender and Borrower under Sections 10.2 and 10.3 may be exercised only where a Margin Excess or Margin Deficit exceeds a specified dollar amount or a specified percentage of the Market Value of the Loaned Securities under such Loans (which amount or percentage shall be agreed to by Borrower and Lender prior to entering into any such Loans).

11. **Representations.**

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of any Loan hereunder:

11.1.    Each party hereto represents and warrants that (a) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (b) it has taken all necessary action to

 **Master Securities Lending Agreement**

authorize such execution, delivery and performance, and (c) this Agreement constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms.

11.2.   Borrower and Lender each represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan and any dividends, remuneration or other funds received hereunder.

11.3.   Borrower and Lender each represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section 12.1(b).

11.4.   Lender represents that he or she is not an affiliate of the company that issued the Loaned Securities.

11.5.   Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein subject to the terms and conditions hereof.

11.6.   (a) Borrower represents and warrants that it (or the person to whom it relends the Loaned Securities) is borrowing or will borrow Loaned Securities that are Equity Securities for the purpose of making delivery of such Loaned Securities in the case of short sales, failure to receive securities required to be delivered, or as otherwise permitted pursuant to Regulation T as in effect from time to time.

(b) Borrower and Lender may agree, as provided in Section 25.2, that Borrower shall not be deemed to have made the representation or warranty in subsection (a) with respect to any Loan.  By entering into any such agreement, Lender shall be deemed to have represented and warranted to Borrower (which representation and warranty shall be deemed to be repeated on each day during the term of the Loan) that Lender is either (i) an "exempted borrower" within the meaning of Regulation T or (ii) a member of a national securities exchange or a broker or dealer registered with the U.S. Securities and Exchange Commission that is entering into such Loan to finance its activities as a market maker or an underwriter.

11.7.   Lender represents and warrants that it has, or will have at the time of transfer of any Loaned Securities, the right to transfer the Loaned Securities subject to the terms and conditions hereof.

12. **Covenants.**

12.1.   Borrower and Lender each agrees either (a) to be liable as principal with respect to its obligations hereunder or (b) to execute and comply fully with the provisions of Annex I (the terms and conditions of which Annex are incorporated herein and made a part hereof).

13. **Events of Default.**



**Master Securities Lending Agreement**

All Loans hereunder may, at the option of the non-defaulting party (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), be terminated immediately upon the occurrence of any one or more of the following events (individually, a "Default"):

13.1.   if any Loaned Securities shall not be transferred to Lender upon termination of the Loan as required by Section 7;

13.2.   if Lender interferes with the return of any Collateral to Borrower upon termination of the Loan as required by Section 7;

13.3.   if Borrower shall fail to transfer Collateral as required by Section 10;

13.4.   if Borrower (a) shall fail to transfer to Lender amounts in respect of Distributions required to be transferred by Section 9, (b) shall have been notified of such failure by Lender prior to the Close of Business on any day, and (c) shall not have cured such failure by the Cutoff Time on the next day after such Close of Business on which a transfer of cash may be effected in accordance with Section 16;

13.5.   if an Act of Insolvency occurs with respect to Borrower or Lender;

13.6.   if any representation made by Borrower or Lender in respect of this Agreement or any Loan or Loans hereunder shall be incorrect or untrue in any material respect during the term of any Loan hereunder;

13.7.   if Borrower or Lender notifies the other of its inability to or its intention not to perform its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder; or

13.8.   if Borrower or Lender (a) shall fail to perform any material obligation under this Agreement not specifically set forth in clauses 13.1 through 13.7, above, including but not limited to the payment of Income as required by Section 6, and the payment of transfer taxes as required by Section 15, (b) shall have been notified of such failure by the other party prior to the Close of Business on any day, and (c) shall not have cured such failure by the Cutoff Time on the next day after such Close of Business on which a transfer of cash may be effected in accordance with Section 16.

The non-defaulting party shall (except upon the occurrence of an Act of Insolvency) give notice as promptly as practicable to the defaulting party of the exercise of its option to terminate all Loans hereunder pursuant to this Section 13. If Lender is the non-defaulting party, such notice shall (except upon the occurrence of an Act of Insolvency) be given by Collateral Agent following its receipt of Lender's notice to Collateral Agent pursuant to Section 14.1.  In the event of the occurrence of an Act of Insolvency with respect to Borrower, such notice and the termination of all Loans hereunder shall be deemed to have been given upon the public filing of any case, proceeding, petition or decree against the defaulting party under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.


Master Securities Lending Agreement

14. **Remedies.**

14.1.    (a) **In the event that Lender decides to exercise its rights under this Section, Lender will contact Collateral Agent at: 800-433-1918 or email at RTIDOps@rnt.com. Collateral Agent and the Bank reserve the right to require Lender to present any information, identification, certification or any other documentation reasonably deemed necessary by Collateral Agent or the Bank to establish Lender's entitlement to funds prior to disbursing any funds to Lender. Collateral Agent may rely upon, and be fully protected in relying upon, such instructions from Lender which it reasonably believes to be genuine, and will have no obligation to determine or verify the occurrence or continuation of a Default.** Upon knowledge of the occurrence of an Act of Insolvency with respect to Borrower pursuant to Section 5.3, Collateral Agent shall, on Lender's behalf, immediately commence the exercise of Lender's remedies as set forth in this Section 14.1.

(b) Upon the occurrence of a Default under Section 13 entitling Lender to terminate all Loans hereunder, Lender shall have the right, in addition to any other remedies provided herein (which, upon the occurrence of an Act of Insolvency, may be exercised following the termination of any applicable stay), (i) to purchase a like amount of Loaned Securities ("Replacement Securities") in the principal market for such Loaned Securities in a commercially reasonable manner, (ii) to instruct Collateral Agent to direct the Bank to remit to Collateral Agent for the benefit of Lender Collateral in the amount that Collateral Agent instructs, which Collateral shall be remitted by Collateral Agent to Lender in accordance with Lender's instructions to Collateral Agent and (iii) to apply and set off the Collateral and any proceeds thereof (including any amounts drawn under a letter of credit supporting any Loan) received from Collateral Agent against the payment of the purchase price for such Replacement Securities and any amounts due to Lender under Sections 6, 9, 15 and 17. Collateral Agent may rely upon, and be fully protected in relying upon, any notice received from Lender which it reasonably believes to be genuine relating to a Default with respect to Borrower and Lender's instruction to Collateral Agent to cause Collateral to be remitted from the Bank to the Collateral Agent for the benefit of Lender. In the event that Lender shall exercise such rights, Borrower's obligation to return a like amount of the Loaned Securities shall terminate. Lender may similarly apply the Collateral and any proceeds thereof to any other obligation of Borrower under this Agreement, including Borrower's obligations with respect to Distributions paid to Borrower (and not forwarded to Lender) in respect of Loaned Securities. In the event that (A) the purchase price of Replacement Securities (plus all other amounts, if any, due to Lender hereunder) exceeds (B) the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon at a rate equal to (1) in the case of purchases of Foreign Securities, ESTR, (2) in the case of purchases of any other Securities (or other amounts, if any, due to Lender hereunder), the Federal Funds Rate or (3) such other rate as may be specified in Schedule B, in each case as such rate fluctuates from day to day, from the date of such purchase until the date of payment of such excess. As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then

 **Master Securities Lending Agreement**

held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower. The purchase price of Replacement Securities purchased under this Section 14.1 shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expenses related to such purchase or sale (as the case may be). In the event Lender exercises its rights under this Section 14.1, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the Replacement Securities or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of Replacement Securities or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source or the last bid quotation from such a source at the most recent Close of Trading. Subject to Section 19, upon the satisfaction of all obligations hereunder, any remaining Collateral shall be returned to Borrower.

14.2.   Upon the occurrence of a Default under Section 13 entitling Borrower to terminate all Loans hereunder, Borrower shall have the right, in addition to any other remedies provided herein (which, upon the occurrence of an Act of Insolvency, may be exercised following the termination of any applicable stay), (a) to purchase a like amount of Collateral ("Replacement Collateral") in the principal market for such Collateral in a commercially reasonable manner, (b) to sell a like amount of the Loaned Securities in the principal market for such Loaned Securities in a commercially reasonable manner and (c) to apply and set off the Loaned Securities and any proceeds thereof against (i) the payment of the purchase price for such Replacement Collateral, (ii) Lender's obligation to return any cash or other Collateral, and (iii) any amounts due to Borrower under Sections 6, 9 and 17. In such event, Borrower may treat the Loaned Securities as its own and Lender's obligation to return a like amount of the Collateral shall terminate; provided, however, that Lender shall immediately return any letters of credit supporting any Loan upon the exercise or deemed exercise by Borrower of its termination rights under Section 13. Borrower may similarly apply the Loaned Securities and any proceeds thereof to any other obligation of Lender under this Agreement, including Lender's obligations with respect to Distributions paid to Lender (and not forwarded to Borrower) in respect of Collateral. In the event that (i) the sales price received from such Loaned Securities is less than (ii) the purchase price of Replacement Collateral (plus the amount of any cash or other Collateral not replaced by Borrower and all other amounts, if any, due to Borrower hereunder), Lender shall be liable to Borrower for the amount of any such deficiency, together with interest on such amounts at a rate equal to (A) in the case of Collateral consisting of Foreign Securities, ESTR, (B) in the case of Collateral consisting of any other Securities (or other amounts due, if any, to Borrower hereunder), the Federal Funds Rate or (C) such other rate as may be specified in Schedule B, in each case as such rate fluctuates from day to day, from the date of such sale until the date of payment of such deficiency. As security for Lender's obligation to pay such deficiency, Borrower shall have, and Lender hereby grants, a security interest in any property of Lender then held by or for Borrower and a right of setoff with respect to such property and any other amount payable by Borrower to Lender. The purchase price of any Replacement Collateral purchased under this Section shall include, and the


**Master Securities Lending Agreement**

proceeds of any sale of Loaned Securities shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expenses related to such purchase or sale (as the case may be). In the event Borrower exercises its rights under this Section 14.2, Borrower may elect in its sole discretion, in lieu of purchasing all or a portion of the Replacement Collateral or selling all or a portion of the Loaned Securities, to be deemed to have made, respectively, such purchase of Replacement Collateral or sale of Loaned Securities for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source or the last bid quotation from such a source at the most recent Close of Trading. Subject to Section 19, upon the satisfaction of all Lender's obligations hereunder, any remaining Loaned Securities (or remaining cash proceeds thereof) shall be returned to Lender.

14.3.   Unless otherwise agreed, Borrower and Lender acknowledge and agree that (a) the Loaned Securities and any Collateral consisting of Securities are of a type traded in a recognized market, (b) in the absence of a generally recognized source for prices or bid or offer quotations for any security, the non-defaulting party may establish the source therefor in its sole discretion, and (c) all prices and bid and offer quotations shall be increased to include accrued interest to the extent not already included therein (except to the extent contrary to market practice with respect to the relevant Securities).

14.4.   In addition to its rights hereunder, the non-defaulting party shall have any rights otherwise available to it under any other agreement or applicable law. In addition to any other remedies to which a non-defaulting party may be entitled under the Agreement, the defaulting party shall, with respect to an individual Loan or with respect to a class of Loans, be liable to the non-defaulting party for (a) the amount of all reasonable legal or other expenses incurred by the non-defaulting party in connection with or as a result of a Default, (b) damages in an amount equal to the cost (including all payments, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of a Default, and (c) any other loss, damage, cost or expense directly arising or resulting from the occurrence of a Default in respect of a Loan.

## 15. **Transfer Taxes.**

All transfer taxes with respect to the transfer of the Loaned Securities by Lender to Borrower and by Borrower to Lender upon termination of the Loan and with respect to the transfer of Collateral by Borrower to Lender and by Lender to Borrower upon termination of the Loan or pursuant to Section 4.5 or Section 10 shall be paid by Borrower.

## 16. **Transfers.**

16.1.   All transfers by either Borrower or Lender of Loaned Securities or Collateral consisting of "financial assets" (within the meaning of the UCC) hereunder shall be by (a) in the case of certificated securities, physical delivery of certificates representing such securities together with duly executed stock and bond transfer powers, as the case may be, with signatures guaranteed by a bank or a member firm of the New York Stock Exchange, Inc., (b) registration of an uncertificated security in the transferee's name by the issuer of such



uncertificated security, (c) the crediting by a Clearing Organization of such financial assets to the transferee's "securities account" (within the meaning of the UCC) maintained with such Clearing Organization, (d) such other means as specified in this Agreement, including but not limited to those means specified in Sections 3.2(c) and 7.1(b), or (e) such other means as Borrower and Lender may agree.

16.2.   All transfers of cash hereunder shall be by (a) wire transfer in immediately available, freely transferable funds, (b) crediting Lender's account carried by Borrower or (c) such other means as Borrower and Lender may agree.

16.3.   All transfers of letters of credit from Borrower to Lender shall be made by physical delivery to Lender of an irrevocable letter of credit issued by a "bank" as defined in Section 3(a)(6)(A)-(C) of the Exchange Act.  Transfers of letters of credit from Lender to Borrower shall be made by causing such letters of credit to be returned or by causing the amount of such letters of credit to be reduced to the amount required after such transfer.

16.4.   A transfer of Securities, cash or letters of credit may be effected under this Section 16 on any day except (a) a day on which the transferee is closed for business at its primary place of business or (b) a day on which a Clearing Organization or wire transfer system is closed, if the facilities of such Clearing Organization or wire transfer system are required to effect such transfer.

16.5.   For the avoidance of doubt, Borrower and Lender agree and acknowledge that the term "securities," as used herein (except in this Section 16), shall include any "security entitlements" with respect to such securities (within the meaning of the UCC).  In every transfer of "financial assets" (within the meaning of the UCC) hereunder, the transferor shall take all steps necessary (a) to effect a delivery to the transferee under Section 8-301 of the UCC, or to cause the creation of a security entitlement in favor of the transferee under Section 8-501 of the UCC, (b) to enable the transferee to obtain "control" (within the meaning of Section 8-106 of the UCC), and (c) to provide the transferee with comparable rights under any applicable foreign law or regulation.

17. **Contractual Currency.**

17.1.   Borrower and Lender agree that (a) any payment in respect of a Distribution under Section 9 shall be made in the currency in which the underlying Distribution of cash was made, (b) any return of cash shall be made in the currency in which the underlying transfer of cash was made, and (c) any other payment of cash in connection with a Loan under this Agreement shall be in the currency agreed upon by Borrower and Lender in connection with such Loan (the currency established under clause (a), (b) or (c) is hereinafter referred to as the " Contractual Currency").  Notwithstanding the foregoing, the payee of any such payment may, at its option, accept tender thereof in any other currency; provided, however, that, to the extent permitted by applicable law, the obligation of the payor to make such payment will be discharged only to the extent of the amount of Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency



**Master Securities Lending Agreement**

(after deduction of any premium and costs of exchange) on the banking day next succeeding its receipt of such currency.

17.2.   If for any reason the amount in the Contractual Currency received under Section 17.1, including amounts received after conversion of any recovery under any judgment or order expressed in a currency other than the Contractual Currency, falls short of the amount in the Contractual Currency due in respect of this Agreement, the party required to make the payment will (unless a Default has occurred and such party is the non-defaulting party) as a separate and independent obligation and to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall.

17.3.   If for any reason the amount in the Contractual Currency received under Section 17.1 exceeds the amount in the Contractual Currency due in respect of this Agreement, then the party receiving the payment will (unless a Default has occurred and such party is the non-defaulting party) refund promptly the amount of such excess.

18. **ERISA.**

Lender shall, if any of the Securities transferred to the Borrower hereunder for any Loan have been or shall be obtained, directly or indirectly, from or using the assets of any Plan, so notify Borrower in writing upon the execution of this Agreement or upon initiation of such Loan under Section 2.1.  If Lender so notifies Borrower, then Borrower and Lender shall conduct the Loan in accordance with the terms and conditions of Department of Labor Prohibited Transaction Exemption 81-6 (46 Fed. Reg. 7527, Jan. 23, 1981; as amended, 52 Fed. Reg. 18754, May 19, 1987), or any successor thereto (unless Borrower and Lender have agreed prior to entering into a Loan that such Loan will be conducted in reliance on another exemption, or without relying on any exemption, from the prohibited transaction provisions of Section 406 of the Employee Retirement Income Security Act of 1974, as amended, and Section 4975 of the Internal Revenue Code of 1986, as amended).  Without limiting the foregoing and notwithstanding any other provision of this Agreement, if the Loan will be conducted in accordance with Prohibited Transaction Exemption 81-6, then:

18.1.   Borrower represents and warrants to Lender that it is either (a) a bank subject to federal or state supervision, (b) a broker-dealer registered under the Exchange Act or (c) exempt from registration under Section 15(a)(1) of the Exchange Act as a dealer in Government Securities.

18.2.   Borrower represents and warrants that, during the term of any Loan hereunder, neither Borrower nor any affiliate of Borrower has any discretionary authority or control with respect to the investment of the assets of the Plan involved in the Loan or renders investment advice (within the meaning of 29 C.F.R. Section 2510.3-21(c)) with respect to the assets of the Plan involved in the Loan.  Lender agrees that, prior to or at the commencement of any Loan hereunder, it will communicate to Borrower information regarding the Plan sufficient to identify to Borrower any person or persons that have discretionary authority or control with respect to the investment of the assets of the Plan involved in the Loan or that render investment advice (as defined in the preceding sentence) with respect to the assets of the Plan involved in the Loan.

 **Master Securities Lending Agreement**

In the event Lender fails to communicate and keep current during the term of any Loan such information, Lender rather than Borrower shall be deemed to have made the representation and warranty in the first sentence of this Section 18.2.

18.3.     Borrower shall mark to market daily each Loan hereunder pursuant to Section 10.1 as is required if Lender is a Customer.

18.4.     Borrower and Lender agree that:

(a) the term "Collateral" shall mean cash; prior to the making of any Loans hereunder, Borrower shall provide Lender with (i) the most recent available audited statement of Borrower's financial condition and (ii) the most recent available unaudited statement of Borrower's financial condition (if more recent than the most recent audited statement), and each Loan made hereunder shall be deemed a representation by Borrower that there has been no material adverse change in Borrower's financial condition subsequent to the date of the latest financial statements or information furnished in accordance herewith;

(b) the Loan may be terminated by Lender at any time, whereupon Borrower shall deliver the Loaned Securities to Lender within the lesser of (i) the customary delivery period for such Loaned Securities, (ii) five Business Days, and (iii) the time negotiated for such delivery between Borrower and Lender; provided, however, that Borrower and Lender may agree to a longer period only if permitted by Prohibited Transaction Exemption 81-6; and

(c) the Collateral transferred shall be security only for obligations of Borrower to the Plan with respect to Loans, and shall not be security for any obligation of Borrower to any agent or affiliate of the Plan.

19. **Single Agreement.**

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting party shall be entitled to set off claims and apply property held by it in respect of any Loan hereunder against obligations owing to it in respect of any other Loan with the Defaulting Party.

20. **APPLICABLE LAW.**

 **Master Securities Lending Agreement**

THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

21. **Waiver.**

The failure of a party to this Agreement to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  All waivers in respect of a Default must be in writing.

22. **Survival of Remedies.**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Securities or Collateral and termination of this Agreement.

23. **Notices and Other Communications.**

Any and all notices, statements, demands or other communications hereunder may be given by TradeStation Securities, Inc. or Collateral Agent to Counterparty by telephone, mail, facsimile, e-mail, electronic message, telegraph messenger or otherwise at the phone and facsimile numbers provided by Counterparty and maintained by TradeStation Securities, Inc. or Collateral Agent, as applicable, in its books and records for such party. Any and all notices, statements, demands or other communications hereunder may be given by Counterparty to TradeStation Securities, Inc. in writing electronically via the secure electronic message center maintained by TradeStation Securities, Inc. for the account of Counterparty.   Any and all notices, statements, demands or other communications hereunder may be given by Counterparty to Collateral Agent in writing 1411 Broadway, 28th Floor, New York, NY 10018-3450, Attn: COO.  Any notice, statement, demand or other communication hereunder will be deemed effective on the day and at the time on which it is received or, if not received, on the day and at the time on which its delivery was in good faith attempted; provided, however, that any notice by a party to the other party by telephone shall be deemed effective only if (a) such notice is followed by written confirmation thereof and (b) at least one of the other means of providing notice that are specifically listed above has previously been attempted in good faith by the notifying party.

24. **MANDATORY ARBITRATION**

THE PARTIES HEREBY AGREE THAT ANY DISPUTE, CONTROVERSY OR CLAIM BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT OR ANY LOAN HEREUNDER SHALL BE SUBJECT TO THE MANDATORY ARBITRATION PROVISION CONTAINED IN ANY CUSTOMER ACCOUNT OR SIMILAR AGREEMENT ENTERED INTO BETWEEN SUCH PARTIES.

25. **Miscellaneous.**

    25.1.    Except as otherwise agreed by the parties or as otherwise provided herein, this Agreement supersedes any other agreement between the parties hereto concerning loans of Securities between Borrower and Lender.  Except in accordance with Section 4.4 of the Collateral Agent Protocols, this Agreement shall not be assigned by Borrower, Lender, or Collateral Agent without the prior written consent of the other parties and any attempted assignment without



**Master Securities Lending Agreement**

such consent shall be null and void. Any attempted assignment that would adversely affect the security interest granted pursuant to this Agreement and perfected by the Control Agreement shall likewise be null and void.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of Borrower, Lender and Collateral Agent and their respective heirs, representatives, successors and assigns.  This Agreement may be terminated by Borrower or Lender upon notice to the other, subject only to fulfillment of any obligations then outstanding.   This Agreement may be modified by TradeStation according to the amendment and modification provisions set forth in Section 32 of the TradeStation Securities, Inc. Customer Account Agreement for Equities (as such provisions may be renumbered or amended from time to time), provided that any such action shall not adversely affect the security interest granted pursuant to this Agreement and perfected by the Control Agreement.  The parties hereto acknowledge and agree that, in connection with this Agreement and each Loan hereunder, time is of the essence.   Each provision and agreement herein shall be treated as separate and independent from any other provision herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

25.2.    Any agreement between Borrower and Lender pursuant to Section 11.5(b) or Section 26.42 shall be made (a) in writing, (b) orally, if confirmed promptly in writing or through any system that compares Loans and in which Borrower and Lender are participants, or (c) in such other manner as may be agreed by Borrower and Lender in writing.

## 26. **Definitions.**

For the purposes hereof:

26.1.    "Act of Insolvency" shall mean, with respect to any party, (a) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party's seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (b) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (i) is consented to or not timely contested by such party, (ii) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (iii) is not dismissed within 15 days, (c) the making by such party of a general assignment for the benefit of creditors, or (d) the admission in writing by such party of such party's inability to pay such party's debts as they become due.

26.2.    "Bank" shall have the meaning assigned in Section 4.1.

26.3.    "Bankruptcy Code" shall have the meaning assigned in Section 27.1.

26.4.    "Borrower" shall have the meaning assigned in Section 1.



**Master Securities Lending Agreement**

26.5.   "Borrower Payment" shall have the meaning assigned in Section 9.5(a).

26.6.   "Broker-Dealer" shall mean any person that is a broker (including a municipal securities broker), dealer, municipal securities dealer, government securities broker or government securities dealer as defined in the Exchange Act, regardless of whether the activities of such person are conducted in the United States or otherwise require such person to register with the U.S. Securities and Exchange Commission or other regulatory body.

26.7.   "Business Day" shall mean, with respect to any Loan hereunder, a day on which regular trading occurs in the principal market for the Loaned Securities subject to such Loan, provided, however, that for purposes of determining the Market Value of any Securities hereunder, such term shall mean a day on which regular trading occurs in the principal market for the Securities whose value is being determined.  Notwithstanding the foregoing, (a) for purposes of Section 10, "Business Day" shall mean any day on which regular trading occurs in the principal market for any Loaned Securities or for any Collateral consisting of Securities under any outstanding Loan hereunder and "next Business Day" shall mean the next day on which a transfer of Collateral may be effected in accordance with Section 16, and (b) in no event shall a Saturday or Sunday be considered a Business Day.

26.8.   "Clearing Organization" shall mean (a) The Depository Trust Company, or, if agreed to by Borrower and Lender, such other "securities intermediary" (within the meaning of the UCC) at which Borrower (or Borrower's agent) and Lender (or Lender's agent) maintain accounts, or (b) a Federal Reserve Bank, to the extent that it maintains a book-entry system.

26.9.   "Close of Business" shall mean 4:00 p.m. (New York City time).

26.10.  "Close of Trading" shall mean, with respect to any Security, the end of the primary trading session established by the principal market for such Security on a Business Day, unless otherwise agreed.

26.11.  "Collateral" shall mean, whether now owned or hereafter acquired and to the extent permitted by applicable law, (a) any property which Borrower and Lender agree prior to the Loan shall be acceptable collateral and which is transferred to Lender pursuant to Sections 4 or 10 (including as collateral, for definitional purposes, any letters of credit mutually acceptable to Lender and Borrower), (b) all accounts in which such property is deposited and all securities and the like in which any cash collateral is invested or reinvested, and (c) any proceeds of any of the foregoing; provided, however, that if Lender is a Customer, "Collateral" shall be limited to cash.

26.12.  "Collateral Account" shall have the meaning assigned in Section 4.1.

26.13.  "Collateral Agent" shall have the meaning assigned in the first paragraph of this Agreement.

26.14.  "Collateral Agent Protocols" shall have the meaning assigned in Section 5.1.



**Master Securities Lending Agreement**

26.15.  "Collateral Distributions" shall have the meaning assigned in Section 9.5(a).

26.16.  "Confirmation" shall have the meaning assigned in Section 2.1.

26.17.  "Contractual Currency" shall have the meaning assigned in Section 17.1.

26.18.  "Control Agreement" shall have the meaning assigned in Section 5.2.

26.19.   "Customer" shall mean any person that is a customer of Borrower under Rule 15c3-3 under the Exchange Act or any comparable regulation of the Secretary of the Treasury under Section 15C of the Exchange Act (to the extent that Borrower is subject to such Rule or comparable regulation).

26.20.  "Cutoff Time" shall mean a time on a Business Day by which a transfer of cash, securities or other property must be made by Borrower or Lender to the other, as shall be agreed by Borrower and Lender in Schedule B, or shall be as specified in the policies and procedures described on TradeStation's website or as agreed otherwise orally or in writing or, in the absence of any such agreement, as shall be determined in accordance with market practice.

26.21.  "Default" shall have the meaning assigned in Section 13.

26.22.  "Defaulting Party" shall have the meaning assigned in Section 19.

26.23.  "Distribution" shall mean, with respect to any Security at any time, any distribution made on or in respect of such Security, including, but not limited to:  (a) cash and all other property, (b) stock dividends, (c) Securities received as a result of split ups of such Security and distributions in respect thereof, (d) interest payments, (e) all rights to purchase additional Securities, and (f) any cash or other consideration paid or provided by the issuer of such Security in exchange for any vote, consent or the taking of any similar action in respect of such Security (regardless of whether the record date for such vote, consent or other action falls during the term of the Loan).  In the event that the holder of a Security is entitled to elect the type of distribution to be received from two or more alternatives, such election shall be made by Lender, in the case of a Distribution in respect of the Loaned Securities, and by Borrower, in the case of a Distribution in respect of Collateral.

26.24.  "ESTR" shall mean for any date a rate per annum equal to the Euro Short Term Rate for such date as published by the European Central Bank (or any successor administrator of the Euro Short Term Rate) on the European Central Bank's website, currently at http://www.ecb.europa.eu, or any successor source for the Euro Short Term Rate.

26.25.  "Equity Security" shall mean any security (as defined in the Exchange Act) other than a "nonequity security," as defined in Regulation T.

26.26.  "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.



26.27. "Extension Deadline" shall mean, with respect to a letter of credit, the Cutoff Time on the Business Day preceding the day on which the letter of credit expires.

26.28. "FDIA" shall have the meaning assigned in Section 27.4.

26.29. "FDICIA" shall have the meaning assigned in Section 27.5.

26.30. "Federal Funds Rate" shall mean the rate of interest (expressed as an annual rate), as published in Federal Reserve Statistical Release H.15 (519) or any publication substituted therefor, charged for federal funds (dollars in immediately available funds borrowed by banks on an overnight unsecured basis) on that day or, if that day is not a banking day in New York City, on the next preceding banking day.

26.31. "Foreign Securities" shall mean, unless otherwise agreed, Securities that are principally cleared and settled outside the United States.

26.32. "Government Securities" shall mean government securities as defined in Section 3(a)(42)(A)-(C) of the Exchange Act.

26.33. "Lender" shall have the meaning assigned in Section 1.

26.34. "Lender Payment" shall have the meaning assigned in Section 9.5(a).

26.35. "Loan" shall have the meaning assigned in Section 1.

26.36. "Loan Fee" shall have the meaning assigned in Section 6.1.

26.37. "Loaned Security" shall mean any Security transferred in a Loan hereunder until such Security (or an identical Security) is transferred back to Lender hereunder, except that, if any new or different Security shall be exchanged for any Loaned Security by recapitalization, merger, consolidation or other corporate action, such new or different Security shall, effective upon such exchange, be deemed to become a Loaned Security in substitution for the former Loaned Security for which such exchange is made.  For purposes of return of Loaned Securities by Borrower or purchase or sale of Securities pursuant to Section 14, such term shall include Securities of the same issuer, class and quantity as the Loaned Securities, as adjusted pursuant to the preceding sentence.

26.38. "Margin Deficit" shall have the meaning assigned in Section 10.2.

26.39. "Margin Excess" shall have the meaning assigned in Section 10.3.

26.40. "Margin Notice Deadline" shall mean the time agreed to by Borrower and Lender in the relevant Confirmation, Schedule B hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of mark-to-market obligations as provided in Section 10 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice).

**TradeStation®**                                                  **Master Securities Lending Agreement**

26.41. "Margin Percentage" shall mean, with respect to any Loan as of any date, a percentage agreed by Borrower and Lender, which shall be not less than 100%, unless (a) Borrower and Lender agree otherwise, as provided in Section 25.2 or Borrower in its discretion determines that applicable laws or market custom require greater than 100%, and (b) Lender is not a Customer. Notwithstanding the previous sentence, in the event that the writing or other confirmation evidencing the agreement described in clause (a) does not set out such percentage with respect to any such Loan, the Margin Percentage shall not be a percentage less than the percentage obtained by dividing (i) the Market Value of the Collateral required to be transferred by Borrower to Lender with respect to such Loan at the commencement of the Loan by (ii) the Market Value of the Loaned Securities required to be transferred by Lender to Borrower at the commencement of the Loan.

26.42. "Market Value" shall have the meaning agreed to by Borrower and Lender in writing. Notwithstanding the previous sentence, in the event that the meaning of Market Value has not been set forth in Annex II or in any other writing, as described in the previous sentence, Market Value shall be reasonably determined by TradeStation in accordance with its standard practices for valuing securities. The determinations of Market Value provided for in Annex II or in any other writing described in the first sentences of this Section 26.42 shall apply for all purposes under this Agreement, except for purposes of Section 14.

26.43. "Payee" shall have the meaning assigned in Section 9.5(a).

26.44. "Payor" shall have the meaning assigned in Section 9.5(a).

26.45. "Plan" shall mean:  (a) any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (b) any "plan" as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986; or (c) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the Department of Labor's plan asset regulation, 29 C.F.R. Section 2510.3-101.

26.46. "Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System, as in effect from time to time.

26.47. "Retransfer" shall mean, with respect to any Collateral, to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer such Collateral, or to re-register any such Collateral evidenced by physical certificates in any name other than Borrower's.

26.48. "Securities" shall mean securities or, if agreed by Borrower and Lender in writing, other assets.

26.49. "Securities Distributions" shall have the meaning assigned in Section 9.5(a).

26.50. "Tax" shall have the meaning assigned in Section 9.5(a).


Master Securities Lending Agreement

26.51.  "UCC" shall mean the New York Uniform Commercial Code.

27. **Intent.**

27.1.  The parties recognize that each Loan hereunder is a "securities contract," as such term is defined in Section 741 and used in Sections 362(b)(6), 546(e) and 555 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), as amended and Section 78eee(b)(2)(B) of the Securities Investor Protection Act of 1970.

27.2.  It is understood that each and every transfer of funds, securities and other property under this Agreement and each Loan hereunder is a "settlement payment," a "margin payment" or a "transfer" as such terms are used in Sections 362(b) (6) and 546(e) of the Bankruptcy Code.

27.3.  It is understood that the rights given to Borrower and Lender hereunder upon a Default by the other constitute a "contractual right" to cause the acceleration, termination and/or liquidation of a securities contract and the right to set off and/or net mutual debts and claims in connection with a securities contract and related credit enhancements, as such terms are used in Sections 555 and 362(b)(6) of the Bankruptcy Code.

27.4.  The parties agree and acknowledge that if a party to a Loan is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Loan hereunder is a "securities contract" and "qualified financial contract," as such terms are defined in the FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to the Loan would render such definitions inapplicable).

27.5.  It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment obligation under any Loan hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation," respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties to a Loan is not a "financial institution" as that term is defined in FDICIA).

27.6.  Except to the extent required by applicable law or regulation or as otherwise agreed, Borrower and Lender agree that Loans hereunder shall in no event be "exchange contracts" for purposes of the rules of any securities exchange and that Loans hereunder shall not be governed by the buy-in or similar rules of any such exchange, registered national securities association or other self-regulatory organization.

28. **DISCLOSURE RELATING TO CERTAIN FEDERAL PROTECTIONS.**

28.1.  **WITHOUT WAIVING ANY RIGHTS GIVEN TO LENDER HEREUNDER, IT IS UNDERSTOOD AND AGREED THAT THE PROVISIONS OF THE SECURITIES INVESTOR PROTECTION ACT OF 1970 MAY NOT PROTECT LENDER WITH RESPECT TO LOANED SECURITIES HEREUNDER AND THAT, THEREFORE, THE CASH COLLATERAL DELIVERED TO THE COLLATERAL ACCOUNT FOR THE BENEFIT OF LENDER MAY**

 **Master Securities Lending Agreement**

**CONSTITUTE THE ONLY SOURCE OF SATISFACTION OF BORROWER'S OBLIGATIONS IN THE EVENT BORROWER FAILS TO RETURN THE LOANED SECURITIES.**

28.2. **LENDER ACKNOWLEDGES THAT, IN CONNECTION WITH LOANS OF GOVERNMENT SECURITIES AND AS OTHERWISE PERMITTED BY APPLICABLE LAW, SOME SECURITIES PROVIDED BY BORROWER AS COLLATERAL UNDER THIS AGREEMENT MAY NOT BE GUARANTEED BY THE UNITED STATES.**

29. **OTHER IMPORTANT DISCLOSURES**

29.1. BY AGREEING TO AND ACCEPTING THIS AGREEMENT, COUNTERPARTY AGREES AND ACKNOWLEDGES THAT HE, SHE OR IT HAS READ AND FULLY UNDERSTANDS THE SEPARATE DOCUMENT ENTITLED IMPORTANT RISK DISCLOSURES WITH RESPECT TO FULLY PAID OR EXCESS MARGIN SECURITIES LENDING, WHICH DESCRIBES MANY OTHER RISKS AND CHARACTERISTICS OF THE PROGRAM, INCLUDING, BUT NOT LIMITED TO POTENTIAL LACK OF SIPC PROTECTION, LOSS OF VOTING RIGHTS, TRADESTATION'S ABILITY TO USE THE LOAN SECURITIES FOR ADDITIONAL LOANS AND TRADESTATION'S ABILITY TO EARN A SPREAD AND/OR OTHER PROFIT, LACK OF GUARANTEE OF RECEIVING BEST RATES, RISKS ASSOCIATED WITH EACH TYPE OF COLLATERAL, THAT THE SECURITIES MAY BE "HARD-TO-BORROW" BECAUSE OF SHORT-SELLING OR MAY BE USED TO SATISFY DELIVERY REQUIREMENTS RESULTING FROM SHORT SALES, POTENTIAL ADVERSE TAX CONSEQUENCES, INCLUDING PAYMENTS DEEMED CASH-IN-LIEU OF DIVIDEND PAID ON SECURITIES WHILE ON LOAN, TRADESTATION'S RIGHT TO LIQUIDATE THE TRANSACTION BECAUSE OF A CONDITION OF THE KIND SPECIFIED IN FINRA RULE 4314(B), AND THE FACTORS THAT DETERMINE THE AMOUNT OF COMPENSATION RECEIVED BY TRADESTATION OR PAID TO CUSTOMER IN CONNECTION WITH THE USE OF THE SECURITIES BORROWED FROM THE CUSTOMER LACK OF INTEREST ON CASH COLLATERAL, AMONG OTHER THINGS.

BY AGREEING TO AND ACCEPTING THIS AGREEMENT, COUNTERPARTY AFFIRMS THAT HE, SHE, OR IT HAS DETERMINED THAT PARTICIPATION IN TRADESTATION'S FULLY-PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY AND THAT IN MAKING SUCH DETERMINATION COUNTERPARTY HAS CONSIDERED COUNTERPARTY'S FINANCIAL SITUATION AND NEEDS, TAX STATUS, INVESTMENT OBJECTIVES, INVESTMENT TIME HORIZON, LIQUIDITY NEEDS, RISK TOLERANCE, AND ANY OTHER RELEVANT INFORMATION.   COUNTERPARTY UNDERSTANDS THAT TRADESTATION DOES NOT GIVE INVESTMENT ADVICE OR MAKE ANY RECOMMENDATIONS REGARDING THE PURCHASE AND SALE OF SECURITIES AND THAT TRADESTATION HAS MADE NO DETERMINATION AS TO THE SUITABILITY OF THE PROGRAM FOR COUNTERPARTY.   COUNTERPARTY SHOULD DISCUSS WITH COUNTERPARTY'S INVESTMENT AND/OR TAX ADVISORS WHETHER PARTICIPATION IN THE FULLY PAID SECURITIES LENDING PROGRAM IS APPROPRIATE FOR COUNTERPARTY.

 **Master Securities Lending Agreement**

29.2.   LENDER ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF, AND UNDERSTANDS, THE COLLATERAL AGENT PROTOCOLS.

                    **Master Securities Lending Agreement**

## Schedule of Basis of Compensation for Loan

The compensation to Counterparty will be in the form of a cash which will be accrued daily and credited monthly.  The Income is calculated as 30% of the net proceeds earned and received by TradeStation for relending Counterparty's shares.  The remaining 70% of the net proceeds earned and received by TradeStation for relending the shares will be kept by TradeStation as its compensation.  The percentages may be changed by TradeStation in TradeStation's sole discretion.  Unless otherwise agreed, any Income payable hereunder shall be payable within 15 days following the last Business Day of the calendar month in which such fee was incurred.  For more information, Counterparty should contact TradeStation Client Services at (954) 652-7000.

**TradeStation®**                    **Master Securities Lending Agreement**

**Annex I**

Party Acting as Agent does not apply.

**Annex II**

Market Value shall not apply.

**Annex III Term**

**Loans**

This Annex sets forth additional terms and conditions governing Loans designated as "Term Loans" in which Lender lends to Borrower a specific amount of Loaned Securities ("Term Loan Amount") against a pledge of cash Collateral by Borrower for an agreed upon Cash Collateral Fee until a scheduled termination date ("Termination Date"). Unless otherwise defined, capitalized terms used but not defined in this Annex shall have the meanings assigned in the Securities Loan Agreement of which it forms a part (such agreement, together with this Annex and any other annexes, schedules or exhibits, referred to as the "Agreement").

1.  The terms of this Annex shall apply to Loans of Equity Securities only if they are designated as Term Loans in a Confirmation therefor provided pursuant to the Agreement and executed by each party to such Loan, in a schedule to the Agreement or in this Annex. All Loans of Securities other than Equity Securities shall be "Term Loans" subject to this Annex, unless otherwise agreed in a Confirmation or other writing.

2.  The Confirmation for a Term Loan shall set forth, in addition to any terms required to be set forth therein under the Agreement, the Term Loan Amount, rate of Interest and the Termination Date. Lender and Borrower agree that, except as specifically provided in this Annex, each Term Loan shall be subject to all terms and conditions of the Agreement, including, without limitation, any provisions regarding the parties' respective rights to terminate a Loan.

3.  In the event that either Borrower or Lender exercises its right under the Agreement to terminate a Term Loan on a date (the "Early Termination Date") prior to the Termination Date, Lender and Borrower shall, unless otherwise agreed, use their best efforts to negotiate in good faith a new Term Loan (the "Replacement Loan") of comparable or other Securities, which shall be mutually agreed upon by Borrower and Lender, with a Market Value equal to the Market Value of the Term Loan Amount under the terminated Term Loan (the "Terminated Loan") as of the Early Termination Date. Such agreement shall, in accordance with Section 2 of this Annex, be confirmed in a new Confirmation at the commencement of the Replacement Loan and be executed by each party thereto. Each Replacement Loan shall be subject to the same terms as the corresponding Terminated Loan, other than with respect to the commencement date and the identity of the Loaned Securities. The Replacement Loan shall commence on the date on which Borrower and Lender agree which Securities shall be the subject of the Replacement Loan and shall be scheduled to terminate on the scheduled Termination Date of the Terminated Loan.

4.  Borrower and Lender agree that, except as provided in Section 5 of this Annex, if they enter into a Replacement Loan, the Collateral for the related Terminated Loan

 **Master Securities Lending Agreement**

need not be returned to Borrower and shall instead serve as Collateral for such Replacement Loan.

5.    If Borrower and Lender are unable to negotiate and enter into a Replacement Loan for some or all of the Term Loan Amount on or before the Early Termination Date, (a) the party requesting termination of the Terminated Loan shall pay to the other party a Breakage Fee computed in accordance with Section 6 of this Annex with respect to that portion of the Term Loan Amount for which a Replacement Loan is not entered into, and (b) upon the transfer by Borrower to Lender of the Loaned Securities subject to the Terminated Loan, Lender shall transfer to Borrower Collateral for the Terminated Loan in accordance with and to the extent required under the Agreement, provided that no Default has occurred with respect to Borrower.

6.    For purposes of this Annex, the term "Breakage Fee" shall mean a fee agreed by Borrower and Lender in the Confirmation or otherwise orally or in writing.  In the absence of any such agreement, the term "Breakage Fee" shall mean, with respect to Loans of Government Securities, a fee equal to the sum of (a) the cost to the non-terminating party (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of the termination of the Terminated Loan, and (b) any other loss, damage, cost or expense directly arising or resulting from the termination of the Terminated Loan that is incurred by the non-terminating party (other than consequential losses or costs for lost profits or lost opportunities), as determined by the non-terminating party in a commercially reasonable manner, and (c) any other amounts due and payable by the terminating party to the non-terminating party under the Agreement on the Early Termination Date.

**TradeStation**®                                    **Master Securities Lending Agreement**

**APPENDIX I: FULLY PAID LENDING PROGRAM COLLATERAL AGENT PROTOCOLS**

These Collateral Agent Protocols (these "Protocols") are referred to in, and incorporated into, Section 5.1 of the TradeStation Master Securities Lending Agreement (the "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed in the Agreement.

1. **POWERS OF COLLATERAL AGENT**

   **1.1    Powers of Collateral Agent**

   Collateral Agent is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Agreement and the Control Agreement (the Agreement and the Control Agreement, collectively, the "FPL Agreements") and applicable law and in equity and to act as set forth in this Section 1 and Section 2 of these Protocols or as requested in any lawful directions given to it from time to time in respect of any matter by Lender, provided such directions are consistent with the FPL Agreements.

   **1.2    Rights and Powers Exercised for Sole and Exclusive Benefit of Lender**

   Collateral Agent agrees that its rights and powers with respect to the Collateral hereunder are exercised solely and exclusively for the benefit of Lender. Collateral Agent will accept, hold, administer and enforce the security interest in the Collateral at any time transferred or delivered to it and all other interests, rights, powers and remedies at any time granted to or enforceable by Collateral Agent solely and exclusively for the benefit of Lender, and will distribute or cause to be distributed all proceeds received by it in realization thereon or from enforcement thereof solely and exclusively pursuant to the provisions of these Protocols and the FPL Agreements.

2. **Obligations OF COLLATERAL AGENT**

   **2.1    Undertakings of Collateral Agent**

   **(a)**    Collateral Agent will act as collateral agent for the benefit solely and exclusively of Lender in accordance with Lender's respective interest in the Collateral as set forth in files or reports furnished or made available to Collateral Agent daily and upon its request (the "Respective Interest").

   **(b)**    Collateral Agent shall, for the benefit of Lender, perform Collateral Agent's obligations under these Protocols and the FPL Agreements, and protect, exercise and enforce the liens in favor of Collateral Agent created under the Agreement and all interests, rights, powers and remedies granted or available to Collateral Agent under, pursuant to or in connection with the FPL Agreements.

   **(c)**    Notwithstanding anything to the contrary contained in these Protocols or the FPL Agreements, Collateral Agent shall not commence any exercise of remedies or otherwise take any action or proceeding against any of the Collateral (other than actions as necessary to prove, protect or preserve the liens securing the obligations of TradeStation under the

**Master Securities Lending Agreement**

Agreement) unless and until it has actual knowledge that a Default has occurred. Collateral Agent shall be deemed to have actual knowledge that a Default has occurred (i) upon receipt of notice from Lender or TradeStation that a Default has occurred, or (ii) with respect to an Act of Insolvency by TradeStation, upon the public filing of any case, proceeding, petition or decree against TradeStation under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**(d)**     Upon receipt of such notice or deemed notice, Collateral Agent shall, at the request and direction (or deemed direction) of Lender, instruct the Bank as to the disposition of the Collateral and apply the proceeds of the Collateral as provided herein. Collateral Agent shall remit to Lender, or cause the Bank to remit to Lender, proceeds of Collateral deliverable to Lender pursuant to Section 2.2 of these Protocols at Lender's instruction.

## 2.2     Application of Proceeds

Collateral Agent will apply or direct the application of the proceeds of any collection, sale, foreclosure or other realization upon any Collateral in the following order of application:

**(a)**     First, to the payment in full of all amounts payable to Lender pursuant to the Agreement (which amounts shall be based on (i) the most recent information concerning the amount of Collateral that should be pledged to Lender received by Collateral Agent from TradeStation and (ii) other amounts owed to Lender under the Agreement as determined on a final basis by the trustee or receiver appointed in connection with an insolvency of TradeStation or the court presiding over TradeStation's bankruptcy case);

**(b)**     Second, to the Bank on account of the Bank's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by it to the extent it would be entitled to the same under the Control Agreement;

**(c)**     Third, to Collateral Agent on account of Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by Collateral Agent to the extent it would be entitled to the same under the Agreement and these Protocols; and

**(d)**     Finally, to TradeStation any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses, its successors or assigns, or as a court of competent jurisdiction may direct.

## 2.3     Amendment of FPL Agreements

**TradeStation**                              **Master Securities Lending Agreement**

Collateral Agent will not agree or consent to any amendment of an FPL Agreement without the consent of Lender (which consent may take the form of negative consent), except that no consent of Lender shall be required for any amendment that has the effect solely of:

(a)    adding or maintaining Collateral;

(b)    preserving, perfecting or establishing the priority of the security interests in favor of Lender on Collateral or the rights of Collateral Agent therein; or

(c)    curing any ambiguity, omission, defect or inconsistency; provided that such amendment does not adversely affect any security interest in Collateral securing the obligations of TradeStation to Lender under the FPL Agreements or perfection thereof or the rights of Lender.

3.    **IMMUNITIES OF COLLATERAL AGENT**

3.1    **No Implied Duty**

Collateral Agent will not have any fiduciary duties nor will it have responsibilities or obligations other than those expressly assumed by it in the FPL Agreements and these Protocols. No implied duties or responsibilities on behalf of Collateral Agent shall be read into this Agreement or otherwise exist.  Collateral Agent will not be required to take any action that is contrary to applicable law or any provision of the FPL Agreements and these Protocols.

3.2    **Solicitation of Instructions**

(a)    Collateral Agent may at any time solicit written confirmatory instructions from Lender or request an order of a court of competent jurisdiction as to any action that it may be requested or required to take, or that it may propose to take, in the performance of any of its obligations under the FPL Agreements or these Protocols and may suspend performance of such obligations as it determines to be appropriate until it receives such instructions or order.

(b)    No instruction or direction given to Collateral Agent by Lender that in the sole judgment of Collateral Agent imposes, purports to impose or might reasonably be expected to impose upon Collateral Agent any obligation or liability not set forth in or arising under the FPL Agreements or these Protocols will be binding upon Collateral Agent unless Collateral Agent elects, at its sole option, to accept such direction.

3.3    **Limitation of Liability**

Collateral Agent will not be responsible or liable for any action taken or omitted to be taken by it under these Protocols, except for its own negligence, bad faith, reckless disregard or willful misconduct.

3.4    **Documents in Satisfactory Form**



**Master Securities Lending Agreement**

Collateral Agent will be entitled to require that all agreements, certificates, opinions, instruments and other documents at any time submitted to it, including those expressly provided for in the FPL Agreements, be delivered to it in a form and with substantive provisions reasonably satisfactory to it.

### 3.5    Reliance

Collateral Agent may seek and rely upon, and will be protected in relying upon, any judicial order or judgment relied upon in good faith without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof.  Collateral Agent may act in reliance upon any instrument comporting with the provisions of the FPL Agreements or any signature reasonably believed by it to be genuine and may assume that any person purporting to give notice or receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

### 3.6    Events of Default

**(a)**    Collateral Agent agrees to monitor for an Act of Insolvency with respect to TradeStation and shall declare such an Act of Insolvency to have occurred upon the public filing of any case, proceeding, petition or decree against TradeStation under Chapter 7 or Chapter 11 of the Bankruptcy Code, under the Securities Investor Protection Act of 1970 or under the Orderly Liquidation Authority under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**(b)**    Other than the obligation to monitor for an Act of Insolvency by TradeStation as described in paragraph (a), Collateral Agent will not be obligated to inquire as to the occurrence or absence of any Default and will not be affected by or required to act upon any notice or knowledge as to the occurrence of any Default unless and until it receives from TradeStation or Lender notice stating that a Default has occurred and is continuing, or it receives instruction from Lender pursuant to Section 14.1 of the Agreement.  Collateral Agent may rely upon, and be fully protected in relying upon, any such notice which it reasonably believes to be genuine and shall have no obligation to verify the occurrence or continuation of a Default.

### 3.7    Actions by Collateral Agent

As to any matter not expressly provided for by the FPL Agreements, Collateral Agent may act or refrain from acting as directed by Lender and will be fully protected if it does so, and any action taken, suffered or omitted pursuant to this Section 3.7 of these Protocols shall be binding on Lender.

### 3.8    Security or Indemnity in Favor of Collateral Agent

Collateral Agent will not be required to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its powers or rights hereunder, including, without limitation, making any filings or other appearances on behalf of Lender or otherwise in any insolvency proceeding, unless it has been provided with security or indemnity reasonably satisfactory to it against any



**Master Securities Lending Agreement**

and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.

**3.9     Rights of Collateral Agent**

If any disagreement among the parties to the FPL Agreements results in conflicting claims or demands being made in connection with the Collateral and if the terms of the FPL Agreements and these Protocols do not unambiguously and specifically mandate the action Collateral Agent is required to take or not to take in connection therewith under the circumstances then existing, or if Collateral Agent is in doubt as to what action it is required to take or not to take under the FPL Agreements or these Protocols, it will be entitled to refrain from taking any action, and will incur no liability for doing so, until directed otherwise in writing by a request signed jointly by the parties entitled to give such direction or by order of a court of competent jurisdiction, accompanied by all security or indemnity reasonably requested by Collateral Agent against any and all liability or expense which may be incurred by it in acting upon such direction.

**3.10    Limitations on Duty of Collateral Agent in Respect of Collateral**

**(a)**    Beyond the exercise of reasonable care in the custody of Collateral in its possession (if any), Collateral Agent will have no duty as to any Collateral in its possession or in the possession of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and Collateral Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any liens on the Collateral. Collateral Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession (if any) if the Collateral is accorded treatment with substantially the same degree of care which it accords its own property, and Collateral Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by Collateral Agent in good faith.

**(b)**    Collateral Agent will not be responsible for the existence or sufficiency of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any act or omission on its part hereunder, for the validity of the title of TradeStation to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or liens upon the Collateral or otherwise as to the maintenance of the Collateral.

**4.      RESIGNATION AND REMOVAL OF COLLATERAL AGENT**

**4.1     Resignation or Removal of Collateral Agent**

**TradeStation**®                                    **Master Securities Lending Agreement**

Subject to the appointment of a successor Collateral Agent as provided in Section 4.2 of these Protocols ("Successor Collateral Agent"), and the acceptance of such appointment by the Successor Collateral Agent:

> **(a)** Collateral Agent may resign at any time by giving not less than ninety (90) days' notice of resignation to TradeStation and Lender; and
>
> **(b)** Collateral Agent may be removed at any time by TradeStation if Collateral Agent fails to perform its duties under the FPL Agreements and these Protocols; and
>
> **(c)** Lender will be notified of the Successor Collateral Agent by TradeStation within reasonable time of the effective change.

**4.2    Appointment of Successor Collateral Agent**

Upon the resignation or removal of Collateral Agent, a Successor Collateral Agent may be appointed by Collateral Agent (at the expense of TradeStation) or TradeStation, or Collateral Agent may petition a court of competent jurisdiction for appointment of a Successor Collateral Agent, which must be a company organized and doing business under the laws of the United States of America or any state or territory thereof or of the District of Columbia that has experience acting as collateral agent for a fully paid securities lending program.  Collateral Agent will fulfill its obligations hereunder until a Successor Collateral Agent meeting the requirements of this Section 4.2 of these Protocols has accepted its appointment as Collateral Agent and the provisions of this Section 4.2 of these Protocols have been satisfied.

**4.3    Succession**

When the person so appointed as Successor Collateral Agent accepts such appointment:

> **(a)** such person will succeed to and become vested with all the rights, powers, privileges and duties of the predecessor Collateral Agent, and the predecessor Collateral Agent will be discharged from its duties and obligations hereunder; and
>
> **(b)** the predecessor Collateral Agent will (at the expense of TradeStation) promptly transfer all liens and Collateral within its possession or control to the possession or control of the Successor Collateral Agent and Collateral Agent and TradeStation will each execute instruments and assignments as may be necessary or desirable or reasonably requested by the Successor Collateral Agent to transfer to the Successor Collateral Agent all liens, interests, rights, powers and remedies of the predecessor Collateral Agent in respect of the FPL Agreements and the Collateral.

Thereafter the predecessor Collateral Agent will remain entitled to enforce the immunities granted to it in Section 3 of these Protocols.

**4.4    Merger, Conversion or Consolidation of Collateral Agent**



**Master Securities Lending Agreement**

Any person into which Collateral Agent may be merged or converted or with which it may be consolidated, or any person resulting from any merger, conversion or consolidation to which Collateral Agent is a party, or any person succeeding to the business of Collateral Agent will be the successor of Collateral Agent pursuant to Section 4.3 of these Protocols, without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto (except where an instrument of transfer or assignment is required by law to effect such succession), if (a) such person satisfies the eligibility requirements set forth in Section 4.2 of these Protocols and (b) prior to any such merger, conversion or consolidation, Collateral Agent has notified TradeStation and Lender thereof in writing.

**4.5    Event or Occurrence of Bankruptcy or Insolvency of Collateral Agent**

In the event that Collateral Agent becomes insolvent as declared pursuant to the public filing of any case, proceeding, petition or decree against Collateral Agent under Chapter 7 or Chapter 11 of the Bankruptcy Code, or any other applicable U.S. law or regulation, TradeStation may: (a) appoint a Successor Collateral Agent (at TradeStation's expense) subject to Lender's consent (which consent may take the form of negative consent); (b) petition a court of competent jurisdiction for appointment of a Successor Collateral Agent subject to the terms and qualifications set forth in Section 4.2 of these Protocols, or (c) terminate the FPL Agreements and return the Loaned Securities to Lender.

Collateral Agent at all times accepts, holds, administers and enforces the security interest in the Collateral, the Collateral, and any accounts in which the Collateral is held solely and exclusively as the collateral agent for the benefit of Lender.  Upon the insolvency or bankruptcy of Collateral Agent, the Collateral shall not be treated as property of Collateral Agent or Collateral Agent's estate and Collateral Agent or the estate of Collateral Agent shall not have any claim or other interest in the Collateral or any account in which the Collateral is held.

**5.    MISCELLANEOUS COLLATERAL AGENT PROTOCOLS**

**5.1    Successors and Assigns**

Except as provided in Section 4.1 and Section 4.4 of these Protocols, Collateral Agent may not, in its capacity as such, delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void; provided, however, that Collateral Agent's affiliates may perform administrative services pursuant to the Agreement and these Protocols on behalf of Collateral Agent.  All obligations of Collateral Agent hereunder will inure to the sole and exclusive benefit of, and be enforceable by, Lender.

**5.2    Delay and Waiver**

No failure to exercise, no course of dealing with respect to the exercise of, and no delay in exercising, any right, power or remedy arising under these Protocols or the Agreement will impair any such right, power or remedy or operate as a waiver thereof. No single or partial exercise of any such right, power or remedy will preclude any other or future exercise thereof or the exercise of any other right, power or remedy.  The remedies herein are cumulative and are not exclusive of any remedies provided by law.

**TradeStation**                                  **Master Securities Lending Agreement**

### 5.3    Compensation; Expenses

TradeStation agrees to pay, promptly upon demand:

    **(a)**    such compensation to Collateral Agent as TradeStation and Collateral Agent may agree in writing from time to time;

    **(b)**    all reasonable out-of-pocket costs and expenses incurred by Collateral Agent and its agents in creating, perfecting, preserving, releasing or enforcing Collateral Agent's security interest in the Collateral, including filing and recording fees, expenses and taxes, stamp or documentary taxes and search fees; and

    **(c)**    after the occurrence of any Default with respect to TradeStation, all out-of-pocket costs and expenses (on a pass-through basis without mark-up) incurred by Collateral Agent in connection with the preservation, collection, foreclosure or enforcement of the Collateral or any interest, right, power or remedy of Collateral Agent or in connection with the collection or enforcement of any of the obligations of TradeStation to Lender under the FPL Agreements or the proof, protection, administration or resolution of any claim based upon such obligations in any insolvency or liquidation proceeding, including the reasonable fees and disbursements of attorneys, accountants, auditors, consultants, appraisers and other professionals engaged by Collateral Agent.

The agreements in this Section 5.3 of these Protocols will survive payment of all of TradeStation's obligations to Lender and the removal or resignation of Collateral Agent.

### 5.4    Amendment

These Protocols may only be amended (a) by TradeStation by sending Lender and Collateral Agent a written notice of such amendment, provided that such action does not adversely affect (i) the first priority perfected security interest granted pursuant to the Agreement and the Control Agreement or (ii) the duties of Collateral Agent to Lender pursuant to these Protocols or (b) with the written consent of all the parties to the Agreement.

### 5.5    Governing Law

These Protocols shall be governed by, and construed in accordance with, the laws of the State of New York.

# EXHIBIT 9



## Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | October 31 2022 |
| THROUGH | November 30 2022 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | |

#      000094377              I=0000


INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

### Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 19,673.25 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$19,673.25** |
| Cash Balance | 59,536.95 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$59,536.95** |
| **Net Equity** | **$79,210.20** |
| **Net Equity Last Statement** | **$0.00** |
| **Change Since Last Statement** | **$79,210.20** |

### Transaction Summary

| | |
|---|---|
| Opening Balance | 0.00 |
| Securities Sold | 61,046.91 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 3.57 |
| Miscellaneous | 109,000.00 |
| **Amount Credited** | **$170,050.48** |
| Securities Bought | -110,513.53 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **-$110,513.53** |
| **Net Cash Activity** | **$59,536.95** |
| **Closing Balance** | **$59,536.95** |

### Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Margin | 0.00 | 59,536.95 |
| **Net Cash Balance** | **$0.00** | **$59,536.95** |
| **Net Cash & Cash Equivalent Balance** | **$0.00** | **$59,536.95** |

Same day transfers of cash between account types are not
included in this section; such transfers, as well as details for all
transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on
this statement will be reported as the Fair Market Value to the
Internal Revenue Service in the format required by IRS rules,
and at the appropriate reporting time.

**TradeStation**
Securities

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 5

**Your Portfolio Holdings**

| Cash and Cash Equivalents | | | | | Market |
|---|---|---|---|---|---|
| Description | | | | | Value |
| Cash Balance | | | | | 59,536.95 |
| **Total Cash and Cash Equivalents** | | | | | **$59,536.95** |

| Equities | | Account | | | Market |
|---|---|---|---|---|---|
| ALLEGRO MICROSYSTEMS INC DEL | ALGM | Margin | 350.000 | 31.140000 | 10,899.00 |
| INSIGNIA SYS INC | ISIG | Margin | 75.000 | 8.990000 | 674.25 |
| NANOVIBRONIX INC | NAOV | Margin | 20,000.000 | 0.405000 | 8,100.00 |
| **Total Equities and Options** | | | | | **$19,673.25** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$19,673.25** |

**TradeStation**
Securities

8050 SW10th Street, Suite 2000
Plantation, FL 33324

| STATEMENT PERIOD | October 31 2022 | |
|---|---|---|
| THROUGH | November 30 2022 | |
| ACCOUNT NUMBER | **11583081** | Page 3 of 5 |

# Transaction Detail

## Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 11/25/2022 | 11/22/2022 | Bought | Margin | ONCOSEC MED INC COM | ONCS | 5,000.000 | $6.200 | -31,000.00 | |
| 11/25/2022 | 11/22/2022 | Bought | Margin | ONCOSEC MED INC COM | ONCS | 5,000.000 | $5.400 | -27,000.00 | |
| 11/25/2022 | 11/22/2022 | Bought | Margin | ONCOSEC MED INC COM | ONCS | 5,000.000 | $4.500 | -22,500.00 | |
| 11/25/2022 | 11/22/2022 | Sold | Margin | ONCOSEC MED INC COM | ONCS | 15,000.000 | $4.072 | | 61,046.91 |
| 11/30/2022 | 11/28/2022 | Bought | Margin | ALLEGRO MICROSYSTEMS INC DEL COM | ALGM | 350.000 | $30.710 | -10,748.50 | |
| 11/30/2022 | 11/28/2022 | Bought | Margin | INSIGNIA SYS INC COM | ISIG | 75.000 | $8.710 | -653.25 | |
| 11/30/2022 | 11/28/2022 | Bought | Margin | NANOVIBRONIX INC COM | NAOV | 20,000.000 | $0.928 | -18,611.78 | |
| **Total Investment Activity** | | | | | | | | **-$110,513.53** | **$61,046.91** |

## Dividends and Interest

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 11/30/2022 | Credit Int | Margin | .15000%11/01-11/30  $29066 | | | 3.57 |
| **Total Dividends and Interest** | | | | | **$0.00** | **$3.57** |

## Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 11/17/2022 | Journal | Margin | WR A/O 11/14 SOLERA NAT | | | 109,000.00 |
| **Total Miscellaneous** | | | | | **$0.00** | **$109,000.00** |

## Trades Executed But Not Yet Settled

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/2022 | 11/29/2022 | Sold | Margin | NANOVIBRONIX INC COM | NAOV | 20,000.000 | $0.463 | | 9,216.26 |

| STATEMENT PERIOD | October 31 2022 |
|---|---|
| THROUGH | November 30 2022 |
| ACCOUNT NUMBER | **11583081** |

**TradeStation**
Securities

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  4  of  5

## Trades Executed But Not Yet Settled

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/2022 | 11/29/2022 | Bought | Margin | COSMOS HLDGS INC COM | COSM | 10,000.000 | $0.687 | -6,866.80 | |
| 12/01/2022 | 11/29/2022 | Sold | Margin | COSMOS HLDGS INC COM | COSM | 10,000.000 | $0.644 | | 6,437.57 |
| 12/01/2022 | 11/29/2022 | Bought | Margin | ENERGY TRANSFER EQUITY L P COM UT LTD PTN | ET | 400.000 | $12.410 | -4,964.00 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | DISNEY WALT CO COM DISNEY | DIS | 50.000 | $94.310 | -4,715.50 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | OCCIDENTAL PETE CORP DEL COM | OXY | 100.000 | $69.040 | -6,904.00 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | VISA INC COM CL A | V | 50.000 | $208.780 | -10,439.00 | |
| 12/02/2022 | 11/30/2022 | Bought | Margin | CRESCENT PT ENERGY CORP COM | CPG | 1,000.000 | $7.900 | -7,900.00 | |
| 12/02/2022 | 11/30/2022 | Sold | Margin | INSIGNIA SYS INC COM | ISIG | 75.000 | $8.300 | | 622.47 |
| 12/02/2022 | 11/30/2022 | Sold | Margin | ALLEGRO MICROSYSTEMS INC DEL COM | ALGM | 300.000 | $29.484 | | 8,844.88 |
| 12/02/2022 | 11/30/2022 | Bought | Margin | MICROSOFT CORP COM | MSFT | 40.000 | $242.069 | -9,682.76 | |
| **Total Trades Executed But Not Yet Settled** | | | | | | | | **-$51,472.06** | **$25,121.18** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation of responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 \* (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | November 30 2022 |
| THROUGH | December 30 2022 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | November 30 2022 |

\#    000123743              I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 0.00 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$0.00** |
| Cash Balance | 368.47 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$368.47** |
| **Net Equity** | **$368.47** |
| **Net Equity Last Statement** | **$79,210.20** |
| **Change Since Last Statement** | **-$78,841.73** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 59,536.95 |
| Securities Sold | 93,210.98 |
| Funds Deposited | 300.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 376.90 |
| **Amount Credited** | **$93,887.88** |
| Securities Bought | -152,671.03 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | -8.43 |
| Miscellaneous | -376.90 |
| **Amount Debited** | **-$153,056.36** |
| **Net Cash Activity** | **-$59,168.48** |
| **Closing Balance** | **$368.47** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 0.00 | 368.47 |
| Margin | 59,536.95 | 0.00 |
| **Net Cash Balance** | **$59,536.95** | **$368.47** |
| **Net Cash** **& Cash Equivalent Balance** | **$59,536.95** | **$368.47** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | November 30 2022 |
| THROUGH | December 30 2022 |
| ACCOUNT NUMBER | **11583081** |

**TradeStation**
Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 7

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | Market Value |
|---|---|
| Cash Balance | 368.47 |
| **Total Cash and Cash Equivalents** | **$368.47** |

**Equities**

| Description | | | Account | | | | Market |
|---|---|---|---|---|---|---|---|
| CONTRA PFD META MATLS | 59199& | | Cash | 9,269.000 | 0.000000 | | 0.00 |

| **Total Equities and Options** | **$0.00** |
|---|---|

| **TOTAL MARKET VALUE OF PRICED SECURITIES** | **$0.00** |
|---|---|

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| CONTRA PFD META MATLS | 59199& | 14.63 |
| META MATLS INC | | 7.51 |
| CONTRA PFD META MATLS | 59199& | 22.22 |
| **Total Accrued Interest** | | 44.36 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

**TradeStation**
Securities

| STATEMENT PERIOD | November 30 2022 |
| THROUGH | December 30 2022 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  3  of  7

# Transaction Detail

## Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/2022 | 11/29/2022 | Sold | Margin | NANOVIBRONIX INC COM | NAOV | 20,000.000 | $0.463 | | 9,216.26 |
| 12/01/2022 | 11/29/2022 | Bought | Margin | COSMOS HLDGS INC COM DO NOT USE | 0001010 | 10,000.000 | $0.687 | -6,866.80 | |
| 12/01/2022 | 11/29/2022 | Sold | Margin | COSMOS HLDGS INC COM DO NOT USE | 0001010 | 10,000.000 | $0.644 | | 6,437.57 |
| 12/01/2022 | 11/29/2022 | Bought | Margin | ENERGY TRANSFER EQUITY L P COM UT LTD PTN | ET | 400.000 | $12.410 | -4,964.00 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | DISNEY WALT CO COM DISNEY | DIS | 50.000 | $94.310 | -4,715.50 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | OCCIDENTAL PETE CORP DEL COM | OXY | 100.000 | $69.040 | -6,904.00 | |
| 12/01/2022 | 11/29/2022 | Bought | Margin | VISA INC COM CL A | V | 50.000 | $208.780 | -10,439.00 | |
| 12/02/2022 | 11/30/2022 | Bought | Margin | CRESCENT PT ENERGY CORP COM | CPG | 1,000.000 | $7.900 | -7,900.00 | |
| 12/02/2022 | 11/30/2022 | Sold | Margin | INSIGNIA SYS INC COM | ISIG | 75.000 | $8.300 | | 622.47 |
| 12/02/2022 | 11/30/2022 | Sold | Margin | ALLEGRO MICROSYSTEMS INC DEL COM | ALGM | 300.000 | $29.484 | | 8,844.88 |
| 12/02/2022 | 11/30/2022 | Bought | Margin | MICROSOFT CORP COM | MSFT | 40.000 | $242.069 | -9,682.76 | |
| 12/06/2022 | 12/02/2022 | Bought | Margin | CLOUDFLARE INC CL A COM | NET | 100.000 | $49.000 | -4,900.00 | |
| 12/06/2022 | 12/02/2022 | Bought | Margin | VISTA OIL & GAS S A B DE C V SPONSORED ADS | VIST | 400.000 | $13.660 | -5,464.00 | |
| 12/06/2022 | 12/02/2022 | Bought | Margin | BARRICK GOLD CORP COM | GOLD | 200.000 | $16.980 | -3,396.00 | |
| 12/07/2022 | 12/05/2022 | Sold | Margin | OCCIDENTAL PETE CORP DEL COM | OXY | 100.000 | $68.900 | | 6,889.83 |
| 12/07/2022 | 12/05/2022 | Bought | Margin | ATOUR LIFESTYLE HOLDINGS LTD ADS | ATAT | 300.000 | $18.610 | -5,583.00 | |

**TradeStation**
Securities

| STATEMENT PERIOD | November 30 2022 |
| THROUGH | December 30 2022 |
| ACCOUNT NUMBER | **11583081** |

Page  4  of  7

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/07/2022 | 12/05/2022 | Sold | Margin | DISNEY WALT CO COM DISNEY | DIS | 50.000 | $99.000 | | 4,949.87 |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 500.000 | $7.996 | -3,998.00 | |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC COM | MMAT | 2,000.000 | $1.775 | -3,551.00 | |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 1,000.000 | $8.017 | -8,017.00 | |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 100.000 | $7.950 | -795.00 | |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 500.000 | $7.990 | -3,994.98 | |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 400.000 | $7.960 | -3,184.00 | |
| 12/07/2022 | 12/05/2022 | Sold | Margin | META MATLS INC COM | MMAT | 2,000.000 | $1.781 | | 3,561.05 |
| 12/07/2022 | 12/05/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 500.000 | $7.890 | -3,945.00 | |
| 12/08/2022 | 12/06/2022 | Sold | Margin | BARRICK GOLD CORP COM | GOLD | 200.000 | $16.450 | | 3,289.89 |
| 12/08/2022 | 12/06/2022 | Sold | Margin | CLOUDFLARE INC CL A COM | NET | 100.000 | $43.185 | | 4,318.39 |
| 12/08/2022 | 12/06/2022 | Bought | Margin | META MATLS INC COM | MMAT | 1,000.000 | $1.995 | -1,995.00 | |
| 12/08/2022 | 12/06/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 100.000 | $8.440 | -844.00 | |
| 12/08/2022 | 12/06/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 3,800.000 | $8.196 | -31,143.70 | |

**TradeStation**
Securities

| STATEMENT PERIOD | November 30 2022 | |
|---|---|---|
| THROUGH | December 30 2022 | |
| ACCOUNT NUMBER | **11583081** | Page  5  of  7 |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Investment Activity

| Settlement Date | Trade Date | Trans- action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/09/2022 | 12/07/2022 | Sold | Margin | MICROSOFT CORP COM | MSFT | 40.000 | $242.610 | | 9,704.16 |
| 12/09/2022 | 12/07/2022 | Sold | Margin | VISA INC COM CL A | V | 50.000 | $207.790 | | 10,389.25 |
| 12/09/2022 | 12/07/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 1,525.000 | $9.900 | -15,097.50 | |
| 12/09/2022 | 12/07/2022 | Sold | Margin | CRESCENT PT ENERGY CORP COM | CPG | 1,000.000 | $6.931 | | 6,930.61 |
| 12/09/2022 | 12/07/2022 | Sold | Margin | ATOUR LIFESTYLE HOLDINGS LTD ADS | ATAT | 300.000 | $14.930 | | 4,478.85 |
| 12/09/2022 | 12/07/2022 | Sold | Margin | VISTA OIL & GAS S A B DE C V SPONSORED ADS | VIST | 400.000 | $12.800 | | 5,119.83 |
| 12/09/2022 | 12/07/2022 | Sold | Margin | ALLEGRO MICROSYSTEMS INC DEL COM | ALGM | 50.000 | $31.760 | | 1,587.96 |
| 12/09/2022 | 12/07/2022 | Sold | Margin | META MATLS INC COM | MMAT | 1,000.000 | $2.130 | | 2,129.82 |
| 12/09/2022 | 12/07/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 114.000 | $8.091 | -922.40 | |
| 12/09/2022 | 12/07/2022 | Sold | Margin | ENERGY TRANSFER EQUITY L P COM UT LTD PTN | ET | 400.000 | $11.851 | | 4,740.29 |
| 12/09/2022 | 12/07/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 250.000 | $8.400 | -2,100.00 | |
| 12/09/2022 | 12/07/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 30.000 | $8.413 | -252.39 | |
| 12/12/2022 | 12/08/2022 | Bought | Margin | META MATLS INC PFD SER A DO NOT USE | 0001010 | 450.000 | $4.480 | -2,016.00 | |
| 12/13/2022 | 12/13/2022 | Journal | Margin | META MATLS INC CORPORATE ACTION | 0001010 | 450.000 | | | |
| 12/13/2022 | 12/13/2022 | Journal | Margin | META MATLS INC CORPORATE ACTION | 0001010 | 8,819.000 | | | |
| 12/13/2022 | 12/13/2022 | Journal | Margin | CONTRA PFD META MATLS CORPORATE ACTION | 59199& | 450.000 | | | |

**TradeStation**
Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 6  of  7

## Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 12/13/2022 | 12/13/2022 | Journal | Margin | CONTRA PFD META MATLS CORPORATE ACTION | 59199& | 8,819.000 | | | |
| 12/20/2022 | 12/20/2022 | Journal | Cash | CONTRA PFD META MATLS TRANSFER FROM 11583081 2 | 59199& | 450.000 | | | |
| 12/20/2022 | 12/20/2022 | Journal | Cash | CONTRA PFD META MATLS TRANSFER FROM 11583081 2 | 59199& | 8,819.000 | | | |
| 12/20/2022 | 12/20/2022 | Journal | Margin | CONTRA PFD META MATLS TRANSFER TO 11583081 1 | 59199& | 450.000 | | | |
| 12/20/2022 | 12/20/2022 | Journal | Margin | CONTRA PFD META MATLS TRANSFER TO 11583081 1 | 59199& | 8,819.000 | | | |
| **Total Investment Activity** | | | | | | | | **-$152,671.03** | **$93,210.98** |

## Deposits and Withdrawals

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 12/15/2022 | Funds Deposited | Margin | WIRE REC'D SOLERA NAT | | | 300.00 |
| **Total Deposits and Withdrawals** | | | | | **$0.00** | **$300.00** |

## Dividends and Interest

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 12/30/2022 | Debit Int | Cash | 12.50000%12/01-12/30    $820 | | -8.43 | |
| **Total Dividends and Interest** | | | | | **-$8.43** | **$0.00** |

## Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 12/23/2022 | Journal | Cash | | | | 376.90 |
| 12/23/2022 | Journal | Margin | | | -376.90 | |
| **Total Miscellaneous** | | | | | **-$376.90** | **$376.90** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
    full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



## Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | December 30 2022 |
| THROUGH | January 31 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | December 30 2022 |

\#     000093880          I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

### Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 0.00 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$0.00** |
| Cash Balance | 412.83 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$412.83** |
| **Net Equity** | **$412.83** |
| **Net Equity Last Statement** | **$368.47** |
| **Change Since Last Statement** | **$44.36** |

### Transaction Summary

| | |
|---|---|
| Opening Balance | 368.47 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 74.09 |
| **Amount Credited** | **$74.09** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -29.73 |
| **Amount Debited** | **-$29.73** |
| **Net Cash Activity** | **$44.36** |
| **Closing Balance** | **$412.83** |

### Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 368.47 | 412.83 |
| **Net Cash Balance** | **$368.47** | **$412.83** |
| **Net Cash & Cash Equivalent Balance** | **$368.47** | **$412.83** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | December 30 2022 | | |
|---|---|---|---|
| THROUGH | January 31 2023 | | |
| ACCOUNT NUMBER | **11583081** | | Page 2 of 4 |

**TradeStation**
Securities

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | Market Value |
|---|---|
| Cash Balance | 412.83 |
| **Total Cash and Cash Equivalents** | **$412.83** |

**Equities**

| | | | Account | | | Market |
|---|---|---|---|---|---|---|
| CONTRA PFD META MATLS | 59199& | | Cash | 9,269.000 | 0.000000 | 0.00 |
| **Total Equities and Options** | | | | | | **$0.00** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | | **$0.00** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| CONTRA PFD META MATLS | 59199& | 35.19 |
| **Total Accrued Interest** | | 35.19 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

STATEMENT PERIOD December 30 2022
THROUGH January 31 2023
ACCOUNT NUMBER **11583081**

**TradeStation**
Securities

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 4

# Transaction Detail

## Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|------|-------------|--------------|-------------|--------------|--------------|---------------|
| 01/04/2023 | Journal | Cash | FPL REVENUE | | | 14.63 |
| 01/04/2023 | Journal | Margin | FPL REVENUE | | | 29.73 |
| 01/25/2023 | Journal | Cash | | | | 29.73 |
| 01/25/2023 | Journal | Margin | | | -29.73 | |
| **Total Miscellaneous** | | | | | **-$29.73** | **$74.09** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**

**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| STATEMENT PERIOD | January 31 2023 |
|---|---|
| THROUGH | February 28 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | January 31 2023 |

\#    000091102              I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

|  | This Period |
|---|---|
| Long Market Value | 158.86 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$158.86** |
| Cash Balance | 147.72 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$147.72** |
| **Net Equity** | **$306.58** |
| **Net Equity Last Statement** | **$412.83** |
| **Change Since Last Statement** | **-$106.25** |

## Transaction Summary

|  |  |
|---|---|
| Opening Balance | 412.83 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 35.19 |
| **Amount Credited** | **$35.19** |
| Securities Bought | -300.30 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **-$300.30** |
| **Net Cash Activity** | **-$265.11** |
| **Closing Balance** | **$147.72** |

## Cash & Cash Equivalent Balance Summary

|  | Opening | Closing |
|---|---|---|
| Cash | 412.83 | 147.72 |
| **Net Cash Balance** | **$412.83** | **$147.72** |
| **Net Cash & Cash Equivalent Balance** | **$412.83** | **$147.72** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2   of   4

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 147.72 |
| **Total Cash and Cash Equivalents** | | | | **$147.72** |

**Equities**

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 110.000 | 1.359900 | 149.59 |
| CONTRA PFD META MATLS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$158.86** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$158.86** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| CONTRA PFD META MATLS | 59199& | 31.64 |
| **Total Accrued Interest** | | 31.64 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time.  Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

| STATEMENT PERIOD | January 31 2023 |
|---|---|
| THROUGH | February 28 2023 |
| ACCOUNT NUMBER | **11583081** |

## TradeStation®

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 4

## Transaction Detail

### Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 02/06/2023 | 02/02/2023 | Bought | Cash | GLOBAL TECH INDS GROUP INC COM | GTII | 110.000 | $2.730 | -300.30 | |
| **Total Investment Activity** | | | | | | | | **-$300.30** | **$0.00** |

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 02/02/2023 | Journal | Cash | FPL REVENUE | | | 35.19 |
| **Total Miscellaneous** | | | | | **$0.00** | **$35.19** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | February 28 2023 |
| THROUGH | March 31 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | February 28 2023 |

#    000118432          I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 210.57 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$210.57** |
| Cash Balance | 179.36 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$179.36** |
| **Net Equity** | **$389.93** |
| **Net Equity Last Statement** | **$306.58** |
| **Change Since Last Statement** | **$83.35** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 147.72 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 31.64 |
| **Amount Credited** | **$31.64** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **$0.00** |
| **Net Cash Activity** | **$31.64** |
| **Closing Balance** | **$179.36** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 147.72 | 179.36 |
| **Net Cash Balance** | **$147.72** | **$179.36** |
| **Net Cash & Cash Equivalent Balance** | **$147.72** | **$179.36** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



| STATEMENT PERIOD | February 28 2023 | | |
|---|---|---|---|
| THROUGH | March 31 2023 | | Page 2 of 4 |
| ACCOUNT NUMBER | **11583081** | | |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | | | | | Market Value |
|---|---|---|---|---|---|
| Cash Balance | | | | | 179.36 |
| **Total Cash and Cash Equivalents** | | | | | **$179.36** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 110.000 | 1.830000 | 201.30 |
| CONTRA PFD META MATLS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$210.57** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$210.57** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| CONTRA PFD META MATLS | 59199& | 35.03 |
| **Total Accrued Interest** | | 35.03 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

| STATEMENT PERIOD | February 28 2023 |
|---|---|
| THROUGH | March 31 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 4

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 03/02/2023 | Journal | Cash | FPL REVENUE | | | 31.64 |
| **Total Miscellaneous** | | | | | **$0.00** | **$31.64** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

(954) 652-7920 * (800) 871-3577
www.tradestation.com

| | |
|---|---|
| STATEMENT PERIOD | March 31 2023 |
| THROUGH | April 28 2023 |
| ACCOUNT NUMBER | 11583081 |
| LAST STATEMENT | March 31 2023 |

\#      000089236                    I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 183.07 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$183.07** |
| Cash Balance | 214.39 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$214.39** |
| **Net Equity** | **$397.46** |
| **Net Equity Last Statement** | **$389.93** |
| **Change Since Last Statement** | **$7.53** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 179.36 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 35.03 |
| **Amount Credited** | **$35.03** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **$0.00** |
| **Net Cash Activity** | **$35.03** |
| **Closing Balance** | **$214.39** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 179.36 | 214.39 |
| **Net Cash Balance** | **$179.36** | **$214.39** |
| **Net Cash & Cash Equivalent Balance** | **$179.36** | **$214.39** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | March 31 2023 |
|---|---|
| THROUGH | April 28 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 4

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 214.39 |
| **Total Cash and Cash Equivalents** | | | | **$214.39** |

**Equities**

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 110.000 | 1.580000 | 173.80 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$183.07** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$183.07** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 33.90 |
| **Total Accrued Interest** | | 33.90 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

STATEMENT PERIOD    March 31 2023
THROUGH    April 28 2023
ACCOUNT NUMBER    **11583081**



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 4

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|------|-------------|--------------|-------------|--------------|--------------|---------------|
| 04/04/2023 | Journal | Cash | FPL REVENUE | | | 35.03 |
| **Total Miscellaneous** | | | | | **$0.00** | **$35.03** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| STATEMENT PERIOD | April 28 2023 |
|---|---|
| THROUGH | May 31 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | April 28 2023 |

#      000089437           I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

### Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 118.17 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$118.17** |
| Cash Balance | 248.29 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$248.29** |
| **Net Equity** | **$366.46** |
| **Net Equity Last Statement** | **$397.46** |
| **Change Since Last Statement** | **-$31.00** |

### Transaction Summary

| | |
|---|---|
| Opening Balance | 214.39 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 33.90 |
| **Amount Credited** | **$33.90** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **$0.00** |
| **Net Cash Activity** | **$33.90** |
| **Closing Balance** | **$248.29** |

### Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 214.39 | 248.29 |
| **Net Cash Balance** | **$214.39** | **$248.29** |
| **Net Cash & Cash Equivalent Balance** | **$214.39** | **$248.29** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | April 28 2023 |
|---|---|
| THROUGH | May 31 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 4

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | | | | | Market Value |
|---|---|---|---|---|---|
| Cash Balance | | | | | 248.29 |
| **Total Cash and Cash Equivalents** | | | | | **$248.29** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 110.000 | 0.990000 | 108.90 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$118.17** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$118.17** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| NEXT BRIDGE HYDROCARBONS | 59199& | 25.43 |
| **Total Accrued Interest** | | 25.43 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| STATEMENT PERIOD | April 28 2023 |
| THROUGH | May 31 2023 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 4

# Transaction Detail

## Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 05/02/2023 | 05/02/2023 | Journal | Cash | CONTRA GLOBAL TECH IND SPINOFF | 379CN[ | 11.000 | | | |
| **Total Investment Activity** | | | | | | | | **$0.00** | **$0.00** |

## Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 05/02/2023 | Journal | Cash | FPL REVENUE | | | 33.90 |
| **Total Miscellaneous** | | | | | **$0.00** | **$33.90** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

 a) any free credit balances to which you are entitled
 b) any fully-paid securities to which you are entitled
 c) any securities purchased on margin upon
     full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | May 31 2023 |
| THROUGH | June 30 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | May 31 2023 |

\#      000116077              I=0000

   INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 99.47 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$99.47** |
| Cash Balance | 273.72 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$273.72** |
| **Net Equity** | **$373.19** |
| **Net Equity Last Statement** | **$366.46** |
| **Change Since Last Statement** | **$6.73** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 248.29 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 25.43 |
| **Amount Credited** | **$25.43** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **$0.00** |
| **Net Cash Activity** | **$25.43** |
| **Closing Balance** | **$273.72** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 248.29 | 273.72 |
| **Net Cash Balance** | **$248.29** | **$273.72** |
| **Net Cash & Cash Equivalent Balance** | **$248.29** | **$273.72** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



| STATEMENT PERIOD | May 31 2023 |
|---|---|
| THROUGH | June 30 2023 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 4

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 273.72 |
| **Total Cash and Cash Equivalents** | | | | **$273.72** |

**Equities**

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 110.000 | 0.820000 | 90.20 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$99.47** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$99.47** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 14.70 |
| **Total Accrued Interest** | | 14.70 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| | |
|---|---|
| STATEMENT PERIOD | May 31 2023 |
| THROUGH | June 30 2023 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  3  of  4

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 06/02/2023 | Journal | Cash | FPL REVENUE | | | 25.43 |
| **Total Miscellaneous** | | | | | **$0.00** | **$25.43** |

Please notify your account executive or representative, or the director of brokerage client service or chief compliance office, in writing of any material changes in your financial circumstances or investment objectives. Remember, you have represented that your objectives are to seek short-term trading profits by actively trading using highly speculative methods.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings**
The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**
Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits

**Methods of Computing Interest on Debit Balances:**
Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon
   full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody:** Whether we are your broker or act as a clearing agent for your broker, we carry your account and act as your custodian for funds and securities, once received by us, which have been deposited directly with us by you, through your broker or otherwise or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. If your account is introduced by another broker, all other inquiries regarding your account and the activity therein should be directed to such broker.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Please promptly notify the office servicing your account in writing of any change of address. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

**Each customer's securities account held at TradeStation Securities, Inc. is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by SIPC (Securities Investor Protection Corporation) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, Inc., up to an additional $24,500,000 per account, subject to a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**Please promptly report customer complaints or any inaccuracy in your account statement to TradeStation's Client Service Department at (800)871-3577 (in the USA) or (954)652-7920 (outside of the USA). Also, confirm any verbal communication in writing.**



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | June 30 2023 |
| THROUGH | July 31 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | June 30 2023 |

#    000088451          I=0000


INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 300.07 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$300.07** |
| Cash Balance | 89.34 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$89.34** |
| **Net Equity** | **$389.41** |
| **Net Equity Last Statement** | **$373.19** |
| **Change Since Last Statement** | **$16.22** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 273.72 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 14.70 |
| **Amount Credited** | **$14.70** |
| Securities Bought | -199.08 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | 0.00 |
| **Amount Debited** | **-$199.08** |
| **Net Cash Activity** | **-$184.38** |
| **Closing Balance** | **$89.34** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 273.72 | 89.34 |
| **Net Cash Balance** | **$273.72** | **$89.34** |
| **Net Cash & Cash Equivalent Balance** | **$273.72** | **$89.34** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 5

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 89.34 |
| **Total Cash and Cash Equivalents** | | | | **$89.34** |

**Equities**

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.868045 | 290.80 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$300.07** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$300.07** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| NEXT BRIDGE HYDROCARBONS | 59199& | 15.19 |
| **Total Accrued Interest** | | 15.19 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  3   of   5

## Transaction Detail

### Investment Activity

| Settlement Date | Trade Date | Trans-action | Acct Type | Description | Symbol/Cusip | Quantity | Price | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|---|---|---|
| 07/27/2023 | 07/25/2023 | Bought | Cash | GLOBAL TECH INDS GROUP INC COM | GTII | 225.000 | $0.885 | -199.08 | |
| **Total Investment Activity** | | | | | | | | **-$199.08** | **$0.00** |

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 07/05/2023 | Journal | Cash | FPL REVENUE | | | 14.70 |
| **Total Miscellaneous** | | | | | **$0.00** | **$14.70** |

Please notify your account executive or representative, a director of brokerage Client Services or the chief compliance officer, in writing, of any material changes in your financial circumstances or investment objectives. Remember, you have represented that you are a self-directed trader, and, and thus you are responsible for all trading decisions in your account. If your objectives include seeking short-term trading profits by actively trading using highly speculative methods, you may carry a higher degree of risk.

**GUIDE TO YOUR STATEMENT**

Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year. Your Portfolio Holdings: Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings:** The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods of Computing Interest on Debit Balances:** Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.
**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses

(including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**SECURITIES RISKS:** It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses if applicable. Prospectuses, if applicable, will be sent under a separate cover.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities:

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective.  As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session.

- Some ETPs may be asset backed, debt or callable securities. Please review additional risks below.

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption rights. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or SPACs may have unique characteristics and risks. If you would like additional information on a security that may be complex, please contact TradeStation Securities for information.

Please review TradeStation's "Investment and Trading Disclosures Booklet - Equities & Options" which can be found here: https://www.tradestation.com/important-information/ for information. Additional information is available and can be provided for any security upon request to TradeStation Securities.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody**

Retail Accounts: TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

Institutional Accounts: TradeStation Securities clears institutional account trades or provides order execution services on Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") basis. Trades in these accounts may be cleared and settled by another broker.  Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker servicing your account.

DVP/RVP Accounts: Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation's Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as any other broker servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.
**Statement Frequency:**  Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All

other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Each customer's securities account held at TradeStation Securities is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**



**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | August 31 2023 |
| THROUGH | September 29 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | August 31 2023 |

\#     000112505          I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 277.27 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$277.27** |
| Cash Balance | 109.72 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$109.72** |
| **Net Equity** | **$386.99** |
| **Net Equity Last Statement** | **$324.85** |
| **Change Since Last Statement** | **$62.14** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 104.53 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 15.19 |
| **Amount Credited** | **$15.19** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$5.19** |
| **Closing Balance** | **$109.72** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 104.53 | 109.72 |
| **Net Cash Balance** | **$104.53** | **$109.72** |
| **Net Cash & Cash Equivalent Balance** | **$104.53** | **$109.72** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



| STATEMENT PERIOD | August 31 2023 |
|---|---|
| THROUGH | September 29 2023 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 5

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | | | | | Market Value |
|---|---|---|---|---|---|
| Cash Balance | | | | | 109.72 |
| **Total Cash and Cash Equivalents** | | | | | **$109.72** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.800000 | 268.00 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$277.27** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$277.27** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.28 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 14.70 |
| **Total Accrued Interest** | | 14.98 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| STATEMENT PERIOD | August 31 2023 |
| THROUGH | September 29 2023 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  3  of  5

## Transaction Detail

**Miscellaneous Activity**

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|------|-------------|--------------|-------------|--------------|--------------|---------------|
| 09/05/2023 | Journal | Cash | FPL REVENUE | | | 15.19 |
| 09/11/2023 | Journal | Cash | Monthly Inactivity Fee Septemb | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$15.19** |

Please notify your account executive or representative, a director of brokerage Client Services or the chief compliance officer, in writing, of any material changes in your financial circumstances or investment objectives. Remember, you have represented that you are a self-directed trader, and and thus you are responsible for all trading decisions in your account. If your objectives include seeking short-term trading profits by actively trading using highly speculative methods, you may carry a higher degree of risk.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year. Your Portfolio Holdings: Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings:** The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods of Computing Interest on Debit Balances:** Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses

(including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**SECURITIES RISKS:** It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are effected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses if applicable. Prospectuses, if applicable, will be sent under a separate cover.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities:

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective. As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session.

- Some ETPs may be asset backed, debt or callable securities. Please review additional risks below.

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or SPACs may have unique characteristics and risks. If you would like additional information on a security that may be complex, please contact TradeStation Securities for information.

Please review TradeStation's "Investment and Trading Disclosures Booklet - Equities & Options" which can be found here: https://www.tradestation.com/important-information/ for information. Additional information is available and can be provided for any security upon request to TradeStation Securities.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody**

Retail Accounts: TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

Institutional Accounts: TradeStation Securities clears institutional account trades or provides order execution services on Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") basis. Trades in these accounts may be cleared and settled by another broker. Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker servicing your account.

DVP/RVP Accounts: Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation's Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as any other broker servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All

other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Each customer's securities account held at TradeStation Securities is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | September 29 2023 |
| THROUGH | October 31 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | September 29 2023 |

\#    000097169          I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 213.59 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$213.59** |
| Cash Balance | 114.70 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$114.70** |
| **Net Equity** | **$328.29** |
| **Net Equity Last Statement** | **$386.99** |
| **Change Since Last Statement** | **-$58.70** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 109.72 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 14.98 |
| **Amount Credited** | **$14.98** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$4.98** |
| **Closing Balance** | **$114.70** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 109.72 | 114.70 |
| **Net Cash Balance** | **$109.72** | **$114.70** |
| **Net Cash & Cash Equivalent Balance** | **$109.72** | **$114.70** |

Same day transfers of cash between account types are not
included in this section; such transfers, as well as details for all
transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on
this statement will be reported as the Fair Market Value to the
Internal Revenue Service in the format required by IRS rules,
and at the appropriate reporting time.



| STATEMENT PERIOD | September 29 2023 |
| THROUGH | October 31 2023 |
| ACCOUNT NUMBER | **11583081** |

Page 2 of 5

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

## Your Portfolio Holdings

**Cash and Cash Equivalents**

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 114.70 |
| **Total Cash and Cash Equivalents** | | | | **$114.70** |

**Equities**

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.609900 | 204.32 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$213.59** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$213.59** |

**Fully Paid Lending Position Detail**

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.34 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 15.19 |
| **Total Accrued Interest** | | 15.53 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

| STATEMENT PERIOD | September 29 2023 |
|---|---|
| THROUGH | October 31 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 3 of 5

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 10/03/2023 | Journal | Cash | FPL REVENUE | | | 14.98 |
| 10/10/2023 | Journal | Cash | Monthly Inactivity Fee October | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$14.98** |

Please notify your account executive or representative, a director of brokerage Client Services or the chief compliance officer, in writing, of any material changes in your financial circumstances or investment objectives. Remember, you have represented that you are a self-directed trader, and and thus you are responsible for all trading decisions in your account. If your objectives include seeking short-term trading profits by actively trading using highly speculative methods, you may carry a higher degree of risk.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:**   Reflects the contributions received and distributions paid during this statement period as well as for the previous year. Your Portfolio Holdings: Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings:** The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods of Computing Interest on Debit Balances:** Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:**   Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.
**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses

(including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**SECURITIES RISKS:** It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses if applicable.  Prospectuses, if applicable, will be sent under a separate cover.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs).  Here are some of the risks of these securities:

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective. As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session.
- Some ETPs may be asset backed, debt or callable securities. Please review additional risks below.

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption rules. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or SPACs may have unique characteristics and risks. If you would like additional information on a security that may be complex, please contact TradeStation Securities for information.

Please review TradeStation's "Investment and Trading Disclosures Booklet - Equities & Options" which can be found here: https://www.tradestation.com/important-information/ for information. Additional information is available and can be provided for any security upon request to TradeStation Securities.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody**

Retail Accounts: TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

Institutional Accounts: TradeStation Securities clears institutional account trades or provides order execution services on Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") basis. Trades in these accounts may be cleared and settled by another broker. Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker servicing your account.

DVP/RVP Accounts: Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation's Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as any other broker servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.
**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All

other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Each customer's securities account held at TradeStation Securities is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**

**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | October 31 2023 |
| THROUGH | November 30 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | October 31 2023 |

\#      000094998               I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 180.96 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$180.96** |
| Cash Balance | 120.23 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$120.23** |
| **Net Equity** | **$301.19** |
| **Net Equity Last Statement** | **$328.29** |
| **Change Since Last Statement** | **-$27.10** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 114.70 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 15.53 |
| **Amount Credited** | **$15.53** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$5.53** |
| **Closing Balance** | **$120.23** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 114.70 | 120.23 |
| **Net Cash Balance** | **$114.70** | **$120.23** |
| **Net Cash & Cash Equivalent Balance** | **$114.70** | **$120.23** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | October 31 2023 |
|---|---|
| THROUGH | November 30 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 5

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | Market Value |
|---|---|
| Cash Balance | 120.23 |
| **Total Cash and Cash Equivalents** | **$120.23** |

### Equities

| Description | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.512500 | 171.69 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$180.96** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$180.96** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.60 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 14.70 |
| **Total Accrued Interest** | | 15.30 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time.  Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page  3  of  5

## Transaction Detail

**Miscellaneous Activity**

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|------|-------------|--------------|-------------|--------------|-------------|---------------|
| 11/02/2023 | Journal | Cash | FPL REVENUE | | | 15.53 |
| 11/10/2023 | Journal | Cash | Monthly Inactivity Fee Novembe | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$15.53** |

Please notify your account executive or representative, a director of brokerage Client Services or the chief compliance officer, in writing, of any material changes in your financial circumstances or investment objectives. Remember, you have represented that you are a self-directed trader, and and thus you are responsible for all trading decisions in your account. If your objectives include seeking short-term trading profits by actively trading using highly speculative methods, you may carry a higher degree of risk.

**GUIDE TO YOUR STATEMENT**

Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year. Your Portfolio Holdings: Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings:** The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods of Computing Interest on Debit Balances:** Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.
**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses

(including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**SECURITIES RISKS:** It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are effected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses if applicable. Prospectuses, if applicable, will be sent under a separate cover.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities:

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective.  As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session.

- Some ETPs may be asset backed, debt or callable securities. Please review additional risks below.

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or SPACs may have unique characteristics and risks. If you would like additional information on a security that may be complex, please contact TradeStation Securities for information.

Please review TradeStation's "Investment and Trading Disclosures Booklet - Equities & Options" which can be found here: https://www.tradestation.com/important-information/ for information. Additional information is available and can be provided for any security upon request to TradeStation Securities.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody**

Retail Accounts: TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

Institutional Accounts: TradeStation Securities clears institutional account trades or provides order execution services on Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") basis. Trades in these accounts may be cleared and settled by another broker.  Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker servicing your account.

DVP/RVP Accounts: Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation's Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as any other broker servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Each customer's securities account held at TradeStation Securities is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**



**TradeStation**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

(954) 652-7920 * (800) 871-3577
**www.tradestation.com**

| STATEMENT PERIOD | November 30 2023 |
|---|---|
| THROUGH | December 29 2023 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | November 30 2023 |

\#    000103586              I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 143.24 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$143.24** |
| Cash Balance | 125.53 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$125.53** |
| **Net Equity** | **$268.77** |
| **Net Equity Last Statement** | **$301.19** |
| **Change Since Last Statement** | **-$32.42** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 120.23 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 15.30 |
| **Amount Credited** | **$15.30** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$5.30** |
| **Closing Balance** | **$125.53** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 120.23 | 125.53 |
| **Net Cash Balance** | **$120.23** | **$125.53** |
| **Net Cash & Cash Equivalent Balance** | **$120.23** | **$125.53** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.

| STATEMENT PERIOD | November 30 2023 |
|---|---|
| THROUGH | December 29 2023 |
| ACCOUNT NUMBER | **11583081** |



8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 5

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | Market Value |
|---|---|
| Cash Balance | 125.53 |
| **Total Cash and Cash Equivalents** | **$125.53** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.399900 | 133.97 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$143.24** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$143.24** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.36 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 15.19 |
| **Total Accrued Interest** | | 15.55 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| STATEMENT PERIOD | November 30 2023 |
|---|---|
| THROUGH | December 29 2023 |
| ACCOUNT NUMBER | **11583081** |

Page 3 of 5

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 12/04/2023 | Journal | Cash | FPL REVENUE | | | 15.30 |
| 12/15/2023 | Journal | Cash | Monthly Inactivity Fee Decembe | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$15.30** |

Please notify your account executive or representative, a director of brokerage Client Services or the chief compliance officer, in writing, of any material changes in your financial circumstances or investment objectives. Remember, you have represented that you are a self-directed trader, and, and thus you are responsible for all trading decisions in your account. If your objectives include seeking short-term trading profits by actively trading using highly speculative methods, you may carry a higher degree of risk.

**GUIDE TO YOUR STATEMENT**
Your statement may contain the following sections:

**Your Portfolio at a Glance:** Reflects the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year. Your Portfolio Holdings: Reflects cash and all securities in your account. Accrued interest represents interest earned but not yet paid or collected on the fixed income securities since the last coupon date. There is no guarantee that this interest will be paid by the issuer. Current yield is calculated by dividing the estimated annual income by the market value of the securities and represents an estimated current yield only.

**Market Prices/Bond Ratings:** The market value of your holdings are as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. Bond ratings are received from outside sources. While we believe our sources for market values and bond ratings to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account this statement period.

Trades Executed But Not Yet Settled: This section will reflect any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods of Computing Interest on Debit Balances:** Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in this firm's business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled
b) any fully-paid securities to which you are entitled
c) any securities purchased on margin upon full payment of any indebtedness to us

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.
**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, losses, costs and expenses

(including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**Bearer Bonds:** If any securities held by us for your account are bearer obligations which have been issued since December 31, 1982 with original maturities of more than one year, we agree that we will satisfy the conditions set forth in subdivisions (i), (ii) and (iii) of Treasury Regulation Section 1.165-12 (c) (3) and covenant that we will comply with the requirements of Treasury Regulation Section 1.165-12 (c) (1) (iii) concerning the delivery of such bearer obligations.

**SECURITIES RISKS:** It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses if applicable. Prospectuses, if applicable, will be sent under a separate cover.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities:

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective.  As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session.

- Some ETPs may be asset backed, debt or callable securities. Please review additional risks below.

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or SPACs may have unique characteristics and risks. If you would like additional information on a security that may be complex, please contact TradeStation Securities for information.

Please review TradeStation's "Investment and Trading Disclosures Booklet - Equities & Options" which can be found here: https://www.tradestation.com/important-information/ for information. Additional information is available and can be provided for any security upon request to TradeStation Securities.

**Financial Statement:** A financial statement of our firm is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

**Custody**

Retail Accounts: TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

Institutional Accounts: TradeStation Securities clears institutional account trades or provides order execution services on Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") basis. Trades in these accounts may be cleared and settled by another broker.  Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker servicing your account.

DVP/RVP Accounts: Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation's Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as any other broker servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Reportable to the Internal Revenue Service:** As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account.

**Statement Frequency:**  Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**Each customer's securities account held at TradeStation Securities is insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.**



**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

| | |
|---|---|
| STATEMENT PERIOD | December 29 2023 |
| THROUGH | January 31 2024 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | December 29 2023 |

#      000093777            I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 99.05 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$99.05** |
| Cash Balance | 131.08 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$131.08** |
| **Net Equity** | **$230.13** |
| **Net Equity Last Statement** | **$268.77** |
| **Change Since Last Statement** | **-$38.64** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 125.53 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 15.55 |
| **Amount Credited** | **$15.55** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$5.55** |
| **Closing Balance** | **$131.08** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 125.53 | 131.08 |
| **Net Cash Balance** | **$125.53** | **$131.08** |
| **Net Cash & Cash Equivalent Balance** | **$125.53** | **$131.08** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



| STATEMENT PERIOD | December 29 2023 | |
|---|---|---|
| THROUGH | January 31 2024 | |
| ACCOUNT NUMBER | **11583081** | |

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

Page 2 of 4

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | Market Value |
|---|---|
| Cash Balance | 131.08 |
| **Total Cash and Cash Equivalents** | **$131.08** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.268000 | 89.78 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$99.05** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$99.05** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.31 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 15.19 |
| **Total Accrued Interest** | | 15.50 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.

**General Information:** This Account statement is furnished solely by TradeStation Securities, Inc. ("TradeStation Securities") for your account at TradeStation Securities. Unless otherwise defined herein, capitalized terms have the same meaning as in your Account Agreement. If you receive communications from any source other than TradeStation which purport to represent your holdings at TradeStation (including balances held at other institutions) you should verify its content with this statement.

Please contact TradeStation Securities, in writing, of any material changes in your financial circumstances or investment objectives. You have represented that you are a self-directed trader, and thus, you are responsible for all trading decisions in your account. If your investment objectives include seeking short-term trading profits by actively trading highly speculative methods, your account may carry a higher degree of risk.

**Address and contact changes:** If you fail to notify TradeStation Securities, in writing, of any changes of address, email or phone number, you may not receive important information about your account, resulting in TradeStation Securities taking action, such as trading restrictions or liquidations, as disclosed in the account agreement.

**GUIDE TO YOUR STATEMENT**

Your statement may contain the following sections:

**Your Portfolio at a Glance: Reflects** the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities for your account during this statement period.

**Market Prices:** The market value of your holdings is calculated as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread

relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. While we believe our sources for market values to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account during this statement period.

**Trades Executed But Not Yet Settled:** Reflects any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods** of Computing Interest on Debit Balances: Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in TradeStation Securities' business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled;

b) any fully-paid securities to which you are entitled; or

c) any securities purchased on margin upon full payment of any indebtedness to us.

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to

your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or in their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**SECURITIES RISKS**

It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses, if applicable. Prospectuses, if applicable, will be provided under a separate cover at the time of the initial transaction. Please carefully read the prospectus or summary prospectus, including investment objectives, risks, charges, and expenses.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect

- Spot Bitcoin ETFs carry many of the same underlying risks as owning Bitcoin outright, including, but not limited to, government regulation, economic conditions, manipulation, fraud, and cyberattacks.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective. As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or special purpose acquisition companies (SPACs) may have unique characteristics and risks.

More information is provided in TradeStation Securities' "Investment and Trading Disclosures Booklet – Equities & Options" which can be found here: https://www.tradestation.com/important-information/

Financial Statement: TradeStation Securities' financial statement is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

Reportable to the Internal Revenue Service: As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account. **TradeStation does not provide tax advice and encourages you to consult with your tax professional.**

**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**CUSTODY**

**Retail Accounts (Non-Retirement):** TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

**Retail Accounts (Retirement):** You are required to open and maintain an account with a qualified Trustee or Custodian approved by the Internal Revenue Code (IRS) under Treasury Regulation Section 1.408-2(e). TradeStation Securities does not offer custody services or act as the custodian for retirement accounts. TradeStation Securities carries your retirement accounts for the IRS-approved custodian for your benefit. Your Custodian is responsible for the tax reporting, controls and specific requirements for these accounts needed to qualify for the tax treatment allowed under the Internal Revenue Code. Inquiries concerning your account or requests for the IRS approval letter should be directed to the Custodian of your choice. The following Custodians offer retirement accounts through TradeStation Securities.

| STRATA Trust Company 7901 Woodway Dr. Waco, TX 76712 https://stratatrust.com/ Service@StrataTrust.com (866) 901-2089 | Equity Trust Company 1 Equity Way Westlake, OH 44145 https://www.trustetc.com/professionals/ IRAServices@EquityInstitutional.com (800) 955-3434 |
|---|---|
| Global Net Provident Fund Management Ltd. Jabotinsky 9 Bnei Brak, Israel, 5126417 https://globalnetgemel.co.il/ sherut@gngemel.co.il (P) 03-5707666 | Midland Trust PO Box 07520 Fort Myers, FL 33919 https://midlandtrust.com/ futures@midlandtrust.com (239) 333-4464 |
| Directed Trust Company 3033 N. Central Ave., Suite 400 Phoenix, AZ 85012 https://directedira.com/ info@directedira.com (602) 899-9396 | Inspira Financial 2001 Spring Road Suite 700 Oak Brook, IL 60523 https://www.mtrustcompany.com/ futuresemail@inspirafinancial.com (800) 258-7878 |

**Institutional Accounts:** TradeStation Securities offers services to institutional accounts including Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") for clearing and order execution services. Trades in these accounts may be cleared and settled by another broker. Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker(s) servicing your account. The broker(s) servicing your account can be found on page 1. Not all institutional accounts qualify for protection as customer accounts as identified in 17 CFR. Section 240.15c3-3 under the Securities Exchange Act of 1934. Accounts not eligible are identified in the account opening documentation.

**DVP/RVP Accounts:** Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation Securities' Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as to any other account executive or representative servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Eligible customer accounts under 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934 held at TradeStation Securities are insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.** Each account agreement identifies the account type and eligibility of that account for insurance. **Balances held in brokerage accounts are not deposits or other obligations of, or guaranteed by, any other institution, are subject to investment risk and may lose value. SIPC does not cover balances or assets held away from TradeStation Securities.**

# TradeStation®

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | January 31 2024 |
| THROUGH | February 29 2024 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | January 31 2024 |

\#      000096673            I=0000



INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 99.06 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$99.06** |
| Cash Balance | 136.58 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$136.58** |
| **Net Equity** | **$235.64** |
| **Net Equity Last Statement** | **$230.13** |
| **Change Since Last Statement** | **$5.51** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 131.08 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 15.50 |
| **Amount Credited** | **$15.50** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$5.50** |
| **Closing Balance** | **$136.58** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 131.08 | 136.58 |
| **Net Cash Balance** | **$131.08** | **$136.58** |
| **Net Cash & Cash Equivalent Balance** | **$131.08** | **$136.58** |

Same day transfers of cash between account types are not
included in this section; such transfers, as well as details for all
transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on
this statement will be reported as the Fair Market Value to the
Internal Revenue Service in the format required by IRS rules,
and at the appropriate reporting time.



| STATEMENT PERIOD | January 31 2024 |
| THROUGH | February 29 2024 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

Page 2  of  5

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | | | | | Market Value |
|---|---|---|---|---|---|
| Cash Balance | | | | | 136.58 |
| **Total Cash and Cash Equivalents** | | | | | **$136.58** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.268020 | 89.79 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$99.06** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$99.06** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.29 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 14.21 |
| **Total Accrued Interest** | | 14.50 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time. Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| STATEMENT PERIOD | January 31 2024 | |
|---|---|---|
| THROUGH | February 29 2024 | |
| ACCOUNT NUMBER | **11583081** | Page 3 of 5 |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Transaction Detail

### Miscellaneous Activity

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|---|---|---|---|---|---|---|
| 02/02/2024 | Journal | Cash | FPL REVENUE | | | 15.50 |
| 02/14/2024 | Journal | Cash | Monthly Inactivity Fee Februar | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$15.50** |

**General Information:** This Account statement is furnished solely by TradeStation Securities, Inc. ("TradeStation Securities") for your account at TradeStation Securities. Unless otherwise defined herein, capitalized terms have the same meaning as in your Account Agreement. If you receive communications from any source other than TradeStation which purport to represent your holdings at TradeStation (including balances held at other institutions) you should verify its content with this statement.

Please contact TradeStation Securities, in writing, of any material changes in your financial circumstances or investment objectives. You have represented that you are a self-directed trader, and thus, you are responsible for all trading decisions in your account. If your investment objectives include seeking short-term trading profits by actively trading highly speculative methods, your account may carry a higher degree of risk.

**Address and contact changes:** If you fail to notify TradeStation Securities, in writing, of any changes of address, email or phone number, you may not receive important information about your account, resulting in TradeStation Securities taking action, such as trading restrictions or liquidations, as disclosed in the account agreement.

**GUIDE TO YOUR STATEMENT**

Your statement may contain the following sections:

**Your Portfolio at a Glance: Reflects** the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities for your account during this statement period.

**Market Prices:** The market value of your holdings is calculated as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread

relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. While we believe our sources for market values to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account during this statement period.

**Trades Executed But Not Yet Settled:** Reflects any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult your tax advisor with regard to your tax liability on these dividend credits.

**Methods** of Computing Interest on Debit Balances: Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in TradeStation Securities' business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled;

b) any fully-paid securities to which you are entitled; or

c) any securities purchased on margin upon full payment of any indebtedness to us.

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to

your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**SECURITIES RISKS**

It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses, if applicable. Prospectuses, if applicable, will be provided under a separate cover at the time of the initial transaction. Please carefully read the prospectus or summary prospectus, including investment objectives, risks, charges, and expenses.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect

- Spot Bitcoin ETFs carry many of the same underlying risks as owning Bitcoin outright, including, but not limited to, government regulation, economic conditions, manipulation, fraud, and cyberattacks.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective. As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or special purpose acquisition companies (SPACs) may have unique characteristics and risks.

More information is provided in TradeStation Securities' "Investment and Trading Disclosures Booklet – Equities & Options" which can be found here: https://www.tradestation.com/important-information/

Financial Statement: TradeStation Securities' financial statement is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

Reportable to the Internal Revenue Service: As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account. **TradeStation does not provide tax advice and encourages you to consult with your tax professional.**

**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

## CUSTODY

**Retail Accounts (Non-Retirement):** TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

**Retail Accounts (Retirement):** You are required to open and maintain an account with a qualified Trustee or Custodian approved by the Internal Revenue Code (IRS) under Treasury Regulation Section 1.408-2(e). TradeStation Securities does not offer custody services or act as the custodian for retirement accounts. TradeStation Securities carries your retirement accounts for the IRS-approved custodian for your benefit. Your Custodian is responsible for the tax reporting, controls and specific requirements for these accounts needed to qualify for the tax treatment allowed under the Internal Revenue Code. Inquiries concerning your account or requests for the IRS approval letter should be directed to the Custodian of your choice. The following Custodians offer retirement accounts through TradeStation Securities:

| STRATA Trust Company | Equity Trust Company |
|---|---|
| 7901 Woodway Dr. | 1 Equity Way |
| Waco, TX 76712 | Westlake, OH 44145 |
| https://www.stratatrust.com/ | https://www.trustetc.com/professionals/ |
| Service@StrataTrust.com | IRAServices@EquityInstitutional.com |
| (866) 901-2089 | (800) 955-3434 |
| **Global Net Provident Fund Management Ltd.** | **Midland Trust** |
| Jabotinsky 9 | PO Box 07520 |
| Bnei Brak, Israel, 5126417 | Fort Myers, FL 33919 |
| https://globalnetgemel.co.il/ | https://midlandtrust.com/ |
| sherut@gngemel.co.il | futures@midlandtrust.com |
| (P) 03-5707686 | (239) 333-4464 |
| **Directed Trust Company** | **Inspira Financial** |
| 3033 N. Central Ave., Suite 400 | 2001 Spring Road Suite 700 |
| Phoenix, AZ 85012 | Oak Brook, IL 60523 |
| https://directedira.com/ | https://www.mtrustcompany.com/ |
| info@directedira.com | futuresemail@inspirafinancial.com |
| (602) 899-9396 | (800) 258-7878 |

**Institutional Accounts:** TradeStation Securities offers services to institutional accounts including Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") for clearing and order execution services. Trades in these accounts may be cleared and settled by another broker. Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker(s) servicing your account. The broker(s) servicing your account can be found on page 1. Not all institutional accounts qualify for protection as customer accounts as identified in 17 CFR. Section 240.15c3-3 under the Securities Exchange Act of 1934. Accounts not eligible are identified in the account opening documentation.

**DVP/RVP Accounts:** Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation Securities' Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as to any other account executive or representative servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Eligible customer accounts under 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934 held at TradeStation Securities are insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.** Each account agreement identifies the account type and eligibility of that account for insurance. **Balances held in brokerage accounts are not deposits or other obligations of, or guaranteed by, any other institution, are subject to investment risk and may lose value. SIPC does not cover balances or assets held away from TradeStation Securities.**



**TradeStation®**

8050 SW 10th Street, Suite 2000
Plantation, FL 33324

**(954) 652-7920 * (800) 871-3577**
**www.tradestation.com**

| | |
|---|---|
| STATEMENT PERIOD | February 29 2024 |
| THROUGH | March 28 2024 |
| ACCOUNT NUMBER | **11583081** |
| LAST STATEMENT | February 29 2024 |

\#     000102641          I=0000

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIR
SAVANNAH GA 31411-3112

## Your Portfolio at a Glance

| | This Period |
|---|---|
| Long Market Value | 100.39 |
| Short Market Value | 0.00 |
| **Total Value of Securities** | **$100.39** |
| Cash Balance | 141.08 |
| Short Cash Balance | 0.00 |
| **Net Cash Balance** | **$141.08** |
| **Net Equity** | **$241.47** |
| **Net Equity Last Statement** | **$235.64** |
| **Change Since Last Statement** | **$5.83** |

## Transaction Summary

| | |
|---|---|
| Opening Balance | 136.58 |
| Securities Sold | 0.00 |
| Funds Deposited | 0.00 |
| Money Fund Purchase | 0.00 |
| Dividends/Interest | 0.00 |
| Miscellaneous | 14.50 |
| **Amount Credited** | **$14.50** |
| Securities Bought | 0.00 |
| Funds Withdrawn | 0.00 |
| Money Fund Redemption | 0.00 |
| Dividends/Interest Charged | 0.00 |
| Miscellaneous | -10.00 |
| **Amount Debited** | **-$10.00** |
| **Net Cash Activity** | **$4.50** |
| **Closing Balance** | **$141.08** |

## Cash & Cash Equivalent Balance Summary

| | Opening | Closing |
|---|---|---|
| Cash | 136.58 | 141.08 |
| **Net Cash Balance** | **$136.58** | **$141.08** |
| **Net Cash & Cash Equivalent Balance** | **$136.58** | **$141.08** |

Same day transfers of cash between account types are not included in this section; such transfers, as well as details for all transactions this period appear in the Transaction Detail.

The period ending market value of any investments shown on this statement will be reported as the Fair Market Value to the Internal Revenue Service in the format required by IRS rules, and at the appropriate reporting time.



| STATEMENT PERIOD | February 29 2024 |
| THROUGH | March 28 2024 |
| ACCOUNT NUMBER | **11583081** |

Page 2 of 5

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Your Portfolio Holdings

### Cash and Cash Equivalents

| Description | | | | Market Value |
|---|---|---|---|---|
| Cash Balance | | | | 141.08 |
| **Total Cash and Cash Equivalents** | | | | **$141.08** |

### Equities

| | | Account | | | Market |
|---|---|---|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | Cash | 335.000 | 0.272000 | 91.12 |
| CONTRA GLOBAL TECH IND | 379CN[ | Cash | 11.000 | 0.000000 | 0.00 |
| NEXT BRIDGE HYDROCARBONS | 59199& | Cash | 9,269.000 | 0.001000 | 9.27 |
| **Total Equities and Options** | | | | | **$100.39** |
| **TOTAL MARKET VALUE OF PRICED SECURITIES** | | | | | **$100.39** |

### Fully Paid Lending Position Detail

| Description | Symbol/Cusip | Accrued Interest |
|---|---|---|
| GLOBAL TECH INDS GROUP INC | GTII | 0.20 |
| NEXT BRIDGE HYDROCARBONS | 59199& | 9.80 |
| **Total Accrued Interest** | | 10.00 |

As a participant in TradeStation's Fully Paid Lending Program (the "Program"), the activity reflected above shows the Accrued Interest earned this month for your Fully Paid Lending positions as of the date of this statement. You may sell shares being loaned at any time.  Accrued Interest reflects interest that is accrued daily and posted to your account monthly. Any and all activity referenced in this section of the statement is conducted pursuant to the Master Securities Lending Agreement and Risk Disclosures to which you agreed and acknowledged at the time you entered the Program.



| STATEMENT PERIOD | February 29 2024 |
| THROUGH | March 28 2024 |
| ACCOUNT NUMBER | **11583081** |

8050 SW10th Street, Suite 2000
Plantation, FL 33324

## Transaction Detail

**Miscellaneous Activity**

| Date | Transaction | Account Type | Description | Symbol/Cusip | Debit Amount | Credit Amount |
|------|-------------|--------------|-------------|--------------|--------------|---------------|
| 03/04/2024 | Journal | Cash | FPL REVENUE | | | 14.50 |
| 03/12/2024 | Journal | Cash | Monthly Inactivity Fee March 2 | | -10.00 | |
| **Total Miscellaneous** | | | | | **-$10.00** | **$14.50** |

**General Information:** This Account statement is furnished solely by TradeStation Securities, Inc. ("TradeStation Securities") for your account at TradeStation Securities. Unless otherwise defined herein, capitalized terms have the same meaning as in your Account Agreement. If you receive communications from any source other than TradeStation which purport to represent your holdings at TradeStation (including balances held at other institutions) you should verify its content with this statement.

Please contact TradeStation Securities, in writing, of any material changes in your financial circumstances or investment objectives. You have represented that you are a self-directed trader, and thus, you are responsible for all trading decisions in your account. If your investment objectives include seeking short-term trading profits by actively trading highly speculative methods, your account may carry a higher degree of risk.

**Address and contact changes:** If you fail to notify TradeStation Securities, in writing, of any changes of address, email or phone number, you may not receive important information about your account, resulting in TradeStation Securities taking action, such as trading restrictions or liquidations, as disclosed in the account agreement.

**GUIDE TO YOUR STATEMENT**

Your statement may contain the following sections:

**Your Portfolio at a Glance: Reflects** the net equity of your account at the close of the statement period, the net equity of your last statement and any change since the last statement. Figures shown for Long and Short Market Value of Securities contain netted values. A more comprehensive breakout of market values is reflected within the body of the statement.

**Transaction Summary and Cash Balance Summary:** Both show your opening and closing balances. Transaction Summary reflects the categories of cash activity. Cash and Cash Equivalent Balance Summary reflects the cash balances by account type. Opening Balance is the credit or debit carried over from the previous period's closing balance. Closing balance is the combination of the total debits and credits for the statement period together with the opening cash balance. A debit balance (money you owe us) is indicated by a minus sign in these sections.

**Retirement Account Summary:** Reflects the contributions received and distributions paid during this statement period as well as for the previous year.

**Your Portfolio Holdings:** Reflects cash and all securities for your account during this statement period.

**Market Prices:** The market value of your holdings is calculated as of the last business day of the statement period. Prices for determining market values represent estimates. These estimates are obtained from multiple sources, including outside services. Pricing estimates may be based on bids, prices within the bid/offer spread, closing prices or matrix methodology that uses data relating to other securities whose prices are more ascertainable to produce a hypothetical price based on the estimated yield spread

relationship between the securities. Pricing estimates do not constitute bids for any securities. Actual prices realized at sale may be more or less than those shown on your statement. While we believe our sources for market values to be reliable, we cannot guarantee their accuracy.

**Transaction Detail:** Reflects all transactions settling or processed for your account during this statement period.

**Trades Executed But Not Yet Settled:** Reflects any trades not yet settled by the statement closing date. The settlement date is indicated in the first column.

**IMPORTANT NOTES**

Dividend Income: Dividends credited to your account may include capital gains, non-taxable dividends and/or dividends on foreign stock. You may wish to consult our tax advisor with regard to your tax liability on these dividend credits.

**Methods** of Computing Interest on Debit Balances: Interest is charged on a day-by-day basis for any day that there is a net debit balance in your overall account. The calculation is made on a 365-day basis at the rate or rates shown on the statement. Interest rates may be changed from time to time with fluctuating money market rates or for other reasons.

Customer free credit balances may be used in TradeStation Securities' business subject to the limitation of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You have the right to receive from us in the course of normal business operation, upon demand, the delivery of:

a) any free credit balances to which you are entitled;

b) any fully-paid securities to which you are entitled; or

c) any securities purchased on margin upon full payment of any indebtedness to us.

If this is a margin account and we maintain a special memorandum account for you, this is a combined statement of your general account and special memorandum account maintained for you under Section 220.6 of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of this separate account, as required by Regulation T, is available for your inspection.

**For Option Accounts:** Further information with respect to commissions and other charges related to the execution of listed options transactions has been included on confirmations of such transactions previously furnished to you and such information will be made available to you promptly upon written request.

**Use of Investment Advisors:** If you have an agreement with an investment or trading advisor or manager (an "investment advisor") whom you have engaged to invest and trade your funds and assets on your behalf, and whom you have authorized to trade your account with TradeStation Securities, you represent, warrant, acknowledge and agree that: (a) as between you and TradeStation Securities, solely you are fully responsible for all acts, omissions and decisions made by your investment advisor with respect to

your account, and you shall fully indemnify and hold harmless TradeStation Securities, and its affiliates, employees and agents, from and against any and all claims, damages, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs) that arise from, or relate to, any of such acts, omissions or decisions, including, but not limited to, claims, damages, liabilities, losses, costs or expenses assertible or suffered by you or your trading account, and claims which others may assert by or through you or on your behalf, or on their own behalves; and (b) your investment advisor has given us instructions, which may be changed by your investment advisor from time to time, concerning amounts that are to be withdrawn from your account(s) and paid to your investment advisor (or your investment advisor's account with us) as and for your investment advisor's fees, charges or costs payable by you pursuant to your agreement with your investment advisor, and TradeStation Securities is authorized by you to rely fully and completely upon your investment advisor's instructions with no obligation or responsibility to verify the authenticity, validity or accuracy of such instructions either with you or any other person or entity, or any document or other material or potential source of such information.

**SECURITIES RISKS**

It is agreed between you and TradeStation Securities, that you understand the risks that may apply to the securities in which transactions are affected. Each security may have its own special risks. Complex securities may not be appropriate for most investors. With respect to effecting transactions in any of the following types of securities, please carefully review the information below, and review prospectuses, if applicable. Prospectuses, if applicable, will be provided under a separate cover at the time of the initial transaction. Please carefully read the prospectus or summary prospectus, including investment objectives, risks, charges, and expenses.

ETPs: Exchange-traded products (ETPs) are types of securities that track underlying security, index, or financial instruments. ETP's include exchange-traded funds (ETFs) and exchange-traded notes (ETNs). Here are some of the risks of these securities

- ETPs are subject to market volatility and the risks of their underlying investments and/or strategies.

- ETPs are subject to management fees and other expenses that reduce performance.

- Complex ETPs, including commodity ETPs and ETNs, that offer leveraged or inverse exposure, may not behave the way most investors expect

- Spot Bitcoin ETFs carry many of the same underlying risks as owning Bitcoin outright, including, but not limited to, government regulation, economic conditions, manipulation, fraud, and cyberattacks.

- ETPs have specific investment strategies, management fees and expenses, which are detailed in an ETP's prospectus or other offering material.

- Leveraged and inverse ETPs are intended to be held no longer than one trading session. Due to the effects of compounding and the fact that they are reset daily, their performance over longer periods of time can differ significantly from their stated daily objective. As such, these may be unsuitable for retail investors who plan to hold them for longer than one trading session

Asset Backed Securities: Debt securities that are considered asset-backed securities represent an interest in or are secured by a pool of receivables or other financial assets that are continuously subject to prepayment. The actual yield of such asset-backed security may vary according to the rate at which the underlying receivables or other financial assets are prepaid. Information concerning the factors that affect yield (including at a minimum estimated yield, weighted average life, and the prepayment assumptions underlying yield) will be furnished upon written request.

Debt and Callable Securities: Any security, such as a bond, municipal bond, debenture, note, certain ETNs, or any other similar instrument which evidences a liability of the issuer (including any such security that is convertible into stock or a similar security) and fractional or participation interests in one or more of any of the foregoing. Transactions in these securities may be subject to call or redemption risks. Securities issued with an embedded call provision allow the issuer to repurchase or redeem the security up to a specified date. These securities may be redeemed or repurchased in whole or in part prior to maturity and are subject to certain conditions. Redemption and call provisions may affect the yields represented. Early redemption could affect the securities' yields. Maturity dates may be extended by the issuer thereof, with a variable interest rate.

Mutual Funds: For front-end load mutual funds, you may be eligible for breakpoint discounts based on the size of your purchase, current holdings or future purchases. The sales charge you paid may differ slightly from the Prospectus disclosed rate due to rounding calculations. Please refer to the Prospectus, Statement of Additional Information or contact TradeStation Securities for further information.

Other Complex Products: Other securities such as warrants/rights, preferred stocks, or special purpose acquisition companies (SPACs) may have unique characteristics and risks.

More information is provided in TradeStation Securities' "Investment and Trading Disclosures Booklet – Equities & Options" which can be found here: https://www.tradestation.com/important-information/

Financial Statement: TradeStation Securities' financial statement is available for your personal inspection at our office, or a copy will be mailed to you upon written request.

Reportable to the Internal Revenue Service: As required by law, at year end, we will report to you and to the Internal Revenue Service, and to certain states, certain information on sales (including short sales), dividends, and various types of interest that have been credited to your account. **TradeStation does not provide tax advice and encourages you to consult with your tax professional.**

**Statement Frequency:** Statements will be mailed to customers who have any transaction during the statement period affecting money balances and/or security positions. All other accounts will be sent statements at least four times during a calendar year provided that the account contains a money or security balance.

**CUSTODY**

**Retail Accounts (Non-Retirement):** TradeStation Securities carries your account and acts as your custodian for funds and securities, once received by us, which have been deposited directly with us by you.

**Retail Accounts (Retirement):** You are required to open and maintain an account with a qualified Trustee or Custodian approved by the Internal Revenue Code (IRS) under Treasury Regulation Section 1.408-2(e). TradeStation Securities does not offer custody services or act as the custodian for retirement accounts. TradeStation Securities carries your retirement accounts for the IRS-approved custodian for your benefit. Your Custodian is responsible for the tax reporting, controls and specific requirements for these accounts needed to qualify for the tax treatment allowed under the Internal Revenue Code. Inquiries concerning your account or requests for the IRS approval letter should be directed to the Custodian of your choice. The following Custodians offer retirement accounts through TradeStation Securities:

| STRATA Trust Company | Equity Trust Company |
|---|---|
| 7901 Woodway Dr.<br>Waco, TX 76712<br>https://stratatrust.com/<br>Service@StrataTrust.com<br>(866) 901-2069 | 1 Equity Way<br>Westlake, OH 44145<br>https://www.trustetc.com/professionals/<br>IRAServices@EquityInstitutional.com<br>(800) 955-3434 |
| Global Net Provident Fund Management Ltd.<br>Jabotinsky 9<br>Bnei Brak, Israel, 5126417<br>https://globalnetgemel.co.il/<br>sherut@gngemel.co.il<br>(P) 03-5707666 | Midland Trust<br>PO Box 07520<br>Fort Myers, FL 33919<br>https://midlandtrust.com/<br>futures@midlandtrust.com<br>(239) 333-4464 |
| Directed Trust Company<br>3033 N. Central Ave., Suite 400<br>Phoenix, AZ 85012<br>https://directedira.com/<br>info@directedira.com<br>(602) 899-9396 | Inspira Financial<br>2001 Spring Road Suite 700<br>Oak Brook, IL 60523<br>https://www.mtrustcompany.com/<br>futuresemail@inspirafinancial.com<br>(800) 258-7878 |

**Institutional Accounts:** TradeStation Securities offers services to institutional accounts including Delivery Versus Payment /Receipt Versus Payment ("DVP/RVP") for clearing and order execution services. Trades in these accounts may be cleared and settled by another broker. Any inquiries regarding your account and the activity therein should be directed to TradeStation Securities and the broker(s) servicing your account. The broker(s) servicing your account can be found on page 1. Not all institutional accounts qualify for protection as customer accounts as identified in 17 CFR. Section 240.15c3-3 under the Securities Exchange Act of 1934. Accounts not eligible are identified in the account opening documentation.

**DVP/RVP Accounts:** Quarterly account statements for DVP/RVP Accounts may be suspended provided that the account is (a) carried solely for the purpose of execution on a DVP/RVP basis in conformity with applicable rules and regulations; (b) every transaction effected for the account is done on a DVP/RVP basis in conformity with FINRA Rule 11860; (c) the account does not show security or money positions at the end of the quarter; and (d) the customer consents to the suspension of such statements in writing. TradeStation Securities will provide any particular statement or statements to the customer promptly upon written request; and promptly reinstate the delivery of such statements to the customer upon written request.

**Please promptly notify the office servicing your account, in writing, of any change of account information, including addresses and contact information. The office servicing your account can be found on page 1.**

**Please prominently include your account number(s) in all correspondence.**

Inquiries concerning your account may be directed to our Client Services Department at (954) 652-7920 or (800) 871-3577. Additionally, please promptly report any complaints and/or statement inaccuracies or discrepancies to TradeStation Securities' Client Services Department at (800) 871-3577 (in the USA) or (954) 652-7920 (outside of the USA), as well as to any other account executive or representative servicing your account, if applicable. Also, confirm any verbal communication in writing.

**Eligible customer accounts under 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934 held at TradeStation Securities are insured up to the amount of total net equity representing a loss of both securities and/or cash up to $25,000,000 per account. The first $500,000 of protection, which includes up to $250,000 of protection for cash, is provided by the Securities Investor Protection Corporation (SIPC) and the balance is provided by a separate excess SIPC bond issued by Lloyd's of London covering accounts maintained at TradeStation Securities, up to an additional $24,500,000 per account, subject to a $900,000 per account maximum for cash and a firm-wide maximum protection limit of $300,000,000. Repurchase agreements, reverse repurchase and stock loan transactions, as well as certain mutual funds, may not be covered by the excess SIPC bond.** Each account agreement identifies the account type and eligibility of that account for insurance. **Balances held in brokerage accounts are not deposits or other obligations of, or guaranteed by, any other institution, are subject to investment risk and may lose value. SIPC does not cover balances or assets held away from TradeStation Securities.**

**TradeStation®**

| | Tax Information<br>Account 11583081 | Statement Date:  02/10/2023<br>Document ID:     1WF3 CM1 1VBB | **2022** |

8050 SW 10th Street
Suite 2000
Plantation, FL 33324
Customer Service:  800-822-0512

INTER-COASTAL WATERWAYS LLC
5 SEAFARERS CIRCLE
SAVANNAH, GA 31411

ACTIVE TRADER

Office Code:    FT
Rep Code:      FTR9

PAYER'S TIN: 65-0607814

RECIPIENT'S TIN: XX-XXX1248

## Summary Information

11 - [ ] FATCA filing requirement (see instructions)

13 - [ ] FATCA filing requirement (see instructions)

### DIVIDENDS AND DISTRIBUTIONS       2022 1099-DIV*      OMB No. 1545-0110

| | |
|---|---|
| 1a- Total ordinary dividends (includes lines 1b, 5, 2e) | 0.00 |
| 1b- Qualified dividends | 0.00 |
| 2a- Total capital gain distributions (includes lines 2b, 2c, 2d, 2f) | 0.00 |
| 2b- Unrecaptured Section 1250 gain | 0.00 |
| 2c- Section 1202 gain | 0.00 |
| 2d- Collectibles (28%) gain | 0.00 |
| 2e- Section 897 ordinary dividends | 0.00 |
| 2f- Section 897 capital gain | 0.00 |
| 3- Nondividend distributions | 0.00 |
| 4- Federal income tax withheld | 0.00 |
| 5- Section 199A dividends | 0.00 |
| 6- Investment expenses | 0.00 |
| 8- Foreign country or US possession:     7- Foreign tax paid: | 0.00 |
| 9- Cash liquidation distributions | 0.00 |
| 10- Noncash liquidation distributions | 0.00 |
| 12- Exempt-interest dividends (includes line 13) | 0.00 |
| 13- Specified private activity bond interest dividends (AMT) | 0.00 |

### MISCELLANEOUS INFORMATION       2022 1099-MISC*     OMB No. 1545-0115

| | |
|---|---|
| 2- Royalties | 0.00 |
| 3- Other income | 0.00 |
| 4- Federal income tax withheld | 0.00 |
| 8- Substitute payments in lieu of dividends or interest | 0.00 |

### SECTION 1256 CONTRACTS              2022 1099-B*        OMB No. 1545-0715

| | |
|---|---|
| 8- Profit or (loss) realized in 2022 on closed contracts | 0.00 |
| 9- Unrealized profit or (loss) on open contracts-12/31/2021 | 0.00 |
| 10- Unrealized profit or (loss) on open contracts-12/31/2022 | 0.00 |
| 11- Aggregate profit or (loss) on contracts | 0.00 |

*If applicable, proceeds from sale transactions appear summarized below and are detailed in subsequent sections of this document.*

\* This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

## SUMMARY OF PROCEEDS, GAINS & LOSSES, ADJUSTMENTS AND WITHHOLDING

*Refer to the 1099-B and Proceeds not reported to the IRS pages to ensure that you consider all relevant items and to determine the correct gains and losses. The amounts shown below are for informational purposes.*

| Term | Form 8949 type | Proceeds | Cost basis | Market discount | Wash sale loss disallowed | Net gain or loss(-) |
|---|---|---|---|---|---|---|
| Short | A (basis reported to the IRS) | 149,517.60 | 181,910.59 | 0.00 | 0.00 | -32,392.99 |
| Short | B (basis not reported to the IRS) | 4,740.29 | 4,964.00 | 0.00 | 0.00 | -223.71 |
| Short | C (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Total Short-term | 154,257.89 | 186,874.59 | 0.00 | 0.00 | -32,616.70 |
| Long | D (basis reported to the IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Long | E (basis not reported to the IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Long | F (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Total Long-term | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Undetermined | B or E (basis not reported to the IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Undetermined | C or F (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Total Undetermined-term | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Grand total | 154,257.89 | 186,874.59 | 0.00 | 0.00 | -32,616.70 |

| Withholding | Amount |
|---|---|
| Federal income tax withheld | 0.00 |

Changes to dividend tax classifications processed after your original tax form is issued for 2022 may require an amended tax form.

| Tradestation Securities, Inc. | | Account    11583081 |
|---|---|---|
| | **Summary Information** | |
| 2022 | (continued) | 02/10/2023 |

## INTEREST INCOME

2022 1099-INT          OMB No. 1545-0112

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

| | |
|---|---|
| 1- Interest income (not included in line 3) | 3.57 |
| 2- Early withdrawal penalty | 0.00 |
| 3- Interest on US Savings Bonds & Treasury obligations | 0.00 |
| 4- Federal income tax withheld | 0.00 |
| 5- Investment expenses | 0.00 |
| 7- Foreign country or US possession:      6- Foreign tax paid: | 0.00 |
| 8- Tax-exempt interest (includes line 9) | 0.00 |
| 9- Specified private activity bond interest (AMT) | 0.00 |
| 10- Market discount (covered lots) | 0.00 |
| 11- Bond premium (covered lots) | 0.00 |
| 12- Bond premium on Treasury obligations (covered lots) | 0.00 |
| 13- Bond premium on tax-exempt bonds (categorized below) | 0.00 |
| *Tax-exempt obligations (covered lots)* | 0.00 |
| *Tax-exempt private activity obligations (AMT, covered lots)* | 0.00 |
| 14- Tax-exempt and tax credit bond CUSIP number | See detail |
| FATCA filing requirement [ ] | |

*The following amounts are not reported to the IRS. They are presented here for your reference when preparing your tax return(s).*

| | |
|---|---|
| Taxable accrued interest paid | 0.00 |
| Taxable accrued Treasury interest paid | 0.00 |
| Tax-exempt accrued interest paid | 0.00 |
| Tax-exempt accrued interest paid (AMT) | 0.00 |
| Taxable accrued nonqualified interest paid | 0.00 |
| Tax-exempt accrued nonqualified interest paid | 0.00 |
| Tax-exempt accrued nonqualified interest paid (AMT) | 0.00 |
| Nonqualified interest | 0.00 |
| Tax-exempt nonqualified interest | 0.00 |
| Tax-exempt nonqualified interest  (AMT) | 0.00 |
| Interest shortfall on contingent payment debt | 0.00 |
| Bond premium- Non Treasury obligations (noncovered lots) | 0.00 |
| Bond premium- Treasury obligations (noncovered lots) | 0.00 |
| Bond premium- Tax-exempt obligations (noncovered lots) | 0.00 |
| Bond premium- Tax-exempt obligations (AMT, noncovered lots) | 0.00 |
| Market discount (noncovered lots) | 0.00 |

## STATE TAX WITHHELD

*Use the details of the State Tax Withholding page(s) to determine the appropriate amounts for your income tax return(s). The amounts shown in this section are for your reference.*

| | |
|---|---|
| 1099-DIV total withheld | 0.00 |
| 1099-INT total withheld | 0.00 |
| 1099-OID total withheld | 0.00 |
| 1099-MISC total withheld | 0.00 |
| 1099-B total withheld | 0.00 |

## ORIGINAL ISSUE DISCOUNT AND ADJUSTMENTS

*Use bond-by-bond details from the* Form 1099-OID *page(s) to determine amounts of Original Issue Discount income for your income tax return(s). The amounts shown in this section are for your reference when preparing your income tax return(s).*

| | |
|---|---|
| Original issue discount for the year | 0.00 |
| Acquisition premium (covered lots) | 0.00 |
| Acquisition premium (noncovered lots) | 0.00 |
| Original issue discount on Treasury obligations | 0.00 |
| Acquisition premium, Treasury obligations (covered lots) | 0.00 |
| Acquisition premium, Treasury obligations (noncovered lots) | 0.00 |
| Tax-exempt OID | 0.00 |
| Tax-exempt OID (lots not reported) | 0.00 |
| Acquisition premium (covered) | 0.00 |
| Acquisition premium (lots not reported) | 0.00 |
| Tax-exempt OID on private activity bonds | 0.00 |
| Tax-exempt OID on private activity bonds (lots not reported) | 0.00 |
| Acquisition premium (AMT, covered) | 0.00 |
| Acquisition premium (AMT, lots not reported) | 0.00 |
| Market discount (all lots) | 0.00 |
| Early withdrawal penalty | 0.00 |
| Investment expenses | 0.00 |

## RECONCILIATIONS, FEES, EXPENSES AND EXPENDITURES

*The amounts in this section are not reported to the IRS. They are presented here for your reference when preparing your income tax return(s).*

| | |
|---|---|
| Other Receipts & Reconciliations- Partnership distributions | 0.00 |
| Other Receipts & Reconciliations- Foreign tax paid- partnership | 0.00 |
| Other Receipts & Reconciliations- Return of principal | 0.00 |
| Other Receipts & Reconciliations- Deferred income payment | 0.00 |
| Other Receipts & Reconciliations- Deemed premium | 0.00 |
| Other Receipts & Reconciliations- Income accrual- UIT | 0.00 |
| Other Receipts & Reconciliations- Basis adjustments | 0.00 |
| Other Receipts & Reconciliations- Foreign tax pd beyond treaty | 0.00 |
| Fees & Expenses- Margin interest | 8.43 |
| Fees & Expenses- Dividends paid on short position | 0.00 |
| Fees & Expenses- Interest paid on short position | 0.00 |
| Fees & Expenses- Non reportable distribution expense | 0.00 |
| Fees & Expenses- Other expenses | 0.00 |
| Fees & Expenses- Severance tax | 0.00 |
| Fees & Expenses- Organizational expense | 0.00 |
| Fees & Expenses- Miscellaneous fees | 0.00 |
| Fees & Expenses- Tax-exempt investment expense | 0.00 |
| Opening transactions- Securities & options purchased | 263,184.56 |
| Opening transactions- Installment payments | 0.00 |
| Opening transactions- Short sales & options written | 0.00 |
| Foreign Exchange Gains & Losses- Foreign currency gain/loss | 0.00 |

| Tradestation Securities, Inc. | Proceeds from Broker and Barter Exchange Transactions | Account    11583081 |
|---|---|---|
| 2022    1099-B*   OMB No. 1545-0715 | | 02/10/2023 |

Sales transactions are organized into sections according to term (long, short or undetermined) and covered status (covered or noncovered). For tax lots whose term is undetermined, use your historical documents to establish the cost basis and date of purchase. The Box 12, basis is reported to the IRS indicator checkmark, is reflected as being checked in the title of the covered securities pages of Forms 1099-B, short-term and long-term. The title pages of the noncovered securities pages for Forms 1099-B reflect that Box 12 is not being checked, as these securities are not being reported to the IRS.

Several columns include both an amount and a qualifying notation to its right. Where proceeds are the result of an option exercise or assignment, there is indication of whether the amount is N (net of option premium) or G (Gross). Accrued market discount and wash sale loss disallowed appear in the same column, identified by the letters D or W, respectively. Where you are not permitted to recognize a loss, an indication of X (change in control or capital structure) or Z (other corporate action) is used. The change in control condition is reported to the IRS for covered lots. Neither the disallowance of loss due to a corporate action nor the amount of gain or loss is reported to the IRS in any instance.

Some tax lots may have notations in the column of Additional Information because they require special treatment on your tax returns. Sales of securities such as Contingent Payment Debt Instruments (CPDI) are marked as "Ordinary" because gains and losses on these instruments generally do not qualify as short- or long-term capital transactions. Similarly, lots noted as "3 - [X] Collectible" are handled distinctly under the tax code. These conditions are reported to the IRS. You may wish to consult with your tax advisor, the IRS or your state tax authority regarding the proper treatment for these scenarios. With further regard to Box 3, there is also a checkmark to indicate the proceeds of sale are from a Qualified Opportunity Zone Fund investment - a QOF. If the proceeds are from a QOF the Additional Information column will reflect the following - "3 - [X] Proceeds from QOF." The tax treatment for QOF investments can be complex and you may wish to consult your tax advisor about such sales.

Closing of written options is presented in a distinct manner in accordance with IRS regulation. For these transactions the Cost or other basis (column 1e) is always presented as $0.00 and the Proceeds (column 1d) is the net of the amount received when the option was written and the cost to close the position.

FATCA filing requirement [ ]

## SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column] *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 12)*
"Gain or loss (-)" is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional information |
|---|---|---|---|---|---|---|---|
| ALLEGRO MICROSYSTEMS INC DEL COM / CUSIP: 01749D105 / Symbol: ALGM | | | | | | | |
| 11/30/22 | 300.000 | 8,844.88 | 11/28/22 | 9,213.00 | ... | -368.12 | Sale |
| 12/07/22 | 50.000 | 1,587.96 | 11/28/22 | 1,535.50 | ... | 52.46 | Sale |
| | Security total: | 10,432.84 | | 10,748.50 | ... | -315.66 | |
| ATOUR LIFESTYLE HOLDINGS LTD ADS / CUSIP: 04965M106 / Symbol: ATAT | | | | | | | |
| 12/07/22 | 300.000 | 4,478.85 | 12/05/22 | 5,583.00 | ... | -1,104.15 | Sale |
| BARRICK GOLD CORP COM / CUSIP: 067901108 / Symbol: GOLD | | | | | | | |
| 12/06/22 | 200.000 | 3,289.89 | 12/02/22 | 3,396.00 | ... | -106.11 | Sale |
| CLOUDFLARE INC CL A COM / CUSIP: 18915M107 / Symbol: NET | | | | | | | |
| 12/06/22 | 100.000 | 4,318.39 | 12/02/22 | 4,900.00 | ... | -581.61 | Sale |
| COSMOS HLDGS INC COM DO NOT USE / CUSIP: 221413206 / Symbol: | | | | | | | |
| 11/29/22 | 10,000.000 | 6,437.57 | 11/29/22 | 6,866.80 | ... | -429.23 | Sale |

* This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. Remember, taxpayers are ultimately responsible for the accuracy of your tax return(s).

| Tradestation Securities, Inc. | | | | Account   11583081 | | |
|---|---|---|---|---|---|---|
| | | **Proceeds from Broker and Barter Exchange Transactions** | | | | |
| 2022     1099-B*   OMB No. 1545-0715 | | | (continued) | | | 02/10/2023 |

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS** [Ordinary gains or losses are identified in the Additional information column] *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 12)*
"Gain or loss (-)" is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional information |
|---|---|---|---|---|---|---|---|
| CRESCENT PT ENERGY CORP COM / CUSIP: 22576C101 / Symbol: CPG | | | | | | | |
| 12/07/22 | 1,000.000 | 6,930.61 | 11/30/22 | 7,900.00 | ... | -969.39 | Sale |
| DISNEY WALT CO COM DISNEY / CUSIP: 254687106 / Symbol: DIS | | | | | | | |
| 12/05/22 | 50.000 | 4,949.87 | 11/29/22 | 4,715.50 | ... | 234.37 | Sale |
| INSIGNIA SYS INC COM / CUSIP: 45765Y204 / Symbol: ISIG | | | | | | | |
| 11/30/22 | 75.000 | 622.47 | 11/28/22 | 653.25 | ... | -30.78 | Sale |
| META MATLS INC COM / CUSIP: 59134N104 / Symbol: MMAT | | | | | | | |
| 12/05/22 | 2,000.000 | 3,561.05 | 12/05/22 | 3,551.00 | ... | 10.05 | Sale |
| 12/07/22 | 1,000.000 | 2,129.82 | 12/06/22 | 1,995.00 | ... | 134.82 | Sale |
| | Security total: | 5,690.87 | | 5,546.00 | ... | 144.87 | |
| MICROSOFT CORP COM / CUSIP: 594918104 / Symbol: MSFT | | | | | | | |
| 12/07/22 | 40.000 | 9,704.16 | 11/30/22 | 9,682.76 | ... | 21.40 | Sale |
| NANOVIBRONIX INC COM DO NOT USE / CUSIP: 63008J108 / Symbol: | | | | | | | |
| 11/29/22 | 20,000.000 | 9,216.26 | 11/28/22 | 18,611.78 | ... | -9,395.52 | Sale |
| OCCIDENTAL PETE CORP DEL COM / CUSIP: 674599105 / Symbol: OXY | | | | | | | |
| 12/05/22 | 100.000 | 6,889.83 | 11/29/22 | 6,904.00 | ... | -14.17 | Sale |
| ONCOSEC MED INC COM / CUSIP: 68234L405 / Symbol: ONCS | | | | | | | |
| 11/22/22 | 15,000.000 | 61,046.91 | 11/22/22 | 80,500.00 | ... | -19,453.09 | Sale |
| VISA INC COM CL A / CUSIP: 92826C839 / Symbol: V | | | | | | | |
| 12/07/22 | 50.000 | 10,389.25 | 11/29/22 | 10,439.00 | ... | -49.75 | Sale |
| VISTA OIL & GAS S A B DE C V SPONSORED ADS / CUSIP: 92837L109 / Symbol: VIST | | | | | | | |
| 12/07/22 | 400.000 | 5,119.83 | 12/02/22 | 5,464.00 | ... | -344.17 | Sale |
| Totals : | | 149,517.60 | | 181,910.59 | | -32,392.99 | |

* This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. Remember, taxpayers are ultimately responsible for the accuracy of their tax return(s).

| Tradestation Securities, Inc. | Proceeds from Broker and Barter Exchange Transactions | Account    11583081 |
|---|---|---|
| 2022    1099-B*   OMB No. 1545-0715 | (continued) | 02/10/2023 |

### SHORT TERM TRANSACTIONS FOR NONCOVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column] *(Line 5)*

Report on Form 8949, Part I with Box B checked. Basis is NOT provided to the IRS. *(Line 12)*
"Date acquired," "Cost or other basis," "Accrued market discount," "Wash sale loss disallowed" and "Gain or loss (-)" are NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | Date acquired | Cost or other basis | Accrued mkt disc (D) & Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional information |
|---|---|---|---|---|---|---|---|
| ENERGY TRANSFER EQUITY L P COM UT LTD PTN / CUSIP: 29273V100 / Symbol: ET | | | | | | | |
| 12/07/22 | 400.000 | 4,740.29 | 11/29/22 | 4,964.00 | ... | -223.71 | Sale |
| Totals : | | 4,740.29 | | 4,964.00 | | -223.71 | |

* This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. Remember, taxpayers are ultimately responsible for the accuracy of their tax return(s).

| Tradestation Securities, Inc. | | Account     11583081 |
|---|---|---|
| | **Detail for Interest Income** | |
| 2022 | | 02/10/2023 |

*This section of your tax information statement contains the payment level detail of taxable interest and associated bond premium. Market discount will be shown here only if you have elected to recognize it currently rather than at the time of sale or maturity. Bond premium and market discount for covered tax lots are totaled on Form 1099-INT and reported to the IRS. For noncovered tax lots, they are totaled and presented beneath the 1099-INT for informational purposes and are not reported to the IRS.*

*To provide a complete picture of activity for each investment, we also include here nonreportable transactions such as accrued interest paid on purchases and payment or receipt of nonqualified interest. Other amounts, such as federal, state and foreign tax withheld and investment expenses are shown as negative amounts but do not net against the reportable income totals.*

| Security description | CUSIP and/or symbol | Date | Amount | Transaction type | Notes |
|---|---|---|---|---|---|
| .15000%11/01-11/30 | $29066 | 11/30/22 | 3.57 | Credit interest | |
| | | | 3.57 | Total Interest | |

| Tradestation Securities, Inc. | | | | | Account   11583081 | |
|---|---|---|---|---|---|---|
| | | **Fees and Expenses** | | | | |
| 2022 | | | | | 02/10/2023 | |

*This section of your tax information statement may contain the detail of fees and investment expenses that are not accounted for in amounts reportable to the IRS on the various Forms 1099.  You may wish to consult with your tax advisor, the IRS or your state tax authority regarding the proper tax treatment.*

*These amounts are provided here to facilitate an accounting of all amounts received during the year and are totaled in the* Reconciliations, Fees, Expenses and Expenditures *found in the Summary Information at the beginning of the statement.*

| Description | CUSIP and/or symbol | Date | Amount | Transaction type | Notes |
|---|---|---|---|---|---|
| 12.50000%12/01-12/30    $820 | | 12/30/22 | -8.43 | Margin interest paid | |
| | | | -8.43 | Total Margin interest paid | |

| Tradestation Securities, Inc. | | | | | Account    11583081 | |
|---|---|---|---|---|---|---|
| **Opening Transactions** | | | | | | |
| 2022 | | | | | 02/10/2023 | |

| Security Description | CUSIP and/or symbol | | Opening date | Quantity | Amount | Transaction type | Notes |
|---|---|---|---|---|---|---|---|
| ALLEGRO MICROSYSTEMS INC DEL COM | 01749D105 | ALGM | 11/28/22 | 350.00 | -10,748.50 | Purchase | |
| ATOUR LIFESTYLE HOLDINGS LTD ADS | 04965M106 | ATAT | 12/05/22 | 300.00 | -5,583.00 | Purchase | |
| BARRICK GOLD CORP COM | 067901108 | GOLD | 12/02/22 | 200.00 | -3,396.00 | Purchase | |
| CLOUDFLARE INC CL A COM | 18915M107 | NET | 12/02/22 | 100.00 | -4,900.00 | Purchase | |
| COSMOS HLDGS INC COM DO NOT USE | 221413206 | | 11/29/22 | 10,000.00 | -6,866.80 | Purchase | |
| CRESCENT PT ENERGY CORP COM | 22576C101 | CPG | 11/30/22 | 1,000.00 | -7,900.00 | Purchase | |
| DISNEY WALT CO COM DISNEY | 254687106 | DIS | 11/29/22 | 50.00 | -4,715.50 | Purchase | |
| ENERGY TRANSFER EQUITY L P COM UT LTD PTN | 29273V100 | ET | 11/29/22 | 400.00 | -4,964.00 | Purchase | |
| INSIGNIA SYS INC COM | 45765Y204 | ISIG | 11/28/22 | 75.00 | -653.25 | Purchase | |
| META MATLS INC COM | 59134N104 | MMAT | 12/05/22 | 2,000.00 | -3,551.00 | Purchase | |
| | | | 12/06/22 | 1,000.00 | -1,995.00 | Purchase | |
| | | | | | -5,546.00 | Security Total | |
| META MATLS INC PFD SER A DO NOT USE | 59134N203 | | 12/05/22 | 100.00 | -795.00 | Purchase | |
| | | | 12/05/22 | 400.00 | -3,184.00 | Purchase | |
| | | | 12/05/22 | 500.00 | -3,945.00 | Purchase | |
| | | | 12/05/22 | 500.00 | -3,994.98 | Purchase | |
| | | | 12/05/22 | 500.00 | -3,998.00 | Purchase | |
| | | | 12/05/22 | 1,000.00 | -8,017.00 | Purchase | |
| | | | 12/06/22 | 100.00 | -844.00 | Purchase | |
| | | | 12/06/22 | 3,800.00 | -31,143.70 | Purchase | |
| | | | 12/07/22 | 30.00 | -252.39 | Purchase | |
| | | | 12/07/22 | 114.00 | -922.40 | Purchase | |
| | | | 12/07/22 | 250.00 | -2,100.00 | Purchase | |
| | | | 12/07/22 | 1,525.00 | -15,097.50 | Purchase | |
| | | | 12/08/22 | 450.00 | -2,016.00 | Purchase | |
| | | | | | -76,309.97 | Security Total | |
| MICROSOFT CORP COM | 594918104 | MSFT | 11/30/22 | 40.00 | -9,682.76 | Purchase | |
| NANOVIBRONIX INC COM DO NOT USE | 63008J108 | | 11/28/22 | 20,000.00 | -18,611.78 | Purchase | |
| OCCIDENTAL PETE CORP DEL COM | 674599105 | OXY | 11/29/22 | 100.00 | -6,904.00 | Purchase | |

| Tradestation Securities, Inc. | | Opening Transactions | | | Account    11583081 |
|---|---|---|---|---|---|
| 2022 | | (continued) | | | 02/10/2023 |

| Security Description | CUSIP and/or symbol | | Opening date | Quantity | Amount | Transaction type | Notes |
|---|---|---|---|---|---|---|---|
| ONCOSEC MED INC COM | 68234L405 | ONCS | 11/22/22 | 5,000.00 | -22,500.00 | Purchase | |
| | | | 11/22/22 | 5,000.00 | -27,000.00 | Purchase | |
| | | | 11/22/22 | 5,000.00 | -31,000.00 | Purchase | |
| | | | | | -80,500.00 | Security Total | |
| VISA INC COM CL A | 92826C839 | V | 11/29/22 | 50.00 | -10,439.00 | Purchase | |
| VISTA OIL & GAS S A B DE C V SPONSORED ADS | 92837L109 | VIST | 12/02/22 | 400.00 | -5,464.00 | Purchase | |
| | | | | | -263,184.56 | Total Opening Transactions | |

## Instructions for Recipient

### Common Instructions for Recipient

Recipient's taxpayer identification number (TIN). For your protection, this form may show only the last four digits of your TIN (social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN)). However, the issuer has reported your complete TIN to the IRS.

Account number. May show an account or other unique number the payer assigned to distinguish your account.

Backup Withholding. Shows backup withholding. Generally, a payer must backup withhold if you did not furnish your taxpayer identification number. See Form W-9 and Pub. 505 for more information. Report this amount on your income tax return as tax withheld.

Nominees. If this 1099 form includes amounts belonging to another person, you are considered a nominee recipient. You must file as the "payer" the respective Form 1099 (DIV, INT, or OID) Copy A (with a Form 1096) to the IRS for each of the other owners as recipient(s) to show their allocable share of the income and you must furnish the respective Copy B Form(s) and amounts to each owner. A spouse is not required to file a nominee return to show amounts owned by the other spouse. See the General Instructions for Certain Information Returns.

FATCA filing requirement. If the FATCA filing requirement box is checked, the payer is reporting on Form 1099 to satisfy its chapter 4 account reporting requirement. You also may have a filing requirement. See the Instructions for Form 8938.

Keep tax documents for your records.

### 1099-INT Instructions for Recipient

The information provided may be different for covered and noncovered securities. For a description of covered securities, see the Instructions for Form 8949. For a taxable covered security acquired at a premium, unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, or for a tax-exempt covered security acquired at a premium, your payer generally must report either (1) a net amount of interest that reflects the offset of the amount of interest paid to you by the amount of premium amortization allocable to the payment(s), or (2) a gross amount for both the interest paid to you and the premium amortization allocable to the payment(s). If you did notify your payer that you did not want to amortize the premium on a taxable covered security, then your payer will only report the gross amount of interest paid to you. For a noncovered security acquired at a premium, your payer is only required to report the gross amount of interest paid to you.

Line 1. Shows taxable interest paid to you during the calendar year by the payer. This does not include interest shown in line 3. May also show the total amount of the credits from clean renewable energy bonds, new clean renewable energy bonds, qualified energy conservation bonds, qualified zone academy bonds, qualified school construction bonds, and build America bonds that must be included in your interest income. These amounts were treated as paid to you during 2022 on the credit allowance dates (March 15, June 15, September 15, and December 15). For more information, see Form 8912. See the instructions above for a taxable covered security acquired at a premium.

Line 2. Shows interest or principal forfeited because of early withdrawal of time savings. You may deduct this amount to figure your adjusted gross income on your income tax return. See the Instructions for Forms 1040 and 1040-SR to see where to take the deduction.

Line 3. Shows interest on U.S. Savings Bonds, Treasury bills, Treasury bonds, and Treasury notes. This may or may not all be taxable. See Pub. 550. This interest is exempt from state and local income taxes. This interest is not included in line 1. See the instructions above for a taxable covered security acquired at a premium.

Line 4. Shows backup withholding. Generally, a payer must backup withhold if you did not furnish your TIN or you did not furnish the correct TIN to the payer. See Form W-9. Include this amount on your income tax return as tax withheld.

Line 5. Any amount shown is your share of investment expenses of a singleclass REMIC. This amount is included in line 1. Note: This amount is not deductible.

Line 6. Shows foreign tax paid. You may be able to claim this tax as a deduction or a credit on your Form 1040 or 1040-SR. See your tax return instructions.

Line 7. Shows the country or U.S. possession to which the foreign tax was paid.

Line 8. Shows tax-exempt interest paid to you during the calendar year by the payer. See how to report this amount in the Instructions for Forms 1040 and 1040-SR. This amount may be subject to backup withholding. See Line 4 above. See the instructions above for a tax-exempt covered security acquired at a premium.

Line 9. Shows tax-exempt interest subject to the alternative minimum tax. This amount is included in line 8. See the Instructions for Form 6251. See the instructions above for a tax-exempt covered security acquired at a premium.

Line 10. For a taxable or tax-exempt covered security, if you made an election under section 1278(b) to include market discount in income as it accrues and you notified your

payer of the election in writing in accordance with Regulations section 1.6045-1(n)(5), shows the market discount that accrued on the debt instrument during the year while held by you, unless it was reported on Form 1099-OID. For a taxable or tax-exempt covered security acquired on or after January 1, 2015, accrued market discount will be calculated on a constant yield basis unless you notified your payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to make a constant yield election for market discount under section 1276(b). Report the accrued market discount on your income tax return as directed in the Instructions for Forms 1040 and 1040-SR. Market discount on a tax-exempt security is includible in taxable income as interest income.

Line 11. For a taxable covered security (other than a U.S. Treasury obligation), shows the amount of premium amortization allocable to the interest payment(s), unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium under section 171. If an amount is reported in this line, see the Instructions for Schedule B (Form 1040 or 1040-SR) to determine the net amount of interest includible in income on Form 1040 or 1040-SR with respect to the security. If an amount is not reported in this line for a taxable covered security acquired at a premium and the payer is reporting premium amortization, the payer has reported a net amount of interest in line 1. If the amount in line 11 is greater than the amount of interest paid on the covered security, see Regulations section 1.171-2(a)(4).

Line 12. For a U.S. Treasury obligation that is a covered security, shows the amount of premium amortization allocable to the interest payment(s), unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium under section 171. If an amount is reported in this line, see the Instructions for Schedule B (Form 1040 or 1040-SR) to determine the net amount of interest includible in income on Form 1040 or 1040-SR with respect to the U.S. Treasury obligation. If an amount is not reported in this line for a U.S. Treasury obligation that is a covered security acquired at a premium and the payer is reporting premium amortization, the payer has reported a net amount of interest in line 1. If the amount in line 12 is greater than the amount of interest paid on the U.S. Treasury obligation, see Regulations section 1.171-2(a)(4).

Line 13. For a tax-exempt covered security, shows the amount of premium amortization allocable to the interest payment(s). If an amount is reported in this line, see Pub. 550 to determine the net amount of tax-exempt interest reportable on Form 1040 or 1040-SR. If an amount is not reported in this line for a tax-exempt covered security acquired at a premium, the payer has reported a net amount of interest in line 8 or 9, whichever is applicable. If the amount in line 13 is greater than the amount of interest paid on the tax-exempt covered security, the excess is a nondeductible loss. See Regulations section 1.171-2(a)(4)(ii).

Line 14. Shows CUSIP number(s) for tax-exempt bond(s) on which tax-exempt interest was paid, or tax credit bond(s) on which taxable interest was paid or tax credit was allowed, to you during the calendar year. If blank, no CUSIP number was issued for the bond(s).

Lines 15-17. State tax withheld reporting lines.

Future developments. For the latest information about developments related to Form 1099-INT and its instructions, such as legislation enacted after they were published, go to www.irs.gov/Form1099INT.

Free File. Go to www.irs.gov/FreeFile to see if you qualify for no-cost online federal tax preparation, e-filing, and direct deposit or payment options.

### 1099-B Instructions for Recipient

Brokers and barter exchanges must report proceeds from (and in some cases, basis for) transactions to you and the IRS on Form 1099-B. Reporting is also required when your broker knows or has reason to know that a corporation in which you own stock has had a reportable change in control or capital structure. You may be required to recognize gain from the receipt of cash, stock, or other property that was exchanged for the corporation's stock. If your broker reported this type of transaction to you, the corporation is identified in box 1a.

CUSIP number. Shows the CUSIP (Committee on Uniform Security Identification Procedures) number or other applicable identifying number.

Applicable checkbox on Form 8949. Indicates where to report this transaction on Form 8949 and Schedule D (Form 1040 or 1040-SR), and which checkbox is applicable. See the instructions for your Schedule D (Form 1040 or 1040-SR) and/or Form 8949.

Line 1a. Shows a brief description of the item or service for which amounts are being reported. For regulated futures contracts and forward contracts, "RFC" or other appropriate description may be shown. For Section 1256 option contracts, "Section 1256 option" or other appropriate description may be shown. For a corporation that had a reportable change in control or capital structure, this box may show the class of stock as C (common), P (preferred), or O (other).

Line 1b. This box may be blank if box 5 is checked or if the securities sold were acquired on a variety of dates. For short sales, the date shown is the date you acquired the security delivered to close the short sale.

Line 1c. Shows the trade date of the sale or exchange. For short sales, the date shown is the date the security was delivered to close the short sale. For aggregate reporting in boxes 8 through 11, no entry will be present.

Line 1d. Shows the cash proceeds, reduced by any commissions or transfer taxes related to the sale, for transactions involving stocks, debt, commodities, forward contracts, non-Section 1256 option contracts, or securities futures contracts. May show the proceeds from the disposition of your interest(s) in a widely held fixed investment trust. May also show the aggregate amount of cash and the fair market value of any stock or other property received in a reportable change in control or capital structure arising from the corporate transfer of property to a foreign corporation. Losses on forward contracts or nonSection 1256 option contracts are shown in parentheses. This box does not include proceeds from regulated futures contracts or Section 1256 option contracts. Report this amount on Form 8949 or on Schedule D (Form 1040 or 1040-SR) (whichever is applicable) as explained in the Instructions for Schedule D (Form 1040 or 1040-SR).

Line 1e. Shows the cost or other basis of securities sold. If the securities were acquired through the exercise of a noncompensatory option granted or acquired on or after January 1, 2014, the basis has been adjusted to reflect your option premium. If the securities were acquired through the exercise of a noncompensatory option granted or acquired before January 1, 2014, your broker is permitted, but not required, to adjust the basis to reflect your option premium. If the securities were acquired through the exercise of a compensatory option, the basis has not been adjusted to include any amount related to the option that was reported to you on a Form W-2. If box 5 is checked, box 1e may be blank. See the Instructions for Form 8949, the Instructions for Schedule D (Form 1040 or 1040-SR), or Pub. 550 for details.

Line 1f. Shows the amount of accrued market discount. For details on market discount, see the Schedule D (Form 1040 or 1040-SR) instructions, the Instructions for Form 8949, and Pub. 550. If box 5 is checked, box 1f may be blank.

Line 1g. Shows the amount of nondeductible loss in a wash sale transaction. For details on wash sales, see the Schedule D (Form 1040 or 1040-SR) instructions, the Instructions for Form 8949, and Pub. 550. If box 5 is checked, box 1g may be blank.

Line 2. The short-term and long-term boxes pertain to short-term gain or loss and long-term gain or loss. If the "Ordinary" box is checked, your security may be subject to special rules. For example, gain on a contingent payment debt instrument subject to the noncontingent bond method generally is treated as ordinary interest income rather than as capital gain. See the Instructions for Form 8949, Pub. 550, or Pub. 1212 for more details on whether there are any special rules or adjustments that might apply to your security. If box 5 is checked, box 2 may be blank.

Line 3. If checked, proceeds are from a transaction involving collectibles or from a Qualified Opportunity Fund (QOF).

Line 4. Shows backup withholding. Generally, a payer must backup withhold if you did not furnish your TIN to the payer. See Form W-9 for information on backup withholding. Include this amount on your income tax return as tax withheld.

Line 5. If checked, the securities sold were noncovered securities and boxes 1b, 1e, 1f, 1g, and 2 may be blank. Generally, a noncovered security means: stock purchased before 2011, stock in most mutual funds purchased before 2012, stock purchased in or transferred to a dividend reinvestment plan before 2012, debt acquired before 2014, options granted or acquired before 2014, and securities futures contracts entered into before 2014.

Line 6. If the exercise of a noncompensatory option resulted in a sale of a security, a checked "net proceeds" box indicates whether the amount in box 1d was adjusted for option premium.

Line 7. If checked, you cannot take a loss on your tax return based on gross proceeds from a reportable change in control or capital structure reported in box 1d. See the Form 8949 and Schedule D (Form 1040 or 1040-SR) instructions. The broker should advise you of any losses on a separate statement.

Line 12. If checked, the basis in box 1e has been reported to the IRS and either the short-term or the long-term gain or loss box in box 2 will be marked. If box 12 is checked on Form(s) 1099-B and NO adjustment is required, see the instructions for your Schedule D (Form 1040 or 1040-SR) as you may be able to report your transaction directly on Schedule D (Form 1040 or 1040-SR). If the "Ordinary" box in box 2 is checked, an adjustment may be required.

Line 13. Shows the cash you received, the fair market value of any property or services you received, and the fair market value of any trade credits or scrip credited to your account by a barter exchange. See Pub. 525.

Lines 14-16. Show state(s)/local income tax information.

Future developments. For the latest information about any developments related to Form 1099-B and its instructions, such as legislation enacted after they were published, go to www.irs.gov/Form1099B.

Instructions for Recipient

Free File. Go to www.irs.gov/FreeFile to see if you qualify for no-cost online federal tax
preparation, e-filing, and direct deposit or payment options.

This page intentionally left blank.

# EXHIBIT 10

# FAQ: MMTLP Corporate Action and Trading Halt

FINRA has received a number of questions relating to a corporate action and trading halt in the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials) that traded under the symbol MMTLP. This *Investor Insights* article provides general information about how corporate actions and trading halts are processed as well as specific information related to MMTLP.

## Corporate Actions—FINRA's Role

A corporate action occurs when a company makes a change that has or could have an impact on its stock and shareholders. Corporate actions include issuing a dividend, engaging in a stock split, or effecting a merger.

When a company decides to engage in a corporate action that affects a security listed on a national securities exchange, the company must provide notice to the listing exchange and comply with all applicable standards and rules of the exchange concerning that security. In contrast, when a company decides to engage in a corporate action that affects an unlisted security that trades in the over-the-counter (OTC) market, federal law requires that the company submit notice of the corporate action to FINRA, and FINRA reviews the submission and publishes a notification about the corporate action to the marketplace (unless the submission is deemed deficient by FINRA). This function helps to keep investors and the market informed of corporate actions affecting OTC securities and of relevant dates.

A company can have both listed and unlisted securities, so different rules can apply to the same company depending on which security is the subject of a corporate action. In any event, FINRA does not initiate, approve, or conduct the underlying corporate action that the company is making, and the company itself is responsible for making sure the corporate action complies with all applicable laws and regulations.

FINRA regulates broker-dealers that facilitate investor access to the securities markets, including the OTC market. However, unlike securities exchanges that list securities, FINRA does not establish listing standards or otherwise regulate the companies that issue OTC securities.

## The MMTLP Corporate Action

Meta Materials' Series A Preferred Shares were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted. These unlisted shares later began trading in the OTC market under the symbol MMTLP (further discussion below).

On July 15, 2022, the company filed a Form S-1 registration statement with the Securities and Exchange Commission (SEC) to register the issuance of the common stock of Next Bridge Hydrocarbons, Inc. (Next Bridge), which at that time was a wholly owned subsidiary of Meta Materials. As disclosed in the registration statement, Meta Materials would distribute to MMTLP shareholders one share of Next Bridge common stock per one share of MMTLP held, and would cancel the Series A Preferred Shares trading under the symbol MMTLP. According to the Form S-1 filed, immediately after the corporate action, Next Bridge would be an independent public reporting company. After several amendments, the registration statement for the Next Bridge shares became effective on November 18, 2022.

On November 23, 2022, Meta Materials issued an announcement regarding the Next Bridge / MMTLP corporate action, stating that each holder of its Series A Preferred Shares—MMTLP—as of December 12, 2022, would become entitled to receive one share of the common stock of Next Bridge for every one share of MMTLP held. Meta Materials also stated that the Next Bridge shares would be distributed to MMTLP shareholders on December 14, 2022, at which time all MMTLP shares would be automatically cancelled and MMTLP holders would cease to have any rights with respect to those shares. In addition, the company stated that the Next Bridge shares received in the distribution would not be eligible for electronic transfer through The Depository Trust Company (DTC) (or through any other established clearing corporation).

As required by federal law, Meta Materials also notified FINRA of the Next Bridge / MMTLP corporate action. Consistent with the information provided by Meta Materials, on December 6 and 8, 2022, FINRA provided public notice of the corporate action on FINRA's website. FINRA's corporate action notice stated that the Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022, and further clarified that any purchasers after December 8, 2022, (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the corporate action distribution. FINRA's corporate action notice also stated that the MMTLP symbol would be deleted effective December 13, 2022 (*i.e.*, when an issuer cancels shares, FINRA will likewise delete the symbol; see the company's announcement stating that the MMTLP shares were to be cancelled as of the December 14, 2022, distribution date of the Next Bridge shares).

On December 9, 2022, FINRA halted trading in MMTLP. One of FINRA's roles in regulating the activities of broker-dealers trading OTC equity securities is exercising the authority to require such firms to halt quoting and trading activities when FINRA determines that doing so is necessary to protect investors and the public interest. Since imposing the halt, FINRA has received questions regarding the MMTLP trading halt and its impact on investors. Below are answers to some questions FINRA has received.

**1. Why did FINRA halt trading in MMTLP?**

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were the facts that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

**2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge**

distribution?

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

### 3. Has the MMTLP trading halt ended?

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

### 4. How were MMTLP shares publicly quoted and traded in the first place?

The answer to the question of whether a security is tradeable is determined by the application of federal law, including any applicable SEC rules. Where a security is or becomes tradeable, a public market for the security may develop—as it did with MMTLP.

FINRA does not approve a company's issuance of securities or approve or determine when broker-dealers or customers may begin trading those securities. However, once a broker-dealer executes a transaction in an unlisted security, the firm is required by FINRA rules to report the executed transaction to FINRA. And where a symbol does not exist for the security, the broker-dealer must request a symbol from FINRA. Because the issuer obtained a CUSIP for the Series A Preferred Shares, FINRA assigned the MMTLP symbol in 2021 upon request by a broker-dealer to facilitate electronic reporting of an executed transaction that occurred in the security.

This trade reporting process is separate from the process by which a broker-dealer begins quoting a security in compliance with SEC Rule 15c2-11. Rule 15c2-11 requires a broker-dealer, prior to quoting a security on its own behalf, to review specified information about the company that issued the security (unless an exception applies). In some cases, a broker-dealer also must file a form with FINRA—a Form 211. In this case, FINRA did not receive a Form 211. Instead, broker-dealers relied on an exception to SEC Rule 15c2-11 that permits broker-dealers to publish a quotation for unsolicited customer orders.

### 5. Did FINRA cancel the MMTLP shares? Did FINRA delete the MMTLP symbol?

FINRA did not cancel the MMTLP shares. The issuer, Meta Materials, cancelled the shares effective December 14. In fact, FINRA does not and cannot cancel any securities that are issued by a company—this was an action of the issuer. However, just as FINRA assigns symbols to unlisted securities, FINRA also can unassign or "delete" a symbol, for example, where it is no longer needed to quote or trade a security. In this case, FINRA deleted the MMTLP symbol on December 13 in light of the imminent cancellation of the shares as announced by the company in connection with the Next Bridge / MMTLP corporate action.

On December 8, FINRA amended its original December 6 corporate action announcement to clarify, among other things, that it would be deleting the MMTLP symbol on December 13 rather than cancelling the shares (because the issuer itself was responsible for cancelling the Series A Preferred Shares). Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.

### 6. What happened to investors who did not sell their MMTLP shares prior to the trading halt?

Investors who had settled positions in MMTLP on December 12 were holders entitled to receive shares of Next Bridge as part the Next Bridge / MMTLP corporate action. Thus, applying the standard settlement cycle of T+2, an investor who did not sell MMTLP by December 8 would receive Next Bridge shares in the distribution—and this would be the case even had FINRA not halted trading on December 9.

As described in the Next Bridge prospectus filed with the SEC, Next Bridge anticipated that the distribution process for the Next Bridge shares would take about two weeks and would be effected by its transfer agent, American Stock Transfer & Trust Company LLC. Transfer agents work for securities issuers to record changes of securities ownership, maintain security holder records, cancel and issue certificates, and distribute dividends. SEC rules and regulations include registration and other requirements for registered transfer agents. FINRA does not regulate transfer agents and does not have a role in distributing securities as part of a corporate action.

*See also* Question #10 regarding what investors should do if they have not received their Next Bridge shares and Question #11 regarding whether the Next Bridge shares are tradeable.

### 7. What would have happened to any trades executed after December 8 had FINRA not halted trading in MMTLP?

As mentioned above, applying the T+2 settlement cycle, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. Any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC. There also was concern that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 may not have understood that they would not yet be a holder entitled to receive the Next Bridge shares in the corporate action

distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution), and that the MMTLP shares purchased would imminently be cancelled.

### 8. Is there public data concerning short sale activity in MMTLP?

Yes, there are several data sets published by FINRA and the SEC about short sale activity that include data for MMTLP.

***Short Interest Data:*** "Short interest" in a security is a snapshot of the total open short positions existing on the books and records of broker-dealers for that security on a given settlement date. FINRA's short interest reports reflect short positions held both in customer and proprietary accounts and are published twice each month. FINRA published short interest reports for MMTLP from October 15, 2021, through November 30, 2022 (the last short interest reporting settlement date available for MMTLP). These reports are available on FINRA's website. Short interest reports for Next Bridge are not available on FINRA's website because firms report short interest by security symbol and Next Bridge does not have a symbol. FINRA is considering how it might enhance the usefulness of the short interest information available to investors, which could include changes to the content and frequency of the short interest reporting.

***Short Sale Volume:*** FINRA also publishes daily short sale volume data by security for OTC equity securities. Importantly, while the two data sets are related in that short sale volume activity may ultimately result in a reportable short interest position, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reported in FINRA's short interest report. For example, while the total short sale volume for transactions in MMTLP that settled from November 16, 2022, through November 30, 2022, was 7,413,679 shares, the published short interest for MMTLP on settlement date November 30, 2022, was 4,658,068 shares.

Differences in the two data sets are expected and occur for a variety of reasons; for example, where a short sale has been covered (either on the same day or at another time prior to the short interest reporting settlement date), which means that there is no longer a short position to report as short interest by the reporting settlement date. As another example, the daily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest.

***Fails-to-Deliver:*** The SEC publishes data on the total quantity of "fails-to-deliver" per security as of each reporting settlement date. As the SEC has explained, a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

### 9. What happens if short positions in MMTLP were not closed out before FINRA halted trading?

Broker-dealers have operational conventions in place for adjusting short positions following a corporate action. In this instance, FINRA understands that firms have adjusted short positions in MMTLP to reflect an equal size short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP now reflects a short position of 100 shares of Next Bridge). In other words, the corporate action did not compel short positions to be closed or extinguish any obligations associated with outstanding short positions.

### 10. What should investors do if they believe they have not received their Next Bridge shares?

If you held a settled position in MMTLP on December 12, 2022, your account should reflect your position in Next Bridge. Your broker-dealer is required to maintain possession or control of your shares in compliance with federal law. You also may request a transfer of shares from the broker-dealer's name to your name; however, this transfer may take time to achieve and your broker-dealer or the transfer agent may charge a fee for this service. If you believe that your shares are not properly reflected in your account or your broker-dealer has not been willing to transfer your shares pursuant to your instructions, you should contact your broker-dealer to understand the status of your Next Bridge shares.

Your broker-dealer may reflect your Next Bridge shares in your account using a numeric or alphanumeric identifier. Different firms may use different identifiers because an official CUSIP number, which is an identifier assigned by CUSIP Global Services at the request of the issuer—not FINRA— has not, to date, been assigned to Next Bridge common stock. The absence of an official CUSIP number does not affect the status of the Next Bridge shares reflected in your account. If you believe that your broker-dealer has not provided a satisfactory explanation to your questions, you may submit an investor complaint to FINRA.

### 11. Are the Next Bridge shares tradeable?

As discussed above, Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of 165,523,363 shares of common stock in connection with the Next Bridge / MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are freely tradeable under federal law.

As of the date of this article, the Next Bridge shares neither have a CUSIP number nor a security symbol. If Next Bridge were to obtain a CUSIP number, that would facilitate secondary market trading. Broker-dealers would be able to request that FINRA assign a symbol to the Next Bridge shares in connection with quoting and trading activity (where such request is consistent with FINRA rules and policies and with federal law). However, even without a CUSIP number, any trades in Next Bridge shares executed by a broker-dealer must be reported by the firm to

FINRA for regulatory purposes through a file submission process.

---

As part of its mission, FINRA provides resources on its website to assist retail investors through the investment process. As relevant to the questions around trading in MMTLP, FINRA has published Investor Insight articles addressing short interest and short sale volume data, as well as corporate actions and the mechanics and risks of trading OTC securities. Visit FINRA's For Investors webpage for more information.

*Note: This article was modified on March 27, 2023, to remove references to the registration of the MMTLP shares, which raised questions that are not relevant to the main focus of this article. The registration status of the MMTLP shares is determined under the Securities Act of 1933 and applicable SEC rules and interpretive guidance thereunder, and not FINRA rules.*

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *position*. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data *and* that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17] While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

### 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been

entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

**17. Why did FINRA halt trading in MMTLP before December 12?**

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased would imminently be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

**18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?**

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

**19. How can a holder of Next Bridge common stock liquidate their securities?**

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[26]

---

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

4   "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

6   Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA, perform functions that include serving as a central securities depository and operating a centralized system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly on the books of the transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

9   For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10   FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory or law enforcement requests.

11   The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been available because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12   December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13   As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding], hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have different trading characteristics.

14   For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15   A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16   While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

18   On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19   *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

21   Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

22   *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23   *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24   It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public notice by FINRA.